H9mWaliC

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          16 Cr. 398 (PAE)

5
     SAJMIR ALIMEHMETI,
6    a/k/a "Abdul Qawii,",

7
                                           Conference
8              Defendant.

9    ------------------------------x

10                                         New York, N.Y.
                                           September 22, 2017
11                                         2:30 p.m.

12
     Before:
13
                    HON. PAUL A. ENGELMAYER,
14
                                           District Judge
15

16                      APPEARANCES

17   JOON H. KIM
          Acting United States Attorney for
18        the Southern District of New York
     GEORGE D. TURNER
19        Assistant United States Attorney

20   DAVID E. PATTON
          Federal Defenders of New York, Inc.
21        Attorney for Defendant
     SYLVIE J. LEVINE

22

23

24

25

H9mWaliC

1        (Case called)

2        MR. TURNER:  Good afternoon, your Honor.  George

3    Turner, for the government.

4        THE COURT:  Good afternoon, Mr. Turner.

5        MS. LEVINE:  Good afternoon, your Honor.  The Federal

6    Defenders of New York, by Sylvie Levine, on behalf of Mr.

7    Alimehmeti.

8        THE COURT:  Very good.  Good afternoon, Ms. Levine.

9        And good afternoon to you, Mr. Alimehmeti.

10        THE DEFENDANT:  Good afternoon.

11        THE COURT:  Good afternoon as well to the members of

12    the public who are here.

13        I had indicated that I would have a ruling on the

14    pending motion to suppress on or before today's conference.  It

15    turns out to be on.  I'm about to read a brief ruling into the

16    record.  Here goes.

17        The Court will rule now on defendant Alimehmeti's

18    pending motion to suppress and for a *Franks* hearing and for

19    disclosure of FISA orders, applications, and related materials,

20    as well as for notice of and discovery about the use of

21    Executive Order 12333 surveillance.

22        For your planning purposes, there will not be a

23    written decision.  I will simply issue a bottom-line order

24    reflecting my disposition of the motion, so if the Court's

25    reasoning here is significant, you will need to order the

H9mWaliC

1    transcript.

2           Alimehmeti is charged with one count of providing

3    material support to the Islamic State in Iraq and the Levant,

4    and one count of making a false statement on a passport

5    application.

6           I will review first the procedural background to these

7    motions.

8           On July 21, 2016, the government gave Alimehmeti's

9    counsel notice that it intended to rely in its case in chief on

10   information obtained and derived from physical searches

11   conducted pursuant to the Foreign Intelligence Surveillance Act

12   of 1978, which I will refer to as FISA.

13          On December 9, 2016, the Court held a status

14   conference and took up with the parties a motions briefing

15   schedule.  The defense did not indicate then an intent to file

16   a FISA suppression motion.  On December 13, 2016, the Court set

17   a briefing schedule requiring the defense to file any Rule

18   12(b)(3) suppression motion by January 9, 2017.  On January 5,

19   2017, the Court extended the deadline for the defendant's Rule

20   12(b)(3) motion to January 23, 2017.  On March 23, 2017, two

21   months after that deadline had passed, the parties appeared at

22   another status conference at which defense counsel expressed,

23   for the first time, an intent to file a FISA suppression

24   motion.  Defense counsel represented that she had believed such

25   a motion not to be governed by the deadline for Rule 12(b)(3)

H9mWaliC

1   motions.  On April 3, 2017, defense counsel filed a letter

2   request for leave, under Federal Rule of Criminal Procedure

3   12(c), to file a FISA suppression motion.  On April 17, 2017,

4   the government opposed that request.  On April 25, 2017, the

5   Court granted the request for leave to file the motion,

6   notwithstanding its having been noticed delinquently, and set a

7   briefing schedule for the motion.

8           On May 15, 2017, Alimehmeti moved to suppress the FISA

9   materials the government intends to offer at trial, for a

10  *Franks* hearing, and to compel disclosure of the FISA

11  application, order, and related materials.  Alimehmeti also

12  moved for notice of and discovery about the use of Executive

13  Order 12333 surveillance.

14          On July 24, 2017, the government submitted an

15  opposition.  It was properly filed *in camera, ex parte*, and

16  under seal.  The government also filed an unclassified version

17  of the same memorandum, which had been redacted to remove the

18  classified information that was provided to the Court.

19          On August 11, 2017, Alimehmeti filed a reply.

20          The Court has thoroughly reviewed the parties'

21  submissions, which include the FISA materials sought to be

22  disclosed.  The Court has carefully considered the issues

23  raised therein.  The Court denies Alimehmeti's motion in its

24  entirety.  The Court's reasoning is as follows.

