UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

SAJMIR ALIMEHMETI,
     a/k/a "Abdul Qawii,"

          Defendant.

S1 16 Cr. 398 (PAE)

# THE GOVERNMENT'S MOTIONS *IN LIMINE*

JOON H. KIM
Acting United States Attorney for the
Southern District of New York
One Saint Andrew's Plaza
New York, New York 10007

Emil J. Bove III
George D. Turner
Assistant United States Attorneys
    *Of Counsel*

## <u>TABLE OF CONTENTS</u>

BACKGROUND ............................................................................................................ 2

ARGUMENT .............................................................................................................. 9

I.   The Defendant Should Be Precluded from Making Any Reference at Trial to the Fact
     That Certain Materials Were Derived from FISA Searches……………………………9

II.  Evidence of Terrorist Propaganda Materials Possessed by Alimehmeti Is Admissible .... 14

     A.   Relevant Facts ........................................................................................... 14

     B.   Applicable Law ........................................................................................... 19

     C.   Discussion ................................................................................................. 20

III. Evidence of Alimehmeti's Dissemination and Possession of Terrorist Propaganda
     Materials at the MCC Is Admissible Pursuant to Rule 404(b) ......................................... 29

     A.   Relevant Facts ........................................................................................... 29

     B.   Applicable Law ........................................................................................... 31

     C.   Discussion ................................................................................................. 33

IV.  The Defendant Is Not Permitted to Offer His Own Out-of-Court Statements .................. 38

V.   The Defendant Should Not Be Permitted to Present an Entrapment Defense at Trial
     Unless and Until He Proffers Evidence to the Court That Is Capable of Supporting
     Such a Defense………………………………………………………………………………40

     A.   Applicable Law ........................................................................................... 40

     B.   Discussion ................................................................................................. 42

VI.  The Court Should Take Judicial Notice of ISIS's Designation as an FTO ...................... 52

VII. The Court Should Implement Certain Security Measures Relating to the UCs................ 53

CONCLUSION.............................................................................................................. 56

## **TABLE OF AUTHORITIES**

**Cases**

*Jacobson* v. *United States*, 503 U.S. 550 (1992) .......................................................... 49

*Mathews* v. *United States*, 485 U.S. 58 (1988) ............................................................. 40

*Old Chief* v. *United States*, 519 U.S. 172 (1997) ......................................................... 20

*United States* v. *Abel*, 469 U.S. 45 (1984) ................................................................... 19

*United States* v. *Abu-Jihaad*, 630 F.3d 102 (2d Cir. 2010) ................................... passim

*United States* v. *Abu-Jihaad*, 553 F. Supp. 2d 121 (D. Conn. 2008) ........................... 26

*United States* v. *Aguinaga*, 643 F. App'x 858 (11th Cir. 2016) ................................... 50

*United States* v. *Al Kassar*, 660 F.3d 108 (2d Cir. 2011) ...................................... 22, 24

*United States* v. *Alcantara*, 396 F.3d 189 (2d Cir. 2005) ........................................... 55

*United States* v. *Ali*, 799 F.3d 1008 (8th Cir. 2015) ................................................... 35

*United States* v. *Al-Moayad*, 545 F.3d 139 (2d Cir. 2008) ......................................... 26

*United States* v. *Barcelo*, No. 13 Cr. 38 (RJS), 2014 U.S. Dist. LEXIS 113906

  (S.D.N.Y. Aug. 15, 2014)……………………………………………………..…10

*United States* v. *Black*, No. 13 Cr. 316 (DLI), 2014 WL 5783067 (E.D.N.Y. Nov. 5, 2014) ...... 39

*United States* v. *Blitch*, 773 F.3d 837 (7th Cir. 2014) ................................................. 51

*United States* v. *Brand*, 467 F.3d 179 (2d Cir. 2006) ...................................... 40, 41, 48

*United States* v. *Bumagin*, 136 F. Supp. 3d 361 (E.D.N.Y. 2015) ............................... 39

*United States* v. *Carboni*, 204 F.3d 39 (2d Cir. 2000) ................................................. 28

*United States* v. *Castro*, 813 F.2d 571 (2d Cir. 1987) ................................................. 39

ii

*United States* v. *Colon*, 880 F.2d 650 (2d Cir. 1989) .................................................................. 32

*United States* v. *Coonan*, 938 F. 2d 1553 (2d Cir. 1991) ........................................................... 20

*United States* v. *Cromitie*, 727 F.3d 194 (2d Cir. 2013) ............................................................ 49

*United States* v. *Diaz-Maldonado*, 727 F.3d 130 (1st Cir. 2013) ............................................. 51

*United States* v. *Dunn*, 779 F.2d 157 (2d Cir. 1985) ................................................................ 50

*United States* v. *El Gammal*, 15 Cr. 88 (ER) (S.D.N.Y) ........................................... 10, 13, 24, 53

*United States* v. *El-Mezain*, 664 F.3d 467 (5th Cir. 2011) .................................................. 22, 25

*United States* v. *Figueroa*, 618 F.2d 934 (2d Cir. 1980) ........................................................... 32

*United States* v. *Gagliardi*, 506 F.3d 140 (2d Cir. 2007). ......................................................... 41

*United States* v. *Gilliam*, 994 F.2d 97 (2d Cir. 1993) ............................................................... 37

*United States* v. *Glover*, 101 F.3d 1183 (7th Cir. 1996) ........................................................... 39

*United States* v. *Gonzalez*, 110 F.3d 936 (2d Cir. 1997) ..................................................... 19, 28

*United States* v. *Hammoud*, 381 F.3d 316 (4th Cir. 2004) ....................................................... 25

*United States* v. *Herron*, No. 10 Cr. 615 (NGG), 2014 U.S. Dist. LEXIS 65131

    (E.D.N.Y. May 12, 2014) ......................................................................................... 33

*United States* v. *Hurtado*, 47 F.3d 577 (2d Cir. 1995).............................................................. 50

*United States* v. *Inserra*, 34 F.3d 83 (2d Cir. 1994). ............................................................... 32

*United States* v. *Jackson*, 180 F.3d 55 (2d Cir. 1999) ............................................................. 39

*United States* v. *Jayyousi*, 657 F.3d 1085 (11th Cir. 2011) ..................................................... 22

*United States* v. *Jimenez*, 789 F.2d 167 (2d Cir. 1986) ........................................................... 37

*United States* v. *Johnson*, 507 F.3d 793 (2d Cir. 2007)............................................................ 39

iii

*United States* v. *Kadir*, 718 F.3d 115 (2d Cir. 2013) ................................................... 38

*United States* v. *Kaziu*, 559 F. App'x 32 (2d Cir. 2014 .................................................... 23

*United States* v. *Kopstein*, 759 F.3d 168 (2d Cir. 2014) .......................................... 41, 47

*United States* v. *LaSanta*, 978 F.2d 1300 (2d Cir. 1992) .............................................. 32

*United States* v. *Livoti*, 196 F.3d 322 (2d Cir. 1999) .................................................... 33

*United States* v. *Maldonado-Rivera*, 922 F.2d 934 (2d Cir. 1990) ............................... 34

*United States* v. *Marin*, 669 F.2d 73 (2d Cir. 1982) ...................................................... 38

*United States* v. *Mayo*, 705 F.2d 62 (2d Cir. 1983) ....................................................... 50

*United States* v. *McDarrah*, No. 05 Cr. 1182 (PAC) (S.D.N.Y. Dec. 19, 2006) ......................... 51

*United States* v. *McKinley*, 70 F.3d 1307 (D.C. Cir. 1995) ........................................... 41

*United States* v. *Mehanna*, 735 F.3d 32 (1st Cir. 2013) ........................................ 22, 25

*United States* v. *Mendoza-Salgado*, 964 F.2d 993 (10th Cir. 1992) .............................. 47

*United States* v. *Mercado*, 573 F.3d 138 (2d Cir. 2009) ............................................... 27

*United States* v. *Mustafa*, 406 F. App'x 526 (2d Cir. 2011) ......................................... 35

*United States* v. *Nachamie*, 101 F. Supp. 2d 134 (S.D.N.Y. 2000) ................................ 32

*United States* v. *Pitre*, 960 F.2d 1112 (2d Cir. 1992). .................................................. 32

*United States* v. *Pugh*, 162 F. Supp. 3d 97 (E.D.N.Y. 2016) ................................... 23, 25, 27, 28

*United States* v. *Rahimi*, 16 Cr. 760 (RMB) (S.D.N.Y.) .............................................. 29

*United States* v. *Reifler*, 446 F.3d 65 (2d Cir. 2006) .................................................... 20

*United States* v. *Roldan-Zapata*, 916 F.2d 795 (2d Cir. 1990). ............................... 33, 37

*United States* v. *Salameh*, 152 F. 3d 88 (2d Cir. 1998) ................................................. 25

iv

*United States* v. *Scarpa*, 913 F.2d 993 (2d Cir. 1990)................................................ 24

*United States* v. *Sistrunk*, 622 F.3d 1328 (11th Cir. 2010).......................................... 50

*United States* v. *Terry*, 702 F.2d 299 (2d Cir. 1983) ................................................... 39

*United States* v. *Turner*, No. 13 Cr. 572 (EEB), 2014 U.S. Dist. LEXIS 132867

    (N.D. Ill. Sept. 22, 2014) ...................................................................................... 11

*United States* v. *Valencia*, 645 F.2d 1158 (2d Cir. 1980)............................................ 42

*United States* v. *Wilkerson*, 84 F.3d 692 (4th Cir. 1996)............................................ 40

*United States* v. *Wilson*, 750 F.2d 7 (2d Cir. 1984)..................................................... 13

*United States* v. *Wood*, 335 F.3d 993 (9th Cir. 2003)................................................. 52

*United States* v. *Yang Chia Tien*, 638 F. App'x 19 (2d Cir. 2015).............................. 49

*United States* v. *Young*, 78 F.3d 758 (1st Cir. 1996) .................................................. 47

*United States* v. *Zackson*, 12 F.3d 1178 (2d Cir. 1993).............................................. 32

**Federal Rules of Evidence**

Fed. R. Evid. 106 .......................................................................................................... 39

Fed. R. Evid. 201 .......................................................................................................... 52

Fed. R. Evid. 401 ..................................................................................................... 11, 19

Fed. R. Evid. 402 .......................................................................................................... 19

Fed. R. Evid. 403 ................................................................................................... passim

Fed. R. Evid. 404 ................................................................................................... passim

Fed. R. Evid. 801 ..................................................................................................... 34, 38

Fed. R. Evid. 901 .......................................................................................................... 34

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| -v.- | S1 16 Cr. 398 (PAE) |
| SAJMIR ALIMEHMETI, a/k/a "Abdul Qawii," | **THE GOVERNMENT'S MOTIONS *IN LIMINE*** |
| Defendant. | |

The Government respectfully submits these motions *in limine* seeking the following

rulings in connection with the upcoming trial of defendant Sajmir Alimehmeti, a/k/a "Abdul

Qawii" ("Alimehmeti" or the "defendant"):

1.  The defendant is precluded from making any reference to the fact that certain materials in this case were obtained through searches pursuant to the Foreign Intelligence Surveillance Act of 1978.

2.  Evidence of certain terrorist propaganda materials located on electronic devices belonging to the defendant is admissible.

3.  Evidence of the defendant's dissemination and possession of terrorist propaganda materials while incarcerated at the Metropolitan Correctional Center in connection with this case is admissible pursuant to Federal Rule of Evidence 404(b).

4.  The defendant is not permitted to offer his own out-of-court statements, which constitute hearsay, unless and until the defendant establishes that the statement is admissible pursuant to a hearsay exception or provision of law.

5.  The defendant is precluded from presenting an entrapment defense to the jury unless and until he proffers evidence to the Court that is capable of supporting such a defense.

6.  The Court should take judicial notice of the designation of the Islamic State of Iraq and al-Sham as a foreign terrorist organization.

