

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

---

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

December 19, 2017

<u>Via ECF & Email</u>
The Honorable Paul A. Engelmayer
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

      Re:    <u>United States</u> v. <u>Sajmir Alimehmeti</u>,
            **S1 16 Cr. 398 (PAE)**

Dear Judge Engelmayer:

      The Government respectfully submits this letter in response to the Court's December 13, 2017 Order (Dkt. No. 78), and to request that the Court conduct a *Curcio* proceeding relating to the potential conflict of interest posed by the concurrent representation of the defendant, Ahmad Khan Rahimi, and a defendant from the Eastern District of New York ("Defendant-1") by the Federal Defenders of New York ("Federal Defenders").

      In addition, based on the Court's inquiry at the December 12, 2017 conference, the Government has consulted with the Federal Bureau of Investigation and has no objection to members of the defendant's immediate family being present in the courtroom during the trial testimony of law enforcement personnel who acted in an undercover capacity during the investigation of the defendant ("UCs"). Enclosed as Exhibit A for the Court's consideration is a revised proposed order.

**I.    The Defendant Received Ample Notice—Over a Year Ago—of the Government's Theory Regarding Foreign Travel**

      In response to a question from the Court at the December 12 conference, defense counsel indicated, as an officer of the court, that it was "correct" that they "had no reason to think the government would argue that the defendant had an ISIL-related reason to travel abroad." (Tr.

20).[1]  The Court expressed skepticism at the time: "I certainly understood the travel abroad to be part and parcel of the allegation here." (*Id.*).  And that skepticism was well founded.

The charging instruments, the Government's May 24, 2016 bail argument, and discovery given to the defendant during the summer of 2016 all provided ample notice to the defense that the Government's theory of the case included its position that the defendant attempted to provide material support to ISIS—in the form of personnel—by traveling abroad to train with, support, and fight on behalf of this designated foreign terrorist organization.  Even in the absence of Count Two, the defendant's foreign travel, intended travel, false passport application, and recorded statements regarding these issues are relevant and admissible in support of this theory on Count One.  This is true for two separate reasons.  First, the travel, intended travel, and passport application are part of a course of conduct that itself rose to the level of an attempted violation of Section 2339B.  Second, those actions are probative of the defendant's intent in connection with the steps he took on May 17, 2016 to facilitate travel by a UC to Syria in order to join ISIS.

### A. Notice of the Government's Theory Regarding Foreign Travel

The May 23, 2016 Complaint contained two charges.  Count One charged the defendant with providing and attempting to provide material support to ISIS, in violation of Title 18, United States Code, Section 2339B.  Count Two charged the defendant with passport fraud, in violation of Title 18, United States Code, Section 1542.  Count One stated that the type of material support at issue "include[ed], among other things, personnel."  The statutory definition of "material support or resources" provides that the term includes "personnel" such as "1 or more individuals who may be or include oneself."  18 U.S.C. § 2339A(b)(1); *see also* 18 U.S.C. §§ 2339B(g)(4), 2339B(h).  As the Court observed at the December 12 conference, Count One of the underlying Indictment, which was filed on June 7, 2016, made explicit that the Government's material-support theory included that the defendant had provided and attempted to provide "personnel (including himself)" to ISIS.  (Dkt. No. 8).  Thus, these charging instruments made it "reasonably anticipatable to the defense," by June 2016, "that the Government might contend in support of Count One that the defendant himself had sought to travel abroad for the purpose of facilitating an act of international terrorism."  (Dkt. No. 78).[2]

---

[1] On multiple occasions in 2014 and 2015, the Secretary of State amended the designation of the relevant foreign terrorist organization ("FTO"), based in part on the group's public statements, to include the aliases "Islamic State," "ISIL," and "ISIS."  References at the December 12 conference and in the Complaint to "ISIL" describe the same FTO that is referred to as "ISIS" in the Superseding Indictment and herein.

