1
                  UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF NEW YORK

2

3
----------------------------------X
                                :

4
UNITED STATES OF AMERICA,       : 16-CR-00398 (PAE)
                                :

5
                  v.           : May 24, 2016

6
                                :
SAJMIR ALIMEHMETI,          : 500 Pearl Street

7
                               : New York, New York
                Defendant.   :

8
----------------------------------X

9
      TRANSCRIPT OF CRIMINAL CAUSE FOR INITIAL APPEARANCE
        BEFORE THE HONORABLE GABRIEL W. GORENSTEIN

10
            UNITED STATES MAGISTRATE JUDGE

11
APPEARANCES:

12

13
For the Government:       BRENDAN FRANCIS QUIGLEY, ESQ.
                        EMIL JOSEPH BOVE, III, ESQ.

14
                        United States Attorney's Office
                        Southern District New York

15
                        One St. Andrew's Plaza
                        New York, New York 10007

16

17
For the Defendant:        SYLVIE JILL LEVINE, ESQ.
                        SABRINA P. SHROFF, ESQ.

18
                        Federal Defenders of New York Inc.
                        New York City

19
                        52 Duane Street, 10th Floor
                        New York, New York 10007

20

21

22
Court Transcriber:        SARA WINKELJOHN, CET-808
                        TypeWrite Word Processing Service

23
                        211 N. Milton Road
                        Saratoga Springs, New York 12866

24

25

Proceedings recorded by electronic sound recording,
transcript produced by transcription service

2

1          COURTROOM DEPUTY:  U.S. v. Sajmir Alimehmeti.

2          Counsel, please state your name for the record.

3          MR. QUIGLEY:  Good afternoon, Your Honor; Brendan

4   Quigley and Emil Bove for the United States joined by Special

5   Agent Joseph Landers of the FBI.

6          MS. LEVINE:  Good afternoon; the Federal Defenders

7   of New York by Sylvie Levine and Sabrina Shroff on behalf of

8   Mr. Alimehmeti.

9          THE COURT:  All right.  Good afternoon.  May I have

10  the time and date of arrest?

11         MR. QUIGLEY:  Your Honor, the defendant was arrested

12  this morning at approximately 5:35 a.m.

13         THE COURT:  All right.  Sir, I'm Judge Gorenstein.

14  Let me begin by telling you that you are not required to make

15  any statements to the authorities.  Anything you say to them

16  could be used against you.

17         If you were are not a United States citizen, you may

18  request that a government attorney or a law enforcement

19  official notify a consular officer from your country that

20  you've been arrested.  Even without a request, notification

21  may be required by treaty or international agreement.

22         You have the right to be represented by an attorney.

23  If you could not afford an attorney, you have the right to

24  request that the Court appoint one for you.

25         I have a form, a financial affidavit form, that

1    you've signed under penalty of perjury.  Please be aware that

2    you can be charged with perjury for any false statements on

3    this affidavit.  Also, you must tell the Court if there's any

4    change the Court if there's any change to your financial

5    status.  Based on the statements that you've made on this

6    form, I'm approving the appointment of counsel.

7            I have before me a complaint that contains the

8    charges in this case.  The charge in Count I is that from

9    September 2014 until May of 2016 that you knowingly and

10   intentionally provided or attempted to provide material

11   support or resources, as that term is defined in 18 U.S.C.

12   Section 233 -- 233(9)(a), to a foreign terrorist organization,

13   specifically, the Islamic State of Iraq and the Levant, which

14   has been designated by the Secretary of State as a foreign

15   terrorist organization pursuant to Section 219 of the

16   Immigration and Nationality Act, and it's currently designated

17   as such.

18           The charge in Count II is a charge of passport

19   frauds, alleged that in October 2015 that you made false

20   statements in an application for a passport, specifically that

21   you submitted a passport application stating that your

22   previous passport had been lost when, in fact, you had no lost

23   the previous passport.

24           Counsel, have you seen the complaint?

25           MS. LEVINE:  Yes, Your Honor.

4

1           THE COURT:  Have you reviewed it with your client?

2   Are you --

3           MS. LEVINE:  I have, and I waive its public reading.

4           THE COURT:  All right.  Sir, you have a right to a

5   hearing at which the Government would have to show probable

6   cause to believe that you committed the crimes you're being

7   charged with.  However, there would not be a hearing if you

8   were indicted by a grand jury.

