I12nalmc

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,

        v.                              16 Cr. 398 (PAE)

SAJMIR ALMEHMETI,

          Defendant.                  Conference

------------------------------x

                          New York, New York
                          January 2, 2018
                          1:05 p.m.

Before:

                HON. PAUL A. ENGELMAYER,

                              District Judge

                    APPEARANCES

JOON H. KIM
    Acting United States Attorney for the
    Southern District of New York
BY:  GEORGE TURNER
    Assistant United States Attorney

SABRINA SHROFF
SYLVIE LEVINE
    Attorney for Defendant

ALSO PRESENT:

ANTHONY STRAZZA, *Curcio* Counsel

I12nalmc

|   |   |
|---|---|
| 1 | (Case called) |
| 2 | MR. TURNER:  Good afternoon, your Honor.  George |
| 3 | Turner and Emil Bove, for the government.  With us is Special |
| 4 | Agent Joseph Landers of the FBI. |
| 5 | THE COURT:  Good afternoon, Mr. Turner, Mr. Bove, and |
| 6 | Mr. Landers. |
| 7 | For the defense? |
| 8 | MS. SHROFF:  Good afternoon, your Honor.  Federal |
| 9 | Defenders of New York, by Sabrina Shroff and Sylvie Levine on |
| 10 | behalf of Mr. Almehmeti, who is seated to my left. |
| 11 | Also present is *Curcio* counsel, Mr. Strazza. |
| 12 | MR. STRAZZA:  Good afternoon, your Honor. |
| 13 | THE COURT:  Good afternoon, Ms. Shroff, Ms. Levine, |
| 14 | and Mr. Strazza, and good afternoon to you, Mr. Almehmeti. |
| 15 | THE DEFENDANT:  Good afternoon. |
| 16 | MS. SHROFF:  Your Honor, this is the first time |
| 17 | Mr. Almehmeti remains cuffed during the proceeding. |
| 18 | THE COURT:  I don't see a need for that. |
| 19 | MS. SHROFF:  Thank you.  I appreciate that. |
| 20 | THE COURT:  Marshals, I will ask you kindly to uncuff |
| 21 | the defendant.  He's been in front of me many tines without |
| 22 | incident. |
| 23 | MR. STRAZZA:  One other thing I would ask, your Honor, |
| 24 | is, just before your Honor entered the courtroom we were |
| 25 | discussing one small issue.  I was wondering if I may have a |

I12nalmc

1    moment to just finish that conversation.

2              THE COURT:  Go ahead.

3              MR. STRAZZA:  Thank you.

4              (Mr. Strazza conferred with the defendant)

5              MR. STRAZZA:  We're ready to proceed, your Honor.

6              THE COURT:  Thank you, Mr. Strazza.

7              This conference has been called really for several

8    purposes.  I scheduled at 1 o'clock a conference to continue

9    with the *Curcio* process that we began on December the 22nd, and

10   we will turn to that in a few moments.

11             Separately, I issued an order which is docketed at

12   Docket 85, scheduling a 2 p.m. conference to entertain any

13   comments or objections from the public or the media with

14   respect to the courtroom closure that the government has

15   proposed.

16             So what I am going to do now is turn to the *Curcio*

17   issue, and then later, at 2 o'clock as scheduled, hear any

18   comments along the lines solicited in my order at Docket 85.

19             Following that, there will be to additional factual

20   matters I want to take up in connection with pending motions in

21   the case.

22             With respect then to *Curcio*, let me turn the floor

23   first to you, Mr. Strazza.  You were appointed as independent

24   counsel for the limited purpose of supplying independent

25   guidance to Mr. Almehmeti with respect to the conflict issue

I12nalmc

1    that has arisen in this case.

2              What do you have to report to me?

3              MR. STRAZZA:  After speaking with Mr. Almehmeti, he

4    has relayed to me his concerns, and I've done my best to give

5    him my advice with respect to those concerns.

6              To sum it up, what he has told me is that he is happy

7    with his current counsel, and he wants to keep his current

8    counsel but he does not feel comfortable waiving the conflict

9    based upon everything he has learned.

10             THE COURT:  OK.  In other words, he would like both

11   current counsel, but for current counsel not to labor under a

12   conflict?

13             MR. STRAZZA:  Yes.

14             THE COURT:  If the choice is put whether he would want

15   his current counsel to stay in the case but he would forego any

16   right to -- let me rephrase that.

17             He is not comfortable with current counsel remaining

18   his counsel in the case, or at least at trial, if they are

19   burdened by a conflict?

20             MR. STRAZZA:  Yes.

21             Those are not his exact words, but, yes, I think after

22   hearing what the Court just said, I mean, what he has relayed

23   to me is that he would like to keep his current counsel, but he

24   is not comfortable with waiving the potential conflict.

25             THE COURT:  OK.  He understands, therefore, that that

I12nalmc

1    may mean that, based on the lack of a waiver, I may ultimately

2    have no choice but to relieve his current counsel.  Obviously

3    some of this may depend on the evidentiary ruling on the prison

4    materials, it may or may not, but he understands that if

5    counsel are subject to a conflict that he doesn't waive, the

6    Court may have no choice but to appoint alternative counsel?

7            Does he understand that?

8            MR. STRAZZA:  He does.  I have explained to him that

9    if he does not waive, the Court may act and replace his

10   counsel.

11           THE COURT:  OK.

12           How much time did you spend with Mr. Almehmeti?

13           MR. STRAZZA:  I've spent approximately an hour with

14   him on December 22 I believe that was.  Then, due to not being

15   able to see him on the third floor today, which I arrived at

16   approximately 11:45, I was only able to speak with him for

17   about 15 minutes today when he was brought to the courtroom.

18           THE COURT:  Have you had any contact with him in any

19   form other than the hour on December 22 and the 15 minutes

20   today?

21           MR. STRAZZA:  No, your Honor.  He has specific

22   limitations based on his communication where he's being housed.

23           THE COURT:  To be clear, you have not, other than

24   those two in-person conversations totaling an hour and a

25   quarter, you haven't had any other form of communication,

I12nalmc

1    whether phone or electronic or otherwise?

2             MR. STRAZZA:  That's correct.

3             THE COURT:  Do you feel that you have had enough time

4    with Mr. Almehmeti to sufficiently discuss the issues such that

5    his current judgment reflects a sufficient enough discussion

6    with counsel to make it thought out?

7             MR. STRAZZA:  I would like the Court to inquire of him

8    what his feelings are with respect to that.  I know we've

9    discussed what we need to discuss from my perspective, but I am

10   not sure.  If he feels that he needs more time, I would like

11   the Court to inquire.

12            THE COURT:  And I will.

13            Just as to your perspective as a professional

14   responsible for this particular function, do you feel that you

15   had enough time with him to make sure that he understands the

16   nature of conflict?

17            MR. STRAZZA:  Yes.

18            THE COURT:  Do you feel he does, in fact, understand

19   the nature of the conflict or the potential conflict?

20            MR. STRAZZA:  I do.

21            THE COURT:  Did you form the impression from your

22   communications with him that he has a sound understanding of

23   the pros and cons of remaining with his current counsel,

24   assuming that the MCC computer evidence were admitted at trial?

25   Do you think he understand what the issues or problems would be

I12nalmc

1    were he to stay with his current lawyers if that evidence was

2    received at trial?

3              MR. STRAZZA:  I do.

4              THE COURT:  What is your basis for that?

5              MR. STRAZZA:  Just based upon the conversations that

6    we have had together and the questions that he has asked me and

7    the way that the conversation leads back to repeating certain

8    things.  Without getting into the substance of the

9    conversations, but based upon his responses and his questions

10   to me.

11             THE COURT:  Do you feel that you had enough of an

12   opportunity to cover and that your conversation with him did

13   cover each of the areas that I identified in my colloquy with

14   counsel several weeks ago, and that your independent assessment

15   of the case leads you to identify of potential conflict?  Do

16   you feel like your conversation was able to focus on each of

17   those?

18             MR. STRAZZA:  Yes, your Honor.

19             THE COURT:  OK.

20             Do you have a view that Mr. Almehmeti's current

21   assessment is likely to reflect a durable assessment, or has

22   his mind on this been changing, or is there a reason to think

23   that if this marinates longer he may come a different position?

24             MR. STRAZZA:  His mind has changed over the two

25   different conversations.  So if I were to answer that, your

I12nalmc

1   Honor, he may benefit from -- his decision may continue -- I

2   want to word this the right way.  There has been a change in

3   his position, and the first meeting that he and I had together

4   was significantly longer than the second meeting.  So I am not

5   sure if there were more time if his position would change again

6   on that.  I don't want to say that I am sure that it wouldn't.

7           THE COURT:  Do you have a view, based on what you have

8   heard so far, that the right course would be to give him and

9   you a little more time together?

10          MR. STRAZZA:  May I have a moment?

11          THE COURT:  Of course.

12          (Mr. Strazza conferred with the defendant)

13          MR. STRAZZA:  Your Honor, after speaking with

14  Mr. Almehmeti, and after thinking about the Court's question, I

15  do think that he may benefit from a little more time.

16          THE COURT:  All right.

17          Mr. Almehmeti, I want to ask you some questions, but I

18  will give you more time to reflect on this important matter.

19          Have you had an opportunity to spend the time that

20  Mr. Strazza has described with him discussing the issues

21  presented by your current lawyer's potential conflict?

22          THE DEFENDANT:  Yes, your Honor.

23          THE COURT:  Are you satisfied with the representation

24  Mr. Strazza has given you with respect to that issue?

25          THE DEFENDANT:  Yes, your Honor.

I12nalmc

1      THE COURT:  Do you feel that you have an understanding

2  of the types of problems or situations that could be presented

3  by your continuing to be represented by Federal Defenders?

4      THE DEFENDANT:  I do.

5      THE COURT:  May I ask you, I want to ask you in your

6  own words to describe to me, now that you have had some

7  opportunity to reflect on this, what your current understanding

8  is of the ways in which your current lawyer's potential

9  conflict could potentially affect their representation.

10      I want to take stock at this point of how well you do

11  or don't understand what the nature of the problem or issue

12  here is.

13      So would you kindly take a moment in your own words

14  just explain to me the potential problems that could exist were

15  your current lawyers to continue to represent you.