25          Alimehmeti challenges the legality of the

H9mWaliC

1    FISA-obtained information on a number of bases.  He argues that

2    the government could not have validly asserted that he was "an

3    agent of a foreign power," as required by the statute.  He

4    further argues that the government could not have asserted that

5    a "significant purpose of the FISA application was to obtain

6    foreign intelligence," as required by the statute.  He argues

7    that the FISA application must have contained intentional or

8    reckless material falsehoods or omissions, thus requiring a

9    hearing under *Franks v. Delaware*, 438 U.S. 154 (1978).  He

10    argues that required certifications were or may have been

11    insufficient.  He argues that the timing of surveillance and

12    searches may have been improper.  He argues that the government

13    may not have utilized effective minimization procedures.

14    Finally, Alimehmeti argues that he is entitled to additional

15    discovery and notice regarding Executive Order 12333

16    surveillance.

17          The Court first finds that it can properly resolve

18    these challenges and deny disclosure without affording

19    Alimehmeti a hearing.  Where, as here, the attorney general

20    certifies "disclosure of FISA materials or an adversary hearing

21    would harm the national security of the United States," the

22    Court, by statute, must "review *in camera* and *ex parte* the

23    application, order, and such other materials relating to the

24    surveillance as may be necessary to determine whether the

25    surveillance of the aggrieved person was lawfully authorized

H9mWaliC

and conducted," citing 50 U.S.C. Section a 1806(f).  Under that

statute, the Court may order disclosure of FISA materials

"under appropriate security procedures and protective

orders,...only where such disclosure is necessary to make an

accurate determination of the legality of the surveillance."

If the Court "determines that the surveillance was lawfully

authorized and conducted, it shall deny the motion of the

aggrieved person except to the extent that due process requires

discovery or disclosure."  *Id.* Section 1806(g).  The Second

Circuit has explained that disclosure of FISA materials is "the

exception and *ex parte, in camera* determination is the rule".

*United States v. Stewart*, 590 F.3d 93, 129 (2d Cir. 2009).

          In this case, the Court conducted such a review.  The

Court's *in camera, ex parte* review of the FISA materials

permitted the Court to make an accurate determination of the

legality of the challenged surveillance consistent with the

requirements of due process.  Disclosure and an adversary

hearing are therefore not necessary.

          The Court next finds, following a comprehensive review

of the FISA materials, that the government has complied fully

with the FISA warrant requirements of materials and that there

is no basis in the record for a *Franks* hearing.

          As the Second Circuit has explained, the FISA Court,

in reaching a decision on a warrant application, considers

"whether (1) the application makes the probable cause showing

H9mWaliC

1    required by FISA, i.e., that the target of the warrant is a

2    foreign power or agent thereof and that the facilities or

3    places to be searched or surveilled are being used or are about

4    to be used by a foreign power organization; (2) the application

5    is otherwise complete and in the proper form; and (3) when the

6    target is a United States person, the application's

7    certifications are not clearly erroneous." *United States v.*

8    *Abu-Jihaad*, 630 F.3d 102, 130 (2d Cir. 2010) (citation

9    omitted).  The Second Circuit instructs that "FISA warrant

10   applications are subject to minimal scrutiny by the courts,

11   both upon initial presentation and subsequent challenge." *Id.*

12   The Second Circuit has cautioned, however, that "even minimal

13   scrutiny is not toothless*." Id.*  A district court, in

14   assessing challenges to orders of the FISA Court, presumes

15   valid "the representations and certifications submitted in

16   support of an application for FISA surveillance...absent a

17   showing sufficient to trigger a *Franks* hearing." *Id.*

18          Here, the classified materials, in this Court's

19   assessment, easily satisfy FISA's requirements.  The

20   application properly makes the required probable cause showing.

21   The certifications do not contain any clear errors.  Alimehmeti

22   has not made "a substantial preliminary showing that a false

23   statement knowingly and intentionally, or with reckless

24   disregard for the truth, was included by the affiant in the

25   warrant affidavit, and...the allegedly false statement is

H9mWaliC

necessary to the finding of probable cause." *Franks*, 438 U.S.

155-56.   There is therefore no need for a *Franks* hearing.

As to Alimehmeti's arguments regarding Executive Order

12333, Alimehmeti does not direct the Court to any legal

authority mandating the additional notice and disclosures he

seeks.  Courts have denied motions for such additional notice

of discovery of surveillance techniques where defendants offer

only speculation of having been subject to unlawful

surveillance.  For example, in this district, in the *United*

*States v. El Gammal*, No. 15 Cr. 588, Judge Ramos recently

denied a motion for additional discovery and notice that

articulated only "suspicion" of surveillance under Executive

Order 12333 and that invoked, as Alimehmeti does here, Title 18

U.S.C. Section 3504, the Fourth and Fifth Amendments, and

Federal Rules of Criminal Procedure 12(b)(3)(C) and

16(a)(1)(E)(i).  Here, just as in *El Gammal*, the Court

understands the government to have complied with its notice and

discovery obligations and declines to impose additional

obligations at this time.