7. The Court should implement certain protective measures relating to the testimony and 3500 material of four undercover employees of the Federal Bureau of Investigation.[1]

## **BACKGROUND**

Alimehmeti is charged in two counts in Superseding Indictment S1 16 Cr. 398 ("PAE") (the "Indictment") with: (1) providing and attempting to provide material support to a designated foreign terrorist organization ("FTO"), namely, the Islamic State of Iraq and al-Sham ("ISIS"), in violation of 18 U.S.C. § 2339B; and (2) attempting to fraudulently procure a U.S. passport to facilitate an act of international terrorism (traveling overseas to join ISIS), in violation of 18 U.S.C. § 1542.  The Government will establish at trial—through, among other evidence, recordings of meetings between Alimehmeti and undercover Federal Bureau of Investigation ("FBI") employees (the "UCs"), the testimony of law enforcement and civilian witnesses, search warrant returns for social media and email accounts used by Alimehmeti, records of online purchases made by Alimehmeti, the contents of electronic devices seized from Alimehmeti, items recovered from Alimehmeti's apartment at the time of his arrest, electronic and telephonic communications captured by law enforcement between Alimehmeti and associates, a fraudulent passport application submitted by Alimehmeti, and expert testimony regarding various aspects of ISIS and its terrorist ideology—that Alimehmeti has demonstrated his allegiance to and support

---

[1] The Government is not aware of any applicable page limitation imposed in the Court's Individual Rules of Practice in Criminal Cases.  To the extent this submission is subject to such a page limit, the Government respectfully requests permission to exceed it in light of the number and complexity of the issues raised in the instant motions.

2

of ISIS since at least 2014, and that in May 2016, Alimehmeti provided assistance to an
undercover FBI employee whom Alimehmeti believed to be traveling to Syria to join ISIS.

Alimehmeti is a 24-year-old native of Albania who resided in the Bronx prior to his May
2016 arrest in this case.  In late 2014, Alimehmeti was twice denied entry into the United
Kingdom as a result of U.K. authorities' concerns—based on the contents of his luggage and
electronic devices—that he planned to participate in terrorist activities.  First, on October 24,
2014, Alimehmeti was denied entry into the U.K. at Manchester Airport, after U.K. authorities
discovered camouflage clothing and nunchucks in his luggage.  Second, on December 18, 2014,
Alimehmeti was again denied entry into the U.K., this time at Heathrow Airport.  U.K.
authorities seized a laptop computer and cellphone from Alimehmeti, and subsequent searches of
those devices revealed an array of evidence of Alimehmeti's support for ISIS and radical jihadist
ideology.  For example, those devices contain, among other things: terrorist propaganda
materials, including images of jihadist fighters and the black flag used by ISIS, multiple videos
disseminated by ISIS media outlets celebrating ISIS's brutally violent military exploits and
execution of captives, and audio files of lectures promoting jihad and martyrdom by Anwar al-
Awlaki ("al-Awlaki"), the now-deceased senior leader of al Qaeda in the Arabian Peninsula
("AQAP"), a designated FTO; photographs showing Alimehmeti making the index-finger-
pointing gesture commonly used by ISIS supporters to symbolize support for ISIS, including at
least one in which the ISIS flag is visible in the background; and an online chat in which
Alimehmeti attempted to facilitate another ISIS supporter's travel to Syria to join ISIS, by
providing contact information for an ISIS member who could arrange the travel.

In the spring of 2015, Alimehmeti began amassing combat knives and military-type gear at his Bronx apartment that could be used in a "lone wolf"-style terrorist attack. Internet records show that, over the course of 2015 and early 2016, Alimehmeti purchased online and had shipped to his apartment the following items, among others: a military-grade survival knife with a five-inch blade; three tactical knives with four-inch blades; two credit card-sized folding knives; a commando wire pocket saw; a 24-inch pocket chainsaw; a rucksack designed for tactical combat; a balaclava tactical ski mask; and a military-grade tactical desert scarf. Many of these items were later recovered by the FBI during a search of Alimehmeti's apartment following his arrest.

In September 2015, as part of law enforcement's effort to monitor and disrupt Alimehmeti, two undercover law enforcement officers ("UC-1" and "UC-2") were introduced to Alimehmeti, through his associates. Over the course of the ensuing months, Alimehmeti participated in numerous recorded meetings with UC-1 and UC-2, including in Alimehmeti's Bronx apartment, where Alimehmeti had an ISIS flag displayed on one of the walls. During those meetings, Alimehmeti repeatedly expressed his support for ISIS; used his laptop to play ISIS propaganda videos, including videos celebrating ISIS's beheading of captives; conveyed his desire to travel to Syria to join ISIS; and demonstrated his commitment to terrorist ideology.[2]

---

[2] Descriptions of recorded communications set forth herein are based on review of those recordings and subject to modification as finalized transcripts are prepared for trial.

In the fall of 2015, Alimehmeti also fraudulently attempted to procure a new U.S. passport because he wanted a passport without the rejection stamps associated with his denied entries into the U.K., to enable him to travel abroad to join ISIS without arousing suspicion. On October 23, 2015, Alimehmeti submitted an application for a U.S. passport to the State Department, on which he claimed, under penalty of perjury, that he had lost his passport by leaving it on a train. When law enforcement personnel interviewed Alimehmeti several weeks later regarding his passport application, he maintained that his application was accurate, and told a story about purportedly leaving his passport on a subway. However, during multiple recorded conversations with UC-1 and/or UC-2 in the ensuing weeks, Alimehmeti confided that his passport was not lost, displayed his purportedly lost passport, explained that his goal was to obtain a passport without rejection stamps, and conveyed that he wanted a clean passport to facilitate his efforts to travel abroad to join ISIS.

Over the course of 2015 into 2016, Alimehmeti also continued to engage in communications with associates (via telephone, Internet, and mobile messaging applications), which further demonstrated his allegiance to ISIS and its violent jihadist principles, his support for terrorist attacks carried out in the name of ISIS, and his desire to make *hijra* to Syria to join ISIS.[3]  For example, hours after the November 13, 2015 terrorist attacks in Paris, France, for which ISIS claimed responsibility, Alimehmeti posted a comment on a social networking site

---

[3] ISIS supporters use the term "hijra" (or "hijrah")—which traditionally refers to the flight of Muhammad from Mecca to Medina to escape persecution—to refer to an obligation to migrate to ISIS-controlled territory to join ISIS and wage jihad.

stating that he was "happy" about the attacks, and on March 22, 2016, during a telephone conversation with an associate, Alimehmeti similarly stated that he "wanted to celebrate" the terrorist attacks that had been perpetrated earlier that day in Brussels, Belgium, for which ISIS claimed responsibility.  In November and December 2015, Alimehmeti engaged in telephone conversations with another ISIS supporter, during which they discussed their shared desire to join ISIS, and whether it would be more feasible to reach Syria or Libya to join ISIS. Alimehmeti also told that ISIS supporter, in substance, that he was seeking to radicalize other individuals in his neighborhood, including a local sheikh, and that if he ended up in jail, he would be viewed as a person who radicalizes other inmates—which is precisely what Alimehmeti appears to have been trying to do at the Metropolitan Correctional Center ("MCC") since his arrest, *see infra* at 29-32.

In February 2016, UC-2 introduced Alimehmeti to another undercover FBI employee ("UC-3"), posing as an ISIS supporter.  On May 9, 2016, during a recorded meeting at Alimehmeti's apartment, UC-2 showed Alimehmeti a photograph of UC-3 waiving an ISIS flag in a desert-like location, and indicated that UC-3 had successfully reached Syria and joined ISIS. Alimehmeti expressed excitement and conveyed that he wanted to be put in contact with the "connections" who had purportedly facilitated UC-3's travel to join ISIS.

About a week later, Alimehmeti was presented with an opportunity to help another purported ISIS supporter make *hijra* to Syria to join ISIS.  On May 16, 2016, during a recorded meeting in Queens, New York, UC-2 told Alimehmeti that an associate of UC-3—who was, in fact, another undercover FBI employee ("UC-4")—would be arriving in New York City from

Florida the following day, for the purpose of traveling to Syria to join UC-3 in the Islamic State. Alimehmeti expressed excitement, and asked if he (Alimehmeti) could travel with UC-4 to join ISIS. Later during the meeting, Alimehmeti played an ISIS propaganda video that featured a particular *nasheed* (a type of Islamic music) and showed the decapitation of a captive. Alimehmeti explained that such *nasheeds* motivated him while exercising.

The next day, May 17, 2016, UC-2 introduced Alimehmeti to UC-4 at a restaurant in Manhattan. Alimehmeti asked UC-4 about the route that UC-4 would take to reach Syria. Alimehmeti also explained that he had saved $2,500 for his own travel to join ISIS, but that he first needed to obtain a passport in a different name, since he was already "in the system." UC-2 asked if Alimehmeti would assist UC-4 by taking UC-4 to obtain supplies, and then to the airport, in preparation for UC-4's travel, and Alimehmeti agreed to do so.

Alimehmeti then took UC-4 to several different stores, at which Alimehmeti helped UC-4 to select and purchase supplies including boots, a cellphone, a compass, a bag, and a flashlight. Over the course of that day, Alimehmeti also advised UC-4 about the most secure encrypted messaging applications to use when communicating with other "brothers" (*i.e.*, ISIS supporters). At one point, Alimehmeti suggested that they visit his Bronx apartment so that he could give UC-4 additional supplies that Alimehmeti had stored there, but he ultimately decided not to take UC-4 to his apartment because of timing concerns. After they obtained supplies, Alimehmeti took UC-4 via subway to a hotel in Queens to meet with the individual who purportedly had secured UC-4's travel documents. While Alimehmeti waited in the hotel lobby for UC-4 to return, Alimehmeti downloaded multiple encrypted messaging applications onto the cellphone

7

that he had helped UC-4 purchase for the trip.  Alimehmeti also wrote his contact information on a piece of paper and asked UC-4 to give it to the purported facilitator.  Earlier that day, Alimehmeti had made clear to UC-4 that he was prepared to travel to Syria himself to join ISIS, stating: "I'm ready to fucking go with you, man . . . you know I would . . . .  I'm done with this place.  There are kuffar everywhere."[4]  After the purported meeting with the facilitator at the Queens hotel, Alimehmeti accompanied UC-4 to John F. Kennedy International Airport, so that UC-4 could begin the journey to the Islamic State.

The FBI arrested Alimehmeti several days later, on May 24, 2016.  A search of Alimehmeti's Bronx apartment resulted in the seizure of, among other evidence, the ISIS flag that UC-1 and UC-2 had seen displayed in the apartment, an array of combat knives and military-type equipment that Alimehmeti had stockpiled, and $2,400 (as described above, Alimehmeti told UC-4 that he had saved $2,500 for traveling to Syria to join ISIS).  Searches of Alimehmeti's cellphone and laptop, which were also seized from the apartment, revealed materials further evidencing Alimehmeti's support for ISIS and terrorist ideology, including various forms of ISIS and jihadist propaganda materials.

---

[4] "Kuffar" is a derogatory Arabic term referring to non-believers.

## ARGUMENT

### I.     The Defendant Should Be Precluded from Making Any Reference at Trial to the Fact That Certain Materials Were Derived from FISA Searches

The Government expects to introduce at trial certain materials that were obtained through searches conducted pursuant to the Foreign Intelligence Surveillance Act of 1978 ("FISA"), as amended, 50 U.S.C. §§ 1801-13, 1821-29 (the "FISA Materials").  The fact that any particular piece of evidence is FISA-derived is not only classified, but also wholly irrelevant to any issue properly considered by the jury.  The Court therefore should issue an order precluding the defense from referencing FISA at trial.

On July 21, 2016, the Government filed a notice (the "FISA Notice") pursuant to 50 U.S.C. § 1825(d) informing the defendant and the Court that it intended to offer into evidence or otherwise use or disclose information obtained and derived from searches conducted pursuant to FISA.  Dkt. No. 14.  On May 15, 2017, the defendant filed a motion to suppress the materials that were the subject of the Government's FISA Notice, *i.e.*, the FISA Materials (the "FISA Suppression Motion").  Dkt. No. 59.  The FISA Materials are described in further detail in the Government's classified, *ex parte* opposition to the defendant's FISA Suppression Motion, filed on July 24, 2017.  On September 22, 2017, the Court denied the FISA Suppression Motion, after conducting an *ex parte*, *in camera* review of the application materials underlying the FISA-authorized searches.  Dkt. No. 68 (Sept. 22, 2017 Tr.) at 2-9 (concluding, based on "a comprehensive review of the FISA materials," that "the government has complied fully with the FISA warrant requirements").

Any reference at trial (or in any public proceeding, for that matter) to the fact that the FISA Materials were obtained through searches conducted pursuant to FISA would be legally impermissible and should be precluded for multiple reasons.