[2] This is particularly true in light of the applicable definition of "international terrorism," which requires that the "violent acts or acts dangerous to human life" at issue "occur *primarily outside the territorial jurisdiction of the United States*, or transcend national boundaries . . . ."  18 U.S.C. § 2331(1)(C) (emphasis added).

Hon. Paul A. Engelmayer                                                                                                Page 3
December 19, 2017

The Government confirmed this during a bail argument on May 24, 2016.[3] Specifically, the Government argued as follows:

- The defendant "repeatedly made clear his own desire to travel overseas and his willingness to acquire fraudulent documents to do so." (Ex. B at 6:19-21 (bail argument transcript)).

- "When talking to the UC last week, [the defendant] said he was ready to go -- he wanted to go to ISIL." (*Id.* at 6:24-25).

- "[L]ast week" the defendant "voiced his own desire to travel over to Syria and his own desire to meet with a document facilitator, he followed through on that by providing the undercover with a piece of paper with his name and his contact information." (*Id.* at 17:16-20).

In denying the bail application on the basis of danger to the community and risk of flight, Judge Gorenstein noted: "[The defendant is] obviously very interested in getting a passport to travel. I know he has family in Albania, but it's also certainly consistent with his expressed desire to join ISIL." (*Id.* at 19:9-12). Thus, the contentions of counsel and reasoning of Judge Gorenstein made it even clearer—in May 2016—that the defendant had sought to travel abroad for the purpose of facilitating an act of international terrorism.

Nevertheless, at the December 12 conference, defense counsel asserted that, "in the context of . . . the complaint" and "the facts surrounding the passport, there would be no reason for either one of us to conclude that at some point [the Government was] going to say that he asked for this passport to travel to join ISIL." (Tr. 19-20). The claim does not survive even a cursory review of the Complaint. The Government alleged in that document that the defendant had repeatedly expressed interest in traveling abroad to join ISIS, and that the defendant had "admitted" that he "wanted a new passport because he believed traveling on his old passport— which had rejection stamps from his two 2014 trips to the United Kingdom—would raise suspicions during his *planned travels*." (*Id.* ¶ 16 (emphasis added); *see also id.* ¶¶ 6, 17). Numerous other allegations showed that the defendant intended to travel abroad to support ISIS, including:

- On October 24, 2014, the defendant "[w]as denied entry [into the United Kingdom] after authorities found camouflage pants and shirts, as well as nunchucks, in [the defendant's] luggage." (Compl. ¶ 7(a)).

---

[3] In addition, the Government's May 24, 2016 press release relating to the defendant's arrest stated that he "took steps to facilitate his own travel to join ISIL." Former U.S. Attorney Preet Bharara was quoted in the release as stating: "'As alleged, Sajmir Alimehmeti, a Bronx man and an ISIL sympathizer, took steps to travel overseas to support ISIL's terror campaign.'"

- On December 18, 2014, the defendant was again denied entry into the United Kingdom after they found on his cellphone and laptop "a number of images of ISIL flags and improvised explosive device ('IED') attacks." (*Id.* ¶ 7(b)).

- On May 9, 2016, after UC-2 told the defendant that UC-3 "had traveled overseas and joined" ISIS, the defendant asked UC-2 to "hook [him] up with [UC-3's] 'connections.'" (*Id.* ¶ 14(c)).[4]

- On May 16, 2016, the defendant "expressed his excitement" to UC-2 about helping another man (UC-4) travel to join ISIS and "inquired whether he could travel with [UC-2's] friend." (*Id.* ¶ 14(d)).

- On May 17, 2016, the defendant told UC-2 that he "wanted to go to Raqqah, as opposed to other locations where ISIL has a presence, such as Iraq and Libya, because Raqqah was the 'heart' of ISIL's operations." (*Id.* ¶ 14(e)).

- On May 17, 2016, the defendant "stated that he had $2,500 saved for his own travel but still needed a passport and 'needed to see someone' to obtain a passport in a different name, because his name was already 'in the system.' [The defendant] added that he and his brother 'had our own plan' to travel from Albania to Raqqah but that his brother had been arrested in Albania." (*Id.* ¶ 14(f)).