9           I'll hear from the Government next as to bail or

10  detention.

11          MR. QUIGLEY:  Your Honor, the Government seeks

12  detention.

13          THE COURT:  Ms. Levine or Ms. Shroff, how do you

14  want to proceed?

15          MS. LEVINE:  Your Honor, I'm prepared to make a bail

16  application today.

17          THE COURT:  Okay.  I'll hear from the Government

18  then.

19          MR. QUIGLEY:  Yes, Your Honor.  To begin with, this

20  is a presumption case under 18 U.S.C. 3142(e)(3)(C).  The

21  defendant is charged in Count I with a federal crime of

22  terrorism which carries a maximum sentence of greater than 10

23  years, so a presumption of detention applies here.  In

24  addition to the presumption, the factors in 18 U.S.C. 3142(g)

25  also show that the defendant presents both a risk of flight

5

1    and a danger to the community.

2         First, with respect to the nature and circumstance

3    of the offense.  Again, this is a federal crime of terrorism

4    which is one of the specific types of crime mentioned in the

5    first part of 3142(g).  The defense -- the crime carries

6    significant penalties.  The defendant is looking at a 20-year

7    maximum sentence on Count I.  His guidelines range on that

8    count would be 240 months imprisonment because the statutory

9    maximum trumps the otherwise applicable guideline range of 360

10   months to life.

11        The complaint -- the nature -- with respect to the

12   nature of the offense, it's detailed in the complaint, but it

13   shows that the defendant has repeatedly demonstrated his

14   support for the -- for ISIL, a violent and dangerous terrorist

15   organization.  There's a picture of him in the complaint with

16   an ISIL flag.  That flag was found this morning in his

17   apartment in the Bronx.  During the search warrant, numerous

18   pictures of him making support -- making gestures of support

19   for ISIL.  Among other things, including most recently as

20   detailed in Paragraph 14 of the complaint, he assisted someone

21   who he believed was traveling to ISIL in Syria, bringing that

22   person around New York City, helping him to purchase supplies,

23   volunteering to provide his own supplies, providing advice on

24   the use of encrypted communications platforms, among other

25   things, and downloading encrypted communications platforms

6

1  with that individual's phone.

2       The complaint also details in Paragraph 13 the

3  defendant's repeated purchases of weapons, including multiple

4  knives, a pocket chainsaw, and gloves with steel knuckles.  A

5  number of these items, including multiple knives, nunchucks,

6  and other weapons were found in the defendant's apartment this

7  morning when the officers executed the search warrant.

8       THE COURT:  I'm sorry.  What was found?

9       MR. QUIGLEY:  Multiple knives, nunchucks --

10      THE COURT:  I mean just knives?  I have multiple

11 knives in my home.  I don't know --

12      MR. QUIGLEY:  They're combat survival-type knives

13 similar to the knives shown in the complaint, Your Honor.  And

14 during meetings with undercover law enforcement employees over

15 a period of many months he displayed -- he would carry these

16 knives, including a fighting knife with him, including a --

17 and also a second knife which was a credit-card sized

18 expandable folding knife.

19      Additionally, he has repeatedly made clear his own

20 desire to travel overseas and his willingness to acquire

21 fraudulent documents to do so.  Two attempt -- he attempted to

22 enter the United Kingdom twice as detailed in Paragraph 17 of

23 the complaint.  He then made a false passport application.

24 When talking to the UC last week, he said he was ready to go

25 -- he wanted to go to ISIL.  He was jealous of the UC.  And

7

1  the strength of the Government's case is strong.  Many of

2  these meetings detailed in the complaint are based on draft --

3  on draft transcripts, recorded conversations, his activities

4  with UC-3 last week were under heavy surveillance, and again,

5  evidence found during a search warrant today including ISIL

6  flag, multiple fighting knives, the passport that he

7  reportedly claimed was lost was found in his apartment wrapped

8  in $2,400 in cash, which is also --

9            THE COURT:  I'm sorry.  Say that again.

10           MR. QUIGLEY:  It was found in his apartment wrapped

11  in $2,400 in cash.

12           THE COURT:  This is the old passport or the new

13  passport?

14           MR. QUIGLEY:  The old passport that he claimed was

15  lost.