16      THE DEFENDANT:  Yes, your Honor.

17      Basically what I understand of the situation is that,

18  should this evidence come into court, then my lawyers also

19  represent Mr. Rahimi, in the case that this evidence has come

20  in, I'm concerned whether or not they will be able to

21  effectively represent me, if by, for example, putting the blame

22  on Rahimi and this sort, and they won't be able to effectively

23  do that while being his attorneys and his attorney.  This is

24  how I understand the situation.

25      THE COURT:  That's helpful.  Do you have any more

I12nalmc

1   concrete understanding as it relates, for example, to the

2   prison computer records that you have heard about?  Do you have

3   any more concrete understanding as to how your lawyers might be

4   affected in trying to represent you with respect to that, given

5   their representation of these other people?  Do you have an

6   understanding as to what some of the potential issues might be?

7             THE DEFENDANT:  Can I have one moment, please.

8             MR. STRAZZA:  I'm sorry.

9             I was just in the process of standing up also so that

10  the record can reflect that, and my other than concern, Judge,

11  and this is something that we have discussed, is what I don't

12  want is him to commit to any sort of defense --

13            THE COURT:  I see.

14            MR. STRAZZA:  -- or make any statements under oath

15  that could later be used to hurt him or affect him.

16            THE COURT:  To be clear, the statements that are being

17  made in this proceeding will not be usable against him in any

18  later part of this case.  I am simply trying to make sure he

19  understands the legal ramifications or the strategic

20  ramifications of this representation.  I appreciate your saying

21  that.  I'm certainly not going to put him in that catch-22.

22            Does that respond to your concern?

23            MR. STRAZZA:  It does.  Thank you.

24            THE COURT:  I also don't want Mr. Almehmeti to be in a

25  situation, and I suspect this may be what Ms. Shroff is

1    concerned about, that he inadvertently gives away some defense

2    strategy by answering my question.

3          I'm really trying to make sure at a larger level that

4    he's able to explain the way in which a lawyer who has the

5    other representations that the Federal Defenders has might be

6    inhibited or affected in her representation of him.

7          Ms. Shroff, is there some landmine that I need to

8    avoid here?

9          MS. SHROFF:  Your Honor, they are two prosecutors who

10   are going to try the case.  I am just speaking without having

11   fully worked this through, but I mean, to the extent

12   Mr. Almehmeti were to now make some statement about the MCC

13   evidence or anything else, that might give them fodder for

14   preparing their cross of Mr. Almehmeti should he take the stand

15   or what they would say to the Rahimi judge should we go before

16   Judge Berman.

17         That's what I was trying to flag.  When I hear the

18   Court saying none of the words that come from Mr. Almehmeti

19   would be used against him, I'm assuming that the Court means

20   used against him should he testify, should he not testify,

21   including at sentence.

22         THE COURT:  All I am trying to make sure, Ms. Shroff,

23   is that he is able to articulate for me that he understands

24   what the nature of the conflict issue is here.  I am certainly

25   not asking him to make any representations of fact, but I'm

I12nalmc

1   really trying to follow up on the conversation we had on

2   December 22 and ask him, as is customary with respect to

3   *Curcio*, to put in his own words what the nature of the conflict

4   is.

5           I understand from what Mr. Strazza says that at this

6   point Mr. Almehmeti isn't ready to waive anyway.  That is fine.

7   But I am trying to take stock of the extent to which he at

8   least understands the nature of the problem.

9           MS. SHROFF:  Your Honor, I certainly did not think the

10  Court was doing anything untoward.  It's a reflex action of

11  putting your hand out when the car is on brake and you want to

12  make sure the passenger doesn't hit the windshield.

13          THE COURT:  Let me do this.  Since mr. Almehmeti isn't

14  making a final election today, let me ask some more leading

15  questions, which may at least be useful in underscoring for

16  you, Mr. Almehmeti, the concern here.

17          I asked you a bunch of questions a week ago Friday

18  about this subject.  I am now going to pursue them a little

19  further.

20          You understand, do you not, that Federal Defenders

21  represents both Mr. Rahimi and the person that's being

22  described as Defendant 1?

23          THE DEFENDANT:  Yes.

24          THE COURT:  Do you understand that the government is

25  proposing to offer evidence that would tend to suggest that you

I12nalmc

shared terrorist propaganda material provided in discovery with
one or both of those people while they were in the same prison
facility, the MCC, as you?

THE DEFENDANT:  Yes.

THE COURT:  Do you understand that the government is
proposing to share evidence that would tend to suggest that you
received such material from Mr. Rahimi while in prison?

THE DEFENDANT:  Yes.

THE COURT:  Do you understand that, among other
things, this evidence might be relevant to the government's
ability to prove its case or your counsel's ability to present
a defense, including a defense of entrapment?

THE DEFENDANT:  Yes.

THE COURT:  Do you understand that?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  And do you understand that at a trial your
counsel might have, for example, an incentive to suggest that
it wasn't your doing that any of your discovery material wound
up on somebody else's computer and that it wasn't your doing
that any of Mr. Rahimi's material wound up on your computer?

They may want to say that this happened because
somebody else made it happen, and you didn't take any knowing
action to cause that.

Do you understand that?

THE DEFENDANT:  Yes, your Honor.

I12nalmc

```
1           THE COURT:  Do you understand that what your lawyers
2   are saying is that they might feel inhibited, they might feel
3   ill at ease making an argument to a jury or eliciting evidence
4   from a witness, including an expert, that would tend to suggest
5   that one of their other clients had been the person sharing
6   that information back and forth?
7           Do you understand that?
8           THE DEFENDANT:  Yes, your Honor.
9           THE COURT:  Do you understand that a lawyer who hadn't
10  represented either of those clients would not have any
11  reservation or inhibition about making those arguments?  If
12  they felt those were the right arguments to make, they wouldn't
13  have to worry about whether it looked like they were speaking
14  ill of or making a negative statement about a different client
15  of theirs.
16          Do you understand that?
17          THE DEFENDANT:  I do.
18          THE COURT:  That, as I understand it, is the heart of
19  the potential conflict here.  What counsel have advised me is
20  that, as they see it, this conflict at least has the potential
21  to affect different things a lawyer might do.  It might affect
22  the witnesses who a lawyer might call.
23          Do you understand that?
24          THE DEFENDANT:  Yes.
25          THE COURT:  It might affect the way the lawyer, your
```

I12nalmc

1    lawyer cross-examines witnesses who are called.

2              THE DEFENDANT:  Yes.

3              THE COURT:  It might affect whether your lawyer's

4    commission certain forensic or computer expert evidence.

5              Do you understand that?

6              THE DEFENDANT:  Yes.

7              THE COURT:  It might affect the way in which your

8    lawyers speak to the Court or to the jury about this evidence.

9              THE DEFENDANT:  Yes, sir.

10             THE COURT:  And fact that this issue is lurking out

11   there in the case in theory could also affect your lawyer's

12   bigger picture strategy of the case.  For example, a lawyer

13   knowing that a trial is going to involve this evidence, it

14   might affect in theory whether or not the lawyer thought you

15   ought to negotiate towards a guilty plea.

16             Do you understand that?

17             THE DEFENDANT:  Yes.

18             THE COURT:  And there's at least a potential that a

19   lawyer who represents other clients who are involved in these

20   events might have a somewhat different view or a different view

21   about whether or not a guilty plea is warranted or a good idea

22   based on that other representation?

23             THE DEFENDANT:  Yes, sir.

24             THE COURT:  And, finally, I think -- not finally, but

25   another area that counsel have identified is that, in the event

I12nalmc

1    this case results in a conviction, whether as a result of a

2    guilty plea or a trial conviction by a jury, counsel's

3    representation of these other people might potentially affect

4    the way they conduct any sentencing proceeding.

5              THE DEFENDANT:  Yes, sir.

6              THE COURT:  That is a nonexclusive list of some of the

7    areas in which this conflict potentially could affect your

8    lawyer's behavior, and I'm trying to just make sure you

9    understand those possibilities.

10             Do you understand everything that I just covered with

11   you?

12             THE DEFENDANT:  Yes, your Honor, I do.

13             THE COURT:  Do you understand as well that I am only

14   using my imagination here in thinking about different scenarios

15   in which your lawyers' multiple representations could

16   potentially affect them.

17             I can't, and at this stage probably nobody here can

18   fully imagine all the possible ways in which the conflict or

19   the potential conflict could affect a lawyer's representation.

20             Do you understand that?

21             THE DEFENDANT:  Yes, sir.

22             THE COURT:  Do you feel that you have had enough time

23   with Mr. Strazza to discuss the potential conflict and the way

24   it could affect the defense of your case?

25             THE DEFENDANT:  Your Honor, I really wish I would have

I12nalmc

1    had some more time speaking with Mr. Strazza about this.  I

2    feel a little rushed today because I came with one thought in

3    my head, and I spoke about 15 minutes and I started developing

4    a different thought.

5          I feel like I didn't have enough time since my last

6    appearance before you to really have someone to speak about

7    this issue with.

8          THE COURT:  OK.

9          Here's what I think I will do, counsel.

10         Government, let me ask you, my inclination would be,

11   because this is quite important and a lot can turn on the

12   defendant's judgment here, that I will put over the

13   continuation of the *Curcio* proceeding to the conference we

14   already have scheduled for Friday at 4 p.m.

15         Any reason not to do that?

16         MR. TURNER:  No, Judge.

17         THE COURT:  Mr. Strazza, are you free then?

18         MR. STRAZZA:  Can I just check?

19         THE COURT:  Yes.

20         MR. STRAZZA:  I am, Judge.

21         THE COURT:  All right.

22         I know for a fact that the government and Federal

23   Defenders are free then, because we have a conference already

24   scheduled for then.

25         MS. SHROFF:  We are free, your Honor.  But I just

I12nalmc

1    wanted to make sure.  I'm sorry.  I just needed a moment to

2    speak to appellate counsel who is in court with me here.

3              On December 29, as the Court knows, of last year, we

4    wrote to the Court setting forth our office's position -- which

5    remains as we appear before you today -- that should the

6    government continue to seek introduction of this evidence, this

7    is not a waivable conflict for Mr. Almehmeti or Mr. Rahimi, and

8    we are per se not properly able to move forward as counsel for

9    them.