Similarly, in *United States v. Aref*, the Second

Circuit affirmed the denial of a defendant's Section 2504

motion for notice and disclosure of surveillance where the

defendant "failed to state a colorable basis for his Section

3504 claim" and instead "merely (1) identified representations

made by unnamed sources in a newspaper article; and (2) argued

H9mWaliC

1   that the prosecutor's pattern of objections shows that he must

2   have been surveilled electronically."  285 F.App'x 784, 793 (2d

3   Cir. 2008).  The circuit cautioned that, "although [a] Section

4   3504 claim need not be particularized, it may not be based upon

5   mere suspicion but must at least appear to have a 'colorable'

6   basis before it may function to trigger the government's

7   obligation to respond under Section 3504."  *Id.* (quoting *United*

8   *States v. Pacella*, 622 F.2d 640, 643 (2d Cir. 1980)).

9        I am informed that I misspoke earlier at one point and

10  inadvertently, I think, said 2504 instead of 3504.  I meant

11  3504.

12       Here, Alimehmeti does not articulate a sufficient

13  basis for his speculation that he has been subjected to

14  unlawful surveillance under Executive Order 12333.  Therefore,

15  the Court reaches the same conclusion as did Judge Ramos.  The

16  Court denies the motion without prejudice "to renew in the

17  event the defense is able to bring something more concrete to

18  the Court's attention," citing Judge Ramos in No. 15 Cr. 588,

19  Dkt. No. 142 at page 25.

20       Accordingly, the Court denies Alimehmeti's pending

21  motion to suppress and for additional notice of discovery.

22       That ends the Court's ruling.  A bottom-line order

23  reflecting the denial of the motion will shortly follow.

24       Having taken up that business, counsel, where do we

25  stand?

H9mWaliC

1          MR. TURNER:  Your Honor, where we stand is, at least

2     having spoken with defense counsel earlier, what remains in our

3     view is setting a trial date at this point, your Honor.

4     Pretrial briefing has been complete, both on the CIPA side as

5     well as Rule 12, and we submit it would be appropriate to set a

6     trial date.

7          THE COURT:  Have you discussed that with opposing

8     counsel?

9          MR. TURNER:  We have, your Honor, and getting a little

10    more specific, in our discussions earlier today, we both

11    believed that a trial in the early part of the new year would

12    be appropriate at this juncture and given the nature of the

13    case, your Honor, subject to the Court's schedule, of course.

14         THE COURT:  All right. Let me just confirm that with

15    defense counsel and then we can start taking up the trial date

16    and other mechanics.

17         Ms. Levine.

18         MS. LEVINE:  That's correct, your Honor.  I did speak

19    to Mr. Turner and we also think it's appropriate at this

20    juncture to set a trial date.

21         THE COURT:  Is that based on an assessment that this

22    case is going to trial, or that the prudent course is to set a

23    trial date but you're not necessarily projecting that?

24         MS. LEVINE:  I think at this time, it is our

25    expectation that this case will go to trial.  There are some

H9mWaliC

1    ongoing conversations, as there always are, at precisely this

2    juncture, and if those conversations change the route that

3    we're taking, we'll obviously inform the Court immediately, but

4    I think at this time it would be proper to put a date on the

5    calendar.

6         THE COURT:  OK.  I'll do that.  Let me ask you, before

7    we start talking about dates and schedules, just to get an

8    understanding, beginning with defense, we've cleared a bunch of

9    hurdles here so far, what do you envision happening between now

10   and trial?  Are there motions *in limine* you have in mind?  I'm

11   trying to get a sense of what we will collectively need to work

12   through beforehand, because that may bear on the trial date.

13        MS. LEVINE:  Sure.  I think some motions *in limine*.

14   For example, I think there may yet be expert disclosure by the

15   government.  I don't want to speculate, but I perhaps would

16   look to the government at this juncture.  I know that they have

17   in others of these types of cases sought to call experts and

18   there's been litigation with regard to the experts.  Obviously,

19   that's something that I think I can contemplate now as coming

20   up that the Court can't sort of otherwise foresee.  Otherwise,

21   I imagine it's standard motions *in limine* with regard to 404(b)

22   applications and such.

23        THE COURT:  In other words, what you're envisioning at

24   this point is motion practice that is not unfamiliar for

25   criminal cases, criminal cases in this district that do not

H9mWaliC

1    implicate classification-type issues but, rather, issues that

2    involve either expertise or limiting instructions, that sort of

3    thing.

4         MS. LEVINE:  Right, and I think I would look to

5    Mr. Turner, if that's acceptable, to maybe elaborate on any

6    other pretrial testimony or such that we're not aware of at

7    this moment but may be shared shortly.

8         THE COURT:  I'm trying to get a sense as well of the

9    likely volume and complexity of what you would expect to be

10   moving on.  Let's assume that, pending what we hear from

11   Mr. Turner, there is potentially expert testimony of the sort

12   that you envision and that you would be moving against it.

13        MS. LEVINE:  Presumably, right.  Other than that, I

14   don't know of anything at this moment to bring to the Court's

15   attention.