*First*, the fact that the FISA Materials are derived from FISA-authorized searches is legally irrelevant, and allowing that fact to be elicited at trial would only confuse the jury and unfairly prejudice both parties by suggesting that the jury should consider matters outside of its proper purview as fact-finder. *See* Transcript, *United States* v. *El Gammal*, 15 Cr. 88 (ER), Dkt. No. 142 (Dec. 29, 2016), at 25 (granting Government's motion *in limine* to preclude defense from making any reference at trial to fact that materials were obtained pursuant to FISA searches). The fact that certain of the evidence to be presented at trial is FISA-derived has no bearing whatsoever on the defendant's guilt or innocence, or on any other issue properly considered by the jury. As courts in this and other districts customarily advise juries regarding all lawful searches conducted in a case, "evidence obtained from these searches was properly admitted" and jurors should consider such evidence "[w]hether you approve or disapprove of how it was obtained." *See, e.g.*, *United States* v. *Barcelo*, No. 13 Cr. 38 (RJS), 2014 U.S. Dist. LEXIS 113906, at *37-39 (S.D.N.Y. Aug. 15, 2014). Evidence obtained through a FISA search is no different in this regard than evidence obtained through a Rule 41 search warrant, a consent search, or any other means. Indeed, as with those other means of obtaining evidence, the law permits—and the defense here has availed itself of—the opportunity to file a suppression motion before trial challenging the admissibility of evidence obtained pursuant to FISA. Such a suppression motion, not a jury trial, is the proper venue to litigate claims about the legality or

10

propriety of the Government's collection of evidence pursuant to FISA.  *See United States* v. *Turner*, No. 13 Cr. 572 (EEB), 2014 U.S. Dist. LEXIS 132867, at *17 (N.D. Ill. Sept. 22, 2014) (granting Government's unopposed motion to preclude defendant from re-litigating the FISA suppression issue at trial, and noting that, under the statute, FISA suppression motions "shall be made before the trial" and reviewed *ex parte*, *in camera* (citing 50 U.S.C. §§ 1806(e)-(f), 1825(f)-(g))).

Simply put, once a court has determined—as the Court did here in denying the FISA Suppression Motion—that evidence was obtained in a manner that did not violate a defendant's Constitutional or statutory rights (*i.e.*, that the evidence should not be suppressed), the authority under which the Government obtained such evidence has no bearing on the defendant's guilt, or on the jury's evaluation of the facts and evidence presented to it.  *See* Fed. R. Evid. 401 (to be relevant, evidence must have a "tendency to make a fact more or less probable than it would be without the evidence," and the fact must be "of consequence in determining the action"). Allowing the defense to present to the jury the fact that evidence was obtained pursuant to FISA, whether through cross-examination or otherwise, would unfairly prejudice the Government by suggesting that the jury should question the entirely lawful method that was used to obtain the evidence.  Conversely, the presentation of such information would also create a substantial risk of unfair prejudice to the defendant, as FISA is legislation specifically designed to combat national security threats involving foreign powers.  Thus, disclosing to the jury that FISA was used in furtherance of the Government's investigation of the defendant likely would lead some jurors to conclude that a court has already determined that the defendant is a threat to national

11

security, and that he therefore must be guilty of the terrorism-related crimes charged against him. *See* Fed. R. Evid. 403 (relevant evidence properly excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice [or] confusing the issues").

*Second*, information describing the precise nature, scope, and origins of the FISA Materials—which was provided to the Court in connection with the Court's review of the FISA Suppression Motion—remains classified and is therefore protected from disclosure at trial (or any other public proceeding). While the fact that the FISA Materials were obtained through FISA searches remains classified, the materials themselves are not classified and may be offered at trial. In other words, it is the association of specific evidence with FISA-authorized search procedures that is classified, not the evidence itself. Thus, any argument or questioning seeking to associate particular pieces of evidence with FISA-authorized searches necessarily would introduce into the public record classified information that is protected from public disclosure. Thus, if the defense seeks to elicit at trial that specific evidence was obtained through FISA-authorized searches, that would constitute the knowing disclosure of a classified fact in a public forum, in violation of federal law and the Court's Protective Order Pertaining to Classified Information entered in this matter, *see* Dkt. No. 19.

Further, even if the defendant had intended to offer any classified evidence at trial, Section 5(a) of the Classified Information Procedures Act ("CIPA") establishes a formal notice procedure that a defendant must follow before seeking to disclose, or cause the disclosure of, classified information in court. *See* 18 U.S.C. app. 3 § 5(a). This notice requirement applies both to documentary exhibits and oral testimony, whether the classified information is

12

anticipated to be brought out on direct examination, cross-examination, or otherwise.  *See, e.g.*, *United States* v. *Wilson*, 750 F.2d 7 (2d Cir. 1984).  Thus, absent notice pursuant to CIPA Section 5(a) and a court ruling permitting the noticed disclosure, a defendant is not allowed to offer classified information at trial.  Here, the defendant elected not to submit any notice pursuant to CIPA Section 5(a), and the deadline set by the Court for filing such a notice was May 4, 2017.  *See* Dkt. Nos. 47, 53, 56, 57.  Accordingly, not only is there no legitimate legal basis for referencing at trial, in any way, that evidence is FISA-derived, but any attempt to do so also would be improper under CIPA.

Another court in this District recently adjudicated this precise issue.  In *United States* v. *El Gammal*, 15 Cr. 88 (ER), the defendant was convicted after trial of, among other offenses, providing material support to ISIS, in violation of 18 U.S.C. § 2339B, stemming from his facilitation of another ISIS supporter's travel to Syria to join and fight for ISIS.  Prior to trial, the Government moved *in limine* to preclude the defense from making any reference at trial to the fact that the Government had employed FISA-authorized searches to obtain certain of its trial proof.  Judge Ramos granted the Government's motion, concluding that "the mere fact that some evidence was derived from a FISA-authorized search is irrelevant to any issue that the jury would have to find at trial."  Transcript, *United States* v. *El Gammal*, 15 Cr. 88 (ER), Dkt. No. 142 (Dec. 29, 2016), at 25; *see also* Order, *United States* v. *El Gammal*, 15 Cr. 88 (ER), Dkt. No. 150 (Jan. 5, 2017) (ordering "preclusion of any reference to or cross-examination of the fact that certain materials were obtained through searches conducted pursuant to FISA").

Accordingly, for the foregoing reasons, the Government respectfully requests that the Court issue an order precluding the defense from referencing FISA at trial, whether during argument, through cross-examination, or otherwise.

## II.   Evidence of Terrorist Propaganda Materials Possessed by Alimehmeti Is Admissible

At trial, the Government plans to introduce certain pro-ISIS and terrorist propaganda videos, images, audio files, and documents recovered from electronic devices seized from Alimehmeti (the "Terrorist Propaganda Materials").  As explained below, the Terrorist Propaganda Materials are highly relevant, as they tend to show, among other things, that Alimehmeti embraced a terrorist ideology, supported ISIS in particular, and believed himself and other Muslims to have been called to join ISIS in the Middle East.  The significant probative value of such materials outweighs any potential prejudicial effect, particularly given that the Government will omit certain especially graphic portions from the videos that it offers, as discussed below.  Accordingly, the Government respectfully seeks a pretrial ruling that the Terrorist Propaganda Materials are admissible.

### A.   Relevant Facts

The Government expects to present expert testimony at trial regarding, among other terrorism-related topics, AQAP, al-Awlaki, ISIS, and ISIS's leader, Abu Bakr al-Baghdadi ("al-Baghdadi").  On November 17, 2017, in accordance with the schedule set by the Court, the Government provided notice to the defense of its intent to offer expert testimony on these topics.  Such testimony will explain, in substance and among other things, that AQAP was founded in 2009 and is considered the official branch of al Qaeda in Yemen and Saudi Arabia.  AQAP's

14

primary goal is to establish an Islamic caliphate and rid Muslim-majority countries of western governments and influences.  AQAP has called for, carried out, and claimed responsibility for terrorist attacks against Americans and other western civilian and military targets in the United States, Europe, Yemen, and Saudi Arabia, among other places.  Anwar al-Awlaki was a Yemeni-American who was born in the United States, became an imam and Islamic lecturer, and ultimately became a senior leader and key ideologue of AQAP.  Before his death in 2011, al-Awlaki assisted in planning terrorist attacks in the United States and the U.K., among other countries.  Al-Awlaki released numerous video and audio recordings of his lectures and sermons in which he preached that it was the duty of every Muslim to kill Americans, by whatever means possible and wherever they could be found.  AQAP continues to issue calls for Muslims to wage jihad and commit lone-wolf attacks against Americans.

ISIS, a militant Islamist group based in Iraq and Syria, has existed in various iterations since at least 2004, and rose to prominence in 2014 when it declared itself a caliphate and consolidated its campaign to amass territory in the Middle East and drive westerners from the region.  ISIS has planned, carried out, and claimed responsibility for terrorist attacks around the world, including in the United States and Europe.  ISIS has also claimed credit for, and glorified, taking westerners as prisoners and executing them, often by decapitation.  Abu Bakr al-Baghdadi, an Iraqi, is recognized as the current leader of ISIS.  In the summer of 2014, al-Baghdadi gave a speech in Mosul, Iraq, in which he promoted the return of the Islamic caliphate and declared himself to be its caliph, or leader.  Al-Baghdadi subsequently gave speeches in which he—like Abu Mohammed al-Adnani, a prominent, now-deceased ISIS spokesman—

15

called for ISIS supporters to kill non-Muslims, in any manner possible, in the United States and other western countries.

ISIS uses various social media platforms and websites to issue a steady stream of propaganda and terrorism-related content in several languages, including English.  The messages in such propaganda materials include calls for followers to commit terrorist attacks, including lone-wolf attacks, against westerners.  ISIS also uses such propaganda to recruit followers from around the world to travel to the Middle East to join ISIS.  Through such outreach, ISIS has successfully recruited followers from countries around the world, including the United States, to make *hijra* to Syria to join ISIS and serve its mission of waging violent jihad and creating a caliphate.  ISIS's recruiting efforts have relied heavily on the use of the Internet, including web-distributed propaganda videos designed to motivate foreign fighters to leave their homelands and join ISIS overseas.  In particular, ISIS's propaganda wings have regularly disseminated professionally produced videos that glorify the violent exploits of ISIS's fighters (known as "mujahideen"), proclaim ISIS's aim of establishing a global caliphate, and seek to recruit new members and fighters.  Such videos often depict, among other things, ISIS fighters marching, training, fighting, and beheading captives.

From at least approximately the fall of 2014 through the time of his arrest in May 2016, Alimehmeti accessed, viewed, and stored—on multiple laptops and cellphones—various videos, images, audio files, and documents promoting and glorifying jihadist and terrorist ideology, and particularly ISIS.  At trial, the Government anticipates offering certain such Terrorist Propaganda Materials recovered from four electronic devices seized from Alimehmeti: (1) a laptop seized by

16

U.K. authorities from Alimehmeti when he was denied entry into the U.K. in December 2014

("Alimehmeti Laptop-1"); (2) a cellphone seized by U.K. authorities when he was denied entry

into the U.K. in December 2014 ("Alimehmeti Cellphone-1"); (3) a laptop seized by the FBI

from Alimehmeti's apartment following his arrest in May 2016 ("Alimehmeti Laptop-2"); and

(4) a cellphone seized by the FBI from Alimehmeti's apartment following his arrest in May 2016

("Alimehmeti Cellphone-2").[5]  Searches of those devices revealed that they contain an array of

content evidencing Alimehmeti's support for terrorist ideology generally and ISIS specifically.

Alimehmeti also accessed and viewed various terrorist propaganda videos during his recorded

meetings with the UCs, including videos graphically celebrating ISIS's executions of captives.

The Terrorist Propaganda Materials located on Alimehmeti's electronic devices that the

Government anticipates introducing at trial include the materials summarized below,[6] which

evidence Alimehmeti's immersion in terrorist ideology and allegiance to ISIS in particular:

- Portions of ISIS propaganda films disseminated by ISIS media outlets such as al Hayat Media Center.  These videos glorify ISIS—including its leaders, extremist agenda, anti-Western ideology, military exploits, and the killing of non-believers—and call for Muslims around the world to join ISIS and serve its cause.  The ISIS flag is superimposed in the background at various points during such videos.  The videos include speeches by ISIS members promoting ISIS and violent jihad.  The videos depict, in large part, ISIS fighters engaging in violent combat operations, including attacks with assault rifles and improvised explosive devices.  Certain of the videos include graphic scenes of ISIS fighters executing prisoners, including by decapitation, shooting, and stoning.  Alimehmeti viewed

---

[5] U.K. authorities created forensic images of Alimehmeti Laptop-1 and Alimehmeti Cellphone-1, and subsequently provided copies of those images to the FBI.

[6] Portions of certain of the Terrorist Propaganda Materials are in Arabic.  The Government anticipates offering English translations of Arabic portions of the Terrorist Propaganda Materials that are introduced at trial.

certain of these videos on his electronic devices during recorded meetings with the UCs.  *See, e.g.*, *infra* at 46.  At trial, the Government plans to offer excerpts of certain of the ISIS propaganda videos located on Alimehmeti's electronic devices.  Those excerpts will include (among other things) graphic footage of ISIS fighters carrying out violent combat operations and attacks, as well as footage showing the lead-up to the execution of captives.  As discussed below, it is essential for the jury to see such footage in order to understand the nature of the terrorist ideology espoused and adopted by Alimehmeti.  However, in an abundance of caution, the Government will not include in the excerpts offered at trial any footage of executions as they are actually carried out, or any footage showing severed heads or mutilated bodies resulting from such executions.