- On May 17, 2016, the defendant asked UC-4 whether he "could 'tell the [Document Facilitator] about me too" because the defendant was "'ready to fucking go with you [UC-4], man . . . you know I would . . . . I'm done with this place. There are kuffar everywhere." (*Id.* ¶ 14(j)).

- Finally, the defendant "provided [UC-4] with a piece of paper containing his contact information, so [UC-4] could provide that to the Document Facilitator." (*Id.* ¶ 14(o)).

Thus, although the defense might conceive of alternative explanations for international trips taken or planned by the defendant, they were on notice as of the May 24, 2016, when the Complaint was unsealed and the bail argument took place, that the Government took a different view of those travel plans.

---

[4] The references to particular UCs in this letter have been modified to correspond to the numbering used in the Government's motions *in limine*.

   Materials provided during discovery in the summer of 2016 provided even more notice of the Government's theory. For example, the Government produced a report written by a British detective who interviewed the defendant when he tried to enter the United Kingdom on December 18, 2014. The reported indicated that:

- The defendant stated during the interview that the purpose of his October 2014 and December 2014 trips was to meet a woman named Safa Faizi (hereinafter, "Safa") because they had "struck up a relationship via texts" that "led to them wanting to marry each other."

- The detective consulted British law enforcement personnel who investigated the defendant's October 2014 attempt to enter the United Kingdom, and learned that: (i) Safa had "posted on her facebook page comments glorifying Jihad and Martyrdom"; (ii) Safa's mother had "contacted Police and expressed her concerns" that Safa was "vulnerable to extremist radicalization"; and (iii) Safa's father had indicated that the defendant "was not that well known to him."

Based on this information and the ISIS propaganda on the defendant's computer and phone, the detective noted in the report that he "strongly suspected that it was [the defendant's] intention to meet with Safa without her families [sic] full knowledge and that they both could be planning to abscond to Syria," *i.e.*, ISIS-controlled territory.[5]

   Evidence seized from the phone obtained by British law enforcement in December 2014, which was also produced during discovery, corroborated the detective's assessment. On October 21, 2014, just days prior to the defendant's first attempted entry to the United Kingdom, a Skype account with username "Saffah Meow" sent a message to the defendant's account—with username "abdul-qawii"—in which she referred to him as "[m]y mujahid." Moreover, numerous photos and videos on the defendant's phone depicted a female who appears to be Safa making the same gesture with her index finger that the defendant used to signify his support of ISIS. (*See, e.g.*, Compl. ¶ 10).

   In addition to the recordings summarized in the Complaint, the Government produced call intercepts to the defendant in the summer of 2016, which included additional conversations regarding his interest in traveling abroad to join and fight on behalf of ISIS. These intercepted calls, among others, support the inference that the defendant believed the October and December 2014 rejection stamps from the United Kingdom rendered his existing passport problematic for purposes of traveling abroad to support ISIS, and further connect the defendant's false passport application to his intended foreign travel for purposes of engaging in terrorist acts abroad. For example, during a coded telephone conversation on November 29, 2015, just over a month after his October 23, 2015 false passport application, the defendant referred to ISIS-

---

[5] The Government will not seek to offer the detective's opinion and conclusion at trial, but identifies this aspect of his report here because it is relevant to the question of whether the defense was provided with notice of the Government's theory.

controlled territory as an "amusement park." He described his intention to "walk" there and indicated that "the line for the amusement park starts in my country"—referring to a ground route to Syria from Albania via Turkey.

During an intercepted call on December 22, 2015, a female associate told the defendant that she was "going away soon . . . on holiday." The defendant asked where the woman was going, and—apparently conscious of potential surveillance—she initially declined to specify. After a pause, the defendant asked, "really?" The woman responded in the affirmative and asked the defendant if he wanted to join her. He replied: "I can't . . . You know why . . . I don't have a 'P'"—referring to the pending passport application—but "obviously I want to go." Later in the call, the woman clarified that "we're not going to 'S-town'" (referring to Syria) and indicated that "we're going to 'L-town'" (referring to Libya).