16           THE COURT:  Is it still valid, the old one?  If you

17  know?

18           MR. QUIGLEY:  I think -- I think it was canceled

19  when he applied for the new one.

20           THE COURT:  Oh, okay.

21           MR. QUIGLEY:  Yeah.  Again --

22           THE COURT:  What about -- what about the new

23  passport?  Is that --

24           MR. QUIGLEY:  He hadn't gotten it yet.  He applied

25  for it, but he hasn't gotten it.

8

1          THE COURT:  So why would the old -- has it been

2     approved?

3          MR. QUIGLEY:  No, it hasn't.

4          THE COURT:  Or don't we know?

5          MR. QUIGLEY:  It has not been approved.

6          THE COURT:  So why do you say the old one's

7     canceled?  Oh, and he said it was lost.

8          MR. QUIGLEY:  Right.  So once it was lost it was

9     canceled.

10          THE COURT:  I see.  But looking at it you wouldn't

11     know that?  I mean someone scanning it would know it but --

12          MR. QUIGLEY:  Correct, Your Honor.

13          THE COURT:  Okay.  Passport wrapped in how much,

14     2,400?

15          MR. QUIGLEY:  $2,400.  Your Honor, that's also --

16     the amount of cash is significant for two reasons.  Number

17     one, in the pretrial services report the defendant claimed

18     that he had no assets other than $50 in a checking account.

19     And also, in meeting with the UC last week, the defendant said

20     that he had saved $2,500, approximately the same amount that

21     was recovered this morning, for his own travel overseas.

22          THE COURT:  Well, perhaps he knew it had been taken

23     by the Government.

24          MR. QUIGLEY:  That's possible, Your Honor.

25          THE COURT:  Okay.

1          MR. QUIGLEY:  Finally, just briefly with respect to

2    his history and characteristics, his ties to the U.S. are

3    limited.  His mother and father and brother have all moved to

4    Albania.  He has no job or really verifiable employment

5    history, and he has a criminal history including a prior

6    conviction for robbery, a while after that conviction, a

7    conviction for assault, forcible touching, and public

8    lewdness.

9          So in light of the presumption, in light of the

10   nature of the offense, in light of the strength of the

11   evidence against the defendant, in light of defendant's

12   history and characteristics, we submit that there are no

13   combination -- there are no conditions or combination of

14   conditions that can overcome the presumption in this case and

15   that detention is appropriate.

16         THE COURT:  All right.  Whoever wants to speak for

17   defendants.

18         MS. LEVINE:  Your Honor, we're asking that you set a

19   significant bail package for Mr. Alimehmeti.  That would

20   include a high bond, three financially responsible cosigners,

21   travel restrictions, no new applications, home confinement,

22   and a restriction that he not be permitted to access a

23   computer or the internet.  My client's a 22-year-old United

24   States citizen.  He lives in the Bronx in the same building

25   where he has lived for the last 16 years.  He's a young man

10

 1  who still lives in his family's home.  As Your Honor can see

 2  in the pretrial services report, he's supported financially by

 3  those parents.  He uses their money to pay the rent, for food,

 4  et cetera.  From -- in many ways he's just like any other

 5  22-year-old or college-age student.  He was enrolled until

 6  recently at school, at a school for funeral services.  He

 7  previously worked as a plumber's assistant.  He went to high

 8  school here in New York City.  And he ultimately earned his

 9  GED.

10          Now the charges in this case are undoubtedly

11  serious,  and the Government emphasized that by focusing on

12  the mandatory maximum.  And I simply note for the record that

13  the mandatory minimum in this case is nothing.  There's no

14  mandatory minimum prison term for either charge here.

15          And I'm also going to ask the Court to look past the

16  terrorism allegation here and look at the actual act that are

17  and are not alleged.  You'll note that there's no allegation

18  of any conspiracy, and the reason for that is in this

19  complaint there's not a single mention of him talking to

20  another individual that's not law enforcement.  That means he

21  doesn't reach out or make contact with, as alleged in the

22  complaint, to a single person overseas via the internet, in

23  person, or via phone to support terrorism.  And that fact

24  persists even though the agents say in the complaint that

25  they've been through his computer and his cell phone.