10             I am assuming that this continued inquiry -- I am

11   certainly not suggesting that the Court meant to do it, but the

12   inquiry could in the end stop here.  Mr. Almehmeti is saying

13   he's not waived.

14             THE COURT:  Mr. Almehmeti's counsel for this purpose

15   says that Mr. Almehmeti could benefit from more time and

16   Mr. Almehmeti says the same thing.

17             I'm simply giving the defendant and his conflict-free

18   counsel more of an opportunity than the hour and a quarter of

19   in-person discussion has permitted to ventilate this complex

20   issue.  That is all.

21             MS. SHROFF:  I understand that, your Honor.  I would

22   ask that, given our office's position, and I am assuming that

23   the Court and government have both received the letter signed

24   by Mr. Patton, who is the executive director of the Federal

25   Defenders' office, and our office's position remains that this

I12nalmc

1    is a nonwaivable conflict should that evidence be entered into

2    the trial or sentence of Mr. Almehmeti.

3            THE COURT:  I understand that is your position.

4            MS. SHROFF:  It is, your Honor.

5            THE COURT:  I'm inclined to think, along with the

6    government, that the right sequence here is first to take up

7    the *Curcio* issue with Mr. Almehmeti, and in the event that

8    Mr. Almehmeti has waived the conflict in a satisfactory way,

9    then I think I reach the issue that you have presented.

10           But if Mr. Almehmeti isn't prepared to waive, it's not

11   clear to me that I ever even need to reach that issue.  You

12   have preserved your right to pursue it.  I am just suggesting

13   that it is not by any means clear to me that the sequencing

14   requires me to engage with your bid to withdraw now.  I have a

15   few other questions which may bear on my ability to resolve the

16   embedded evidentiary issue this week.

17           MS. SHROFF:  OK.  Your Honor, again, I understand the

18   Court's ruling and the Court's position.  It is just simply

19   that my research shows that the defendant's consent is not the

20   first step of an inquiry such as this one.  If the lawyer feels

21   that the lawyer is in fact conflicted being put in this

22   position.

23           THE COURT:  Is there some reason why I can't go in the

24   sequence I'm proposing, which is to take up the *Curcio* issue

25   with Mr. Almehmeti now and then, if necessary, take up your

I12nalmc

1    issue?  I am not preventing you from litigating this.  The

2    issue is just is there some reason why what you want has to

3    come first?

4             MS. SHROFF:  Your Honor, could Mr. Lee from my

5    office --

6             THE COURT:  Who is this?

7             MR. LEE:  My name is Yuanchung Lee.  I am in the

8    appeals unit of the Federal Defenders.

9             THE COURT:  Right.  The only issue here because I am

10   not seeking an argument on the merits.

11            MR. LEE:  I understand.

12            THE COURT:  I haven't gotten a straight answer yet to

13   the question of why we can't go in the sequence that I am

14   proposing, which is to continue the ongoing *Curcio* proceeding

15   and, depending on its outcome, if need be, engage with the

16   issue that Ms. Shroff has raised.

17            MR. LEE:  I understand the Court's perspective.  From

18   our perspective as lawyers, our ethical obligations are the

19   consent is not the threshold issue, as the government puts it

20   or as the Court thinks.  In the commentary to the ethical rules

21   it says that if a lawyer genuinely believes that she cannot

22   reasonably represent the client the lawyer should neither ask

23   for the client's consent nor provide representation on the

24   basis of the client's consent.  The client's consent to a

25   nonconsentable conflict is ineffective.

I12nalmc

1          I would say I read that to mean that, from our

2     perspective, if we genuinely believe that we have an actual

3     conflict that exists, regardless of a waiver, that we shouldn't

4     even ask for his consent on that.

5          THE COURT:  You are not asking for his consent.

6          MR. LEE:  I understand.

7          THE COURT:  I have commissioned a *Curcio* hearing

8     because the government was the one, even though your lawyers

9     knew about this issue a few weeks before, the government

10    brought the issue of a *Curcio* issue to me.

11         So Federal Defenders didn't ask for anybody's consent.

12    The government cued up with the issue for me.  So I am not

13    quite sure what you are talking about when you are saying that

14    you shouldn't be asking for the defendant's consent.

15         MR. LEE:  I am saying your obligation here may be

16    different from ours.

17         I would like to follow up with, the concern that we

18    have about the Court's continued questioning of Mr. Almehmeti

19    after he already indicated that he would not waive.  I

20    understand --

21         THE COURT:  I didn't ask you about that.

22         MR. LEE:  I understand, your Honor.

23         THE COURT:  You didn't appear here today.  You have

24    trial counsel here for these purposes.  I raised a simple

25    question which Ms. Shroff solicited your input on, which is, is

I12nalmc

1    there some reason why it is a problem for me to complete the

2    *Curcio* inquiry before determining whether it's necessary to

3    reach what would be a separate reason for your withdrawal,

4    which would be your independent obligation, my thinking here

5    being, if Mr. Almehmeti is unprepared to waive, the entire

6    letter that was submitted by Federal Defenders on December 29

7    may well become moot.

8         That is the sum and substance of it.  That's what I am

9    seeking your views on.

10        MR. LEE:  That is fine, your Honor.  I understand from

11   your Honor's perspective that's the way to do things.  I am

12   just saying from our perspective the two are concomitant.

13        If we determined that there is, you know, his waiver

14   is ineffective, then that's it from our perspective.  That's

15   all.  I understand the Court has a different obligation.

16        THE COURT:  If what you are saying is that if he

17   eventually makes a waiver which I found effective, but which

18   you did not, you might then take the view that you need on that

19   basis alone to withdraw.  I hear you.  I have no idea if we are

20   going to get there.  I am not in the business of resolving

21   hypotheticals.

22        MR. LEE:  That's fair.

23        You don't wish me to be heard on the other issue?

24        THE COURT:  The other issue meaning?

25        MR. LEE:  The issue of this continued questioning of

23

I12nalmc

1    Mr. Almehmeti after he's already indicated that he would not

2    waive.

3              THE COURT:  The answer is I don't want to hear from

4    you on that.  I didn't call on you for that.  You have trial

5    counsel for that.  She chose to seek out your view on the

6    sequencing issue.  I am not inviting this as oral argument from

7    you.  I am trying to engage in a *Curcio* proceeding.  You may

8    retake your seat.

9              MR. LEE:  That's fine.

10             THE COURT:  Let me put a few other questions to

11   counsel that deal with simply the sequencing of my work.

12             When we met last week, I stated that it was my view

13   that I needed to resolve the *Curcio* issue before resolving the

14   admissibility of the evidence.  Federal Defenders urged me to

15   resolve the issue of the admissibility of the evidence first.

16             My view had been that, in theory, the advocacy on the

17   admissibility could be affected by the potential conflict, and

18   therefore I should determine first whether or not there was a

19   potential conflict before resolving the admissibility issue.

20             Having thought about it and having reviewed the

21   submissions the parties had already made on the issue, it's not

22   by any means clear to me that I have to be that rigid about it.

23   I think there would be some obvious benefit here in my

24   resolving, at least in an indicative way, how I expect to come

25   out on the computer issue, because it may have relevance to all

I12nalmc

1     these issues.

2           Federal Defenders is it still your view that a Court

3     can resolve the evidentiary issue before coming to final terms

4     with respect to whether it's the conflict waiver or the

5     withdrawal application?

6           MS. SHROFF:  Your Honor, as noted in our December 29

7     letter, we do think it would be proper for the Court to address

8     the motion *in limine* on that subsection now rather than after

9     the conflict.

10          As Mr. Patton's letter indicates, these are positions

11    that we regularly take on 404(b) admissibility, and we ask that

12    the Court actually to rule on that section before --

13          THE COURT:  Understanding that a lawyer may not always

14    be aware of the implications of his or her potential conflict,

15    as you stand here now, is there anything you think you may have

16    left on the table in litigating that point on account of your

17    Federal Defenders other relationships?

18          MS. SHROFF:  No, your Honor.

19          THE COURT:  All right.

20          I am not prepared to rule today, but I will proceed I

21    expect then to promptly consider that issue.  I hope to be in a

22    position to resolve it promptly.

23          I'm not committing that I will resolve it before the

24    *Curcio* waiver proceeding is complete, but it may be that on

25    Friday I'm in a position to tell you the outcome of that

I12nalmc

1    ruling.

2              As to that, I do have follow-up for the government.

3              You had indicated to me that you were in the process

4    of doing forensic work.  Is there any further follow-up on the

5    status of the forensic work that you are doing with respect to

6    the computers?

7              MR. TURNER:  Your Honor, at this time we do not have

8    any new information regarding the forensic examination since we

9    were last before the Court.

10             THE COURT:  OK.

11             Do you have a sense of when you are going to have that

12   information?

13             MR. TURNER:  Your Honor, the FBI is working

14   expeditiously to complete any forensic examination.  We do not

15   have a set timetable on when it will be complete at this time.

16             THE COURT:  Here is an issue.  If it's taken this time

17   for the FBI to work through the forensic examination, it's

18   reasonable to assume, depending on what the examination shows,

19   that the defense might want its own expert to do its own

20   version of that expert examination.  We can't assume that the

21   FBI's examination is necessarily the final word.

22             Any reason to think that the defense's independent

23   examination, whether it's Ms. Shroff or a successor lawyer

24   commissions one, wouldn't take as long as the FBI is taking?

25             MR. TURNER:  Your Honor, to the extent that we do have

I12nalmc

1    additional results and plan to use those results, we would, of

2    course, be turning those over to the defense.  With respect to

3    timetable, we do anticipate that in the near future, in the

4    coming days any such examination will be complete.

5              THE COURT:  When did the examination begin?

6              MR. TURNER:  Your Honor, there have been various

7    stages of the examination because of the recovery of different

8    pieces of media at different times, but in the last several

9    weeks the examination has been ongoing.

10             THE COURT:  When did the last piece of media, if you

11   will, come into the possession of the examiner?

12             MR. TURNER:  Your Honor, I don't have an exact date,

13   but the last piece of media was the disk with the al-Awlaki

14   lectures, and that was -- estimating here -- but approximately

15   several weeks ago.

16             THE COURT:  All right.  Thank you.

17             May I ask defense counsel in particular this question.

18   There are other motions *in limine* that are under review.

19             My judgment is that, whatever the potential for this

20   conflict to affect the motion *in limine* as it relates to the

21   prison computer records, and you have represented that you left

22   nothing on the table, you've said your full piece, safe to say

23   this potential conflict has no bearing on the other motions *in*

24   *limine* that are pending.