16        THE COURT:  In other words, from the perspective of

17   motion practice, based on what you know now, while there would

18   likely be some, we're not talking about the sort of volume that

19   requires a protracted delay.

20        MS. LEVINE:  I don't believe so, your Honor.

21        THE COURT:  Thank you.

22        Mr. Turner.

23        MR. TURNER:  Your Honor, we agree with that assessment

24   with the CIPA-related litigation as well as the FISA

25   suppression motion having been decided.  We envision standard

H9mWaliC

criminal pretrial motion practice within the spectrum of what
would be considered the norm here, I think, your Honor.  That
will likely include expert disclosure, expert notice, as well
as *in limine* briefing, but at this point, your Honor, we don't
foresee something that is outside what your Honor has alluded
to.

THE COURT:  Give me a sense of when you would make
whatever expert disclosures you have in mind making.

MR. TURNER:  Your Honor, we could be prepared to make
expert disclosure in the range of, say, a couple months before
trial, which would seem to be in the range of what is standard
practice in these types of cases.

THE COURT:  And without holding you to it, is there
anything more you could tell me about the number or areas of
expertise that you have in mind?

MR. TURNER:  Broadly speaking, your Honor, and some of
this will depend, of course, on whether and to what extent
there are stipulations, for example, related to the extraction,
for example, of forensic data from electronic devices.  That
would be one potential subject of expert testimony.  It is also
customary, we would anticipate, in this type of case to elicit
expert testimony regarding ISIS as a terrorist organization and
related topics like that.

THE COURT:  One category is more technical involving
the receipt of the extraction of data; that's the sort of thing

H9mWaliC

1   by its nature often is stipulated to but no obligation that

2   that happen.  The other one is more substantive, right, and

3   involves, as you say, ISIS?

4               MR. TURNER:  That's right, your Honor.

5               THE COURT:  Any other areas of expertise that you

6   presently envision?  I'm not holding you to it.  I'm just

7   trying to get a preview.

8               MR. TURNER:  Your Honor, I think at this point, those

9   are the broad areas.  Obviously, we will need some time to

10  consider that as we prepare for trial.

11              THE COURT:  Government, how long would you envision a

12  trial would take?

13              MR. TURNER:  Your Honor, and we did speak about this

14  aspect of it as well a little bit with defense counsel earlier,

15  we would anticipate being able to present the government's

16  case, including opening jury addresses, within two weeks.

17              THE COURT:  From jury selection through the government

18  resting, two weeks.  Are you making any assumption about the

19  number of trial days per week?

20              MR. TURNER:  Your Honor, we did have a question as to

21  whether your Honor sits on Fridays.

22              THE COURT:  My general practice is to sit long days

23  but on Monday through Thursday and not on Friday.  That's not

24  etched in stone, and if there's a good reason to sit on Friday,

25  I'm open to considering it, but ordinarily I prefer to give

H9mWaliC

1    counsel Friday to catch their breath, and that obviously serves

2    other interests in terms of my docket management, but there

3    have been criminal cases and other cases where I've sat on

4    Friday and am open to considering it.

5             MR. TURNER:  Understood, your Honor.  Thank you.

6             THE COURT:  How many trial days do you envision from

7    jury selection through the end of the government's case?

8             MR. TURNER:  Again, your Honor, recognizing that some

9    of this, with the usual caveats as to stipulations, whether

10   custodians will need to be called, things of that nature, I

11   think we're looking at something in the order of ten trial

12   days.

13            THE COURT:  Right, to which, then, needs to be added

14   the defense case, closing arguments, charge and deliberations.

15            MR. TURNER:  That's right, your Honor.

16            THE COURT:  Ms. Levine.

17            MS. LEVINE:  I think at this point, we would, for

18   scheduling purposes, expect to ask the Court for two to three

19   business days for a defense case.

20            THE COURT:  I'm not limiting you in any way.  I'm just

21   trying to figure out where we slot this in in the calendar.

22            MS. LEVINE:  Right, so that's my answer.

23            THE COURT:  All right.  So putting that together, and

24   then figuring that closing arguments may be substantial and a

25   charge and deliberations, I think we have to block at least

H9mWaliC

1    three weeks for this, and probably to play it safe, have to

2    assure ourselves that we have four weeks to work with.  Sounds

3    only prudent.

4              MS. LEVINE:  That sounds right, your Honor.

5              THE COURT:  All right.  I understood from my deputy

6    that you have some scheduling constraints.

7              MS. LEVINE:  Your Honor, I unfortunately have some

8    personal obligations in the month of January that are going to

9    take me out of the country for some of it and out of the office

10   for part of it, such that it would be my request that the Court

11   not schedule the trial before February.

12             THE COURT:  May I ask you, and don't take away any

13   skepticism, because I will accommodate you, but is Ms. Shroff

14   still trying the case with you?

15             MS. LEVINE:  Yes, your Honor.  Ms. Shroff and

16   Mr. Bove, who I believe are both going to try this case, are

17   both currently in preparation for a trial that starts Monday

18   here in this district, but Ms. Shroff is certainly going to try

19   this case with me.