- A brief video consisting of an Arabic audio recording, with English subtitles, of remarks attributed to a particular radical Islamic cleric, justifying suicide bombing.  For example, the English subtitles state that a suicide bomber "is a person who has ended his life but in Jihad. . . .  He risks his soul[] in Jihad, in favour of Martyrdom."  In the background, a video shows a vehicle exploding into flames.  The file name of this video, which was located on Alimehmeti Laptop-1, is "Suicide Bombing In Islam _ Sheikh Bin Baz Fatwa justifying Al Qaeda type Martyrdom Operations."

- Various images promoting violent jihad and ISIS.  These still images depict, among other things: the ISIS flag; ISIS fighters carrying and firing assault rifles; ISIS fighters making the index-finger-pointing gesture symbolic of support for ISIS; al-Awlaki delivering one of his lectures (the electronic devices seized from Alimehmeti contain an array of lectures by al-Awlaki); and bin Laden making a speech while holding an assault rifle.  None of these images contains any graphic depictions of violence.

- Portions of audio files containing lectures by al-Awlaki.  Among other things, the al-Awlaki lectures discuss and promote violent jihad, martyrdom, and terrorist ideology.  The file names of these lectures saved on Alimehmeti's electronic devices include, for example: "JIHAD = FIGHTING"; "THE PUNISHMENT OF THOSE WHO DON'T PARTICIPATE IN JIHAD"; and "ON THE COMMAND OF JIHAD."

- Portions of audio files consisting of *nasheeds* celebrating, among other things, violent jihad, mujahideen, the establishment of ISIS, and Usama bin Laden.  For example, the file names of two such *nasheeds* recovered from Alimehmeti's electronic devices are "Establishment Of The Caliphate" and "Sheikh Usamah" (a reference to bin Laden).

18

- Pro-ISIS documents downloaded from the Internet, which promote ISIS and terrorism, justify the beheading of non-believers, demonize America and the West, and celebrate terrorist attacks carried out in the name of ISIS. For example, one such document includes a photograph that appears to depict a group of prisoners about to be beheaded by ISIS fighters, and states, in part: "[B]eheading the disbelieving Jews, Christians . . . who do what they do to the Muslims, it is obligatory to terrorize them and grow fear in their hearts. So their heads can be cut off with no respect." Another of the ISIS propaganda documents downloaded by Alimehmeti specifically justifies and celebrates the Paris and Brussels terrorist attacks, for which ISIS claimed responsibility. The document instructs, among other things, that a "kafir's blood is permissible to spill."

The Government will provide the Court and the defendant with the Government's proposed exhibits, including excerpts of the video and audio files summarized above, in advance of trial. The Government reserves the right to identify additional Terrorist Propaganda Materials that it intends to offer at trial, as the Government prepares and finalizes its exhibits.

### B.      Applicable Law

Federal Rules of Evidence 401 and 402 establish the broad principle that relevant evidence is admissible at trial except as otherwise provided by the Constitution, federal statute, or Rules of Evidence. *See* Fed. R. Evid. 401, 402; *United States* v. *Abel*, 469 U.S. 45, 51 (1984). Rule 403 allows a trial judge to exclude relevant evidence if, among other things, "its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403.

"To be relevant, evidence need not be sufficient by itself to prove a fact in issue, much less to prove it beyond a reasonable doubt." *United States* v. *Abu-Jihaad*, 630 F.3d 102, 132 (2d Cir. 2010). Rather, evidence is relevant if it has any tendency to make the existence of any fact of consequence to the determination of the action more probable or less probable than it would be without the evidence. Fed. R. Evid. 401; *see United States* v. *Gonzalez*, 110 F.3d 936, 941

(2d Cir. 1997) ("To be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency."). Thus, evidence is often admissible "to provide background for the events alleged in the indictment" or "to enable the jury to understand the complete story of the crimes charged." *United States* v. *Reifler*, 446 F.3d 65, 91-92 (2d Cir. 2006) (internal quotation marks omitted). "Background evidence may be admitted to show, for example, the circumstances surrounding the events, or to furnish an explanation of the understanding or intent with which certain acts were performed." *United States* v. *Coonan*, 938 F. 2d 1553, 1561 (2d Cir. 1991) (internal quotation marks omitted). As the Supreme Court has recognized, in analyzing the admissibility of evidence, the trial court should make its determinations "with an appreciation of the offering party's need for evidentiary richness and narrative integrity in presenting a case." *Old Chief* v. *United States*, 519 U.S. 172, 183 (1997).

### C.    Discussion

The Terrorist Propaganda Materials recovered from Alimehmeti's electronic devices are relevant in multiple respects and admissible as direct proof of the charged terrorism offenses.

*First*, the Terrorist Propaganda Materials constitute direct evidence of Alimehmeti's motivation and intent to provide support to ISIS. Based on Alimehmeti's recorded meetings with the UCs, among other evidence, Alimehmeti viewed himself as part of the global jihadist movement, and was inspired by the Terrorist Propaganda Materials that he saved and viewed on his electronic devices. Alimehmeti's immersion in such materials during the period of the charged offenses is an important piece of the Government's proof demonstrating and explaining

20

his efforts to support ISIS, including through helping others to travel to join ISIS and seeking to

travel to join ISIS himself.  The Terrorist Propaganda Materials located on Alimehmeti's

electronic devices tend to show, among other things, that Alimehmeti subscribed to, and was

motivated by, a jihadist and terrorist ideology—indeed, Alimehmeti conveyed to UC-2 that he

took inspiration from music videos showing ISIS fighters decapitating prisoners—and that he

supported ISIS in particular.

Evidence of Alimehmeti's possessing and viewing the Terrorist Propaganda Materials

also is inextricably intertwined with the Government's other evidence of Alimehmeti's activities

in support of ISIS, such that presentation of those materials to the jury is necessary for the jurors

to understand the complete story of Alimehmeti's conduct and intent.  For the jury to understand

Alimehmeti's radicalization, his embrace of terrorist ideology and ISIS, his desire to make *hijra*

to join ISIS, and his interest in helping others travel to Syria to join ISIS, it is essential for the

jury to consider the radical propaganda materials that Alimehmeti absorbed and embraced during

the period in which he engaged, and prepared to engage, in those activities.  Alimehmeti's

immersion in the Terrorist Propaganda Materials—all of which were recovered from devices

seized from Alimehmeti during the time period of the charged terrorism offenses—calling on

Muslims to travel to the caliphate, glorifying martyrdom in the name of jihad, celebrating ISIS's

military campaigns and killing of civilians, and spewing anti-U.S. sentiment, are important

aspects of the circumstances surrounding Alimehmeti's efforts to support ISIS and crucial to

explaining the motive and intent with which he undertook the charged criminal conduct.  *See*

*Abu-Jihaad*, 630 F.3d at 133–34 (2d Cir. 2010) (affirming district court's finding that the "pro-

21

jihadist contents of the [terrorist propaganda] videos were relevant to understanding [the defendant's] motive and intent"); *United States* v. *Mehanna*, 735 F.3d 32 (1st Cir. 2013) (holding that videos, images, and literature that defendant had "absorbed and endorsed" were admissible to establish that defendant was "inspired by terrorist rants" and "developed an anti-American animus" that culminated in his decision to travel to Yemen to join al-Qaeda); *United States* v. *El-Mezain*, 664 F.3d 467, 509-10 (5th Cir. 2011) (holding that material seized from defendant, "including images of violence and videos glorifying Hamas and depicting Hamas leaders, was probative of the motive or intent of the [defendant] to support Hamas"); *United States* v. *Jayyousi*, 657 F.3d 1085, 1108 (11th Cir. 2011) (holding that televised interview with bin Laden was properly admitted as "state of mind evidence").

*Second*, the Terrorist Propaganda Materials located on Alimehmeti's electronic devices are highly probative of his knowledge that ISIS was a designated FTO or has engaged in "terrorist activity" or "terrorism," which is an element of the charged material-support offense. *See* 18 U.S.C. § 2339B(a)(1); *United States* v. *Al Kassar*, 660 F.3d 108, 129 (2d Cir. 2011) (observing that § 2339B requires proof that defendant knows that "the organization he is aiding is a terrorist organization or engages in acts of terrorism"); *see* 8 U.S.C. § 1182(a)(3)(B) (defining "terrorist activity" for purposes of § 2339B to include any unlawful activity involving the use of any "explosive, firearm, or other weapon or dangerous device . . . with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property," or "[a] threat, attempt, or conspiracy to do any of the foregoing"); 22 U.S.C. § 2656f(d)(2) (defining "terrorism" for purposes of § 2339B to include "premeditated,

politically motivated violence perpetrated against noncombatant targets by subnational groups or clandestine agents").

Here, Alimehmeti stored on his electronic devices materials depicting, among other things, ISIS's murdering of civilians, military combat operations, promotion of lone-wolf attacks, and threats against the West.  Such materials thus constitute powerful, direct evidence of Alimehmeti's knowledge that ISIS is a terrorist group that engages in terrorism and terrorist activity.  *See, e.g.*, *United States* v. *Pugh*, 162 F. Supp. 3d 97, 114 (E.D.N.Y. 2016) (agreeing, as conceded by defendant charged with providing material support to ISIS, that "the fact that [the defendant] possessed certain ISIS or Jihadist propaganda on his computer or social media is potentially relevant to the charged offenses," and noting that "[t]he Second Circuit has regularly allowed terrorist propaganda to be admitted, particularly in the context of material support offenses, in order to prove the *mens rea* element of the offense" (citing *United States* v. *Kaziu*, 559 F. App'x 32, 35 (2d Cir. 2014); *Abu-Jihaad*, 630 F.3d at 133-34)); *see also id.* at 116 (finding that ISIS propaganda material offered by the Government "speaks directly to state of mind because it was found in [the defendant's] possession").  There is, in short, no question that

the Terrorist Propaganda Materials are directly relevant to the terrorism offenses charged against Alimehmeti.[7]

The admission of the Terrorist Propaganda Materials does not run afoul of Rule 403.  The probative value of this evidence is not outweighed, much less "substantially outweighed," by any risk of unfair prejudice.  Alimehmeti supported, wanted to join, and helped others to join a brutally violent terrorist organization, and carried with him videos and other materials glorifying and promoting the group's violent agenda.  As discussed above, this evidence is highly probative of Alimehmeti's knowledge and intent.  Any argument that the potential prejudicial effect of such evidence substantially outweighs its probative value is meritless.  Indeed, numerous courts "confronting similar Rule 403 issues have found that jihadist propaganda videos and documents found in a defendant's possession are admissible to show intent in a material-support case,

---

[7] The Government notes that, during the period of the charged offenses, Alimehmeti naturally also engaged in various types of non-criminal conduct that have nothing to do with this case (such as, for example, engaging in miscellaneous non-criminal activities on the Internet). Evidence of Alimehmeti's involvement in non-criminal conduct unrelated to the charged crimes (or his lack of involvement in criminal conduct that is not charged) is irrelevant and inadmissible under well-established law.  *See, e.g.*, *United States* v. *Scarpa*, 913 F.2d 993, 1011 (2d Cir. 1990) (defendants in criminal cases "cannot hope to use a process of elimination to defend themselves by presenting evidence of their noncriminal activities"); *United States* v. *Al Kassar*, 660 F.3d 108, 122-23 (2d Cir. 2011) (affirming preclusion of evidence of defendants' prior non-criminal activity, which constitutes inadmissible "prior good act" evidence under Rule 404(a)); Transcript, *United States* v. *El Gammal*, 15 Cr. 88 (ER), Dkt. No. 142 (Dec. 29, 2016), at 25 (granting Government's motion to preclude defendant—who was charged with providing material support to ISIS by facilitating another individual's travel to join ISIS—from offering evidence of defendant's purported lack of involvement in uncharged terrorist activity, concluding that the fact that law enforcement searches "did not yield certain inculpatory evidence is simply irrelevant to the issue of whether the defendant is guilty of the crimes charged").