Finally, on May 19, 2016—two days after attempting to facilitate UC-4's travel to Syria to join ISIS—a call was intercepted in which the defendant spoke to Erald Alimehmeti (hereinafter, "Erald"), the defendant's brother who was incarcerated in Albania at the time. (*See* Compl. ¶ 14(f) n.4 (noting Erald's "arrest[] on weapons and assault charges in Albania in August 2015")). Erald asked if the defendant had found work, and referred to a "super[intendant] job" with an apartment. The defendant responded that he was "not going to be needing that," and asked if his brother remembered "what I told you that time." Erald responded, "oh, vacation, yes." The defendant then stated, haltingly, "don't worry . . . don't worry . . . it's like, yeah . . . ." Erald asked, "can I come out of jail please, can I come out of jail first?" The defendant expressed concern that Erald would not be released for four years, and he subsequently referred to his assistance to UC-4: "Yeah, man, I just . . . another friend of mine just, you know." Erald interrupted, "you should read that stuff I told you to read before . . . going to the beach. . . Before you go to the beach you gotta learn how to swim. Remember how [*unintelligible*] traveled? I told him two weeks before he traveled, I said, 'go to the beach, I teach you how to swim.' He said, 'no, I'm ok.' Two weeks later, pow, he died, and they couldn't find his body . . ." Later during the call, the defendant referred to UC-4 and the pending passport application: "You know that thing that I don't have that you need, you know? . . . I don't even need it. . . . I'm not saying I, I don't need one. I like, I still need one, but I know where I can get one. . . A friend of mine just did it two days ago."

Thus, defense counsel has been on notice for over a year that the Government might contend in support of Count One that the defendant himself had sought to travel abroad for the purpose of facilitating an act of international terrorism.

### B. Evidence of the Defendant's Travel and Intended Travel Is Admissible As To Count One

Even in the absence of Count Two as charged in the Superseding Indictment, evidence relating to the defendant's foreign travel, intended travel, false passport application, and recorded statements regarding these issues would be relevant and admissible with respect to Count One because it is probative of the required *actus reus* and *mens rea*.

1. **Applicable Law**

"The material support statute criminalizes a range of conduct that may not be harmful in itself but that may assist, even indirectly, organizations committed to pursuing acts of devastating harm." *United States* v. *Farhane*, 634 F.3d 127, 148 (2d Cir. 2011). In 2004, Congress amended the relevant definition of "material support and resources" to include "personnel (1 or more individuals who may be or include oneself)." Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. 108-458, Title VI, § 6603(b), 118 Stat. 3638, Dec. 17, 2004. The current version of Section 2339B also "imposes two express scienter requirements: that the aid be intentional and that the defendant know the organization he is aiding is a terrorist organization or engages in acts of terrorism." *United States* v. *Al-Kassar*, 660 F.3d 108, 129 (2d Cir. 2011); *see also Holder* v. *Humanitarian Law Project*, 561 U.S. 1, 16-17 (2010) ("Congress plainly spoke to the necessary mental state for a violation of § 2339B, and it chose knowledge about the organization's connection to terrorism, not specific intent to further the organization's terrorist activities.").

"[E]vidence is 'relevant' if it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *United States* v. *Abu-Jihaad*, 630 F.3d 102, 132 (2d Cir. 2010) (quoting Fed. R. Evid. 401). Relevant evidence "need only tend to prove the government's case," such as "evidence that adds context and dimension to the government's proof of the charges." *United States* v. *Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997). Thus, background evidence is relevant and admissible, pursuant to Rule 401, where it tends "'to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed.'" *Id.* (quoting *United States* v. *Coonan*, 938 F.2d 1553, 1561 (2d Cir. 1991)).