1    There's also a lot of talk that's alleged in the

2 complaint, and the number of the -- that there are a number of

3 statements that are attributed to my client that expressed

4 interest or enthusiasm for something.  But none of those

5 statements appear to be followed by any act.  And I know that

6 talk can be very powerful.  It can sound scary or it can sound

7 repulsive, but Your Honor well knows that that is not enough.

8 And if you look at the time line as alleged, the agents are in

9 regular contact with him since the fall of last year.  That's

10 six months, six months of them being in regular contact

11 waiting for him to do something and that something is not

12 charged.  For example, the talk attributed to him, as the

13 Government said, indicates a willingness to put forth a

14 passport application in someone else's name, but he's not

15 alleged to have done that.  The application that's alleged to

16 be pending according to Count II is in his own legal name.

17 All of his interactions with the undercover agents in this

18 case are alleged to have taken place within the five boroughs.

19    Likewise, I'm going to address the pictures of the

20 -- of some of the items that are contained in the criminal

21 complaint, many of which have no criminality on their face

22 whatsoever.  But they're alleged to have been purchased in

23 such a way that there's no covertion [sic].  They're traced to

24 back to him.  The --

25    THE COURT:  There's no  -- I'm sorry, there's no

12

1   what?

2           MS. LEVINE:  Covertion.  There's no -- there's

3   nothing secret or hidden about these transactions.  They --

4   the Government says they can trace them directly to the

5   client.  They say that upon the undercover's request in the

6   complaint he's walking into stores.  He's not hidden.  He's

7   not using an alternative identity.  He's out in the open.

8   There's nothing covert about that, either.  And those are

9   stores that sell lawful, legal items.

10          I want to talk -- if I can have one second.  Right.

11  And I would ask the Court, I'm sure Your Honor read the

12  complaint carefully, but if you look through it each act that

13  Mr. Alimehmeti is alleged to have taken, I would look

14  carefully at whether or not that was prompted by a member of

15  law enforcement based on a request made by them.

16          Now with regard to my client's criminal history, he

17  -- it consists of the following.  He's arrested and ultimately

18  receives a sentence of probation and is adjudicated a youthful

19  offender for his full felony case.  And that's important

20  because that means that a prosecutor and a judge, who were

21  much closer to that case than any of us can be from here

22  today, decided that he should not only not go to jail but also

23  get no criminal conviction from that.

24          Now he starts on probation and there's a single

25  warrant that arises from that case, but I would ask the Court

13

 1   to look at the dates.  The warrant appears to be from June

 2   13th to June 20th.  So he arrived back in court within one

 3   week.  And that probation is terminated upon his arrest for

 4   the next case on his record.  But the important thing about

 5   that case I think is despite the really serious nature of

 6   those charges, he's ultimately -- he ultimately pleads guilty

 7   solely to misdemeanor conduct.  And again, those decisions

 8   were made by prosecutors and judges who had all of the facts

 9   at their disposal.

10           So after he gets arrested -- after he pleads to the

11   misdemeanor in the second case they then resentence him on the

12   earlier case to one-to-three years in prison.  I think that's

13   the time line.  And what one-to-three years in prison, what an

14   indeterminate term, means is you do a portion of it in jail

15   and a portion of it on parole.  And the -- as the pretrial

16   service report indicates, Mr. Alimehmeti was on parole from

17   August of 2013 to August of 2014.  And that means that for a

18   year he was successful -- and there's no violation of parole

19   whatsoever.  And that means that he adjusted to and completed

20   supervision appropriately.  It means he followed the rules.

21   It means he appeared when he was supposed to.  It means he

22   complied with terms set by a supervising body.

23           THE COURT:  You mean -- you mean after September 6,

24   2012.  Obviously not before then.  There was a violation

25   before then.

14

1          MS. LEVINE:  So the violation I believe stemmed from

2   -- the reason for the violation is the arrest on the second

3   case.

4          THE COURT:  Right.

5          MS. LEVINE:  Right.  And then after he gets the --

6   it appears that from what I can tell here that case -- the

7   dates are sort of confusing, but what I think it shows is that

8   it looks like his arrest is back in 2010, and he fights -- it

9   -- the violation was filed ultimately on the date that he

10  pleads which is -- or is convicted which is September 6,

11  [inaudible].