25             MS. SHROFF:  We think that is safe to say, your Honor.

I12nalmc

1    THE COURT:  In other words, to the extent the Court

2    wishes to resolve those motions, there's no theory on which

3    your advocacy on those motions could potentially be

4    compromised?

5        I am going to ask the same question of the government

6    in a moment.  You have told me your advocacy even on the prison

7    motion was unaffected by the conflict.  I take it it stands to

8    reason that your advocacy on motions *in limine* that have

9    nothing to do with Rahimi or Defendant 1 but just other issues

10   in the case are unaffected by this potential conflict?

11       MS. SHROFF:  I think that's right.  I pause only

12   because when the Court was conducting the *Curcio* inquiry there

13   seems to be or perhaps there is an overlap between the MCC

14   evidence and the issue of the instruction on the entrapment

15   defense.

16       I do not think the advocacy was lacking, but I am just

17   saying that, to the extent the Court drew that thread between

18   the two, I just flag that for you again here.

19       THE COURT:  I understand that point.  I don't

20   understand that I will be obliged to determine what instruction

21   I will be giving at this stage.  I'm really talking about the

22   pending motions *in limine*.

23       MS. SHROFF:  Right.  I am just laying out that in

24   terms of -- I thought part of the issue the motions *in limine*

25   was the government moving when the government said we should

I12nalmc

1    not be able to raise the issue of entrapment, and we briefed

2    that as part of our motions *in limine*.

3         THE COURT:  I see.  So the issue would be whether in

4    theory your advocacy on that point, which postdated your

5    awareness of the prison issue, could in theory have been

6    compromised?

7         MS. SHROFF:  That's correct.

8         THE COURT:  Is there any coherent way you can

9    articulate why a lawyer in your shoes would have been affected

10   or could have been effected in litigating the entrapment issue,

11   if you will, by your representation of the two other defendants

12   who are factually involved in the prison computer records

13   issue?

14        MS. SHROFF:  I was speaking merely of a potential

15   conflict in terms of a potential conflict, but I suppose one

16   could argue that since we are conflicted counsel we did not

17   push far enough to say that the issue of entrapment is totally

18   unrelated to the facts bearing on the MCC investigation,

19   because the MCC investigation is from 2017 versus the

20   entrapment and the mindset of the entrapment is from the 2014

21   time period.

22        THE COURT:  I see.

23        MS. SHROFF:  Potentially one could say that I was not

24   strong enough in my advocacy to keep the evidence out.

25        THE COURT:  OK.

I12nalmc

 1          Government, do you see any reason why the Court can't

 2   now proceed to resolve any of the motions *in limine*, meaning

 3   this week, including the prison computer records issue?

 4          MR. TURNER:  Your Honor, we do not.

 5          THE COURT:  All right.

 6          Defense, one just housekeeping issue.  I think you

 7   asked to have withdrawn from ECF your originally filed

 8   opposition to the motions *in limine*, and I granted that.  I

 9   don't see you have yet refiled that motion in redacted form.

10   Would you please do so.

11          MS. SHROFF:  Yes, your Honor.  We didn't do it because

12   we thought perhaps today would be a decisive day.  I guess that

13   was wrong.

14          THE COURT:  That was wrong.  Please do file it.

15          Whatever was destined to happen today, as a matter of

16   public access it needs to get filed.

17          MS. SHROFF:  Certainly, your Honor.

18          THE COURT:  Here's what I would like to do.

19          We will take a few-minute break, and then I will open

20   the floor up to members of the public or the media who want to

21   make a response to the order I issued at docket No. 85.

22          THE COURT:  After that I think I would benefit by some

23   explication from the defense, which I will permit to be ex

24   parte if there is an application for that, as to the way in

25   which a defense lawyer might defend against the computer

I12nalmc

1   records issue.

2          I am not asking for the defense to tell me how they

3   necessarily would.  I don't need to know that.  But I do want

4   to make sure I understand capaciously what some of the ways it

5   might be defended would be.  That issue may prove germane to

6   the motion *in limine*, it may prove germane to accepting, or

7   not, a *Curcio* waiver if given, and it may prove germane to the

8   independent issue of whether or not Federal Defenders should be

9   allowed to withdraw even in the face of a valid *Curcio* waiver.

10          I am just trying to understand how one might defend

11  against that.  I found your letter quite helpful, but probably

12  of necessity, because it was being shared with the other side,

13  put at a rather general level as to means of defense.  I think

14  I need to understand that issue a little more granularly.

15          After we are done with the colloquy with the public

16  and the media, I would welcome having that conversation with

17  the defense, and I will ask defense counsel to reflect on that.

18          I will see you in five minutes for the purpose of

19  taking up response to my order at Docket 85.

20          Thank you.

21          MS. SHROFF:  Thank you, your Honor.

22          (Recess)

23          (Defense counsel not present)

24          THE COURT:  We are back on the record in this case.  I

25  just took a brief recess.  The purpose of the proceeding now is

I12nalmc

1    to solicit feedback in response to the order that I issued on

2    December 21 that's been docketed at Docket 85.  In brief, the

3    order indicated that the government has moved for the Court to

4    implement certain security measures designed to protect from

5    disclosure the true identities of one or more undercover law

6    enforcement officers expected to testify at Mr. Almehmeti's

7    trial.  Specifically, the government has requested that the

8    courtroom remain closed to members of the public, subject to

9    certain exceptions during these officers' testimony.  I

10   attached to the order that I mentioned the government's

11   proposed order that would set out in more detail the proposed

12   restrictions on public access.

13          The order is under the Court's consideration.

14          I have invited feedback from members of the press and

15   the public as to that order.  That is the purpose of the

16   proceeding now.  I called this conference for 2 p.m. today.  It

17   is now 2:09 p.m.  Let me see a show of hands to begin with

18   whether there are people here who would like to be heard on

19   this matter.

20          OK.  I see two hands.

21          Here's what I would like to do.  I very much value

22   hearing what you have to say.  Let's go one by one, and I will

23   ask the speaker to come to the podium, speak into the

24   microphone, and just slowly and distinctly identify yourself

25   and then slowly and distinctly set forth the nature of your

I12nalmc

1    interest and then what your views are.

2            One moment.

3            We are going to take a brief recess.  I had overlooked

4    the fact that defense counsel has stepped out of the room.  I

5    thank my law clerk for the heads-up.  We will take a brief

6    pause.

7            (Defense counsel present)

8            THE COURT:  The record will reflect that defense

9    counsel has reentered the courtroom.

10           Counsel, I overlooked the fact that you were not here

11   and briefly summarized the order that I issued on December 21

12   and indicated that I was about to receive one by one the

13   statements of interest by affected members of the public and

14   the press.

15           I asked for a show of hands as to how many such people

16   intended to speak.  As of when I asked I got two hands.

17           Let me see again.  A few more people have come in.

18   Just a show of hands, who else wants to speak?

19           There are two people.  I will ask you each to come

20   forward to the podium one by one.  Please introduce yourself

21   and spell your name for the benefit of the court reporter.  I

22   would welcome if you started off by telling me what the nature

23   of your interest is and then I'm happy to hear your views.

24           Go ahead, sir.

25           MR. RILEY:  John Riley, R-i-l-e-y.  I am a reporter

I12nalmc

1    with Newsday.  The nature of my interest is we will be covering

2    all or parts of the trial, and we want to be able to report

3    completely and fully to the public on what the testimony is.

4          I have a general objection.  There is a presumption of

5    access that should be honored.  I guess I am not privy to the

6    information that may or may not constitute a compelling reason

7    for secrecy, but institutionally it's my job to be skeptical

8    about such claims.

9          Two particular issues:

10         As I understand the government's order, the

11   defendant's family would be allowed to be present in the

12   courtroom.  I mean, I am sure the defendant's family is as fine

13   and upstanding as I am, but I find it hard to understand a

14   presumption that people who want to help the defendant are no

15   threat to disclosing what everyone can glean from sitting in

16   the courtroom about the undercover officer, but that a

17   reporter, potentially a pooled reporter who has been cleared

18   and passed security clearance to be an in-house reporter at the

19   Southern District of New York, is somehow a greater threat from

20   what he or she might observe than the defendant's family would

21   be.

22         You might even consider a pooled reporter under

23   certain restrictions to not physically describe the undercover,

24   assuming it's visual identification that is the risk here.

25         My second concern --

I12nalmc

1            THE COURT:  When you say a pool reporter, I just want

2       to make sure I understand what the nature of the proposal is.

3            MR. RILEY:  We have about 20 to 30 reporters who are

4       in-house press in the Southern District.  We are somewhat

5       organized.  We all work at desks in the same room.

6            I am sure we could come to some agreement or

7       suggestion as to somebody who, one reporter who would sit in,

8       take notes, and then inform the other reporters as to what was

9       said, what was observed within the restrictions that the Court

10      placed on the passing along observations.

11           THE COURT:  Let me make sure I understand essentially

12      how that would modify the proposal as the government has it.

13           The proposal would essentially be that all other

14      reporters would have the form of intermediated access that is

15      proposed in the government's order, that is to say, they would

16      be offsite effectively listening, but the pool reporter would

17      be able to be an eyewitness to what happened, would share those

18      observations with the balance of the reporters, but would not

19      physically describe the undercover either in his or her

20      reporting or in the report to the other members of the pool?

21           Do I get you right?

22           MR. RILEY:  If that was your order, that physical

23      descriptions not be provided and if that's the primary concern,

24      then, yes.  So if the defendant reacted in a particular way,

25      somebody would be in the courtroom to report on that to the

I12nalmc

1   public.

2           Similarly, if a prosecutor reacted in some notable way

3   to the testimony, the reporter would be able to describe that.

4           THE COURT:  I take it the concern here is that, under

5   the mechanism that's been proposed, even a pixelated video of

6   the witness let us say doesn't give a 360 as to what else is

7   happening in front of the bar in the courtroom, and that's

8   something that might be of interest, a reaction from one of the

9   trial personnel for example?