20             THE COURT:  OK.  So it will be Mr. Turner and Mr. Bove

21   and Ms. Levine and Ms. Shroff.

22             MS. LEVINE:  At least.

23             THE COURT:  And perhaps more.  And I take it it is

24   implicit that there is a reason why the case can't be tried

25   before the new year.  Just articulate it, because somebody

1    apparently is going to have to move for the exclusion of time,

2    so I'd like you to explain why you're not seeking a trial

3    before then.

4             MS. LEVINE:  Yes, your Honor.  I think including the

5    other trial that I just referenced that Ms. Shroff is committed

6    to, I think, for the entirety of October, I have a trial the

7    first week of December, and therefore, we landed on the

8    beginning of next year.

9             THE COURT:  All right.  And you're tied up through

10   January.

11            MS. LEVINE:  I will, of course, accommodate whatever

12   schedule the Court sets, but yes.

13            THE COURT:  Here's the question.  Right now it's late

14   September.  You have lots of notice of a trial if it's early in

15   the next year.  While this will conflict with part 1

16   obligations I have, I may be able to work through it.  I want

17   to get this trial moving sooner rather than later.  Would you

18   be able to start, in effect, the last Monday in January?  I

19   realize that may or may not have you going back to back, but

20   you have a trial partner, which is why I established it, and

21   you would have many months between now and then to get ready.

22            MS. LEVINE:  It would be my request, given that I'm --

23   I think for me, my request would be to start the following week

24   or even later in that week, if just a few extra days.

25            THE COURT:  How about this; let me try the following.

H9mWaliC

1    Again, I'm just throwing out ideas here.

2              MS. LEVINE:  Sure.

3              THE COURT:  I have had several complex cases that are

4    by their nature both long and challenging as a matter of jury

5    selection.  I'm thinking here about several lengthy gang cases,

6    which took many weeks and involved inflammatory facts, multiple

7    murders and the like, and I found it useful in a couple of them

8    to do jury selection one week and the substance of the trial

9    beginning the Monday of the next.

10             One of the values of that is it allows us to stretch

11   into jury selection and take all the time we need to get it

12   right while everyone can really plan their trial lawyering, by

13   which I mean opening statements and witnesses, with some

14   confidence as to when that work begins.  One possibility would

15   be to do jury selection beginning the last Monday of January

16   and then the substance of the trial beginning the following

17   Monday.  I will need to make some accommodations with respect

18   to my part 1 obligations, but I think Mr. Alimehmeti's interest

19   in a speedy trial has to trump that.

20             Thoughts?

21             MS. LEVINE:  I can make that work.

22             THE COURT:  I mean, it seems to me that that

23   represents a fair accommodation of the interests here.

24             MS. LEVINE:  I would agree with that.

25             THE COURT:  If we were to, then, begin the substance

H9mWaliC

1    of the trial, Mr. Turner, stripped away of jury selection the

2    first Monday in February, I guess the expectation would be that

3    the trial would presumably run through February.  That would be

4    the operating assumption, that we need to all keep that free.

5              MR. TURNER:  I think that's right, your Honor.

6              THE COURT:  All right.  One moment.

7              Before I lock in, let me put out for bid exactly what

8    I have in mind to make sure that everyone is comfortable with

9    what I'm proposing.  Jury selection would begin on Monday,

10   January 29, and I expect we would be complete with jury

11   selection sometime in the first two days, worst case three

12   days, but in any event, we'll take care of it that week.  The

13   substance of the trial, meaning preliminary instructions and

14   opening statements, would then begin February 5.  I'm going to

15   reserve on whether or not we would be sitting four days or five

16   days, but you should budget your schedules accordingly.

17             Beginning with you, Ms. Levine, just making sure that

18   works for the defense.

19             MS. LEVINE:  Yes, and I appreciate the accommodation,

20   your Honor.

21             THE COURT:  Of course.  Look, I'm trying to balance

22   everybody's needs.

23             Mr. Turner, does that work for the government?

24             MR. TURNER:  Yes, your Honor.

25             THE COURT:  All right.  There are a handful of other

H9mWaliC

things, but those will be our trial dates, the 5th for the

substance of the trial of February and the 29th for jury

selection of January.

With respect to jury selection, I expect that there

would be at least two issues here that would potentially

complicate jury selection.  One is the length of the trial,

which is on the longer side.  In longer trials, I have used a

questionnaire that the venire submits that helps fence out

people who have hardship problems beforehand, and the other

issue would be the subject matter of the trial.

Have counsel given any thought, and I'm looking, I

guess, particularly to you, Mr. Turner, because the office has

done a number of cases in this broad space, to any particular

issues the Court needs to be sensitive to with respect to

mechanics of jury selection in a case like this?