24

despite the fact that such videos and documents risk prejudice."  *Pugh*, 162 F. Supp. 3d at 115;

*see, e.g.*, *Abu-Jihaad*, 630 F.3d at 132-34 (affirming district court's admission of excerpts of

jihadist propaganda videos including graphic combat scenes); *United States* v. *Salameh*, 152

F.3d 88 (2d Cir. 1998) (per curiam) (affirming district court's admission, over defendant's Rule

403 challenge, of "terrorism propaganda documents, possessed by the defendants, which bristled

with strong anti-American sentiment and advocated violence against targets in the United

States," reasoning that the materials evidenced the defendant's motive and also "provided the

jury with background and an explanation of the understanding or intent with which certain acts

were performed" (internal quotation marks omitted)); *Mehanna*, 735 F.3d at 59-64 (finding

terrorist propaganda admissible in material-support trial because it was highly probative to state

of mind and "central to the government's narrative"); *United States* v. *El-Mezain*, 664 F.3d 467,

508-511 (5th Cir. 2011) (admitting terrorist propaganda evidence in material-support case over

defendant's Rule 403 challenge, and stating: "Because this [is] a case about supporting terrorists,

it is inescapable . . . that there [will] be some evidence about violence and terrorist activity.  It

cannot be denied that [such] evidence [will be] unfavorable to the defendant[], but [the court]

cannot conclude that it [will be] unduly prejudicial."); *United States* v. *Hammoud*, 381 F.3d 316,

340-342 (4th Cir. 2004) (admitting evidence of terrorist propaganda videos found in defendant's

home because they were relevant to motive and were not unduly prejudicial).

The Second Circuit's decision in *Abu-Jihaad* is instructive.  The defendant in *Abu-*

*Jihaad*, an enlistee in the U.S. Navy, was convicted of communicating the anticipated

movements of a U.S. Navy battlegroup to persons supportive of violent jihad.  The Second

Circuit affirmed the district court's determination that the probative value, on the question of the defendant's motive and intent, of video excerpts offered by the Government that depicted violent combat scenes—"including an execution and a suicide truck bombing"—outweighed the risk of undue prejudice.  *Abu-Jihaad*, 630 F.3d at 113 n.12, 132-34.  The Second Circuit observed that, "[a]lthough these excerpts included depictions of violence, as was necessary not to distort the sense of the films as a whole, the depictions were limited and . . . less gruesome than many seen on nightly news dispatches from Baghdad."  *Id.* at 102 (internal quotation marks omitted).  The district court, in the ruling affirmed by the Second Circuit, held that because the videos glorified martyrdom and the killing of non-believers, they constituted significant evidence of the defendant's intent.  *See United States* v. *Abu-Jihaad*, 553 F. Supp. 2d 121, 128 (D. Conn. 2008) ("[I]t is difficult—if not impossible—for the Government to give the jury an accurate sense of the nature of these videos without playing for the jury some of the violent and graphic portions of the videos.  Otherwise the jury would have an inaccurate sense of their content.").  The same is true here.  Moreover, as explained above, it is not as if the Terrorist Propaganda Materials are divorced from the charged conduct; rather, they constitute powerful, direct evidence of the *mens rea* required for a § 2339B violation.  *Cf. United States* v. *Al-Moayad*, 545 F.3d 139, 159-61 (2d Cir. 2008) (finding that district court erred in admitting lengthy testimony regarding suicide bus bombing, during which witness repeated graphic narrative multiple times, where the events were "almost entirely unrelated to elements of the charges").

Furthermore, as reflected in the descriptions set forth above, some of the Terrorist Propaganda Materials do not contain any graphic content whatsoever, and some of those

26

materials depict violence (such as explosions, the use of artillery, the firing of automatic weapons, and various forms of combat) only indirectly or from a distance. While certain of the videos among the Terrorist Propaganda Materials possessed by Alimehmeti do depict more graphic violence, such as the brutal executions of captives, the Government will not, in an abundance of caution, introduce or play footage showing such executions at trial (as discussed above), in order to avoid any risk of unfair prejudice. *See, e.g.*, *Pugh*, 162 F. Supp. 3d at 117-18 (admitting ISIS propaganda videos located on defendant's laptop showing mass executions and the rounding up and beheading of prisoners, provided that the Government edited the clips that it showed at trial to leave out the executions and beheadings, reasoning that while the proffered clips "show[] executioners, wielding knives, in the moments before an unseen execution," which is naturally "viscerally disturbing," such evidence "speaks strongly to [the defendant's] state of mind" and was not "unduly prejudicial").

Because it is impossible to grasp the full force of such propaganda videos without gaining at least some sense of the exceptionally brutal violence that the videos seek to glorify, the Government anticipates briefly summarizing certain of the violence that has been omitted from the excerpts played at trial through the testimony of law enforcement and/or expert witnesses. Finally, the Government notes that, to the extent the Court has any concern about the risk of unfair prejudice in connection with the admission of the Terrorist Propaganda Materials, any such concern can be addressed through a limiting instruction to the jury. *See United States* v. *Mercado*, 573 F.3d 138, 142 (2d Cir. 2009) (upholding Rule 403 determination where challenged evidence was "not especially worse or shocking than the transactions charged" and district court

27

"gave several careful instructions to the jury regarding what inferences it could draw from the admitted evidence"); *Abu-Jihaad*, 630 F.3d at 134 (proper limiting instruction minimizes risk of undue prejudice from admission of relevant terrorist propaganda materials); *see, e.g.*, *Pugh*, 162 F. Supp. 3d at 118 ("[T]o the extent the risk of unfair prejudice arises at trial, the court will issue an appropriate limiting instruction at the appropriate time and at the request of the Defendant.").

In sum, the Terrorist Propaganda Materials are plainly relevant to establishing Alimehmeti's commission of the charged offenses, and any risk of unfair prejudice does not substantially outweigh the probative value of the evidence, particularly given that the Government will not play or offer certain particularly graphic portions of those materials at trial. Accordingly, the Government respectfully requests that the Court enter an order that such evidence is admissible at trial.[8]

---

[8] As explained above, the Terrorist Propaganda Materials are properly admitted as direct proof of the charged offenses. *See United States* v. *Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (articulating well-established principle that evidence is not considered other act evidence under Rule 404(b) if it is inextricably intertwined with the evidence of the charged offense or necessary to complete the story of the charged offense (citing *Gonzalez*, 110 F.3d at 942)); *see also* Weinstein's Federal Evidence § 404.20[2][c] (observing that evidence the absence of which "would leave a chronological or conceptual void in the story of the crime" is "intrinsic evidence, and thus not governed by Rule 404"). In any event, the Government notes that the Terrorist Propaganda Materials are also admissible pursuant to Rule 404(b) as other act evidence of Alimehmeti's preparation, plan, knowledge, motive, intent, absence of mistake, and lack of accident. As discussed above, the evidence is highly probative of Alimehmeti's knowledge of ISIS's existence, goals, and terrorist activities, and of his motive and intent for knowingly and intentionally engaging in activities supportive of ISIS and its terrorist ideology.

**III.    Evidence of Alimehmeti's Dissemination and Possession of Terrorist Propaganda Materials at the MCC Is Admissible Pursuant to Rule 404(b)**

The Government intends to offer evidence at trial demonstrating that, since his arrest in this case, Alimehmeti has participated in the receipt and dissemination of terrorist propaganda materials within the MCC.  Specifically, the Government plans to offer evidence showing that: (1) Alimehmeti was found to be in possession of a hard drive at the MCC containing an array of terrorist propaganda materials, including materials that were produced in discovery not to Alimehmeti, but to inmate Ahmad Khan Rahimi ("Rahimi"), who was recently convicted in this District of terrorism-related offenses for carrying out the September 2016 bombing in the Chelsea neighborhood of New York City; and (2) another inmate was found to be in possession of a disc containing terrorist propaganda materials originating from discovery materials produced to Alimehmeti and Rahimi (and not to the inmate in possession of the disc).  Such evidence of Alimehmeti's possession and dissemination of terrorist propaganda materials at the MCC is highly probative of, among other things, Alimehmeti's motive and intent in committing the charged terrorism crimes, and is therefore admissible pursuant to Rule 404(b).

**A.    Relevant Facts**

The Government recently discovered that a hard drive (the "Drive") in Alimehmeti's possession at the MCC was modified to remove discovery materials and contains a plethora of terrorist propaganda materials, including particular files that were produced by the Government not to Alimehmeti, but to Rahimi, who was recently convicted on all counts after trial for bombing the Chelsea neighborhood in Manhattan in September 2016.  *See United States* v. *Rahimi*, 16 Cr. 760 (RMB).  In mid-November 2017, the MCC provided the Drive to the

29

Government, after MCC staff confiscated it from the locker assigned to Alimehmeti in the law library area of the MCC.  Inmates are permitted to review their discovery materials in that area of the prison, often in close proximity to each other.  Each inmate's locker, including Alimehmeti's, is secured by a combination lock, and MCC staff provides the combination to the single inmate to whom the locker is assigned.[9]

Based on the FBI's ongoing review of the Drive, it appears that since the Drive was originally produced by the Government to Alimehmeti in summer 2016, discovery materials have been deleted from the Drive, terrorist propaganda materials have been added to the Drive, and the Drive now consists largely or entirely of terrorist propaganda materials.  For example, the Drive contains, among other materials, audio files of lectures by now-deceased AQAP leader al-Awlaki; various issues of *Inspire*, a terrorist propaganda publication periodically disseminated by AQAP; and *nasheeds* espousing jihadist ideology.  At least some of the materials on the Drive are files that were located on electronic devices seized from Rahimi during the FBI's investigation of Rahimi, and were not included among the materials produced by the Government to Alimehmeti.  In other words, at least some of the terrorist propaganda materials on the Drive are files that were transferred, within the MCC, from media produced to Rahimi to the Drive maintained by Alimehmeti.  The files on Alimehmeti's Drive that originated from

---

[9] The Government learned that the Drive found in Alimehmeti's locker appeared to contain terrorist propaganda materials originating from Rahimi's discovery materials on Saturday, November 18, 2017.  That same day, the Government provided notice to the defense of its intention to introduce such evidence at trial pursuant to Rule 404(b).

Rahimi's discovery materials include, for example, multiple issues of the AQAP publication *Inspire*, including issue 16, which describes how to build pressure-cooker bombs and celebrates the September 2016 attack carried out by Rahimi.  In the course of the MCC's investigation of these activities within the prison, MCC staff also located a notebook belonging to Rahimi in Rahimi's cell (the "Rahimi Notebook").  The Rahimi Notebook includes several pages itemizing particular electronic files of terrorist propaganda materials, and Alimehmeti's Drive appears to contain some of those files.

The Government also recently discovered that another inmate at the MCC ("Inmate-1") was in possession of a disc (the "Disc") containing terrorist propaganda materials originating from discovery produced to Alimehmeti and Rahimi.  The FBI's review of the Disc, which is ongoing, has revealed that the contents of the Disc include terrorist propaganda materials that were produced to Alimehmeti in discovery, as well as terrorist propaganda materials that were produced to Rahimi in discovery.  For example, the Disc appears to contain certain pro-ISIS and jihadist materials that were located on Alimehmeti Laptop-2 (including propaganda videos disseminated by ISIS media outlets, *nasheeds*, and documents promoting martyrdom), and produced to Alimehmeti in discovery.  In other words, Inmate-1 possessed a disc containing terrorist propaganda materials that had been transferred from electronic media produced to Alimehmeti and Rahimi in discovery.

### B.    Applicable Law

It is well established that evidence of "other acts" is admissible under Rule 404(b) if the evidence (1) is advanced for a proper purpose; (2) is relevant to an issue in the case; and (3) its

probative value is not substantially outweighed by any unfair prejudicial effect.  *See* Fed. R. Evid. 404(b) (evidence of a defendant's other crimes, wrongs, or acts is admissible for purposes other than showing propensity, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident").  If requested, such evidence must be admitted with limiting instructions to the jury.  *See United States* v. *Zackson*, 12 F.3d 1178, 1182 (2d Cir. 1993); *United States* v. *Pitre*, 960 F.2d 1112, 1119 (2d Cir. 1992).  The Second Circuit "follow[s] the inclusionary approach to the admission of prior-act evidence," such that "evidence of prior crimes, wrongs, or acts is admissible for any purpose other than to show a defendant's criminal propensity."  *United States* v. *LaSanta*, 978 F.2d 1300, 1307 (2d Cir. 1992) (internal quotation marks omitted).  As noted, one of the proper purposes for admitting other act evidence is to prove a defendant's intent.  A defendant's *mens rea* is in issue unless the defendant has expressed with sufficient clarity a decision not to dispute that element of the offense.  *See United States* v. *Colon*, 880 F.2d 650, 656-57 (2d Cir. 1989); *Zackson*, 12 F.3d at 1182; *United States* v. *Nachamie*, 101 F. Supp. 2d 134, 138-39 (S.D.N.Y. 2000) (citing *United States* v. *Figueroa*, 618 F.2d 934, 942 (2d Cir. 1980)).  Evidence that is admissible under Rule 404(b) may be introduced by the Government in its direct case.  *See Zackson*, 12 F.3d at 1183; *see also United States* v. *Inserra*, 34 F.3d 83, 90 (2d Cir. 1994).