2. **Discussion**

Evidence of the defendant's prior foreign travel and intended travel are admissible as to Count One. This evidence is probative of the defendant's violation of Section 2339B on the theory that the defendant attempted to provide material support and resources to ISIS, in the form of himself, by traveling to the purported Caliphate to train, support, and fight with members of the terrorist organization. *See United States* v. *Farhane*, 634 F3d at 148 ("[A] substantial step towards the provision of material support need not be planned to culminate in actual terrorist harm, but only in support—even benign support—for an organization committed to such harm."). The Second Circuit discussed a similar legal theory in *Farhane*, where defendant Rafiq Sabir and a co-defendant participated in a May 20, 2005 meeting in New York with a UC purporting to be a member of al Qaeda. During the meeting, Sabir pledged allegiance to al Qaeda, promised "to be on call in Saudi Arabia to treat wounded al Qaeda members," and "provid[ed] private and work contact numbers for al Qaeda members to reach him in Saudi Arabia whenever they needed treatment." *Id.* at 149. The court concluded that Sabir's actions during the meeting "were a substantial step in the provision of Sabir himself as personnel." *Id.* at 151; *see also id.* (finding

"no support" for the application of "a different standard of sufficiency to the provision of personnel depending on whether the person being provided is oneself or another"). The court also distinguished between the attempted provision of personnel, which is alone sufficient to violate Section 2339B, from any services a defendant might subsequently provide to a terrorist organization upon traveling abroad. *See id.* at 153 ("[E]ven if Sabir needed to return to Riyadh before he could provide actual medical services to members of al Qaeda . . . his actions [during the meeting] on May 20, 2005, constituted a substantial step clearly intended to culminate in supplying himself as personnel to work under the direction of that terrorist organization.").

Based on the statutory definition of "material support and resources," as interpreted in *Farhane*, evidence of the defendant's travel and intended travel are probative of a violation of Section 2339B. The defendant twice tried to enter the United Kingdom to meet with Safa, and evidence from the December 2014 search of the defendant's phone supports the inference that Safa intended to aid ISIS to at least the same extent that he did. Less than a year later, in October 2015, the defendant submitted an application for a U.S. passport in which he claimed that he lost the passport that contained the British rejection stamps. On November 29, 2015, just over a month after submitting the application, the defendant spoke on the phone about traveling abroad to engage in foreign terrorist activities. In December 2015, he made specific reference to the issue with his "P," *i.e.*, passport, during the course of a conversation with a woman who said she intended to travel to Libya. In May 2016, the defendant told a UC about, among other things, his plan to travel with Erald to Raqqah, Syria. In the context of subsequent efforts to help a UC leave the country to fight for ISIS, the defendant tried to give his phone number to a person he believed had helped the UC-4 obtain travel documents for the trip. And just days after doing so, he suggested to Erald on the phone that he had found an *alternate* solution to the passport issue, which further underscores the fact that the October 2015 false passport application was part of an earlier effort by the defendant to obtain a travel document without rejection stamps that he could use to travel to ISIS-controlled territory.

Evidence relating to the defendant's travel and intended travel is also relevant to establish that the defendant acted with the requisite intent when he advised and escorted UC-4 on May 17, 2016 prior to UC-4's purported departure from the United States. Specifically, evidence that the defendant intended to travel abroad to join ISIS tends to show that he acted intentionally in facilitating UC-4's purported efforts to do the same thing, and that he knew that ISIS engages in acts of terrorism. Therefore, even in the absence of Count Two in its current form, this evidence would be admissible at trial because it is probative of acts by the defendant in violation of the statute and the defendant's intent during the course of the violation.

II. **The Court Should Conduct a *Curcio* Hearing Regarding the Potential Conflict of Interest Posed by the Concurrent Representation of the Alimehmeti, Rahimi, and Defendant-1**

The Federal Defenders represent the defendant, Ahmad Khan Rahimi, and Defendant-1. Accordingly, for the reasons set forth below, the Government respectfully requests that the Court conduct an inquiry pursuant to *Curcio* to evaluate and address the potential conflict.