12          So the proposal that we're making is similar to

13  parole in that you are required to follow the rules but is

14  dissimilar to parole in the sense that the supervision

15  required by pretrial services is far more restrictive than New

16  York State parole, and that's particularly true when home

17  confinement is a requirement.  That means that someone in this

18  building is alerted if my client steps so much as outside of

19  his front door.

20          And that condition, home confinement, coupled with a

21  $200,000 personal recognizance bond and three financially

22  responsible cosigners -- and with regard to the cosigners, we

23  do expect that his cosigners would be his immediate family.

24  But as the report indicates, they have been out of New York

25  for some time.  His father is ill.  But we're working actively

15

1   with the Government to get their contact information, and we

2   do expect that if that condition can be met that they -- that

3   they would be willing to sign for him.  They're incredibly

4   close with their son and their brother.  They stay in close

5   contact with him.  Like I said, they support him financially

6   and otherwise.

7           So in addition to the standard conditions, which of

8   course the Court would impose, travel restrictions,

9   restrictions on new applications, I think it should be noted

10  that the -- any passport, whether it's valid or not, was

11  seized by the agents this morning.  Likewise, the cash was

12  also taken such that it's -- the purpose of the financial

13  affidavit -- or excuse me, the purpose of the financial

14  questions as posed by pretrial services, it -- the questions

15  specifically asked today were was there any money in your

16  pocket when you got arrested and what money do you have in

17  your bank account.  So I don't think that would cover that

18  cash.

19          But these conditions, particularly the one I'm

20  suggesting the Court add with regarding to simply restricting

21  his computer and internet access entirely, those conditions

22  altogether directly address the allegations in this case and

23  they -- and they, I submit, are wholly sufficient to both

24  overcome the presumption and ensure the safety of the

25  community and address any potential risk of flight.

16

1    Your Honor, my client was arrested this morning at

2 home in his own bed.  And while the allegations in this case

3 sound quite serious, and they are, it's distinct from a lot of

4 cases you see charged under this statute because there are no

5 acts that Mr. Alimehmeti is alleged to have taken once he's in

6 these conversations with the undercovers.  For all of these

7 reasons, we're asking that you set significant conditions, as

8 I've laid out, to be -- and if, and only if, we meet those

9 conditions that Mr. Alimehmeti be released.

10    THE COURT:  Anything else from the Government?

11    MR. QUIGLEY:  Just two very brief points, Your

12 Honor.  Just first with respect to the defendant's criminal

13 history and his history under court supervision, I think it's

14 worth noting that after he was sentenced on the robbery

15 conviction in March of 2010, just seven months thereafter on

16 October 12th, 2010, he committed another serious offense which

17 was the assault, forcible touching, and public lewdness.  And

18 while he was discharged from parole in September 2012, he

19 immediately began committing this offense, and it's not in the

20 complaint, but among other things we would show that in

21 September 2012 [sic] he had communications with another person

22 about putting that person in touch with an ISIL facilitator to

23 travel to Syria.

24    THE COURT:  I'm sorry.  It's --

25    MR. QUIGLEY:  I thought I said -- 2014, Your Honor.

17

1          THE COURT:  Yeah.

2          MR. QUIGLEY:  I misspoke.

3          THE COURT:  He was -- just so it's clear since your

4   statement didn't seem to recognize it, he was jailed on

5   September 6th, 2012, for an additional one-to-three year term

6   and then was released almost a year later.

7          MR. QUIGLEY:  Right.  And I'm saying after he -- I

8   meant to say after he was discharged from parole in August of

9   2014 he immediately began the offense conduct in this case the

10  next month.

11         THE COURT:  All right.  I --

12         MR. QUIGLEY:  And then finally, with respect to the

13  -- you know, that this is all talk, that these are just acts

14  -- no acts, with respect to that argument, I think the

15  complaint details a number of acts taken by the defendant.

16  And most specifically, last week when he voiced his own desire

17  to travel over to Syria and his own desire to meet with a

18  document facilitator, he followed through on that by providing

19  the undercover with a piece of paper with his name and his

20  contact information.  I think that speaks to both his risk of

21  flight and his danger to the community.  So for those reasons

22  and the reasons we started earlier, we believe and submit that

23  the defendant should be detained.  Thank you.