10          MR. RILEY:  That's correct.

11          My second suggestion, and I don't know if --

12          THE COURT:  By the way, just as to the defendant's

13  family -- and I am not making any ruling here, but just as a

14  trying to make sure the Court is user friendly -- the reason I

15  suspect for the proposal with respect to the defendant's family

16  is that there is Second Circuit case law that specifically

17  addresses the defendant's family as properly present even when

18  there are these restrictions.

19          I am not suggesting that that is necessarily an

20  ironclad rule for all purposes, but there is an anchor in the

21  case law for that.  So my understanding is that is the reason

22  why that line has been proposed.

23          MR. RILEY:  I am not sure whatever Second Circuit case

24  law there is would be directly on point to the presumption of

25  access and if the Second Circuit has concluded that can be a

I12nalmc

1    compelling reason to keep a member of the press out, but not to

2    keep family out based on risk that the description of the

3    undercover will be passed along.  I mean, the Second Circuit

4    judges are pretty smart, but that strikes me as an irrational

5    distinction.

6              THE COURT:  OK.

7              MR. RILEY:  The second point I would make, Judge, I

8    don't know if it's relevant in this case or not.  We have dealt

9    with situations in which an undercover officer has been called

10   and in part of the testimony is asked to narrate some kind of

11   surveillance video or other video that is shown in the

12   courtroom to the jury.  To be outside the courtroom seeing a

13   pixelated picture of the undercover and hearing the testimony

14   but not able to see in real time what he is talking about makes

15   it difficult to substantively describe his testimony.

16             In one case I was involved in with Judge Garaufis over

17   in Brooklyn, he prevailed on the government, when the

18   undercover started testifying about the video to have the video

19   played for people in the remote location rather than the static

20   picture of a pixelated face.

21             THE COURT:  Sorry.  Explain it to me.

22             MR. RILEY:  Do you understand what I am saying?

23             THE COURT:  Not quite.  When the video is played, how

24   would it proceed.  What are you proposing happen when the --

25             MR. RILEY:  Judge Garaufis ordered the government to,

I12nalmc

with the court administration, to substitute for the courtroom

feed a feed of the video that was being played in the

courtroom.

THE COURT:  I see.

MR. RILEY:  So we are sitting in the other courtroom,

and once the undercover starts talking about here you see Mr. X

walking from point A to point B, that video of Mr. X would cut

in in our feed, and we could see what he was talking about.

THE COURT:  In other words, I think what the

government is proposing is not pixelation or a video

presentation of the witness while testifying, but pixelation of

the underlying materials, whether videos or photographs, to the

extent they would identify the undercover.

What you are proposing is that, if those materials are

shown in court, they should also be transmitted to the other

room with only that which is necessary to pixelate the identity

of the undercover?

Am I hearing you right?

MR. RILEY:  Yes.  But I need to ask you a question.

If the undercover is not going to be on the witness stand, but

is only going to be in a video, then who's going to be

testifying?

THE COURT:  No.  In other words, my understanding is,

and I will confirm this at the end of my questioning with you

in a moment from the government, that an undercover would

38

I12nalmc

1    testify, and that it might be that exhibits are shown during

2    the undercover's testimony, including -- and I don't know

3    this -- but audiotapes and perhaps including either videotapes

4    or still photographs.

5          Paragraph 10 of the proposed order proposes to the

6    Court that "Any videos, photographs, or other images of the UC

7    that are shown in open court . . . shall be altered to pixelate

8    or otherwise obscure the UCs' faces."

9          I don't understand the proposal to be that those

10   materials be inaccessible to the press or the public, only that

11   the face or the identifying features of the UC, the undercover,

12   be pixelated.

13         That's about as far as I can go in answering your

14   question, and I'm really reading from the proposed order.

15         MR. RILEY:  If I'm understanding it correctly, the

16   undercover would be sitting on the stand testifying about a

17   video in which the undercover appeared.

18         THE COURT:  That could well be what happens.

19         MR. RILEY:  The press and public would be removed from

20   the courtroom, not so much because of the videos, because the

21   video would be pixelated and would be available to us

22   afterwards, but we would be removed so we couldn't see the

23   undercover on the witness stand testifying.

24         so what I would be suggesting is that it would be more

25   useful I think to the press and public to see the video that

I12nalmc

1   was being played from our remote location with the pixelated

2   face instead of to just hear an audio of --

3              THE COURT:  In other words, you want to make sure that

4   the remote location has the pixelated video playing in real

5   time as it's shown to the jury?

6              MR. RILEY:  Yes.

7              THE COURT:  OK.

8              MR. RILEY:  That's all.

9              THE COURT:  Before I hear from the second member of

10  the public who had raised her hand, let me, while this is

11  fresh, just take this up with the government to see to what

12  degree, if any, there is any difference of judgment.  Let's

13  start with the back end of that.

14             Paragraph 10 of the order appears to contemplate, as I

15  read it, exactly what Mr. Reilly is proposing with respect to

16  live access to pixelated videos or photographs.  That is to say

17  that people not in the courtroom who are following along in the

18  remote location would be able to see in real time the pixelated

19  photograph or video as it is presented.

20             Is that what the government had in mind?

21             MR. BOVE:  It is, Judge.  There is a question here

22  about the practical capabilities of the technology, because in

23  court during the proposed closure we would be playing

24  nonpixelated videos and showing to the jury nonpixelated

25  photographs.  So there would be some question about whether it

I12nalmc

would be sufficient to simply provide the pixelated exhibits in

the room where the testimony is being transmitted so that the

people in that room can follow along or if there's some further

step that can be taken so that we can simultaneously play the

videos.

THE COURT:  Right.

I take it the challenge with the simultaneity is that

you literally have two different videos, one pixelated for

outside of the courtroom and one nonpixelated for inside.  If

the nature of the examination is to stop, for example, at

various points in the video to pause and ask the witness a

question, "What are you pointing to here?" it becomes

mechanically harder to stop the remote video which is perhaps a

separate document.  You would probably need a legal assistant

who is cued to stop the video at the same marker, something

like that?

MR. BOVE:  That certainly illustrates the concern.  I

agree it is just a question of how we address it.

Another potential way to do it is the lawyers'

questions just for purposes of record making will necessarily

be referring to the time stamps on the videos.  The time stamps

will be the same between the nonpixelated version and the

pixelated versions, so perhaps the people present in this

overflow room themselves would navigating along with --

THE COURT:  If I were to issue an order along the

I12nalmc

1    lines of the following, would it be technologically feasible.

2    I take it the pixelated video is created before trial, and it

3    would have the same time stamps as the nonpixelated video.

4            Therefore, if during the course of an examination of a

5    witness counsel were sensitive to call out the time stamp, we

6    are now at time stamp two minutes and forty-six seconds, it

7    would be practicable for, let us say, a legal assistant in the

8    overflow room to then advance the pixelated video to that same

9    time stamp, recognizing that it is an extra draw on personnel,

10   but frankly so if the whole process -- there is a

11   personnel-intensive quality to the whole process of a partial

12   courtroom closure, as your order illustrates.

13           I take it that would likely be workable, and then the

14   backstop would be that the pixelated video would in any event

15   be available, as all court videos are, to the press.

16           MR. BOVE:  I agree, Judge.

17           THE COURT:  I take it there is no reason off the top

18   of your head why that is not a workable, if a little bit more

19   labor-intensive, solution.

20           MR. BOVE:  I agree with everything you have said,

21   subject to the caveat that I am not an expert in the courtroom

22   technology, but it seems to me in my experience that that would

23   all work.

24           THE COURT:  Let's go back to the other issue that

25   Mr. Riley raised.

I12nalmc

1          Put aside the Second Circuit doctrine with respect to

2     the family, and let's just talk about the practicalities of

3     having a pool reporter here.

4          Assuming that the Court were to order that, in

5     addition to the people who are in your proposed order, a pool

6     reporter would be present with instructions not to physically

7     describe the undercover either in reporting or in the report to

8     the pool, what is the harm with that?

9          MR. BOVE:  I think the concern then is some sort of

10    inadvertent disclosure or piece of information that gets out

11    that leads to the identification of one of these witnesses.

12         I say that in the context of the submissions that we

13    have made, meaning we think that the risks associated with such

14    an inadvertent disclosure are extremely high in this case.  We

15    think we have made that showing, so that in our view the

16    appropriate bounds here are the ones set forth in --

17         THE COURT:  I appreciate that is your position.  Do

18    you think there are steps the Court can take that can impress

19    upon the reporter, if there is a singular pool reporter who is

20    tasked with this job, of the need not to include any physical

21    descriptors of the testifying witness or for that matter the

22    undercover as depicted on any still or video?

23         I would like to think that, particularly with pool

24    reporters, who are seasoned reporters familiar with courtrooms,

25    they can be expected to be sensitive to the restrictions along

I12nalmc

1   the lines that Mr. Riley has proposed.

2           MR. BOVE:  I certainly agree that you could direct

3   reporters in the courtroom to do that.  I am not intending to

4   cast any aspersions on the reporters who would be tasked with

5   that.

6           My point is simply that the costs of an error in

7   complying with that order are exceedingly high in this case.

8   The type of error that could occur would, I think, lead to not

9   just a communication from one person to another outside the

10  courtroom, but a public report that could inadvertently lead to

11  the identification of one of these witnesses.  We think that

12  the costs of that situation are so high that the measures we

13  have proposed as set forth in the order are the appropriate

14  bounds.

15          THE COURT:  All right.

16          I take it a counter could be that, for better or

17  worse, that if the case law permits family members in the

18  courtroom, in an era in which there are YouTube -- not YouTube,

19  but, you know, tweeting and stuff like that, such a person

20  could equally as well describe the facial hair or the color of

21  the hair or the color of the eyes or whatever the descriptor

22  might be.

23          MR. BOVE:  I think that's right, Judge.  My

24  understanding of what's animating the case law pushing towards

25  allowing the immediate family in the courtroom is the measure

I12nalmc

1   of support that those family members and comfort provide to the

2   defendant, a criminal defendant at a trial who is under this

3   very stressful experience.  So that is another consideration

4   that has led the circuit to suggest, if not direct, that the

5   family members be present that is not present when we are

6   talking about members of the media.

7        THE COURT:  No.  There is a different countervailing

8   interest, which is the benefits of public access to the court,

9   and what is lost by not having a reporter present along the

10   lines of describing, for example, how the defendant reacted or

11   somebody else in the courtroom reacted to testimony, and, you

12   know, a picture's worth a thousand words, and the reporter by

13   being remote is cut off from the visual imagery.