MR. TURNER:  Your Honor, I think the Court has hit on

them.  We would defer to the Court's customary and usual

practices in that regard with respect to cases of this sort

that your Honor has mentioned, and we certainly would have no

objection to proceeding as your Honor has described.

THE COURT:  All right.  I'm just reflecting on this

for a moment.  In some of the gang-related cases that I've

spoken about, we had a couple of cases where we usefully had a

hardship questionnaire, which identified five or six hardship

questions, and in effect, all the members of the venire,

H9mWaliC

1   several hundred, came in and filled out those questionnaires.

2   After they filled them out, counsel reviewed them and sorted

3   them for the Court into categories beginning with jurors who

4   had no hardship "yes" answers; jurors who had answers but where

5   neither counsel felt that they justified being excused; the

6   third category were people who had "yes" answers where one

7   party felt that there was a valid justification; and the fourth

8   category were people who had "yes" answers where both parties

9   believed there was a valid hardship claim.  We excused the last

10  category and then sequenced jury selection beginning with

11  category 1, and had it been necessary, we would have gone to

12  categories 2 and 3.

13          Thinking aloud here, and we need to figure out the

14  schedule for all this, I have in mind the notion that there may

15  be a value in doing something like that here to at least

16  effectively eliminate the hardship question as a major

17  stumbling block to jury selection.

18          Any preliminary views from counsel as to that?

19          MR. TURNER:  We would be amenable to that, your Honor,

20  particularly if the Court has found it to work well in prior

21  cases.

22          MS. LEVINE:  I would echo that.  I haven't seen it

23  done, but I would defer to the Court's expertise on this.

24          THE COURT:  OK.  What I am likely to do is reflect on

25  this, but I'm leaning toward doing something like that.

H9mWaliC

1   Otherwise we wind up with an enormous amount of time spent,

2   often with robing room conversations with individual jurors

3   about hardship issues that were easily spotted earlier.  I'd

4   like to avoid that.  How exactly the mechanics of this work in

5   terms of dates is something that Mr. Smallman will need to work

6   out with the jury administrator, but in all likelihood the

7   panel would come in on someday prior to the onset of jury

8   selection to fill out the questionnaire, and then there would

9   need to be a little bit of time in between then so that counsel

10  could sort the questionnaires and make their assessments and

11  give a spreadsheet to the Court.

12          What I will ask you to do is set aside the trial dates

13  that I have given, but be mindful that it is possible that the

14  week before what I set aside for jury selection, the venire

15  might be coming in to fill out the questionnaire.

16          What that means, Ms. Levine, is Ms. Shroff would then

17  be presumably with whoever else from your office is covering

18  for you the ones who review the questionnaires and do the

19  sorting in conjunction with the government.  But since you

20  wouldn't be present for the jury filling out the

21  questionnaires, it's really a back-office function, but fair

22  warning that if we go this route and the actual human side of

23  jury selection begins on January 29, it's entirely possible

24  we'd need to do this the previous week.

25          MS. LEVINE:  I understand that, your Honor.

H9mWaliC

1          THE COURT:  With that, I definitely want to set a

2     check-in date with you in the fall just to make sure we're on

3     track in every way we need to be, including, I would expect,

4     nailing down some of the mechanic issues with respect to jury

5     selection.

6          Other than that, though, I want to set a schedule for

7     expert disclosure and for motion *in limine* briefing that allows

8     us to resolve all issues amply before trial so that we're not

9     in a scramble right before.  Let's work backwards.

10          Ms. Levine, once you get expert disclosures from the

11     government on the assumption that you are the most likely mover

12     for motion *in limine*, how much time would you need?

13          MS. LEVINE:  From the time of the expert disclosure or

14     in advance of the trial?

15          THE COURT:  How much time after getting the expert

16     disclosure will you need to move against it and to make any

17     other motions *in limine*?  Two weeks?

18          MS. LEVINE:  Two weeks sounds right.

19          THE COURT:  All right.  And then, Mr. Turner, assuming

20     you get a challenge to your expert and some other familiar

21     motion *in limine*, how long would you need to respond?

22          MR. TURNER:  Two weeks, your Honor.

23          THE COURT:  All right.  And then I will need, let's

24     say, a week to prepare.  If I set a conference date now at

25     which I am apt to hear argument on and review and/or resolve

H9mWaliC

1   the motions, we need to back up the dates by about five weeks

2   from there.  One moment.

3           Let me throw out a few dates and tell me how this

4   works for everybody.  I would propose to set November 6 as the

5   deadline for expert disclosures and 404(b) disclosures.  I

6   would then propose that any motion *in limine* be filed by the

7   movant on Monday, November 20, trying to avoid the Thanksgiving

8   holiday, but then any opposition to the motion *in limine* would

9   be due Thursday, December 7.  Again, I'm building in time for

10  Thanksgiving for the party in that position, and I will then

11  have a conference at which I will hear argument, if necessary,

12  but in any event expect to rule on or hope to rule on the

13  motions on December 15 at 2:30 p.m.