Such evidence also must satisfy Rule 403, which provides that "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Fed. R. Evid. 403.  "In this circuit,

evidence is not unduly prejudicial when it is not 'more inflammatory than the charged crime[s].'" *United States* v. *Herron*, No. 10 Cr. 615 (NGG), 2014 U.S. Dist. LEXIS 65131, at *16 (E.D.N.Y. May 12, 2014) (quoting *United States* v. *Livoti*, 196 F.3d 322, 326 (2d Cir. 1999)).  Thus, the touchstone of the prejudice analysis under Rule 403 is whether the proffered Rule 404(b) evidence does "not involve conduct any more sensational or disturbing than the crimes with which [the defendant] [is] charged." *United States* v. *Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990).

### C.    Discussion

Evidence of Alimehmeti's involvement with Rahimi in sharing and possessing terrorist propaganda materials within the MCC is indicative of Alimehmeti's continued support for terrorist ideology, highly probative of his motive, intent, absence of mistake, and lack of accident in providing material support to an FTO as charged in the Indictment, and plainly admissible pursuant to Rule 404(b).  The evidence that the Government presently intends to introduce on this subject includes: terrorist propaganda materials contained on the Drive recovered from Alimehmeti's locker at the MCC; testimony and forensic evidence showing that certain of the materials on the Drive originated from Rahimi's discovery materials, as they were initially located on electronic devices seized from Rahimi; terrorist propaganda materials contained on the Disc possessed by Inmate-1; testimony and forensic evidence showing that certain of the materials on the Disc originated from Alimehmeti's discovery materials, and certain of those materials originated from Rahimi's discovery materials; and pages from the Rahimi Notebook identifying certain of the electronic files of terrorist propaganda materials that appear on the

33

Drive and Disc.[10]  The Government is continuing to assess this recently discovered evidence of Alimehmeti's conduct at the MCC, and reserves the right to seek protective measures, to the extent necessary, in connection with the presentation of such evidence at trial.  The Government notes that it does not presently intend to introduce any materials from the Drive or Disc that contain graphic depictions of violence.

Such evidence fits squarely within the parameters of Rule 404(b).  It is highly probative of Alimehmeti's state of mind—particularly his motive and intent—in committing the charged terrorism offenses.  Alimehmeti is charged with providing and attempting to provide material support to a designated FTO, ISIS, over the course of at least approximately a year and a half, including by seeking to help other supporters travel overseas to join ISIS.  The Government will offer evidence at trial—including terrorist propaganda materials located on electronic devices seized from Alimehmeti and statements made by Alimehmeti during recorded meetings with the UCs—that Alimehmeti was motivated by his fervent support of jihadist and terrorist ideology, and that he was interested not only in joining ISIS himself, but also in radicalizing others so that they would support the cause.  Indeed, in late 2015, during a telephone conversation captured by

---

[10] The Government notes that the lists of files in the Rahimi Notebook do not constitute hearsay, as they will be offered not for the truth of any matter asserted therein, but for the fact of their existence.  *See* Fed. R. Evid. 801(c).  Nor is there any issue as to the authenticity of the notebook, which was seized from Rahimi's cell and is self-authenticating based on its contents, which include not only such lists of files, but also notes regarding classes attended by Rahimi at the MCC.  *See United States* v. *Maldonado-Rivera*, 922 F.2d 934, 957 (2d Cir. 1990) (evidence can be authenticated by "distinctive characteristics" such as "'[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with the circumstances'" (quoting Fed. R. Evid. 901(b)(4))).

the FBI between Alimehmeti and another ISIS supporter, Alimehmeti conveyed that he was seeking to radicalize other individuals in his neighborhood, including a local sheikh, and that if he ended up in jail, he would be viewed as a person who radicalizes other inmates.  Evidence of Alimehmeti's dissemination of terrorist propaganda materials at the MCC is directly probative of his efforts to radicalize other individuals.  Such evidence is also highly relevant in demonstrating the absence of any accident or mistake in Alimehmeti's commission of the charged crimes, as it further shows, among other things, that it was no accident or coincidence that Terrorist Propaganda Materials were located on the electronic devices seized from Alimehmeti in the course of the investigation, *see supra* at 14-19.

Evidence that Alimehmeti collaborated with Rahimi to possess a Drive at the MCC that was modified to become a veritable cache of terrorist propaganda materials is, in short, powerful evidence of Alimehmeti's dedication to terrorist ideology.  The Government will offer such evidence to address any doubt that Alimehmeti was, and is, a dedicated believer in terrorist ideology and that he acted to support that cause.  *See, e.g.*, *United States* v. *Mustafa*, 406 F. App'x 526, 528 (2d Cir. 2011) (affirming admission of Rule 404(b) evidence showing that defendant charged with providing material support to al Qaeda had also "associated with terrorist groups other than al Qaeda," as such evidence was "highly probative of [the defendant's] state of mind, including his intent and knowledge" (internal quotation marks omitted)); *United States* v. *Ali*, 799 F.3d 1008, 1026-27 (8th Cir. 2015) (affirming admission of Rule 404(b) evidence showing that defendant charged with providing material support to al

Shabaab (a designated FTO) had associated with another jihadist group generally aligned with al Shabaab, as such evidence "helped to establish [the defendant's] intent for the charged crimes").

Rule 403 does not provide any basis for excluding this evidence.  Evidence of Alimehmeti's conduct at the MCC is significantly less inflammatory than the charged conduct, which includes stockpiling weapons that could be used in an attack, expressing support to associates for the mass-casualty terrorist attacks in Paris and Brussels, drawing inspiration from propaganda videos graphically depicting ISIS fighters beheading captives, and assisting others to travel overseas to join ISIS.  Moreover, the Government's evidence of the charged conduct already includes various terrorist propaganda materials located on Alimehmeti's electronic devices, *see supra* at 14-19, such that the presentation of additional such materials possessed by Alimehmeti at the MCC does not present any Rule 403 issue (and, as noted, the Government does not presently intend to introduce materials from the Drive or Disc depicting graphic violence, further eliminating any potential Rule 403 issue).  Additionally, in order for the jury to understand Alimehmeti's conduct at the MCC, it is necessary to explain that certain of the files on Alimehmeti's Drive originated from electronic devices seized from Rahimi during the FBI's investigation of Rahimi, to provide some general context regarding Rahimi and the nature of that investigation, and to explain that those files were transferred from (a) media produced to Rahimi in discovery to (b) the Drive possessed by Alimehmeti (as corroborated by the Rahimi Notebook, which evidences the coordinated effort to share propaganda materials within the prison).  All of that evidence is germane to understanding the nature of Alimehmeti's conduct at the MCC, directly relevant to establish his motive and intent—specifically, his allegiance to and support of

36

terrorist ideology, including his association and collaboration with others sharing those radical beliefs—and certainly no more sensational or disturbing than the charged conduct.

In sum, the probative value of the Government's Rule 404(b) evidence relating to Alimehmeti's involvement with Rahimi in the sharing and possession of terrorist propaganda materials while incarcerated far outweighs any potential prejudicial effect. *See Roldan-Zapata*, 916 F.2d at 804 (evidence of additional cocaine transactions properly admitted under Rule 404(b) and Rule 403 in narcotics prosecution, as the evidence "did not involve conduct any more sensational or disturbing than the crimes with which [defendant] was charged"); *United States* v. *Gilliam*, 994 F.2d 97, 100 (2d Cir. 1993) ("Evidence is prejudicial only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." (internal quotation marks omitted)); *United States* v. *Jimenez*, 789 F.2d 167, 171 (2d Cir. 1986) ("The more pertinent evidence is, the more prejudicial it is.  What 'prejudice' as used in Rule 403 means is that the admission is, as the rule itself literally requires, 'unfair' rather than 'harmful.'").  In any event, any risk of prejudice could be further mitigated by a standard limiting instruction from the Court addressing the purposes for which Rule 404(b) evidence is properly considered.

37

Accordingly, the evidence discussed above showing Alimehmeti's involvement with Rahimi in disseminating and possessing terrorist propaganda materials at the MCC is properly admitted under Rule 404(b) and Rule 403.[11]

## IV.   The Defendant Is Not Permitted to Offer His Own Out-of-Court Statements

Under well-established law, the defendant is not permitted to offer his own out-of-court statements at trial.  The Government's proof at trial will consist, in part, of statements made by the defendant, including during recorded meetings with the UCs, electronic and telephonic communications with associates, and online posts.  When offered by the Government, the defendant's statements are not hearsay and are admissible.  *See* Fed. R. Evid. 801(d)(2)(A) ("A statement that meets the following conditions is not hearsay: . . . The statement is offered against an opposing party and . . . was made by the party in an individual or representative capacity.").

However, "[w]hen the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible."  *United States* v. *Marin*, 669 F.2d 73, 84 (2d Cir. 1982); *accord United States* v. *Kadir*, 718 F.3d 115, 124 (2d Cir. 2013) ("A

---

[11] In addition to the above-discussed evidence of Alimehmeti's conduct at the MCC, the Government previously provided notice to the defense, pursuant to the schedule set by the Court, that it may offer at trial evidence relating to Alimehmeti's two visits in 2014 to the Fishkill Correctional Facility to meet with inmate Mohamed Mamdouh ("Mamdouh"), who was serving a five-year sentence after pleading guilty to terrorism offenses in New York State court stemming from his participation in a plot to blow up synagogues in Manhattan.  While the Government may introduce photographs taken during those visits showing Alimehmeti and Mamdouh making the index-finger-pointing gesture commonly used by ISIS supporters to symbolize support for ISIS—which photographs are admissible as direct proof of Alimehmeti's support for ISIS during the time period of the charged crimes—the Government does not intend to introduce evidence relating to the identity of Mahmoud or the location of such photographs.

defendant may not introduce his own prior out-of-court statements because they are hearsay, and . . . not admissible." (internal quotation marks omitted)).  Further, the rule of completeness, *see* Fed. R. Evid. 106, "does not render admissible evidence that is otherwise inadmissible." *United States* v. *Terry*, 702 F.2d 299, 314 (2d Cir. 1983).  Instead, the rule of completeness requires admission of a hearsay statement only when the statement is "*necessary* to explain the admitted portion, to place the admitted portion in context, to avoid misleading the jury, or to ensure fair and impartial understanding of the admitted portion."  *United States* v. *Johnson*, 507 F.3d 793, 796 (2d Cir. 2007) (emphasis added) (quoting *United States* v. *Castro*, 813 F.2d 571, 575-76 (2d Cir. 1987)).[12]

Accordingly, courts have routinely precluded defendants from offering their own self-serving statements, including through cross-examination of the Government's witnesses.  *See, e.g.*, *United States* v. *Jackson*, 180 F.3d 55, 73 (2d Cir. 1999) (affirming trial court's preclusion of portion of tape that included defendant's "own self-serving statements"); *United States* v. *Bumagin*, 136 F. Supp. 3d 361, 375 (E.D.N.Y. 2015) ("Defendant is precluded from cross-examining the Government's witnesses in an effort to elicit exculpatory statements made by Defendant because such statements are inadmissible hearsay"); *United States* v. *Black*, No. 13 Cr. 316 (DLI), 2014 WL 5783067, at *1 (E.D.N.Y. Nov. 5, 2014) (granting Government's

---

[12] Moreover, the defendant bears the burden of showing that the portion of a statement that he seeks to offer is necessary to clarify or explain the portion offered by the Government.  *See United States* v. *Glover*, 101 F.3d 1183, 1190 (7th Cir. 1996) ("[T]he proponent of the additional evidence sought to be admitted must demonstrate its relevance to the issues in the case, and must show that it clarifies or explains the portion offered by the opponent.").

motion *in limine* to preclude defendant from eliciting defendant's out-of-court statements because "[w]hen the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible"); *United States* v. *Wilkerson*, 84 F.3d 692, 695 (4th Cir. 1996) recognizing that the Federal Rules of Evidence "do not provide an exception for self-serving, exculpatory statements made by a party which are being sought for admission by that same party").

Under this well-settled law, the defendant should not be permitted to offer his own out-of-court statements, including statements made during recorded conversations, unless and until the defendant establishes that the statement is admissible pursuant to a hearsay exception or provision of law.