A. **Relevant Facts**

One member of the defense team represents Rahimi, who is scheduled to be sentenced on January 19, 2017. *See United States* v. *Rahimi*, 16 Cr. 760 (RMB). A different member of the Federal Defenders represents Defendant-1.

At trial in this case, the Government seeks to offer, through testimony of law enforcement witnesses, the following evidence: (i) a hard drive (the "Drive") and disc ("Disc-1") confiscated in November 2017 from a locker assigned to Alimehmeti at the MCC, which contained terrorist propaganda, including materials that were produced in discovery to Rahimi rather than Alimehmeti[6]; (ii) a laptop provided to Rahimi for viewing his discovery was used to open files on the Drive; (iii) the Drive and Disc-1 contain a series of English-language lectures whose titles are listed in a notebook confiscated from Rahimi (the "Notebook") on a page titled "The Hereafter Series"; (iv) in October 2017, Defendant-1 was found to be in possession of a disc ("Disc-2") that contained terrorist propaganda that was included in discovery produced to Alimehmeti and Rahimi but not Defendant-1.[7]

The Government also seeks to offer the contents of the Drive, Disc-1, Disc-2, and the Notebook. The files on Disc-1, which are also on the Drive, appear to be a series of lectures by Anwar al-Aulaqi, who was a senior leader of al Qaeda in the Arabian Peninsula ("AQAP"). Other lectures by al-Aulaqi were found, among other places, on the laptop computer that Alimehmeti tried to bring into the United Kingdom in December 2014. (*See* Compl. ¶ 12).[8] The Drive and Disc-2 contain, among other things, issues of an AQAP propaganda publication called *Inspire*, which were produced to Rahimi during discovery. Disc-2 also contains ISIS-specific propaganda, including PDF documents titled "The Media War Upon The Islamic State" and "The Issue of Beheading" that were also seized from a laptop in Alimehmeti's apartment.

B. **Applicable Law**

The Sixth Amendment guarantees a criminal defendant the right to the effective assistance of counsel, which includes "the right to representation by conflict free counsel." *United States* v. *Schwarz*, 283 F.3d 76, 90 (2d Cir. 2002). "An attorney has a potential conflict of interest

---

[6] The Government no longer seeks to disclose Rahimi's identity to the jury or offer evidence relating to the offenses committed by Rahimi.

[7] The Government is still seeking to identify the origin of the files on Disc-2, and whether the laptop provided to Rahimi was used to create or modify Disc-1 or Disc-2.

[8] On November 17, 2017, the Government notified the defense that it intends to offer expert testimony at trial relating to, among other topics, AQAP, al-Aulaqi, ISIS, and some of ISIS's leaders and senior members.

if 'the interests of the defendant may place the attorney under inconsistent duties at some time in the future.'" *United States* v. *Perez*, 325 F.3d 115, 125 (2d Cir. 2003) (quoting *United States* v. *Klitti*, 156 F.3d 150, 153 n.3 (2d Cir. 1998)). Conflicts "such as an attorney's representation of two or more defendants or his prior representation of a trial witness, are generally waivable." *United States* v. *Perez*, 325 F.3d at 125.

Courts have two separate obligations where there is a possible conflict of interest. First, the court has an "inquiry obligation" when it is apprised of the possibility of a conflict of interest, pursuant to which it must "investigate the facts and details of the attorney's interests to determine whether the attorney in fact suffers from an actual conflict, a potential conflict, or no genuine conflict at all." *United States* v. *Levy*, 25 F.3d 146, 153 (2d Cir. 1994). Second, if the court finds that the defendant's attorney faces an actual or potential conflict, a "disqualification/waiver" obligation arises, pursuant to which the court must either: (i) disqualify the attorney if the conflict is sufficiently severe, or (ii) if the conflict may be waived, conduct a *Curcio* hearing to advise the defendant of the ramifications of the conflict and obtain a waiver of any conflict from the defendant.