24         THE COURT:  Go ahead.

25         MS. LEVINE:  Just briefly, Your Honor.  I think the

1  record just made illustrates my point precisely.  He said the

2  act that took place last week is that he voiced his desire to

3  do something coupled with the handing of his contact

4  information.  But the substance of that statement, as alleged,

5  does not come to fruition.  There's no other act beyond the

6  statement and that's exactly my point.

7         THE COURT:  Just so I understand the point, why

8  isn't driving around the person that he thinks is leaving an

9  act?

10        MS. LEVINE:  I -- no, I think driving someone is an

11 act.  I think the statement just before by the Government

12 indicates his own desire to do something.  And that comes I

13 think in the complaint midway through the driving, but he

14 doesn't take any further steps in support of that expressed

15 desire.  I think the desires referred to in the complaint is

16 about his own participation, and there's nothing of that about

17 his own participation that seems to appear to come to

18 fruition.

19        THE COURT:  All right.  Just give me a moment.

20               [Pause in proceedings.]

21        THE COURT:  All right.  This is a presumption case,

22 and I find that the presumption has not been overcome in this

23 case.  In other words, I believe that there is no combination

24 of conditions that will ensure the defendant's return to court

25 or the safety of the community, and let me just explain why.

19

1  The -- on the issue of the risk of flight, I think that's

2  actually been well-established by a preponderance of the

3  evidence by the Government.  This is an individual with very

4  strong ties to a foreign country who is facing a significant

5  potential sentence to the extent the guidelines can act as a

6  predictor of that sentence.  He has two prior criminal

7  convictions showing his willingness to put his interests ahead

8  of those of society.  He committed one of the crimes while he

9  was under supervision for the first crime.  He's obviously

10 very interested in getting a passport to travel.  I know he

11 has family in Albania, but it's also certainly consistent with

12 his expressed desire to join ISIL.  He has a large amount of

13 cash that he's kept which obviously would facilitate flight.

14         I'm going to address the strength of the evidence as

15 I discuss this factor because it's been raised and it's

16 certainly one of the bell factors.  I think the defense's

17 point -- and they've certainly made a very capable and able

18 argument -- is that his own participation in an actual

19 terrorist act is not reflected anywhere in the complaint, and

20 that may well be true.  But that, of course, is not the charge

21 here.  The charge is giving material support to a terrorist

22 organization, and the complaint is filled with examples of

23 that and of specific acts that constitute that crime.  And the

24 strength of the evidence is reflected in the fact that these

25 individuals involved are actual law enforcement undercover

20

1  officers.

2           So while I understand certainly that there are ties

3  to the United States and long-term ties to the United States,

4  I find the Government has shown by a preponderance of the

5  evidence that he's a risk of flight.

6           With respect to danger to the community, once again,

7  we have not only -- well, I won't go over the allegations of

8  the complaint, but there's also the prior conviction for

9  robbery and for the assault, forcible touching offense which

10 by itself shows danger.  There's also his own expressed

11 interests in joining a terrorist organization.  There's his

12 repeated purchase of weapons, the finding of weapons in his

13 apartment, and carrying them on his person.  So in light of

14 that I think the Government has shown by clear and convincing

15 evidence that the defendant represents a danger to the

16 community that there's no combination of conditions that can

17 ensure the safety of the community.

18           Currently, the defendant is ordered detained.  What

19 day shall I put the preliminary hearing?

20           MS. LEVINE:  The 14th day, Your Honor.

21           THE COURT:  That would be June 7th.

22           Anything else from the Government?

23           MR. QUIGLEY:  No, Your Honor.  Thank you.

24           THE COURT:  And defense counsel?

25           MS. LEVINE:  Your Honor, I'd ask for a medical order

1  with regard --

2          THE COURT:  What shall I put?

3          MS. LEVINE:  Treatment for asthma.

4          THE COURT:  Asthma?  Okay.  You got it.

5          MS. LEVINE:  Thank you.

6          THE COURT:  Anything else from the defense?

7          MS. LEVINE:  No, nothing further.

8          THE COURT:  All right.  Thank you, everyone.

9                      * * * * *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

22

1      I certify that the foregoing is a court transcript from

2   an electronic sound recording of the proceedings in the above-

3   entitled matter.

4

5   _____

6                              Sara Winkeljohn, CET-808

7   Dated:   December 17, 2017