14        MR. BOVE:  I think maybe then a different way to

15   strike this balance would be if there are reactions like that

16   that are notable, your Honor could describe them, and the press

17   would have the benefit of them.

18        THE COURT:  I have other things going on than being

19   Vin Scully during the testimony.  I am here to make rulings on

20   evidence, not to describe that the defendant just yawned.  That

21   is not going to happen.

22        MR. BOVE:  I am here, Judge, and we're here trying to

23   ensure that the safety of these undercovers, who have families

24   and have been involved in very dangerous work, is protected to

25   the fullest extent possible.

I12nalmc

<table>
<tr><td>1</td><td>THE COURT:  OK.  Thank you.</td></tr>
</table>

1          THE COURT:  OK.  Thank you.

2          I will take this under advisement.  But I think Mr.

3     Riley's suggestion is at least a colorable one, and I am going

4     to give thought to it.

5          OK.  Who was the second speaker?

6          Let me just thank you, Mr. Riley, for your thoughtful

7     suggestions, which I am going to take under advisement.  And

8     thank you, Mr. Bove, for the government's perspective on them.

9          Good afternoon.

10          MS. ZAVADSKI:  Good afternoon, your Honor, my name is

11     Katy Zavadski.

12          THE COURT:  Your affiliation?

13          MS. ZAVADSKI:  I am a reporter at the Daily Beast.  I

14     have been covering this case, and I intend to continue to cover

15     it.

16          Your Honor, I wholeheartedly agree with many of the

17     comments made by my colleague John Riley.  I also wanted to

18     briefly comment on the sort of public interest in this case as

19     compared to perhaps other cases.

20          The charges in this case stem almost in their entirety

21     from the defendant's interactions with undercover officers.

22     This puts the undercovers at the center of this case, and puts

23     the public interest in hearing what they have to say, what the

24     courtroom is like during their testimony sort of into the

25     center of what this case is about.

I12nalmc

1            And, your Honor, I would argue that this fits into the

2    broader public conversation with the role of undercover

3    officers in terrorism proceedings.  And perhaps it might be

4    central to one of the defenses in the case.  I don't know about

5    that.

6            But I think there is a compelling public interest both

7    in this case in particular and in the broader conversation

8    about issues of entrapment and the defendant's role in what

9    allegedly transpired.

10           Your Honor, in a different case in the Eastern

11   District that I'm also covering, there is a similar issue with

12   an undercover officer and several possible solutions were

13   discussed that I would like to propose here.

14           THE COURT:  What case and what Judge?

15           MS. ZAVADSKI:  It's the United States v. Velentzas and

16   Siddiqui.

17           THE COURT:  Who is the judge?

18           MS. ZAVADSKI:  Sterling Johnson, your Honor.

19           In that case Judge Johnson is inclined to keep the

20   courtroom opened to an extent during the undercover's

21   testimony.  I don't believe it's been completely decided, but

22   the proposed solutions that have been discussed have included a

23   strategically placed screen that would shield the undercover

24   from public view while allowing the jury to view her in that

25   case.

I12nalmc

1          Also Judge Sterling Johnson is considering having the

2     undercover put on a niqab that would protect her --

3          THE COURT:  A what?

4          MS. ZAVADSKI:  A niqab, n-i-q-a-b.  It is a

5     traditional garment worn in some Muslim cultures that would

6     allow her eyes to be visible but would otherwise shield her

7     face.

8          I don't know what the male equivalent of such an

9     attire would be, but perhaps there is a way to conceal the

10    undercover's identity while allowing the public to view his

11    mannerisms, to monitor his inflection in conjunction with his

12    body language, things like that.

13          Then, finally, I think my colleague Mr. Riley's

14    proposal about certain restrictions on reporters present in the

15    courtroom is, I think, a reasonable and sound one.  Certainly I

16    think the press corps in the Southern District is very

17    responsible.

18          In response to Mr. Bove's suggestions about the press

19    accidentally leaking characteristics of the undercover to the

20    public, I will point out that in the Eastern District case the

21    press actually has copies of photographs of that undercover's

22    identity, which we have been incredibly responsible in not

23    revealing to the press.  So I think we --

24          THE COURT:  Copies obtained via the trial evidence or

25    some other means?

I12nalmc

1          MS. ZAVADSKI:  Copies obtained via public access, your

2     Honor, on social media, that we have been incredibly

3     responsible in not revealing and not tracing back to the

4     location where we obtained them.

5          So I think in this case we will certainly manage to

6     not reveal anything about the undercover's facial hair or

7     ethnic background or whatever else might be the case.

8          THE COURT:  May I ask you this.  Something sits funny

9     about the idea of a court order that tells a reporter what not

10    to publish.

11         MS. ZAVADSKI:  Yes, your Honor.

12         THE COURT:  In some respects, the wholesale exclusion

13    from the courtroom gets rid of a content directive by a judge,

14    which sits very uncomfortably.  Yet both you and Mr. Riley have

15    indicated that, as between the two, you would be happier with

16    being here and promising to accede to a court condition that

17    said no commentary on the characteristics of the undercover.

18         Am I reading you correctly?

19         MS. ZAVADSKI:  Yes.

20         THE COURT:  I don't know who the pool reporter would

21    be under the arrangement that's been proposed, and I am not

22    sure who makes that choice, we will come to that in a moment,

23    do you think though that the view that you and Mr. Riley are

24    articulating is a commonly held one that the press would accede

25    to, or as opposed to balk at or challenge an order that said

I12nalmc

1    you can be here if you don't publish a description of the

2    undercover?

3            MS. ZAVADSKI:  Yes, your Honor.  I don't think you

4    would have to resort to necessarily a court order.  As I

5    mentioned, I think this press corps is exceedingly

6    professional, and we have acceded in both the Southern and

7    Eastern Districts to similar restrictions.

8            For example, I can direct you to the Martin Shkreli

9    case earlier this year, where a pool reporter was present for

10   jury selection at sidebar with the understanding that she would

11   not relay the names of the jurors or any identifying

12   characteristics to the other reporters or of course report them

13   in her own reporting.  With that accommodation for the Court's

14   interest in making sure the jurors are comfortable stating

15   their true opinions, the press was able to get colorful

16   commentary about what the jurors thought of Mr. Shkreli without

17   compromising the integrity of the proceedings.

18           THE COURT:  What about the pool concept?  Has that

19   been used before where a singular member of the press in this

20   sort of situation is treated as the oracle as to the visual

21   descriptions of what happened in court?

22           MS. ZAVADSKI:  Your Honor, that is what happened at

23   sidebar in the Shkreli case.  I don't have off the top of my

24   head an instance where during a piece of testimony there was

25   only one pool reporter, but certainly the Southern District

I12nalmc

1    press corps has rotated pool reporters in limited capacities

2    through parts of trials with exceeding public interest.

3              THE COURT:  How does that person tend to be chosen?

4              MS. ZAVADSKI:  It is a democratic process, your Honor.

5              THE COURT:  It is by vote or by lot?

6              MS. ZAVADSKI:  It is by volunteering.

7              THE COURT:  It is not by court selection?

8              MS. ZAVADSKI:  No, your Honor.

9              THE COURT:  How are the parameters of the eligible

10   candidates chosen?

11             MS. ZAVADSKI:  Your Honor, I will defer to Mr. Riley

12   if he has maybe another suggestion, but I think it is usually

13   from within the in house reporters who sit in the press room in

14   this building or in the building next door, your Honor.

15             THE COURT:  I suppose one possible way to handle those

16   mechanics would be that, if I'm inclined towards directionally

17   what you and Mr. Riley are proposing, leave the details to be

18   worked out through a later proposal by the in-house reporters

19   of the court.  That way one gets the benefit of the feedback

20   and perhaps a written commitment by the chosen reporter or

21   reporters to heed the instruction not to identify in any way

22   the UC.

23             MS. ZAVADSKI:  Yes your Honor.

24             THE COURT:  OK.

25             MS. ZAVADSKI:  I would also argue, if the court were

I12nalmc

1    to limit it to sort of vetted in-house reporters, perhaps

2    limiting to it one pool reporter who be on responsible for

3    being there for all of those days of testimony of the

4    undercover in their entirety might not be at the only way to

5    go.  Perhaps there could be a rotating system where several

6    people --

7             THE COURT:  Right.  I assume the notion would be,

8    given the possibilities of multiple undercovers in this case,

9    it may be that a way to handle this would be to invite a

10   proposal by the embedded, if you will, reporters in the

11   courthouse to propose how this would work, and the Court could

12   then evaluate it.  But if, for example, the notion would be

13   that two people would cover each day taking turns so that they

14   could each have an opportunity to report back to the rest of

15   the courthouse reporting community or take a break, I guess the

16   case may be there would be that opportunity.

17            MS. ZAVADSKI:  Yes, your Honor.

18            THE COURT:  Anything further from you?

19            MS. ZAVADSKI:  No.  That's it.

20            Thank you so much.

21            THE COURT:  OK.  Thank you.

22            Let me just then, Mr. Bove, take that up with you.

23            On the assumption that the Court were inclined to

24   permit a pool reporter to be present, but with a commitment not

25   to describe the undercover, does the government have any

I12nalmc

```
 1   experience with that approach?  I know it's been used with
 2   respect to jury selection, including the mechanics by which
 3   such a reporter would be chosen and the commitment not to
 4   expose the undercover embodied.
 5            MR. BOVE:  The two lawyers at the table don't have
 6   experience, Judge, but we would be happy to look into it.
 7            THE COURT:  Good.  I am going to take that request
 8   very seriously.
 9            MR. BOVE:  Also, as maybe another way to accommodate
10   this concern, I am not sure if it's feasible technologically,
11   but perhaps there would be a video setup that captured the
12   lawyers and the defendant, but not the undercover that was
13   played into that room where the press and the public have
14   access.
15            THE COURT:  All right.  Thank you.
16            Anything else from you, Mr. Bove?
17            MR. BOVE:  No, your Honor.
18            THE COURT:  I saw that at that suggestion Ms. Zavadski
19   alerted.  If you want to speak, I'm happy to hear your comment,
20   but you need to speak from the mic.
21            MS. ZAVADSKI:  Yes, your Honor.
22            Your Honor, I just wanted to briefly note the various
23   issues that reporters have had with video in this courthouse
24   and more broadly.  It is impossible to capture everything that
25   is said in the courtroom on video.
```

I12nalmc

1          There have been issues with attorneys stepping away

2     from the mic and us losing video feed, audio for periods of

3     time.  There's also an issue of the video feed just not being

4     that great in quality.