14          That motion *in limine* schedule applies in both

15  directions.  In other words, although I'm envisioning that the

16  more likely motion will be made by the defense, if the

17  government moves *in limine*, you, Mr. Turner, would be governed

18  by the same schedule.

19          Does the schedule make sense?

20          MR. TURNER:  Your Honor, may I have one moment to

21  consult with defense counsel?

22          THE COURT:  Of course.

23          MR. TURNER:  Your Honor, while, of course, the parties

24  will work with whatever schedule the Court sets, our

25  preliminary reaction, I think, is that particularly with

H9mWaliC

1    respect to items such as *in limine* briefing, it seems awfully

2    early and awfully far in advance of a trial substantively

3    beginning on February 5 to be briefing *in limine* motions as

4    early as late November.  I would have thought that sort of

5    briefing would take place a little bit closer to trial.

6          THE COURT:  Ordinarily it would, but here's the

7    concern, which is I expect there to be more complexity in the

8    motions here than in the average case, and I had the sense that

9    there would be value to all in understanding what the ground

10   rules were going into January, particularly with Ms. Levine

11   effectively being out in January.  What I'm trying to do, while

12   being heedful of her schedule as well, is clear away all the

13   underbrush we can so that you can prepare for trial in earnest

14   without having what may be complex motions unresolved.  That

15   was the thought process, anyway.

16         Look, I certainly take this point descriptively, but

17   between Ms. Levine's schedule and the inherent nature of what I

18   suspect will be some of the complicated motions here, this

19   seems to me prudent.  I may be able to move the dates a little

20   bit later within November, December, but I was hoping to get

21   this resolved, in effect, before everybody scatters.  I'm happy

22   to try to move this into March if that would accommodate

23   counsel and give you a little more time to take stock of the

24   trial needs.

25         MR. TURNER:  Your Honor, we're certainly prepared to

H9mWaliC

1    abide by this schedule.  I suppose one option could be if you

2    pushed things back by in the range of a couple weeks and the

3    Court were holding the conference and ruling on matters in sort

4    of the early to early-mid part of January, which is still a

5    month in advance of trial.

6              THE COURT:  That may well work.

7              Ms. Levine, what does that do to you?

8              MS. LEVINE:  That's fine, your Honor.  If the

9    conference were scheduled the first week of January, I think

10   that would be fine.

11             THE COURT:  All right.  How about this, I'll have a

12   conference and hopefully rule on Friday, January 5, at 2 p.m.

13             Mr. Turner, I take it that gives you at least some

14   more breathing room.

15             MR. TURNER:  Yes, your Honor.

16             THE COURT:  And Ms. Levine, you're comfortable with

17   that as well.

18             MS. LEVINE:  Yes, your Honor.  Thank you very much.

19             THE COURT:  All right.  One moment.  Let me propose

20   the dates which lead up to it.

21             Does anybody have a vacation I need to be sensitive

22   to?  I can work this to be sensitive to each of you.

23             MR. TURNER:  Not from the government, your Honor.

24             MS. LEVINE:  I've already shared with the Court my

25   vacation schedule.

H9mWaliC

1          THE COURT:  All right.  How about these dates:  On

2     November 20, any 404(b) or expert disclosures would be due.

3     That is a Monday.  On Friday, December 8, any opening motion *in*

4     *limine* would be due, and on Friday, December 22, any opposition

5     to any motion *in limine* would be due.

6          Does that work for you, Mr. Turner?

7          MR. TURNER:  Yes, your Honor.

8          THE COURT:  I take it that at least takes some of the

9     edge off of the early schedule.

10          MR. TURNER:  We do think that's a sensible schedule,

11     your Honor.

12          THE COURT:  Ms. Levine.

13          MS. LEVINE:  That works well.  Thank you, Judge.

14          THE COURT:  All right.  I'll set that schedule.

15          I also want to have another conference with you just

16     given the complexity of the case.  Why don't we do this.  Let

17     me change the date of the notice to Friday, the 17th, of

18     November, just moving it up a little bit, and let me meet with

19     you on November the 20th.  Once the notice is in, at least that

20     way I'll have some idea of what's coming, and it may help me in

21     scheduling.  If, for example, it appears likely that somebody's

22     going to have a factual hearing or a motion that requires

23     something evidentiary, I'd rather know sooner than later.

24          Mr. Turner.

25          MR. TURNER:  I apologize, your Honor.  One thought for

H9mWaliC

1    your Honor's consideration is it seems conceivable that your

2    Honor might have a better idea of whether such a hearing or

3    arguments are going to be made after the initial motions *in*

4    *limine* are actually presented, because they could involve

5    issues that are not related necessarily to 404(b) or expert

6    disclosure, but other trial-related issues.