**V.     The Defendant Should Not Be Permitted to Present an Entrapment Defense at Trial Unless and Until He Proffers Evidence to the Court That Is Capable of Supporting Such a Defense**

There is no factual basis to support an entrapment defense in this case.  The Court therefore should preclude the defendant from arguing entrapment to the jury at trial, unless and until the defendant points to evidence that could support such a defense—which he cannot.

**A.     Applicable Law**

"[A] valid entrapment defense has two related elements: government inducement of the crime, and a lack of predisposition on the part of the defendant to engage in criminal conduct." *Mathews* v. *United States*, 485 U.S. 58, 63 (1988).  "[A] defendant hoping to assert the entrapment defense bears the burden of establishing inducement by a preponderance of the evidence."  *United States* v. *Brand*, 467 F.3d 179, 190 (2d Cir. 2006); *see United States* v.

40

*Kopstein*, 759 F.3d 168, 173 (2d Cir. 2014) (a defendant seeking to pursue an entrapment

defense bears the burden of producing "credible evidence of government inducement").  To

satisfy the burden of establishing inducement, a defendant must do more than "simply point to

the [G]overnment's use of an undercover agent."  *Brand*, 467 F.3d at 190 (internal quotation

marks omitted).  Because "stealth and strategy are necessary weapons in the arsenal of the police

officer, and artifice and stratagem may be employed to catch those engaged in criminal

enterprises, that the government employed either does not necessarily mean that it was the

government that initiated the crime."  *Id.* (internal quotation marks omitted); *see United States* v.

*McKinley*, 70 F.3d 1307, 1312 (D.C. Cir. 1995) ("Even when a government agent repeatedly

requests that the defendant engage in criminal conduct, inducement is not established unless the

requests are coupled with persuasive overtures." (internal quotation marks omitted)).

     If a defendant meets his burden of establishing inducement, "[t]he burden then shifts to

the government to show that the defendant was predisposed to commit the crime beyond a

reasonable doubt."  *United States* v. *Gagliardi*, 506 F.3d 140, 149 (2d Cir. 2007).  "A defendant

is predisposed to commit a crime if he is ready and willing without persuasion to commit the

crime charged and awaiting any propitious opportunity to do so."  *United States* v. *Salerno*, 66

F.3d 544, 547 (2d Cir. 1995) (internal quotation marks omitted).  As the Second Circuit

explained in *Salerno*:

> The government may show that a defendant was predisposed to
> commit the crime charged by demonstrating: "(1) an existing course
> of criminal conduct similar to the crime for which [the defendant] is
> charged, (2) an already formed design on the part of the accused to
> commit the crime for which he is charged, or (3) a willingness to

41

commit the crime for which he is charged as evidenced by the
accused's ready response to the inducement."

*Id.* (quoting *United States* v. *Valencia*, 645 F.2d 1158, 1167 (2d Cir. 1980)).

## B.    Discussion

The evidence in this case overwhelmingly establishes that the defendant was not induced
to commit the terrorism-related crimes charged in the Indictment, and that he was predisposed to
commit those offenses.  For example, the electronic devices seized from Alimehmeti by U.K.
authorities when he was denied entry into the U.K. in December 2014—which was more than
*eight months* before his first contact with any of the UCs—contain an array of evidence of
Alimehmeti's radicalization, his support for terrorist ideology and particularly ISIS, and his
desire to travel, and help others travel, to ISIS-controlled territory to join ISIS.  The contents of
those devices include, among other evidence, the following:

- a photograph showing Alimehmeti in his Bronx apartment, with an ISIS flag
  displayed on the wall;

- multiple photographs of Alimehmeti making the index-finger-pointing gesture
  commonly used by ISIS supporters to symbolize support for ISIS;

- multiple images of the ISIS flag;

- multiple images of jihadist fighters carrying assault rifles;

- an ISIS propaganda video graphically depicting and celebrating ISIS violent
  combat operations, including the execution of captives;

- multiple audio files of lectures by al-Awlaki, the now-deceased former leader of
  AQAP, promoting jihad and martyrdom; and

- evidence that on September 2014, just weeks before his first failed attempt to
  reach Europe, Alimehmeti ran a Google search for "do I need a visa to enter
  Turkey."

42

The cellphone seized from Alimehmeti by U.K. authorities in December 2014 also showed that, in September 2014, Alimehmeti attempted to facilitate the travel of another apparent ISIS supporter ("Person-1") to the Middle East to join ISIS.  In the course of an online chat, Person-1 asked Alimehmeti how to travel "to dawla" [*i.e.*, to ISIS] from a particular country in Africa.  Alimehmeti responded: "the only way i know is from turkey but u might not be able to even go with out visa."  As the chat continued, Alimehmeti informed Person-1 that "u deff need a passport before u even try."  Alimehmeti then instructed Person-1 to download a particular encrypted messaging application ("Application-1") "on ur phone nd ill give u a con[t]act with a muj [*i.e.*, mujahid, an Arabic term for one engaged in jihad] to help u."  Shortly thereafter, Alimehmeti sent a message to Person-1 stating: "Mujahid_muhajir."  The evidence will show that the Application-1 account with username "Mujahid_muhajir" is associated with the Twitter account "@abdullahhabashi," which was used in August 2014—that is, the month before Alimehmeti passed the "Mujahid_muhajir" Application-1 address to Person-1—to post various tweets indicating that the user of "@abdullahhabashi," and by extension "Mujahid_muhajir," was a Syria-based ISIS member who encouraged others to travel to Syria to join ISIS.

Other evidence, including online purchase records, will further establish that by early 2015, prior to any contact between Alimehmeti and the UCs, Alimehmeti had begun amassing combat knives and military-type gear at his Bronx apartment—the type of equipment that could be used to carry out a lone-wolf attack or potentially in the course of traveling to the Middle East

43

to join and fight for ISIS.  *See supra* at 4.  Alimehmeti continued stockpiling combat knives and other tactical equipment through the spring of 2016, when he was ultimately arrested.

In addition to the communications with Person-1 discussed above, over the course of 2015 into 2016, Alimehmeti engaged in telephone conversations and electronic messaging exchanges with various other individuals, during which Alimehmeti continued to express his support for ISIS and his desire to join ISIS overseas.  The UCs did not initiate, or otherwise have any involvement in, these communications.  For example, in November and December 2015, Alimehmeti engaged in telephone conversations with another ISIS supporter ("Person-2"), which included extended discussion regarding their shared desire to join ISIS overseas, and whether it would be more feasible to join ISIS in Syria or Libya.  Alimehmeti and Person-2 used coded language during those communications, referring to ISIS-controlled territory as the "amusement park," to traveling overseas to join ISIS as taking a "vacation," and to Syria and Libya as "S Town" and "L Town," respectively.  In the course of those conversations, Alimehmeti stated, in substance and in part, that if he had the opportunity to travel to ISIS-controlled territory, he would do so, but that he currently lacked a "P" (*i.e.*, passport).  Alimehmeti also conveyed that he wished he had traveled to Syria earlier, when it was easier to reach ISIS-controlled territory.

On or about December 30, 2015, in the course of an exchange of audio messages with another individual ("Person-3"), Alimehmeti conveyed his belief that he was likely under investigation as a result of his association with ISIS.  Alimehmeti stated that "they [*i.e.*, law enforcement] probably already have the team that will do my house."  Alimehmeti also expressed his intention to take certain countermeasures to frustrate the efforts of law

44

enforcement.  He noted that he had "the flag" (*i.e.*, the ISIS flag) in his apartment, and that he would need to delete materials from his computer.  Alimehmeti further indicated that he was prepared to booby-trap his apartment such that law enforcement officers would be harmed if they entered, stating that he planned to "put shit in my house, so as soon as they come in they will step on shit."  In the course of his communications with non-law enforcement personnel, as described above, Alimehmeti also explicitly stated his support for mass-casualty terrorist attacks in Paris and Brussels for which ISIS claimed responsibility.  *See supra* at 5-6.

Alimehmeti's interactions with the UCs further demonstrate Alimehmeti's predisposition and the absence of government inducement.  For example, on February 29, 2016, during a recorded meeting with UC-2, Alimehmeti raised the subject of whether he (Alimehmeti) was bound by a "covenant of security" with the United States.[13]  Alimehmeti conveyed his belief that he was not, and that killing Americans therefore would be permissible under the version of Islamic law that he espoused.  Alimehmeti had expressed a similar belief to associates (*i.e.*, non-law enforcement personnel) on multiple prior occasions, including on February 23, 2016, when Alimehmeti conveyed his belief to an associate, via telephone, that the United States was at war with Islam, such that he (Alimehmeti) was not bound by a covenant of security with the United States.  In the course of the February 29, 2016 meeting with UC-2, Alimehmeti further asserted, in support of his rejection of any covenant of security, that "the Caliph"—a reference to ISIS's

---

[13] The phrase "covenant of security" refers to the view, popularized by British jihadists in the 1990s but not generally held by supporters of ISIS, that Muslims should refrain from conducting attacks in territories where the local government provides them with safety and security.

leader, al-Baghdadi—had instructed ISIS supporters to carry out attacks in their homelands, if they were unable to make *hijra* to join ISIS in ISIS-controlled territory.

On March 14, 2016, during a recorded meeting with UC-1 and UC-2 in Alimehmeti's apartment, Alimehmeti accessed and played an ISIS propaganda video on his laptop titled "Clashing of the Swords, Part 4," which graphically depicts ISIS fighters violently murdering other individuals using assault rifles, destroying vehicles using improvised explosive devices, and executing captives. Alimehmeti stated that he had already watched the first and third parts of the series, and had been waiting for this fourth installment. Also during that meeting, Alimehmeti opened a map on his computer, magnified the area of the Turkey-Syria border, and discussed various routes that could be used to cross from Turkey into Syria to join ISIS. Alimehmeti asserted that the best route would be to travel from Albania to Greece, from Greece to Turkey, and from Turkey into Syria, but that it would be necessary to establish a "contact" in that region to facilitate the travel. Alimehmeti further indicated that he could use the ruse of a family visit to enter Albania and complete the first leg of the journey to Syria.

Alimehmeti's predisposition, and the lack of government inducement, are also readily apparent in connection with Alimehmeti's efforts to facilitate UC-4's purported travel to join ISIS overseas in the spring of 2016. When UC-2 showed Alimehmeti a photograph of a purported ISIS supporter (UC-3) who had successfully joined ISIS in Syria, Alimehmeti immediately expressed excitement and apparent jealousy, and asked to be put in contact with the "connections" who had facilitated UC-3's travel. About a week later, when UC-2 presented Alimehmeti with the opportunity to help another purported ISIS supporter (UC-4) travel to Syria

46

to join ISIS, Alimehmeti again immediately expressed excitement and his eagerness to assist, and even asked if he could accompany UC-4 overseas to join ISIS, stating that he was "ready to fucking go with [UC-4]."  When UC-2 left Alimehmeti with UC-4, Alimehmeti assumed the initiative, taking UC-4 to multiple different stores, at which Alimehmeti helped UC-4 pick out and purchase various supplies for UC-4's purported *hijra* to join ISIS.  He advised UC-4 about the most secure encrypted messaging applications to use when communicating with other "brothers" (*i.e.*, ISIS supporters).  At one point, Alimehmeti even suggested that they go to his apartment in the Bronx, so that Alimehmeti could give UC-4 additional supplies that Alimehmeti had stored there (as described above, Alimehmeti had stockpiled various military-type equipment at his apartment).  Later, Alimehmeti also took the affirmative steps of writing his contact information on a piece of paper, giving it to UC-4, and asking that it be provided to the individual purportedly facilitating UC-4's travel.

The foregoing facts, which represent a mere sampling of the evidence that the Government expects to present at trial, make clear that the defendant cannot establish an entrapment defense as a matter of law.  The defendant has not, and cannot, satisfy his burden of producing "credible evidence of government inducement."  *Kopstein*, 759 F.3d 168, 173 (2d Cir. 2014).  The UCs did not induce Alimehmeti to support ISIS; they merely presented him with the *opportunity* to help a purported ISIS supporter to travel overseas and join ISIS.  *See United States* v. *Young*, 78 F.3d 758, 762 (1st Cir. 1996) (finding no inducement where there was no evidence of "coercion, intimidation or any promise of benefits other than the opportunity to commit the crime"); *United States* v. *Mendoza-Salgado*, 964 F.2d 993, 1004 (10th Cir. 1992)

47

(finding no inducement where "the government informer did no more than advertise [an undercover agent's] interest in purchasing cocaine" and set up the controlled transaction). It is well established that the mere fact that undercover agents were involved in the investigation does not enable the defendant to satisfy his burden of establishing inducement. *See Brand*, 467 F.3d at 190.