With respect to the Court's inquiry obligation, New York's Rules of Professional Conduct offer guidance regarding conflicts of interest involving current clients. "Concurrent conflicts of interest, which can impair a lawyer's professional judgment, can arise from the lawyer's responsibilities to another client . . . ." N.Y. Rules of Prof'l Conduct 1.7 cmt. 1. Rule 1.7(b) provides:

> (b) Notwithstanding the existence of a concurrent conflict of interest . . . , a lawyer may represent a client if:
>
> (1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;
>
> (2) the representation is not prohibited by law;
>
> (3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and
>
> (4) each affected client gives informed consent, confirmed in writing.

*Id.* Under Rule 1.10(a), any potential conflict faced by defense counsel under Rule 1.7 is imputed to the Federal Defenders, who also represent Defendant-1.

Consistent with the requirements of Rule 1.7(b), the Second Circuit has expressed "uneasiness about sanctioning the joint representation of criminal defendants." *United States* v. *Curcio*, 680 F.2d 881, 887 (2d Cir. 1982); *see also Holloway* v. *Arkansas*, 435 U.S. 475, 490 (1978) ("[I]n a case of joint representation of conflicting interests the evil—it bears repeating—is

in what the advocate finds himself compelled to *refrain* from doing, not only at trial but also as to possible pretrial plea negotiations and in the sentencing process." (emphasis in original)). Nevertheless, if a defendant "can rationally opt to retain counsel of his choice despite a conflict, the court conduct[s] a *Curcio* hearing to determine whether the defendant knowingly and intelligently waives his right to conflict-free representation." *Perez*, 325 F.3d at 127.

Finally, courts "retain discretion to reject a defendant's knowing and intelligent waiver when his attorney's conflict jeopardizes the integrity of judicial proceedings." *Id.* at 125; *see also United States* v. *Locascio*, 6 F.3d 924, 933-34 (2d Cir. 1993) ("[W]aiver by the accused of the conflict can conceivably alleviate the constitutional defect, so long as the representation by counsel does not seriously compromise the integrity of the judicial process.").

### C. Discussion

The potential conflict of interest described above could present challenges to the Federal Defenders' duties of loyalty and confidentiality to Alimehmeti, Rahimi, and Defendant-1.[9]  For example, counsel may have access to information from the representation of Rahimi that she may not use to investigate these issues on behalf of Alimehmeti.  In addition, counsel may have an incentive to cross-examine witnesses at trial in a way that attributes the dissemination of terrorist propaganda to Rahimi or Defendant-1 rather than Alimehmeti.

---

[9] Disc-1 also bears markings referring to the Federal Defenders, which could present an advocate-witness issue that the Government will seek to address by proposing a redaction or substitution to the defense.

   Under these circumstances, the Government respectfully requests that the Court conduct a *Curcio* proceeding to advise the defendant of his right to conflict-free representation and to inquire as to whether he understands and waives the potential conflict. After advising the defendant of the risks inherent in Federal Defenders' continued representation of him, the Government requests that the Court afford the defendant reasonable time to digest and contemplate those risks, as well as an opportunity to consult with independent counsel. *See United States* v. *Curcio*, 680 F.2d 881, 890 (2d Cir. 1982). If the defendant subsequently informs the Court that he wishes to proceed with Federal Defenders as his counsel, the Government requests that the Court elicit narrative responses from him designed to ascertain whether he is fully aware of the risks involved in the representation, and determine whether the defendant is making a knowing and intelligent waiver of his right to conflict-free representation. Enclosed as Exhibit C for the Court's consideration is a proposed list of questions relating to the requested *Curcio* inquiry.

                Respectfully submitted,

                JOON H. KIM
                Acting United States Attorney

          By: _____
             Emil J. Bove III
             George D. Turner
             Assistant United States Attorneys
             (212) 637-2444

Enclosures

Cc:  Defense Counsel
   (Via ECF)