5          So I just wanted to flag that.

6          THE COURT:  OK.

7          MS. ZAVADSKI:  Thanks.

8          THE COURT:  Mr. Bove, can you give me a present

9     estimate as to the collective length of the direct examinations

10     of the undercovers in total in this case.

11          MR. BOVE:  Can I have a moment, Judge.

12          THE COURT:  Yes.

13          MR. BOVE:  Just in an effort to be conservative,

14     Judge, we are obviously still preparing for trial, but speaking

15     about it right now, we're estimating some period between one

16     and a half to two trial days.

17          THE COURT:  One and a half to two trial days that

18     would be comprised of the direct of undercovers in total?

19          MR. BOVE:  Yes, Judge.

20          THE COURT:  OK.  What percentage, if you will, of the

21     government's overall direct case might that one and a half or

22     two trial days represent?

23          MR. BOVE:  Approximately a third or so, Judge.

24          THE COURT:  OK.

25          Does the government have any experience with the

I12nalmc

1    screen proposal?  I understand the issues about the prejudice

2    to the defendant of using that -- I see Ms. Shroff nodding

3    already, the prejudice to the defendant of having a screen

4    which the jury would be aware of, but I'm just curious whether

5    in practice it has been used to your knowledge in this

6    district.

7            MR. BOVE:  Again, the two lawyers at the table are not

8    aware of it having been used, but also familiar with the case

9    law expressing concerns about the prejudicial effect of such a

10   screen.

11           THE COURT:  Right.  Thank you.

12           Let me see if there's anybody else from the press or

13   public who wants to be heard?

14           All right.  The record will reflect the answer is no.

15           Government, do you have anything further to add?

16           The issue I have reserved judgment on, but we have had

17   a full discussion today.  Let me just give all lawyers here an

18   opportunity to be heard if there's something more you want to

19   a.

20           MR. BOVE:  One last note, Judge.

21           In our briefing on this we did request that, to the

22   extent the closures we had proposed were not granted, that to

23   the extent that did not happen the undercovers be permitted to

24   testify in some kind of light disguise.  As your Honor

25   evaluates the comments today, we would ask you to consider that

I12nalmc

1    as an alternative.

2              THE COURT:  Supposing I were considering the two

3    proposals that have been made, Mr. Riley's proposal of a pool

4    reporter and of real-time showing in a side room of pixelated

5    photos or videos, and suppose I were considering that Ms.

6    Zavadski as amplified on how the pool concept might work,

7    supposing I was considering that, do you really think those

8    changes would occasion a need to put on light disguises or

9    include a traditional head garment or anything like that?  It

10   sounds like overkill.

11             MR. BOVE:  I understand the concern.  We are not

12   proposing the head garment issue.

13             I make this proposal, Judge, on the understanding that

14   I am here as an advocate on behalf of these people who have

15   these concerns.  I understand the Court has other concerns or

16   bounds.  In this posture here today I feel like my job is do

17   secure as many protections as possible.

18             THE COURT:  I appreciate that.

19             MR. BOVE:  I don't mean to be impractical or

20   disrespectful.

21             THE COURT:  You never are.  But I'm trying to engage

22   with --

23             MR. BOVE:  Right.

24             THE COURT:  -- if we are talking about two changes

25   from what you have proposed, the pixelated photographs of trial

I12nalmc

1    evidence don't implicate this concern at all.

2          So the issue is having the pool reporter here only, on

3    top of what you have proposed, does that really occasion a need

4    for a wig or heavy makeup or a fake mustache or whatever you

5    have in mind?

6          MR. BOVE:  In our view it does.  Based on the

7    consultations that we have had with the FBI and the interests

8    that we represent here today, we would ask that the Court

9    consider that in striking the appropriate balance here.

10         THE COURT:  If that were done, would it be drawn to

11   the jury's attention that the person was wearing a disguise?

12   After all, if there is a video of the undercover, the jury is

13   already seeing what the undercover in real life looks like as

14   of the date of the events at issue.

15         I am now using my imagination to imagine what a

16   disguise would be so as to not put you in a position of having

17   to describe the features of the disguise.  But suppose we had

18   bushy eyebrows and a mustache and glasses.  Question one is

19   would you elicit from the undercover the fact that some

20   disguise is being used and why; and, if not, wouldn't there be

21   some issue that there might be a degree of prejudice to the

22   defense from the perception of danger that comes from the need

23   to gussy up the undercover?  Either way the jury is going to

24   see that the undercover looks different than on the video.

25         MR. BOVE:  In response to the first question, no, we

I12nalmc

1  would not seek to elicit that from the witness.  In response to

2  the second question, I think that in the context of videos that

3  were made in May of 2016, that the jury night --

4              THE COURT:  2016.  That's the arrest date?

5              MR. BOVE:  I apologize.  I'm focused on some of the

6  videos right around the arrest time.  There are ones that are

7  even older than that.

8              THE COURT:  Right.

9              MR. BOVE:  That the jury might not be as focused on

10  this issue and the differences in appearance.  It would be our

11  intention that the disguises be as light as possible and not

12  noticeable to anybody who is watching the proceedings.

13              THE COURT:  Well, if the reporter were in the

14  courtroom, the reporter would see the video already.  If the

15  reporter is seeing the video of the events at issue and then

16  seeing the undercover now with more or less facial hair or

17  lighter or darker skin thanks to mascara, what's the value of

18  that if the reporter can see the video anyway?

19              MR. BOVE:  It is a fair question, your Honor.

20              THE COURT:  I mean, I guess at some level all of this

21  says something about the level of confidence we have in the

22  press to heed a safety-related directive.

23              Does the government in its institutional experience

24  have a reason beyond the conjectural to be concerned about

25  this?

I12nalmc

1          MR. BOVE:  Not at all.

2          THE COURT:  OK.

3          Defense, do you have anything you would like to add?

4          MS. SHROFF:  Your Honor, we think there is a concern

5     with using the screen process.  Obviously the jury would get a

6     signal somehow that the work that undercover does is just so

7     dangerous that he or she should be afforded a higher level of

8     emphasis of care or sort of even their gratefulness as perhaps

9     even keeping them safe.  So I think the screen sort of sends

10    the wrong message.

11         On the visage of the undercover and the pedigree

12    information that is going to be elicited by the government, I

13    want to break it up into two parts.  I hardly think somebody is

14    going to find a physical description of the undercover to be

15    noteworthy in the newspapers.  I just don't see that as being

16    the crux of a reporter's focus on writing the article.

17         THE COURT:  Sure.  But it is not out of the question,

18    and the issue would be if the reporter were here whether some

19    commitment or order be secured that helps assure that it's

20    front and center for the reporter not to reveal those things in

21    the remote chance that there's some feature that for some

22    reason seems germane in the moment on report on.

23         MS. SHROFF:  I leave that between the Court and

24    journalists and prior restraint under the First Amendment.

25    That is not my issue at all in terms of a fair trial.

I12nalmc

```
 1           THE COURT:  Look, you have been a veteran lawyer in
 2   this courthouse in terrorism cases.  Have you any concern that
 3   a pool reporter from this courthouse would heed an admonition
 4   along the lines we have been talking about?  Do you have any
 5   doubt that they would?
 6           MS. SHROFF:  No.  I don't know the whole pool of
 7   reporters, but I could speak to Mr. Neumeister, who I know, or
 8   Mr. Riley, who I know or somebody else that I know, but I
 9   couldn't possibly speak to some random reporter who is chosen
10   as the pool reporter.  I wouldn't know that.
11           THE COURT:  I received your advocacy as to the broader
12   proposal by the government.  As to the modifications that have
13   been broached by the members of the media today, which are
14   essentially real-time pixelated photos and videos in the
15   overflow room and the presence of a pool reporter here at all
16   times, having promised not to disclose identifying features of
17   the undercover, do you have any problem with those?
18           MS. SHROFF:  I mean, I don't, because I don't think
19   the impact on Mr. Almehmeti's fair trial rights, I am not
20   concerned beyond that portion.  As Mr. Bove has a limited
21   concern here, so is mine.
22           On the makeup and the wig, those are the things that
23   concern me more, because they send a message to the jury.  My
24   concern is what and how the jury perceives the testimony and
25   how the testimony is evaluated by the jury.
```

I12nalmc

1        We are all in a different place in 2018.  The last

2    three months for New York have been extremely dangerous.

3    Already picking a jury is going to be hard enough.  Then you

4    finally pick a jury, and you think you have a fair and

5    impartial jury, and then the fair and impartial jury is sort of

6    inundated with things that sort of send to them a clear

7    message -- it may be subtle, but it's clear -- that these are

8    dangerous jobs.  These are jobs that come at a great price, and

9    a person is putting their own safety at risk to do it.  That

10   does not help Mr. Almehmeti at all.

11        THE COURT:  That I take it applies both to the screen

12   as well as to the subtle makeup.

13        MS. SHROFF:  Right.

14        THE COURT:  On the theory that if a reporter can see

15   the difference between the subtle makeup and the picture on the

16   undercover video, so too with the jury, and they will wonder

17   about it.

18        MS. SHROFF:  Right.

19        Also, I question the efficacy of subtle makeup.  If

20   it's that subtle, nobody is going to benefit from it, neither

21   the government nor us.

22        THE COURT:  OK.  Thank you.

23        I will take this issue under advisement and hope to

24   rule in short order.

25        Why don't we take a ten-minute break, and I will come

I12nalmc

1    out and invite defense counsel to come to the robing room.

2            Concretely what I am going to be seeking is an

3    illustration of the range of ways in which, if the computer

4    records were admitted, the sort of things that a defense lawyer

5    would be considering in defending against it.  This would be

6    helpful for me for the reasons I indicated, including in

7    determining conflict issues.

8            Thank you.  I will see you in ten minutes.

9            (Recess)

10           THE COURT:  All right.  I would like to pick up now to

11   my hearing from the defense more concretely what the nature of

12   the defense attack would likely be in the event that the

13   computer records allegedly transferred or shared in jail were

14   to be received.