7            THE COURT:  Right.  OK.  Fair enough.  Mr. Turner, I

8    think what you just said makes sense, so let me do this.  I'll

9    move the notice back to November 20.  We'll issue an order to

10   sort out all the confusion, but the next conference, then,

11   would be on December the 12th, which will allow everyone to

12   have a few days to review what has been filed *in limine*, and

13   that way, if there's scheduling that is prompted by what's been

14   filed, we'll be able to take it up then.  In all likelihood, an

15   order will issue between now and then that gives you a little

16   more concreteness as to the jury selection methodology

17   vis-à-vis hardship questionnaires.

18           Putting aside the exclusion of time motion, which I

19   expect is coming, does anyone else have anything to raise?

20           MR. TURNER:  Your Honor, is the Court inclined to set

21   dates at this point for either the submission of requests to

22   charge and/or the disclosure of 3500 material?

23           THE COURT:  I don't set dates for 3500 material.  I

24   admonish the government to provide 3500 material amply in

25   enough time so that there's no bona fide claim of the need for

H9mWaliC

1    a trial delay.  Let me ask you as to the 3500 material, is

2    there anything you can tell me about the types of witnesses

3    you'll have that might shed light on whether anybody's got

4    deeply voluminous material?

5         MR. TURNER:  Your Honor, at this point, taking the

6    second part of the question first, we do not anticipate

7    particularly voluminous 3500.  Witnesses will include law

8    enforcement witnesses as well as some set of civilian

9    witnesses.  For example, your Honor, as the Court is aware,

10   even from the charging instruments, there were law enforcement

11   personnel who interacted with the defendant.

12        THE COURT:  Right.  How long in advance would you

13   envision being prepared to produce 3500 material?

14        MR. TURNER:  Your Honor, in a case as here where we

15   don't see any reason to depart from the ordinary, we would be

16   producing 3500 in the range of a week before trial.

17        THE COURT:  Can I take that to mean a week before the

18   jury selection part of the trial?

19        MR. TURNER:  We can be prepared to produce 3500 --

20        THE COURT:  Look, I'm not directing it, but it

21   certainly would be helpful.

22        MR. TURNER:  Yes, your Honor.

23        THE COURT:  Obviously, there are exceptions, where

24   there's a sensitivity or witness security or something like

25   that, A, I'm not ordering you to do that, and of course, I'm

H9mWaliC

1  sensitive to that, but it's useful for defense counsel's

2  planning to know when to expect this.  Why don't we say

3  proposed requests to charge and voir dire due on January the

4  8th.  OK?

5          MR. TURNER:  Very well, your Honor.

6          THE COURT:  Anything further besides the exclusion of

7  time?

8          MR. TURNER:  Not from the government.

9          MS. LEVINE:  Did the Court set a time for the December

10  12 conference?  I'm sorry if I missed it.

11          THE COURT:  2:30.

12          MS. LEVINE:  Thank you.

13          THE COURT:  All right.  Anything further from you,

14  Ms. Levine?

15          MS. LEVINE:  No, your Honor.

16          THE COURT:  OK.  Is there an application for the

17  exclusion of time?

18          MR. TURNER:  There is, your Honor.  We'd ask that the

19  Court exclude time under the Speedy Trial Act between today's

20  date and the conference date that's been set by the Court of

21  December 12.  We submit that the exclusion will be in the

22  interests of justice.  It will, among other things, allow the

23  parties to prepare for trial; it will provide an opportunity

24  for the parties to engage in discussions about a potential

25  resolution prior to trial, and to begin preparing pretrial

H9mWaliC

1   motion practice, your Honor.

2               Ms. Levine.

3               MS. LEVINE:  No objection.

4               THE COURT:  I'll exclude time between now and December

5   12.  I find that the interests of justice outweigh the

6   interests of the public and the defense in a speedy trial.

7               To begin with, the defense counsel has asked that the

8   trial be put over so that it doesn't begin until late January,

9   early February specifically to accommodate the conflicting

10  commitments of what appear to be both defense counsel.  As a

11  result, the defendant's interests are very much in favor of

12  excluding the time to make sure that counsel are ready and

13  prepared.  Beyond that, I am mindful, as counsel are, that this

14  is a case with a significant amount of discovery and some

15  complex discovery.  Maxing that and thinking about it from a

16  trial usability and trial-use perspective obviously justifies

17  an exclusion of time.

18              There will also be, I expect, considerable attention

19  to potential motions practice.  Once the government submits its

20  expert disclosure or disclosures, the defense will then need to

21  determine whether there's a basis for moving against that.  All

22  of these reasons, separately and together, justify the

23  exclusion of time.  And finally, both counsel have now

24  indicated to me that at least at some level they expect there

25  will be and already have apparently been some discussions about

H9mWaliC

1    the possibility of a pretrial disposition.  It goes without

2    saying, but I encourage you to have fulsome discussions along

3    those lines and to start early and often; it's always better to

4    do that.  All these reasons justify the exclusion of time.

5             Thank you.  I look forward to seeing you, I guess, in

6    person next in December.  Have a good weekend.

7             MS. LEVINE:  Thank you.

8             MR. TURNER:  Thank you, your Honor.

9             (Adjourned)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25