In this vein, there is no evidence whatsoever that the UCs used coercion, intimidation, or the promise of benefits to induce Alimehmeti to support ISIS. To the contrary, as reflected above, when Alimehmeti began meeting with UC-1 and UC-2 in September 2015, he was already an established ISIS supporter. During his subsequent meetings with the UCs, Alimehmeti repeatedly declared his support for ISIS and jihadist ideology, and his interest in traveling to Syria to join ISIS. Further, with respect to Alimehmeti's provision of assistance to UC-4, the facts set forth above demonstrate precisely the opposite of government inducement. Alimehmeti needed no encouragement or prompting; instead, he jumped at the opportunity when it was provided to him, and took various affirmative steps clearly demonstrating his eagerness not only to assist UC-4 but also to travel himself to join ISIS overseas. Indeed, Alimehmeti had already attempted to help another ISIS supporter—Person-1—travel to Syria to join ISIS more than a year earlier. Because the defendant cannot meet his burden of establishing inducement, the entrapment defense is unavailable as a matter of law, and he should not be permitted to argue it at trial.

Assuming *arguendo* that the defendant could meet his burden of showing inducement— and he cannot—the evidence summarized above leaves no doubt that Alimehmeti was

48

predisposed to, and indeed had already attempted to, provide material support to ISIS well before the UCs became involved in the investigation.  The evidence of Alimehmeti's predisposition includes the content of his electronic devices seized by U.K. authorities in December 2014 (*i.e.*, more than eight months before his first contact with UC-1 and UC-2), which demonstrate his commitment to terrorist ideology, support of ISIS, and attempt to facilitate another ISIS supporter's travel to Syria to join ISIS.  The evidence also includes Alimehmeti's stockpiling, beginning in early 2015, of combat knives and military-type equipment that could be used to carry out a lone-wolf attack—consistent with Alimehmeti's professed belief that killing American civilians was permissible under Islamic law.  Similarly, Alimehmeti's immediate acceptance of the proposal to help UC-4 travel to join ISIS further demonstrates his predisposition. *See United States* v. *Cromitie*, 727 F.3d 194, 206 (2d Cir. 2013) ("[T]he Supreme Court has stated that if the defendant 'had promptly availed himself of the criminal opportunity' presented by government agents, 'it is unlikely that his entrapment defense would have warranted a jury instruction.'" (quoting *Jacobson* v. *United States*, 503 U.S. 550, 548 (1992))); *see also United States* v. *Yang Chia Tien*, 638 F. App'x 19 (2d Cir. 2015) ("A defendant's ready response to a government agent's proposition may show the defendant's predisposition, even where the government agent, rather than the defendant, first broaches the subject of the illegal scheme.").  The recently discovered evidence showing that Alimehmeti has been involved in disseminating terrorist propaganda materials within the MCC since his arrest only further confirms his deep allegiance to terrorist ideology, and is yet additional proof of his predisposition to commit the charged terrorism offenses in the absence of law enforcement.  In

49

short, this was not entrapment, it was disruption—the disruption by the FBI of an established

ISIS supporter and resident of New York City, who had been denied the ability to travel overseas

and then amassed weapons at his Bronx apartment that could be used to carry out an attack.

As the foregoing makes clear, there is no factual basis to support an entrapment defense

in this case. Any attempt by the defendant to assert entrapment at trial (for example, during his

opening statement or through cross-examination) would confuse the jury and prejudice the

Government, especially if an entrapment charge ultimately is not given by the Court because it

would be, as explained herein, unwarranted. Thus, the Court should preclude the defendant from

asserting the defense unless and until he proffers evidence to support it, which he cannot. *See*

*United States* v. *Hurtado*, 47 F.3d 577, 585 (2d Cir. 1995) ("If the government . . . presents

uncontradicted proof of predisposition, the entrapment defense is precluded as a matter of law."

(citing *United States* v. *Dunn*, 779 F.2d 157, 159 (2d Cir. 1985))); *United States* v. *Mayo*, 705

F.2d 62, 70 (2d Cir. 1983) (holding that "the entrapment defense will not go to the jury in the

face of substantial evidence of propensity unless the defendant produces some evidence to

contradict directly the prosecution's showing"); *United States* v. *Sistrunk*, 622 F.3d 1328, 1333

(11th Cir. 2010) ("The defendant's right to present the entrapment defense is conditional, since

before an entrapment defense may be presented to the jury, an evidentiary foundation for a valid

entrapment defense must be present."); *see also*, *e.g.*, *United States* v. *Aguinaga*, 643 F. App'x

858, 860-61 (11th Cir. 2016) (affirming district court's granting of Government's pretrial motion

to preclude entrapment defense, because defendant "failed to produce sufficient evidence of

government inducement," as "the government's mere suggestion of a crime or initiation of

50

contact is not enough" to satisfy defendant's burden); *United States* v. *Blitch*, 773 F.3d 837, 843-46 (7th Cir. 2014) (affirming district court's granting of Government's pretrial motion to preclude entrapment defense, concluding that defendants had failed to proffer evidence showing that they were "subject to anything that would transform the government's solicitation into something more than an ordinary opportunity to commit a crime" (internal quotation marks omitted)); *United States* v. *Diaz-Maldonado*, 727 F.3d 130, 135-40 (1st Cir. 2013) (affirming district court's pretrial ruling precluding defense from raising entrapment defense in opening statement, finding that the defendant had failed to meet his "entry-level burden of production" with respect to inducement, and citing "the need to avoid having criminal trials turn into diversionary examinations of long-permitted operations of law enforcement").[14]

---

[14] In the alternative, if the defendant is permitted to advance a purported entrapment defense at trial, but the evidence adduced at trial is insufficient to support an entrapment charge, the Government respectfully requests that the Court instruct the jury that entrapment is not a defense in this case with the following curative instruction:

> There has been some mention in this trial about entrapment. Entrapment is a complicated legal doctrine, but it has nothing at all to do with this case. I am instructing you as a matter of law that entrapment is not a defense in this case and you are not permitted to consider it during your deliberations.

*See United States* v. *McDarrah*, No. 05 Cr. 1182 (PAC) (S.D.N.Y. Dec. 19, 2006) (giving similar instruction regarding entrapment).

**VI.     The Court Should Take Judicial Notice of ISIS's Designation as an FTO**

The Government respectfully requests that the Court take judicial notice at trial of the designation of ISIS as an FTO, effective October 15, 2004.  ISIS's designation as an FTO is an element of Count One of the Indictment.  *See* 18 U.S.C. §§ 2339B(a)(1), 2339(a).

The Federal Rules of Evidence allow a court to take judicial notice of adjudicative facts—such as whether ISIS is, in fact, a designated FTO—when those facts "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(1).  Further, federal courts are required to judicially notice items published in the Federal Register.  *See* 44 U.S.C. § 1507 (providing that "[t]he contents of the Federal Register shall be judicially noticed"); *United States* v. *Wood,* 335 F.3d 993, 1001 (9th Cir. 2003) (holding that the district court complied with federal law by judicially noticing a rule published in the Federal Register).

As to ISIS, the relevant portions of the Federal Register include the following:

- On October 15, 2004, the U.S. Secretary of State designated al-Qa'ida in Iraq ("AQI"), then known as Jam'at al Tawhid wa'al-Jihad, as an FTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist under section 1(b) of Executive Order 13224.  *See* 69 Fed. Reg. 61292 (October 15, 2014).

- On May 15, 2014, the Secretary of State amended the designation of AQI as an FTO to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name.  *See* 79 Fed. Reg. 27972 (May 15, 2014).  The Secretary also added the following aliases to the ISIL listing: the Islamic State of Iraq and al-Sham ("ISIS"—which is how the FTO is referenced herein), the Islamic State of Iraq and Syria, ad-Dawla al Islamiyya fi al-'Iraq wa'sh'Sham, Daesh, Dawla al Islamiya, and Al-Furqan Establishment for Media Production.  *Id.*

- On September 21, 2015, the Secretary of State added the following aliases to the FTO listing: Islamic State, ISIL, and ISIS.  *See* 80 Fed. Reg. 58804 (September 30, 2014).

To date, ISIS remains a designated FTO.  *See* U.S. Dep't of State, Foreign Terrorist Organizations, http://www.state.gov/j/ct/rls/other/des/123085.htm (last visited Dec. 8, 2017).

Based on the foregoing, and pursuant to 44 U.S.C. § 1507 and Rule 201, the Government respectfully requests that the Court take judicial notice of the fact that the Islamic State of Iraq and al-Sham—including its aliases the Islamic State of Iraq and the Levant, the Islamic State of Iraq and Syria, ad-Dawla al-Islamiyya fi al-'Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, Al-Furqan Establishment for Media Production, Islamic State, ISIL, and ISIS—is designated as an FTO, as determined by the U.S. Secretary of State and published in the Federal Register.  In the recent *El Gammal* prosecution, Judge Ramos granted a similar motion *in limine* by the Government, and issued an order taking judicial notice of ISIS's designation as an FTO.  Order, *United States* v. *El Gammal*, No. 15 Cr. 88 (ER), Dkt. No. 139 (Jan. 3, 2017).  A proposed order, substantially identical to the order issued in *El Gammal*, is attached as Exhibit A.[15]

## VII.   The Court Should Implement Certain Security Measures Relating to the UCs

The Government is contemporaneously filing, under seal and for *in camera* review, a classified motion (the "Motion") pursuant to Section 6 of CIPA, 18 U.S.C. app. 3 § 6, requesting the implementation of certain security measures (the "Security Measures") relating to (1) the

---

[15] The Government will confer with the defense in an effort to craft a stipulation regarding ISIS's designation as an FTO.  If those discussions lead to a stipulation obviating the need for the relief sought in Part VI herein, the Government will promptly advise the Court.

anticipated trial testimony of the UCs, and (2) materials produced pursuant to 18 U.S.C. § 3500

and/or *Giglio* v. *United States*, 405 U.S. 150 (1972), relating to the UCs (the "3500 Material").

The Government expects to call one or more of the UCs at trial to testify about their interactions

with Alimehmeti, and will produce 3500 Material pursuant to the schedule set by the Court.  The

classified Motion and supporting papers establish, among other things, that the Government has

a compelling interest in protecting from disclosure the true identities of the UCs, which are

classified with respect to their participation in this and other national security investigations, in

order to protect the safety of the UCs and their families, preserve the integrity of other national

security investigations, and maintain law enforcement's ability to deploy the UCs effectively in

an undercover capacity.  Accordingly, the Government respectfully requests that the Court

implement Security Measures including, among other protections, closing the courtroom to the

public during the UCs' testimony, such that only the Court, essential courtroom personnel, the

defendant, the defendant's counsel, and the Government's trial team are permitted to be present

in the courtroom, but provided that (a) a live audio broadcast of the UCs' testimony shall be

made available to the public at another location in the courthouse, and (b) transcripts of the UCs'

testimony shall be made available as soon as feasible following their testimony.

A proposed order reflecting the foregoing Security Measures (the "UC Protective Order")

is attached as Exhibit B.  Through the public docketing of (1) the notice of the fact of the filing

of the sealed, classified Motion seeking the above-specified Security Measures, and (2) the

proposed UC Protective Order, the public and the press will be afforded notice of the

Government's Motion seeking partial courtroom closure and an opportunity to lodge any

objections.  *See United States* v. *Alcantara*, 396 F.3d 189, 199-200 (2d Cir. 2005) (setting forth

notice procedures generally applicable to closure motions).

Additionally, for the reasons set forth in the Motion and supporting papers, the

Government respectfully requests that the Court implement certain Security Measures regarding

the UCs' 3500 Material, as specified in the proposed order attached as Exhibit C (the "3500

Protective Order").  The proposed 3500 Protective Order appropriately limits the dissemination

of the 3500 Material by, among other protections: (1) prohibiting the defense from using the

3500 Material for any purpose other than the defense of this action; (2) requiring that the 3500

Material be maintained in a safe and secure manner solely by the defendant's counsel;

(3) precluding the defendant from possessing the 3500 Material outside the presence of his

counsel; (4) prohibiting the defense from disclosing the 3500 Material other than to certain

designated persons, namely, paralegals, investigators, clerical personnel, and defense experts;

and (5) requiring the defense to return all 3500 Material at the conclusion of trial or when the

resolution of any appeal has become final.

55

## **CONCLUSION**

For the foregoing reasons, the Government respectfully submits that the Court should grant

the relief requested herein.

Dated:  New York, New York
        December 8, 2017

                                        Respectfully submitted,

                                        JOON H. KIM
                                        Acting United States Attorney for the
                                        Southern District of New York

                            By:    _____/s/_____
                                        Emil J. Bove III / George D. Turner
                                        Assistant United States Attorneys
                                        212-637-2444 / 2562