15           Ms. Shroff, I take it the nature of that conversation

16   is one that really is not properly ventilated in front of your

17   litigation adversary?

18           MS. SHROFF:  That's correct, your Honor.

19           THE COURT:  I will be happy to see defense counsel in

20   the robing room accompanied by the court reporter and my staff.

21           (Pages 62 through 84 sealed)

22

23

24

25

I12nalmc

1          (In open court)

2          (All counsel and defendant present)

3          THE COURT:  While I was in the robing room with

4     defense counsel, we had an extended discussion about the issue

5     that I identified earlier.  The nature of the discussion is

6     that it is properly *ex parte* and under seal, with a transcript

7     of the robing room conversation available only to the defense

8     and the Court.  I thank defense counsel for a very helpful

9     ventilation of the issues that we covered.

10          I have nothing further for counsel.

11          Is there anything that anyone has to raise with me

12    today?

13          MR. BOVE:  One thing, Judge.

14          We don't want to get too far ahead of ourselves and,

15    this is the *Curcio* issue, but we wanted to know, given the

16    limited number of days between now and the scheduled start of

17    the trial, that there is an absence of information in the

18    record about the positions of the two other affected clients.

19    The government's position is that the *Curcio* proceeding that

20    your Honor has commenced can be completed without that

21    information.  But if there's going to be additional motion

22    practice about withdrawal, I think those two affected clients'

23    positions are germane to the motion practice along those lines,

24    and so we would like to have that information available by the

25    Friday proceeding if there's going to be --

I12nalmc

1          THE COURT:  What information are you speaking of?

2          MR. BOVE:  Whether those two clients are giving, to

3  use the language of the rules, informed consent in writing,

4  which I think can actually take a number of forms.

5          THE COURT:  Let's just play out one of the branches of

6  the decision tree here.

7          Let us suppose that the Court's ruling was to not

8  admit the evidence in question.  Would there be a need for a

9  *Curcio* proceeding again with respect to those clients?

10          MR. BOVE:  Our view is yes, Judge, in light of the

11  certainty with respect to Mr. Rahimi, and in the event of a

12  sentencing with respect to the defendant here that the

13  government will offer this evidence at sentence.

14          THE COURT:  Articulate for me, if the evidence isn't

15  coming in here, purely hypothetical, what the conflict becomes?

16          Is it that each defendant, assuming a conviction in

17  each case, has an incentive to assist the government in proving

18  up the sharing within the MCC with the other.

19          MR. TURNER:  I think that's one way that it could play

20  out.

21          Another is the same way that it could play out at the

22  trial, in that each defendant would have an incentive to seek

23  to establish that the person who disseminated the propaganda

24  was the other.

25          THE COURT:  I understand the need for the *Curcio* in

87

I12nalmc

1   the event that the evidence is coming in.  I am just playing

2   out the other scenario.

3            MR. BOVE:  At sentencing?

4            THE COURT:  No.

5            Let's suppose at trial the evidence was excluded,

6   without prejudice to the government's right at either

7   defendant's sentencing, assuming a conviction, to establish

8   responsibility by that person for the sharing.

9            I take it your point would be there remains some

10  incentive that each would have to assist the government to

11  prove up the sharing as an act at least in part by the other.

12           MR. BOVE:  Yes, Judge.

13           THE COURT:  *I.e.*, to tell a narrative in which

14  together they agreed to share, to swap.

15           MR. BOVE:  Yes.

16           THE COURT:  And is that a crime?

17           MR. BOVE:  Excuse me.

18           THE COURT:  Is it a crime to share that information

19  within the MCC?

20           MR. BOVE:  I haven't thought carefully about that.

21           THE COURT:  Really?  I mean, I would have thought you

22  would have thought very carefully about it, because if it were

23  a colorable basis for a crime, you would be making the argument

24  to me, would you not, that there is an incentive right here and

25  now for each of them to cooperate and implicate the other in

1    this quote-unquote crime to reduce exposure?

2            I'm trying to smoke out whether or not you think that

3    the sharing of terrorist propaganda within prison, even if in

4    violation of let's say a discovery restriction in a particular

5    case, if so, whether that's a crime.

6            MR. BOVE:  I think that it could be, and I think we

7    are still developing some of the facts that bear on that.

8            THE COURT:  In other words, the notion would be from

9    your perspective, insofar as you don't have full visibility

10   into what each would say about the other, and all you have is

11   what's on the computer, there's a scenario under which that

12   sharing could be part of a crime, depending on what other

13   information is out there; but, without more, the facts that you

14   know you are not confident in calling a crime?

15           MR. BOVE:  Framed that way, yes, I agree with that.

16           THE COURT:  All right.

17           Defense counsel, what is the status of potential

18   *Curcios* with respect to the other defendants?

19           I read in one side or the other's letter that Judge

20   Berman declined to defer the sentencing, but that may or may

21   not be a different issue about *Curcio*.

22           What is the status of *Curcios* to your knowledge with

23   respect to Federal Defenders' other clients?

24           MS. SHROFF:  Your Honor, we submitted the same letter

25   that we wrote to this Court to Judge Berman.  Judge Berman also

I12nalmc

1    received a copy of the government's letter which was filed on

2    ECF.

3              I believe Judge Berman endorsed our letter to the

4    language that read something akin to Mr. Patton should be

5    notified or proceed under the assumption that the Federal

6    Defenders of New York remains counsel to Mr. Rahimi and fully

7    expects them to be present or be his lawyers at sentence.

8              THE COURT:  Right.

9              MS. SHROFF:  That is where Judge Berman's endorsement

10   ended.  If I'm reading it wrong, maybe the government can

11   correct me.  I'm really doing it from memory.

12             THE COURT:  It suggests that no *Curcio* is as yet

13   scheduled in front of him, but that the request remains

14   pending?

15             MS. SHROFF:  I think he scheduled a status conference

16   for us for January 5, which is this Friday?

17             THE COURT:  What time?

18             MS. SHROFF:  I don't remember.

19               January 4?  I'm really not good with dates.

20             THE COURT:  January?

21             MR. BOVE:  4th.

22             THE COURT:  So you will have a better insight as to

23   what is happening in the Rahimi case.

24             Have you any knowledge as to whether a *Curcio* is

25   scheduled in the Defendant 1 case?

I12nalmc

1          MS. SHROFF:  I don't think we would know the first

2     thing about that because he is a sentenced defendant, and the

3     case is up on appeal to the Second Circuit.  So I am not really

4     sure how we would even go about scheduling a *Curcio* on the

5     case.

6          THE COURT:  My experience tells me that,

7     notwithstanding the pendency of the appeal to the circuit, it

8     is likely that the district judge could hear the separate

9     matter of a *Curcio*, or at least issue some order alerting the

10    circuit to the intention to undertake that.  But I don't want

11    to get out in front of my skis.  It's somebody else's case.

12         Mr. Bove, I am not sure exactly what it is you are

13    asking be done at this point.  For better or worse, the issue

14    has been raised to my colleagues.  I am not sure that defense

15    counsel can do something different than has been done.  The

16    issue has been raised.  It is what it is.

17         MR. TURNER:  I think what I am seeking to do is draw a

18    distinction between the *Curcio* proceeding and the ethical

19    rules, and the ethical question that's been raised.  My point

20    is that under the ethical rules, these are all existing

21    representations, which is the case here right now --

22         THE COURT:  Right.

23         MR. TURNER:  -- or even if the Federal Defenders were

24    to withdraw as to one or both of the other affected clients,

25    they is still under the New York ethical rules a question of

I12nalmc

1   whether these current or former clients other than the

2   defendant here gives consent.

3          THE COURT:  Right.

4          I will offer this thought.  I understand the point.

5   If we get to that stage, it will be undeniably of value to know

6   what the outcome is with respect to the motion to exclude, or

7   receive as the case may be, the prison evidence.

8          It seems to me it's much easier to have that

9   conversation with respect to those clients once there's clarity

10  from me as to whether this evidence is coming in.  I will

11  endeavor to resolve that quickly, but it seems to me that that

12  more than anything is the gating issue here.

13         MR. TURNER:  Thank you, Judge.

14         THE COURT:  I appreciate your valid point.

15         But it seems to me that is, more than anything, the

16  key issue.  There are sequels that we have to follow regardless

17  of which way that goes in this case, and there are likely

18  implications in the other cases.  But rather than putting the

19  colleagues of mine and defendants in a confusing situation

20  based on one big imponderable here, it seems to me the onus is

21  on this Court to resolve the issue promptly.

22         I would note just as a matter of punctiliousness the

23  following:  In the event that this Court were to rule that the

24  evidence is coming in at trial, the computer evidence, and in

25  the event that the effect of that ruling were to require the

I12nalmc

1    substitution of counsel, whether because of a lack of consent

2    by Mr. Almehmeti, whether based on granting the defense motion

3    to withdraw, whether some exercise of the Court's supervisory

4    authority, whatever the cause would be, I think I would need to

5    extend to successor counsel as to that one motion *in limine* the

6    opportunity to be heard anew on it on the possibility, even if

7    it's more theoretical than real, that Federal Defenders was in

8    some way inhibited in its advocacy on this point that involved

9    its other client.

10           So in the event that the evidence comes in and I rule

11   that and the effect is that Federal Defenders is out, we have

12   new lawyer, inevitably some trial adjournment while the new

13   person gets up to speed, I would extend to that lawyer the

14   right to bring new arguments to my attention that bear on that

15   issue because of the possibility which, knowing defense counsel

16   as I do, I regard as theoretical rather than real, that they

17   held back in making some argument in deference to a different

18   client relationship.  OK.

19           MR. BOVE:  I understand.

20           THE COURT:  I will see you all at 4 o'clock on Friday.

21           Mr. Strazza, I expect that the first order of business

22   will be to complete the *Curcio* proceeding, and I will ask you

23   to please assume for the purposes of your conversation with

24   your client that the evidence is coming in.  It seems to me

25   that will focus your conversation better.

I12nalmc

1           It's not indicative of the ruling I will make, but

2     that is the much more challenging path vis-a-vis a *Curcio*, and

3     I would like you to have him prepared on that assumption.

4           MR. STRAZZA:  Yes, your Honor.

5           THE COURT:  Thank you.

6           We stand adjourned.

7           (Adjourned)