Hcmnalmc

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4                v.                        16 Cr. 398 (PAE)

5   SAJMIR ALMEHMETI,

6                Defendant.                Conference

7   ------------------------------x

8                                          New York, New York
                                           December 22, 2017
9                                          9:20 a.m.

10

    Before:
11
                      HON. PAUL A. ENGELMAYER,
12
                                           District Judge
13

14                       APPEARANCES

15  JOON H. KIM
         Acting United States Attorney for the
16       Southern District of New York
    BY:  GEORGE TURNER
17       Assistant United States Attorney

18  SABRINA SHROFF
         Attorney for Defendant
19
    ALSO PRESENT:
20
    ANTHONY STRAZZA
21

22

23

24

25

Hcmnalmc

```
 1            (Case called)

 2            MR. TURNER:  Good morning, your Honor.

 3            George Turner, for the government.

 4            THE COURT:  Good morning, Mr. Turner.

 5            MS. SHROFF:  Good morning, your Honor.  On behalf of

 6   Mr. Almehmeti, Federal Defenders of New York, by Sabrina

 7   Shroff.

 8            THE COURT:  Good morning, Ms. Shroff.

 9            Good morning to you, Mr. Almehmeti.

10            THE DEFENDANT:  Good morning.

11            THE COURT:  I understand that somewhere out there is

12   Anthony Strazza, correct?

13            MR. STRAZZA:  Yes.  Good morning, your Honor.

14            THE COURT:  Good morning.

15            Mr. Strazza is here as CJA counsel.  Depending on the

16   course that events take today, I may well be appointing

17   Mr. Strazza for a limited purpose in connection with the Curcio

18   issue that has arisen.

19            In any event, I thank you for being here.  You may all

20   be seated.  I wanted to thank counsel for accommodating this

21   short-notice hearing.

22            To set the stage here, I received a letter on December

23   19 from the government indicating the perceived need for a

24   Curcio procedure, and a separate letter filed under seal on the

25   same day elaborating on relevant issues.  My law clerk was then
```

Hcmnalmc

1   notified by defense counsel that they could make themselves

2   available for a *Curcio* conference.

3           Given the trial date in the case and all the work

4   ahead of us, and the fact that the *Curcio* issue here intersects

5   with one of the issues that is *sub judice* as the subject of a

6   motion *in limine*, it seemed to me important to gather us now.

7           I thought that it was particularly important given the

8   likelihood that this will be, as is commonly the case, a

9   two-step *Curcio* process in which the defendant at the first

10  conference is educated as to the issues that are presented and

11  then has an opportunity to reflect on them, confer with

12  conflict-free counsel, and then report back to the Court as to

13  whether or not he waives the potential conflict.

14          Given that, I wanted to have our initial conference

15  sooner rather than later.  In any event, I'm mindful that you

16  may have had other things to do, and I appreciate everyone

17  accommodating the schedule.

18          With that, I think what would be most useful before I

19  turn any attention to the defendant would be for me to have a

20  colloquy with the government at which the government can slowly

21  and distinctly set out the facts that can be put on the public

22  record relating to the *Curcio* issue here.

23          At the end of that, I want to make sure that I have an

24  itemized colloquy with you, Mr. Turner, that sets out the areas

25  of potential conflict that the government perceives.

Hcmnalmc

1          I want to make sure that our discussion essentially

2   ventilates the issues here, because that will promote greater

3   understanding for all concerned, including Mr. Almehmeti.

4          So the floor is yours.

5          MR. TURNER:  Yes, Judge.

6          There are three defendants involved here, as we set

7   forth in our letter of the 19th, Mr. Almehmeti, defendant

8   Rahimi, and the defendant that we referred to at Defendant 1 in

9   our publicly filed letter of the 19th.  All three of those

10  defendants are represented concurrently by the Federal

11  Defenders.

12         Ms. Shroff, one of the cocounsel here on behalf of

13  Mr. Almehmeti, represents both Rahimi and, of course,

14  Mr. Almehmetii.

15         Recently, the government learned -- and again as we've

16  set fourth in greater detail in our letters -- that those three

17  defendants have been involved in the receipt and dissemination

18  of terrorist propaganda materials within the Metropolitan

19  Correctional Center.

20         Specifically, there are several pieces of media

21  involved.  There is a hard drive that was recovered from a

22  locker assigned to Mr. Almehmeti at the MCC.  That drive

23  appears to contain materials produced in discovery both to

24  Mr. Rahimi and to Mr. Almehmeti.

25         Again, Judge, let me just say that --

1            THE COURT:  The hard drive in his locker --

2            MR. TURNER:  Yes.

3            THE COURT:  -- you represent has discovery material as

4    to his own case, which doesn't present an issue, but also the

5    Rahimi case?

6            MR. TURNER:  Correct.

7        When I say discovery materials, I'm referring

8    specifically to what we've identified as terrorist propaganda

9    materials in our submissions.

10        I would also note, Judge, that the FBI's forensic

11   examination is ongoing of these piece of media.

12        Second, there is a disk which is the disk referred to

13   as disk 1 in the government's December 19 letter, which was

14   also recovered from the same locker assigned to Mr. Almehmeti

15   at the MCC, and it contains a series of lectures by Anwar

16   al-Awlaki, a former senior leader of al-Qaeda in the Arabian

17   Peninsula, known as AQAP, materials that were located on

18   devices or at least a device seized from Mr. Almehmeti during

19   this case and then produced to him in the course of discovery.

20   In other words, Mr. Almehmeti's discovery materials.  Those

21   files, those lectures, as we also explain in our letter --

22            THE COURT:  Sorry.  Wait.  The disk that is found in

23   Mr. Almehmeti's locker contains material that is discovery in

24   his own case.  Maybe you haven't gotten to it yet.  Does that

25   disk contain materials of this nature that were not discovery

Hcmnalmc

1    in Mr. Almehmeti's case, but were discovery in either the

2    Rahimi or Defendant 1 case?

3              MR. TURNER:  Our current assessment, Judge is that,

4    first of all, the disk contains only that set of lectures.  It

5    is not those lectures and other materials.

6              THE COURT:  OK.

7              MR. TURNER:  It is a set of lectures, approximately

8    20.

9              And our current assessment is that all of those files

10   are contained in Mr. Almehmeti's discovery materials.  We are

11   in the process of determining whether there is overlap.  And

12   those materials are also contained in Mr. Rahimi's materials.

13             THE COURT:  Assuming that all of the lectures are in

14   the Almehmeti discovery materials, you would need some forensic

15   proof to show that they nevertheless got to this disk via some

16   other defendant's discovery material.

17             In other words, the natural inference would be, if it

18   was already produced to him and is on a disk in his locker,

19   absent some other proof, that it presumably came from the

20   discovery in his own case.

21             MR. TURNER:  That is correct.  That is our current

22   assessment.  But let me add one gloss, which is that as we've

23   also explained there is a notebook that was seized from

24   Rahimi's cell which contained several pages identifying

25   itemizing files of terrorist propaganda materials, including

Hcmnalmc

1    what appears to be a close, if not exact, match of these 20

2    approximately 20 files that were located on the disk that I

3    just described.

4            THE COURT:  When you say there is a file in the Rahimi

5    cell, is it an electronic file or a hard copy file?

6            MR. TURNER:  It is a hard copy, paper notebook

7    handwritten.

8            THE COURT:  So it is actually not photographic

9    reproductions, but it's his own handwritten summary?

10           MR. TURNER:  Yes.

11           I should note that those, or at least a subset of

12   those lectures also appear on the drive that was obtained from

13   Mr. Almehmeti's locker.

14           THE COURT:  Sorry.  What is similar between what is in

15   the locker and Rahimi -- the last point I didn't follow.

16           MR. TURNER:  The last point is that the materials on

17   the disk --

18           THE COURT:  Right.

19           MR. TURNER:  -- the al-Awlaki lectures, some or all of

20   those also appear on the hard drive that I mentioned first.

21           THE COURT:  I see.

22           MR. TURNER:  That was seized from the locker, which

23   contains a larger volume of materials.

24           THE COURT:  Right.

25           But, again, Mr. Almehmeti's possession, in whatever

Hcmnalmc

1   form, of materials that either are or are derivatives of his

2   own Rule 16 material presents no issue.  It's only when it

3   cross-pollinates with a different defendant, either his sharing

4   his materials with that defendant or his possessing materials

5   from a different defendant's case that the issue is joined?

6          MR. TURNER:  Which is I think what we can get to now

7   with the laptop as well as the disk that was obtained from

8   Defendant 1 as we've referred to him.

9          THE COURT:  Go ahead.

10          MR. TURNER:  A laptop was provided to Rahimi for

11   purpose of Rahimi viewing discovery, and as we have set forth

12   in our letter, the FBI's forensic examination has shown that

13   the hard drive that was seized from Mr. Almehmeti's locker was

14   plugged into, used by the laptop that was produced to defendant

15   Rahimi.

16          THE COURT:  Meaning it was -- just help me with the

17   technology here.  How does the hard drive physically intersect

18   with the laptop?

19          MR. TURNER:  In other words, the hard drive was

20   connected to the laptop.  The hard drive in Mr. Almehmeti's

21   locker was connected to the laptop that was provided to and in

22   the possession of defendant Rahimi.

23          THE COURT:  Just help me with the technology.

24   Particularly in the context of the MCC, how would one sync up

25   or connect the hard drive in a locker with the laptop?  What

Hcmnalmc

would that entail doing?

         MR. TURNER:  Again, so this is naturally somewhat

speculative.

         THE COURT:  Right.  What are the ways in which it

might have happened?

         MR. TURNER:  The ways in which it could have happened

is if the two defendants were in close proximity reviewing

discovery material.  The cord that is attached to the hard

drive could be essentially connected to, plugged into the

laptop and files could be modified on the hard drive through

use of the laptop.

         THE COURT:  And how would one forensically -- is there

a way forensically of proving that that happened?

         MR. TURNER:  There is a way forensically to determine

if the hard drive was connected to the laptop, and the FBI is

in the process of determining whether we can say more about

exactly what was or was not done to files on the hard drive --

         THE COURT:  I see.

         MR. TURNER:  -- by the laptop.

         THE COURT:  Got it.

         But, for the time being, you are making the

circumstantial inference that the presence of the materials on

both and the presence of both defendants in the same facility,

circumstantially it gets us somewhere down the road of the

inference that there was sharing.  The manner of proof remains

Hcmnalmc

1    to be seen.

2           MR. TURNER:  Yes, including specifically the fact

3    that, as your Honor noted, the hard drive contains materials

4    that were produced both to Almehmeti and to Rahimi.  So

5    defendant Rahimi's discovery materials appear on the hard drive

6    that was plugged into the laptop that was produced provided --

7           THE COURT:  The inference therefore being that there

8    was some collaboration between the two?

9           MR. TURNER:  Yes, Judge.  That inference also being

10   strengthened by the fact that you also have a page in the

11   Rahimi notebook that lists the 20 some-odd al-Awlaki lectures

12   specifically found on the disk that was in Mr. Almehmeti's

13   possession in his locker.

14          THE COURT:  All right.  Go ahead.

15          MR. TURNER:  Your Honor, the last category is what is

16   referred to as Disk 2 in our December 19 letter, the disk that

17   was obtained from Defendant 1.

18          That disk contains terrorist propaganda materials that

19   were contained in both discovery materials provided to

20   Mr. Rahimi as well as discovery materials that were provided to

21   Mr. Almehmeti.  In other words, another example of a

22   combination of materials from the two defendants.

23          THE COURT:  OK.  May I just ask, before we proceed

24   with this, I am asking this purely in my supervisory capacity

25   here, but when the government searches material of this nature

Hcmnalmc

1   that is found in a defendant's possession in a facility like

2   the MCC, who does that, and what protections are there to make

3   sure that attorney-client communications aren't inadvertently

4   or otherwise reviewed?

5           MR. TURNER:  Judge, we have specifically instituted a

6   wall procedure in the first instance at the U.S. Attorney's

7   Office so that members not of the case team are in the first

8   instance ensuring that there is no attorney-client material on

9   the media before it is reviewed by either FBI personnel or U.S.

10  Attorney's Office personnel specific to the case.

11          THE COURT:  How was it in this case, if I may, that it

12  was determined that the sharing or the cross-pollination, or

13  whatever word we are going to say is the right word, that this

14  occurred, *i.e.*, that as among these three inmates there appears

15  to have been Rule 16 sharing?

16          MR. TURNER:  If I am appreciating your Honor's

17  question.

18          THE COURT:  How did you figure out that this had

19  occurred, if you can say?

20          MR. TURNER:  The first instance, your Honor, the first

21  piece of media that was came into the government's possession

22  was disk 2, the disk obtained from Defendant 1.  And it was

23  immediately apparent that it --

24          THE COURT:  I see.

25          MR. TURNER:  -- contained materials --

Hcmnalmc

```
 1              THE COURT:  You then followed --

 2              MR. TURNER:  -- that were not produced to that

 3    defendant.

 4              THE COURT:  I see.

 5              You followed leads from that.

 6              MR. TURNER:  Yes, Judge.

 7              THE COURT:  OK.  Thank you.

 8              The purpose, of course, today is not to discuss the

 9    motion in limine, but the operating premise here has to be that

10    it is possible that the motion in limine, it is possible that

11    some or all of the species of evidence that is being covered

12    would be admitted at trial.

13              So, defense, to the extent that we are discussing the

14    Curcio here, you are, of course, conceding nothing by

15    participating in the Curcio proceeding, but I have to operate

16    on the presumption that this is within play and that the

17    evidence at issue here may come up at trial and therefore that

18    this implicates Curcio issue.

19              But I want to make it clear that in no way, shape, or

20    form am I assuming an outcome with respect to the embedded

21    motion in limine.

22              I am still in the middle of speaking with Mr. Turner.

23              MS. SHROFF:  Sorry.

24              THE COURT:  Having now gotten the facts, is there any

25    other further factual material you want to bring to my
```

Hcmnalmc

attention here?

MR. TURNER:  I think that's sufficient on the factual background, your Honor.

THE COURT:  OK.

So when did you first discover the potential *Curcio* issue, *i.e.*, that there were Federal Defenders' representations implicated here?

MR. TURNER:  Your Honor, we first learned about the involvement of Mr. Almehmeti in these activities in mid-November, and we promptly provided 404(b) notice on November 18, which was a Saturday, the day that we learned that the drive that was obtained from Mr. Almehmeti's locker contained some of his discovery materials.  It was apparent in the days and weeks following that that there was the possibility of a conflict issue here.

THE COURT:  In other words, the conflict is presented, for example, by learning the identity of the sharing defendant or the defendant with whom he is sharing, *i.e.*, Rahimi or Defendant 1.

When did you become aware of those people as potentially implicated here?

MR. TURNER:  I think it is fair to say, Judge, that the time frame that I just laid out is when we first understood at least the identities of all the three participants.

However, in our view, the important additional point

Hcmnalmc

 1   is that we were not yet aware of the full factual nature of the

 2   activities or even how to flesh out the full nature of the

 3   potential conflict at that point.

 4        We submit that it was only significantly more recently

 5   that we were able to get our hands around the nature of the

 6   conflict that would allow us in our view to present it in an

 7   acceptable fashion.

 8        THE COURT:  Understood.

 9        I'm more just trying to understand the chronology.

10        So on November 22 is when you put defense counsel in

11   this case on notice that there is a potential issue here

12   presented by the shared discovery materials?

13        MR. TURNER:  The 18th I believe, Judge.

14        THE COURT:  November 18, I'm sorry.

15        At that point both sides are aware that there is

16   material that is -- I use the word in a nonjudgmental way --

17   implicating two Federal Defenders' clients at least?

18        MR. TURNER:  At least two, your Honor.

19        To be very specific, the 18th notice that we provided

20   made very clear that we had found media in the MCC which

21   contained materials attributable both to defendant Rahimi and

22   defendant Almehmeti.

23        I believe our disclosure regarding the third

24   defendant, Defendant 1, was somewhat after that.  But, yes,

25   that initial disclosure made very clear that two Federal

Hcmnalmc

1    Defenders' defendants were involved here.

2              THE COURT:  Can you estimate approximately in time

3    when you notified Federal Defenders that Defendant 1 was

4    involved in these events?

5              MR. TURNER:  I believe we made that disclosure, Judge,

6    when we set out the facts in the background in our *in limine*

7    brief, which was on December 8.

8              THE COURT:  OK.  So from November 18 on, both sides in

9    this case have been aware of an issue percolating that would

10   lend itself to an eventual *Curcio* motion, even if the full

11   range of facts were as yet, as they will continue to be, a work

12   in progress?

13             MR. TURNER:  I believe that is accurate, Judge.

14             THE COURT:  Had there been any discussions prior to

15   your December 19 letter between you and the defense in this

16   case in either direction as to *Curcio* or conflict issues?

17             MR. TURNER:  I do not believe that we have had a

18   *Curcio*-related discussion with defense counsel.

19             THE COURT:  May I ask you just in fairness, because we

20   are now here the day before the holidays -- and the same

21   question of-course goes to the defense, but you are speaking

22   now -- why that wasn't raised if only because the *Curcio*

23   process always benefits by letting issues marinate with the

24   defendant.

25             So, for example, had you in November said to

Hcmnalmc

1    Ms. Shroff it is a matter of time before we raise a *Curcio*

2    issue with the Court, just alerting you to that so that you and

3    your client can begin to talk, maybe Ms. Shroff has somebody

4    she would like to use the as the independent counsel to consult

5    with her client on.

6           Is there a reason why this wasn't highlighted at least

7    in your discussions earlier so that we wouldn't be time

8    constrained, as we are now?

9           MR. TURNER:  Judge, I certainly appreciate the point

10   that is being raised by the Court.  Our response would be

11   twofold:

12          First, it was our view that by providing the notice

13   that we did, both sides were at that point on notice that there

14   was an issue that was percolating.

15          THE COURT:  Sure.  But there's also no harm in putting

16   the *Curcio* label on it.  I appreciate that the facts would lead

17   a counsel on either side to connect the dots, at least as to

18   Rahimi, where it's literally the same lawyers.  With respect to

19   Defendant 1, I suppose the question would be whether your

20   disclosure identified that person as represented by a sister

21   Federal Defender office.

22          But as for Rahimi, I take the point that it would be

23   easily inferred.  Nonetheless, if it was the case that you

24   perceived an eventual *Curcio* coming, can you explain to me why

25   you wouldn't use those words in your communication to

Hcmnalmc

1   Ms. Shroff, who's got a busy practice and a lot of other things

2   to do and no doubt would have been benefited by your

3   highlighting the *Curcio* point?

4          Again, it is more a best-practice point I'm making,

5   but the *Curcio* issues more than most really benefit by the

6   passage of time and an opportunity for calm reflection by the

7   defendant.

8          MR. TURNER:  Understood, Judge.

9          The only second point that I would raise to try to

10  provide the Court with some insight into where we were coming

11  from on this is, as I'm sure the Court can appreciate, there

12  were numerous pieces of media devices involved, and we believed

13  it was appropriate and ultimately would be helpful for all

14  involved to have a fuller understanding of what really had gone

15  on here.

16          For example, it's only re recently that we learned and

17  then disclosed that the forensic examination had determined

18  that the laptop had, in fact, been connected to the drive, and

19  that the second disk did, in fact, contain materials that were

20  obtained from both Mr. Almehmeti and Mr. Rahimi.

21          We did not feel on November 18, and frankly until

22  fairly recently, that we had a sufficient understanding of the

23  facts here that would allow all involved to fully flesh out the

24  conflict for purposes of the sort of colloquy that would need

25  to occur.

Hcmnalmc

1           THE COURT:  Look.  While I appreciate that, and it

2    sounds as if your view is that it wasn't until recently that

3    the dimensions of the conflict came into more crystallized

4    form, you know I offer as a friendly supervisory suggestion

5    that in the future, as soon as you can even begin to see in a

6    dim way a *Curcio* taking shape in any case, you ought to alert

7    your adversary, because they're busy, they have other things to

8    do, and the process of explaining *Curcio* with a client is not

9    necessarily an easy one.  It requires some understanding of the

10   legal system.  The sooner Ms. Shroff, or in a future case her

11   analog is notified that the government in any way sees such a

12   proceeding coming down the pike, the sooner those discussions

13   within the defense function can take place.  Enough said.

14           Let me pivot you then towards your articulation of the

15   conflict issues.

16           MR. TURNER:  Yes, Judge.

17           Again, as we've tried to summarize in our submission,

18   we do believe that in light of the facts that we have just

19   discussed, the concurrent representation of these three

20   defendants does pose challenges to the Federal Defenders duties

21   of loyalty.

22           THE COURT:  And all three representations are

23   confirmed, right?

24           MR. TURNER:  That is correct.

25           THE COURT:  The status of the Rahimi case is what?

Hcmnalmc

1          MR. TURNER:  Pending sentencing.

2          THE COURT:  Following a trial or a plea?

3          MR. TURNER:  Following a trial.  We are, of course, on

the eve of trial.

5          THE COURT:  Right.

6          MR. TURNER:  I understand that Defendant 1's case is

also ongoing, your Honor.

8          THE COURT:  Is Defendant 1's case postindictment

preresolution?  There's not been a sentencing in the case, is

that correct?

11          MR. TURNER:  I believe it is actually on appeal, your

Honor.

13          THE COURT:  OK.

14          Just tell me what the public docket would reflect.

15          MR. TURNER:  I believe that case is on appeal, your

Honor.

17          THE COURT:  OK.  Thank you.

18          Your understanding is that Rahimi and Defendant 1

continue to be represented by the respective offices of Federal

Defenders?

21          MR. TURNER:  Yes.

22          THE COURT:  So, we are in the concurrent

representation box such that there are ongoing duties, active

duties to each of the three clients?

25          MR. TURNER:  Yes, that is our understanding.

Hcmnalmc

1          THE COURT:  Go ahead.

2          MR. TURNER:  Judge, perhaps starting at a macro level

3    and then to the extent the Court wants to drill down on

4    particular scenarios, putting it in general form, we believe it

5    is conceivable that there is the potential for Federal

6    Defenders, to take an example, to take Mr. Rahimi and

7    Mr. Almehmeti just as an example, an incentive with respect to

8    the issues that we have been discussing today to take positions

9    with the Court to cross-examine witnesses, to frame arguments,

10   even to investigate these issues in a way that, wearing the hat

11   as Mr. Rahimi's attorney, there would be an incentive to

12   perhaps attribute the dissemination or larger aspects of the

13   dissemination to Mr. Almehmeti; whereas the opposite could be

14   true wearing the hat as Mr. Almehmeti's attorney, to attribute

15   the conduct and the dissemination and the activities within the

16   MCC to Mr. Rahimi.

17          THE COURT:  Let me see if I can sharpen that.  Let me

18   ask you -- Mr. Almehmeti, I want you to pay very close

19   attention to the discussion I am having with the prosecutor

20   now.  What he and I are discussing are potential conflicts.

21   There's no suggestion here that any lawyer did anything wrong,

22   but we are merely trying to identify ways in which a lawyer in

23   the situation your lawyers find themselves in, in theory could

24   have competing loyalties or incentives to do things that are

25   not exclusively in your best interest.

Hcmnalmc

1          In no way am I suggesting that your lawyers would, in

2     fact, do that, and I'm certainly not suggesting that any lawyer

3     did anything wrong.  They did not.

4          But the purpose of this discussion is to make sure

5     that you're educated about what in theory the problems could be

6     by your continued representation by Federal Defenders.

7          Because I am having a precise discussion with

8     Mr. Turner trying to identify the issues it's important that

9     you pay close attention.  OK?

10          THE DEFENDANT:  I understand, your Honor.

11          THE COURT:  As to this first category of issues, the

12     concern would be, Mr. Turner, from Mr. Almehmeti's perspective

13     in particular, that Federal Defenders might try to protect

14     Mr. Rahimi at the risk of not using all the arguments or

15     ammunition they might use on Mr. Almehmeti's part.

16          So, for example, Federal Defenders, if only

17     representing Mr. Almehmeti, might have an incentive to thrust

18     responsibility for any of the sharing exclusively on let us say

19     Mr. Rahimi and not at all on Mr. Almehmeti.

20          But the concern would be that, because Mr. Rahimi is

21     also a client of Federal Defenders, Federal Defenders might be

22     less willing to cast responsibility on Mr. Rahimi?

23          MR. TURNER:  Yes, Judge.

24          THE COURT:  So that's one category.

25          That I take it would apply to a variety of tasks that

Hcmnalmc

1   Federal Defenders might carry out, investigating what happened,

2   making arguments to the Court or to the jury about what

3   happened, or developing evidence, including through

4   cross-examination or presentation of direct testimony as to

5   what happened.

6           MR. TURNER:  Yes, Judge.

7           We see that as the primary articulation of the

8   potential conflict here, and that there are any number of

9   permutations.  Naturally it is impossible to see every

10  permutation, but there are many different permutations of that

11  articulation.

12          THE COURT:  OK.

13          The second parallel point is the same point, but as it

14  relates to Defendant 1?

15          MR. TURNER:  That's right.

16          THE COURT:  I take it within each of those there are a

17  number of different defense functions or tasks that could be

18  affected by, in theory, the same motivation?

19          MR. TURNER:  That's right, Judge.

20          THE COURT:  Are there any other areas of potential

21  conflict that the government has identified?

22          MR. TURNER:  Well, the one other issue that we did try

23  to flag in our letter is that, because of the concurrent

24  representations of the three defendants, it is also possible

25  that members of the Federal Defenders may have learned

Hcmnalmc

1    information during the course of their representation of one or

2    more of these defendants that is relevant to this issue and

3    their ability to investigate and litigate the issue on behalf

4    of Mr. Almehmeti that may be privileged within the confines of

5    the attorney-client privilege of that other defendant that they

6    may not be able to use, and we wanted to flag that issue as

7    well.

8              THE COURT:  Let me push back on that and just

9    understand it.  If what you are saying is that Federal

10   Defenders may have learned something relevant from the, let's

11   say Rahimi representation, but they can't use it to benefit

12   Mr. Almehmeti because it's privileged, I understand that

13   they're limited in that sense, but they wouldn't have had that

14   information had they not represented Rahimi.  So in that

15   respect they are in the same position they would have been with

16   or without the Rahimi representation.

17             MR. TURNER:  To your Honor's point, an independent

18   attorney would, of course, not have come to be privy to that

19   information in the first place.

20             So that is not what we see as the primary articulation

21   of the conflict here.  It is just an issue that we thought it

22   was worth flagging.

23             THE COURT:  I'm glad you did.  I suppose the way to

24   put the conflict would then be that an attorney who is

25   possessing privileged information let's say from Mr. Rahimi

Hcmnalmc

might overdeter.  In other words, in order to make sure that

they are not running afoul of the their duties to Mr. Rahimi,

they might be extra careful in using information at trial for

Mr. Almehmeti, lest it be suggested that they were dipping into

privileged information that was known only in the context of

the Rahimi representation?

          MR. TURNER:  Yes, Judge.

          THE COURT:  OK.

          So we have the issue of divided loyalties in theory

with respect to Rahimi, divided loyalties with respect to

Defendant 1.  We have the issue of overdeterrence in terms of

privileged information with respect to Rahimi, and the same for

Defendant 1.

          Any other potential conflicts you see here?

          MR. TURNER:  Those are the conflicts that we see,

Judge.

          THE COURT:  OK.

          All right.  Thank you very much.

          Anything else you want to raise before I speak with

Ms. Shroff?

          MR. TURNER:  No, your Honor.

          THE COURT:  Ms. Shroff, again I'm going to preface

this by saying what I said a few moments ago.  I'm not

presupposing any outcome on the motion in limine.  We just have

to have this conversation on the premise that this evidence is

Hcmnalmc

1       potentially in play, number one.

2                Number two, I want to make it absolutely clear that --

3       and I'm really saying this for the benefit of your client, but

4       it's always worth saying this on the record -- that the fact

5       that this issue has arisen is no ill reflection.  It's just the

6       sort of process that we have to go through in many cases where

7       at some point midstream in a case a potential conflict arises.

8                So, take no umbrage at the fact that we're having this

9       discussion.  It's a necessary procedure that I need to go

10      through to make sure that your client is aware of the potential

11      conflict and to determine, if he waives it, that he's doing so

12      knowledgeably.

13               So, with that preface, before I work with you to

14      sharpen and articulate the theories of potential conflict, is

15      there anything you want to put on the table?

16               MS. SHROFF:  If I may, your Honor, just briefly.

17               THE COURT:  Yes.

18               MS. SHROFF:  I appreciate that, and I really do

19      appreciate that for the government and Mr. Turner, whom I have

20      other cases with, that it takes time for something to

21      percolate.  I have been at fault for not having it percolate

22      faster, so I appreciate that.

23               I do want to just say one thing about Person 1.

24      Person 1's identity was only known to us I think as of Friday

25      of last week, which I think was the 19th.  I don't think before

Hcmnalmc

1     that we knew the identity of Person 1.

2               THE COURT:  You have known that person's identity

3     since about December 15, a week ago?

4               MS. SHROFF:  If that's the Friday, OK.  Whatever that

5     date was, on Friday, but when we were last here in Court, we

6     inquired as to that, and we were told by government counsel

7     that we would have that information on the Friday before -- the

8     Court is right, the 15th.  The 19th was this Tuesday.  I

9     understand.

10              THE COURT:  OK.

11              MS. SHROFF:  So the Federal Defenders' position is

12    that we asked this Court most -- I'm sorry, I'm having trouble

13    because I am not feeling well -- that we ask the Court most

14    respectfully to resolve the pending motion *in limine* portion on

15    this particular topic before engaging in the *Curcio*.

16              If I may just have one minute to tell the Court why.

17    Unlike the government, we are in the very unique and somewhat

18    nonenviable position of disrupting three relationships, the

19    Federal Defenders' relationship with Mr. Rahimi --

20              THE COURT:  What three relationships?

21              MS. SHROFF:  Three --

22              THE COURT:  I didn't hear the verb.  I thought

23    something three relationships.  I didn't hear what the verb

24    was.

25              MS. SHROFF:  We did not want to rupture our

1    relationship with three separate clients.

2          The Court knows the three clients, Mr. Almehmeti,

3    Mr. Rahimi, and Client 1, right?  As far as the Federal

4    Defenders is concerned, even if Mr. Almehmeti -- if this *Curcio*

5    hearing should play out, and Mr. Almehmeti were to, and I don't

6    know if he is, were to tell this Court that he plans to waive

7    the conflict and keep the Federal Defenders, we still have an

8    obligation to go through the same steps with Mr. Rahimi as well

9    as with Client 1.  So we have an obligation, an independent

10   obligation, it appears, to flesh this out with all three

11   clients.

12         It would involve discussing attorney-client

13   relationships.  It would involve assigning three *Curcio* lawyers

14   and then going back trying to figure out which of the three

15   waived and what that waiver means vis-a-vis our relationship to

16   the other two.

17         For defense counsel, this issue is not that simple.

18   We most respectfully ask this Court, before we engage in

19   conversations that literally involve -- and it is a rupture, it

20   may be a healable rupture, but there's a definite rupture,

21   because I'm sure no matter how much Mr. Almehmeti knows me or

22   Ms. Levine by now, I'm sure there is some part of this young

23   man that wonders, Is she going to put Mr. Rahimi ahead of me,

24   or if somebody going to force her to put Mr. Rahimi or Client 1

25   ahead of me?  That's the foundation that I wanted to --

Hcmnalmc

1          THE COURT:  Let me pause you on that.

2          The problem with that is that your representation of

3     the defendant in connection with the motion *in limine* itself is

4     affected by the conflict.  In other words, I can't resolve the

5     motion *in limine* without satisfying myself that you are

6     conflict free in litigating that very motion.

7          The problem is that if hypothetically there was a

8     problem infecting your representation -- and again we are

9     talking entirely theory here -- but if there were, it would

10    affect your ability to litigate even on the motion *in limine*.

11         As a result I can't simply resolve the motion *in*

12    *limine* and say this evidence is in or out or a split decision

13    or some is in and some is out where your representation as to

14    the motion *in limine* has not itself been vetted for *Curcio*

15    purposes.  That is number one.

16         Number two is, whatever the evidentiary ruling is

17    here, it is my expectation that some form of *Curcio* probably

18    has to happen for those other clients as well.  The parameters

19    of it change to some degree depending on the ruling here,

20    because if some or all of the evidence is in as it relates to a

21    different client, that adds another dimension to the areas of

22    theoretical conflict.

23         But when all is said and done, even for the other two

24    people, if one hypothesizes that there was improper sharing,

25    surely hypothetically, some judge is going to need to

Hcmnalmc

1   presumably make a *Curcio*-related determination as to those

2   clients.

3          So, with respect, that moment is coming; it is just a

4   matter of when.  I don't opine in the other cases when you need

5   to have that resolved, although I would urge that the courts in

6   each of these cases be made aware sooner rather than later that

7   this issue is marinating, even if the application is to hold

8   off doing anything until we have more certainty as to where

9   this case stands.

10          But it seems to me that one way or the other it's

11   likely that those *Curcio* inquiries in those other cases are

12   going to have to happen.  Fundamentally the reason I don't

13   agree with you is that the motion *in limine* itself can't be

14   resolved until I have confirmed that you are conflict free as

15   to it.

16          MS. SHROFF:  Your Honor, then the motion *in limine*

17   response is improper in itself.

18          THE COURT:  It is not that it is improper.

19          MS. SHROFF:  It is conflicted.  It is the response

20   submitted by a conflicted lawyer, which is why I was trying

21   to -- as the Mr. Turner uses the word cabin only this portion

22   of the motion *in limine*.

23          THE COURT:  Right.  Where I'm going is I want to have

24   the *Curcio* proceeding first, because if we meet today and then

25   on a later date in early January, depending on the outcome of

Hcmnalmc

1   the *Curcio*, I may then be able to resolve the motions *in*

2   *limine*.  I may not be able to.

3          If you are out of the case, we have a fundamental

4   issue that affects scheduling, and your successor counsel would

5   presumably have an opportunity to take a whack at the

6   then-pending motions *in limine*.  If you are out of the case,

7   our trial date is I expect likely going to move.

8          So there are a whole host of issues.  If, however, you

9   are in the case and there has been a valid waiver -- which

10  there may well be, there very often is where the conflict is

11  waivable -- in that case I can proceed on the submissions

12  you've made to resolve the issue.

13         So sequencing here has to be that we square away

14  whether there is a knowing *Curcio* waiver before I make any

15  further determinations in the case.  The lawyering prior to

16  your awareness of any conflict here including all the

17  litigation that went before is unaffected by any of this.  It

18  is your awareness of the sharing within the MCC or the alleged

19  sharing that gives rise to any of these issues, but I want to

20  resolve that first.

21         So let's move on.

22         We are going to deal with the *Curcio* first.

23         MS. SHROFF:  Your Honor, just one final point so that

24  I have done what I'm supposed do in terms of keeping a record.

25         It is our office's position that our response in terms

1  of simply this issue, right, no other part of the motion *in*

2  *limine*, just in terms of saying that this evidence simply

3  should not be considered by this Court is not a conflicted

4  position because Mr. Almehmeti and Mr. Rahimi's interests are

5  not conflicted on that point.

6          THE COURT:  I'm trying to understand, to pin down what

7  it is you are saying.  Your opposition to the motion *in limine*

8  as it relates to the MCC discovery communications the due date

9  on that is what?

10          MS. SHROFF:  Tomorrow, your Honor.

11          THE COURT:  OK.  So is what you are saying that you

12  don't want to submit your opposition tomorrow?

13          MS. SHROFF:  I have submitted it already.  I submitted

14  it yesterday.  I filed it on ECF yesterday, just so the Court

15  would not think --

16          THE COURT:  I'm sorry.  I thought you said tomorrow.

17          MS. SHROFF:  It's due tomorrow.

18          THE COURT:  But you submitted it?

19          MS. SHROFF:  I finished it earlier, so we filed it

20  earlier.

21          THE COURT:  Look, what I am saying is I am not going

22  to engage on the merits of that motion and I am not going to

23  reach any final determination on it until I confirm that any

24  conflict that you may have, in theory, labored under in

25  connection with it is one that has been waived.

Hcmnalmc

```
 1              I get that.  I fully understand that.  But assuming
 2     that the defendant waives the conflict, your having submitted
 3     that submission, I can then consider that submission.  Bottom
 4     line is we need to deal with the Curcio first.
 5              MS. SHROFF:  OK.
 6              THE COURT:  With that, is there anything you want to
 7     say about the Curcio?
 8              MS. SHROFF:  Well, your Honor, on the Curcio itself,
 9     the other thing I would like to say is we are all proceeding on
10     the very premise that this is a waivable conflict.
11              THE COURT:  Right.
12              MS. SHROFF:  I am not sure anybody has engaged in --
13     maybe I shouldn't say that --
14              THE COURT:  Do you believe it is a waivable conflict?
15              MS. SHROFF:  We are not sure.
16              THE COURT:  OK.
17              MS. SHROFF:  As you know, this for many is a holiday
18     season.  We have tried to get our appeals people moving on
19     this.  We are simply not sure that whether this is a waivable
20     or a nonwaivable conflict.  I don't have a final answer on
21     that.
22              THE COURT:  OK.  I would like a final answer on that
23     soon, because I had taken as a premise of the government's
24     letter that they perceived this as a waivable conflict.  That
25     was my initial read on the situation.  But if you have a
```

1    different view, I need to hear it.

2              MS. SHROFF:  Right.  We were trying to get that, your

3    Honor.  It is just that I'm here, but not many in my office

4    are.  I have flagged it for Mr. Patton, and we are trying to

5    get an answer for the Court as soon as possible.

6              THE COURT:  OK.

7              MS. SHROFF:  We also wanted to make sure that the

8    government had thought that -- I wanted to make sure of the

9    government's position.  To the extent I am used to this Court

10   being miles ahead of me, I just thought --

11             THE COURT:  I am glad you raised the issue.  Here's

12   what I would like do.  I need like to give you a deadline so we

13   can actually work this.  If you take the view that this is a

14   nonwaivable conflict, please get me a letter within a week.

15             MS. SHROFF:  Sure.

16             THE COURT:  The reason is I am going to proceed on the

17   assumption today -- since we are not going to complete any

18   *Curcio* proceeding today, we are simply going to do step one --

19   that it is a waivable conflict and we will proceed on that

20   premise.

21             If, however, you believe it is not, please get me a

22   letter a weak from today.  Then, government, I will need you

23   pronto to respond to any such letter because I am going to be

24   bringing you all back in here I expect on January 2 on one side

25   or the other of the conference we've already scheduled.

Hcmnalmc

1       If we are headed towards a *Curcio* waiver, that would

2   be the conference at which I would ordinarily take up that

3   second stage, where I allocute the defendant as to the *Curcio*

4   waiver.  If there are other issues, implicated so be it.

5       MR. TURNER:  If A letter to that effect is submitted

6   on Friday, the 29th, could we submit a letter by Monday, which

7   would be the 1st?

8       THE COURT:  Yes.

9       MR. TURNER:  So you would have an opportunity to

10  review it before the 2nd.

11      THE COURT:  Absolutely.

12      I am mindful of what days all that is, but I think you

13  understand the urgency of all of this.  In the event,

14  obviously, that you are submitting such a letter, ECF will be

15  closed, so make sure it is e-mailed to counsel and to the

16  Court.

17      With that, Ms. Shroff, I appreciate that you are

18  reserving the right to argue that this is a nonwaivable

19  conflict, and I will make that determination.

20      Let's operate on the assumption for the time being

21  that it is a waivable conflict.  The articulation of the areas

22  of potential conflict that I just went through with Mr. Turner,

23  which is broadly in line with the letter that he wrote me, do

24  you take issue with any of those as being areas of potential

25  conflict, and do you have other areas of potential conflict

Hcmnalmc

1    that you can identify?

2         MS. SHROFF:  Your Honor, I don't have other areas of

3    potential conflict that I would identify.  I would just note

4    that we would have to have similar discussions with our other

5    two clients.

6         THE COURT:  With your what?

7         MS. SHROFF:  Our other two clients.

8         THE COURT:  Right.  And I hope you are doing that.

9         MS. SHROFF:  We are proceeding as I'm sure the Court

10   would expect the Federal Defenders to proceed.

11        THE COURT:  All right.

12        MS. SHROFF:  Is that fair?

13        THE COURT:  Let me just say this, to the extent that

14   discussions with your other clients are in any way a predicate

15   for any discussion with Mr. Almehmeti, you need to do that

16   pronto.

17        To the extent is that there is a freestanding issue of

18   your obligation to your other clients, I'm not going to

19   choreograph what you do, except to say as a general practice

20   clients, criminal, civil, paid, appointed, tend to like prior

21   notice of issues that may affect them, early notice.  So I

22   leave that to you.

23        To the extent your discussions with either of the

24   other clients conceivably could affect your discussions with

25   Mr. Almehmeti, and it's not clear to me that they would, but

Hcmnalmc

1  you will make that judgment, that's really important to do

2  pronto.

3          With that, though, I take it you are not taking issue

4  with any of the areas that Mr. Turner and I identified as areas

5  of potential conflict?

6          MS. SHROFF:  I am not taking issue with any of them.

7          I am saying, though, your Honor, that given the

8  posture of conflict that we are in, we are not able to engage

9  in any investigation of those matters.

10         THE COURT:  All right.

11         I mean, I guess the issue is -- I understand it might

12  be that there's something that none of us are imagining, but

13  for the purposes of this exercise I am trying to and government

14  counsel is trying to use our respective imaginations to imagine

15  the full scope of potential conflicts.

16         So I understand that one can have out of left field

17  facts that emerge that add conflict wrinkles, but the purpose

18  of this exercise for us to be as broad thinking as we can so as

19  to identify all issues for your client.

20         All right.  With that --

21         MS. SHROFF:  Your Honor -- I'm sorry.  Go ahead.

22         THE COURT:  Have you spoken with your client prior to

23  the beginning of this conference today about the potential

24  conflict, the *Curcio* issue?

25         MS. SHROFF:  Yes, your Honor.

Hcmnalmc

1          THE COURT:  OK.  I am not asking about the substance

2     of your communication, but just trying to get a sense of the

3     extent to which he is coming into this conference familiar with

4     the issue at hand and what a *Curcio* proceeding is.

5          Can you give me a sense of your assessment of his

6     knowledge of that legal -- that background?

7          MS. SHROFF:  Your Honor, I can tell the Court that

8     Ms. Levine and I visited with Mr. Almehmeti on two separate

9     occasions to discuss this matter.

10          THE COURT:  Discuss the *Curcio* issue?

11          MS. SHROFF:  Yes.  I'm only speaking to the *Curcio*

12     issue, to discuss the *Curcio* issue.  I believe we first

13     presented a general overview, because *Curcio* -- I am not trying

14     to overinflate our representation of him or anything, but

15     sometimes it invokes a little bit of panic when you are going

16     to lose the person you are with, so we had a preliminary

17     discussion on one event, and then we went back on a second

18     legal visit to sort of lay out the parameters a little bit

19     more.

20          I explained to him the case name, and, you know, the

21     types of questions you would ask.  I explained to him the

22     process.  And I'm happy to tell the Court that I explained to

23     him that he would get, that the *Curcio* hearing could go in one

24     of three ways:  Sometimes the client just waives and says I

25     don't want to talk to a *Curcio* lawyer, sometimes they say they

1    want to talk to a *Curcio* lawyer take some time and come back,

2    and then they come back with difference expense.

3              THE COURT:  Understood.

4              MS. SHROFF:  I explained to him, of course, this Court

5    would assign him a conflict-free lawyer, who is here today.

6              I was not able to see Mr. Almehmeti yesterday, but

7    some member of our team kind of flagged for him that there had

8    been a schedule for an appearance today and likely he would

9    meet conflict-free counsel, and I think that Mr. Almehmeti has

10   been informed of that process.

11             THE COURT:  First of all, thank you for doing all of

12   this.  I realize it was something of an expedited schedule.

13             Were the two meetings you have had with Mr. Almehmeti

14   as to this both this week?

15             MS. SHROFF:  I think so.  There might have been -- I

16   was wrong about the 15th and the 19th, so my -- I've seen him

17   so many times.  I can't --

18             THE COURT:  The government's letter first came in

19   alerting me to the issue on Tuesday, the 19th.

20             Did you speak with your client about this subject

21   prior to then?

22             MS. SHROFF:  It may have been.

23             THE COURT:  OK.  Look I'm glad you got ahead of it.

24             Thank you.  All right.

25             What I am going to, unless you have something further,

1    turn to speaking with your client.

2         I'll again by just prefacing for him my assessment

3    situation, and then I will go through questions substantially

4    in line with what the government proposed.

5         MS. SHROFF:  May I just have one second.

6         THE COURT:  Of course.

7         MS. SHROFF:  We are good.

8         Thank you, your Honor.

9         THE COURT:  OK.

10         MS. SHROFF:  I just wanted to make sure of the

11    accuracy of what I recited to the Court.

12         THE COURT:  By the way, Mr. Turner, may I clarify

13    something which may be useful, among other things, for thinking

14    about *Curcio* and may also be relevant to the issue of

15    waivability or not.

16         I think you had already taken off the table, I'm quite

17    sure you had, any allegation that it was improper, against the

18    rules for Mr. Almehmeti or for that matter any of the other

19    affected people to be swapping or sharing the information.

20         In other words, what's at issue here is not any

21    allegation of wrongdoing with respect to the sharing of

22    information within the MCC; it's the fact of that which was

23    shared, that is the point the government is hoping to establish

24    through this evidence, is that correct?

25         MR. TURNER:  That is correct.  We did agree to take

Hcmnalmc

1    that off the table at the December 12 conference, your Honor.

2         THE COURT:  Right.

3         So, to the extent that had that not been taken off the

4    table, there might have been some argument about fault or as to

5    whose responsibility, both or neither, as to any act of

6    sharing.  That is to say, did somebody break a rule, that part

7    is off the table.

8         Nevertheless, in theory, Mr. Almehmeti could argue

9    that somebody put something on his computer without his

10   knowledge or something of that ilk, and in that respect we

11   still have a *Curcio* issue as to causation in effect.

12         MR. TURNER:  We agree with that assessment, Judge.

13         THE COURT:  With that, Mr. Almehmeti in a few moments

14   I am going to ask you some questions, but I want to just begin

15   by putting this in a context for you.

16         You can be seated, but when you speak, I will just

17   need the microphone in front of you.

18         You have clearly been listening very closely during

19   this conference, and I want to thank and commend you for doing

20   that.

21         THE DEFENDANT:  Thank you, your Honor.

22         THE COURT:  The purpose of this exercise is to make

23   sure that you are ultimately satisfied with the lawyers that

24   you have and that you are prepared, if you choose to be

25   prepared to do so, to proceed with the lawyers you have,

Hcmnalmc

1      notwithstanding what is a theoretical conflict.

2              I say "theoretical" because I have hearings like this

3      not at all infrequently.  There are many cases in which there

4      is some issue that is presented that in theory could lead a

5      lawyer to be less than fully loyal to his or her client.  They

6      might do something a little different than they otherwise would

7      if they didn't have some conflict or other incentive.

8              It's, therefore, a Court's responsibility to have a

9      conversation with the client to make sure that you're

10     comfortable proceeding notwithstanding that issue.

11             I have had many, many, cases with Federal Defenders,

12     and a good number with Ms. Shroff, and some with Ms. Levine as

13     well, and they are superb lawyers and professionals who are

14     very high in my estimation.

15             So I want to make it clear to you that what I am doing

16     here is going through the process of identifying for you in

17     theory the incentives that might exist for a lawyer who has a

18     different representation, like the ones of Rahimi or the person

19     we are describing as Defendant 1.  But I want to make it clear

20     to you that there's no suggestion that your lawyers did

21     anything wrong; they did not.  I'm merely identifying for you

22     the theoretical conflicts that could be presented by lawyers in

23     the situations in which Ms. Shroff and Ms. Levine find

24     themselves.

25             Do you understand that?

Hcmnalmc

1          THE DEFENDANT:  I understand, your Honor.  Thank you.

2          THE COURT:  What I am going to do now is I am going to

3   ask you a bunch of questions to make sure that you basically

4   understand for now the nature of the conflict.

5          At the end, although I will elicit your view as to

6   whether you want to decide this today, it's my strong

7   preference that you not and that you let me appoint a

8   Court-appointed lawyer for you so that you have an independent

9   person to talk to about these issues.

10          Then, if we go that route, we would meet again in

11   early January.  At that point, you would have had an

12   opportunity to talk with the independent lawyer, and I will

13   then take up with you what your decision is.  I'll make sure

14   then that you understand what the issues are, and I'll find out

15   for you then whether you do or don't waive the conflict.

16          OK?

17          THE DEFENDANT:  OK.

18          THE COURT:  So, with that, I am going to just ask

19   Mr. Smallman just to place you under oath.

20          (Defendant sworn)

21          THE COURT:  Mr. Almehmeti, you will forgive me.  A few

22   of the questions I am going to ask at the beginning about your

23   background have almost certainly been asked of you at the time

24   of arraignment.  I am just doing this now so I can make a fresh

25   assessment of your ability to understand the issues here.  OK?

Hcmnalmc

1          THE DEFENDANT:  OK.

2          THE COURT:  How old are you?

3          THE DEFENDANT:  24 years old.

4          THE COURT:  Again, how far did you go in school?

5          THE DEFENDANT:  I was currently in private college

6    before my arrest.

7          THE COURT:  OK.  How far had you gotten in college?

8          THE DEFENDANT:  I was about a year into it.

9          THE COURT:  And are you currently under the care of a

10   doctor or a mental health professional?

11         THE DEFENDANT:  No.

12         THE COURT:  Are you currently under the influence of

13   alcohol or drugs?

14         THE DEFENDANT:  No.

15         THE COURT:  Is there anything today that's interfering

16   with your ability to understand what's been happening?

17         THE DEFENDANT:  Nothing, your Honor.

18         THE COURT:  Have you been able to follow our

19   discussion so far?

20         THE DEFENDANT:  I have.

21         THE COURT:  When you have had your discussions with

22   your lawyers, and I don't want to hear about the content, have

23   you been able to follow what they have told you?

24         THE DEFENDANT:  I have been able to make an

25   understanding about the issue, yeah.

Hcmnalmc

```
 1              THE COURT:  In general, apart from this issue, just
 2      when you have been speaking with your lawyers about the case,
 3      have you been able to follow clearly as they have given you
 4      advice, told you information?
 5              THE DEFENDANT:  Yes.
 6              THE COURT:  OK.
 7              Ms. Shroff, are you confident that your client is of
 8      sound mind and is capable of understanding the issues at hand?
 9              MS. SHROFF:  Yes, your Honor.
10              THE COURT:  All right.
11              You are currently represented, are you not, by
12      Ms. Shroff and Ms. Levine of the Federal Defenders of New York?
13              THE DEFENDANT:  That's correct.
14              THE COURT:  I am going to call them Federal Defenders
15      for the purpose of this discussion.
16              Have you been satisfied with the work and the
17      representation by Ms. Shroff and Ms. Levine so far?
18              THE DEFENDANT:  So far I have, your Honor.
19              THE COURT:  OK.  Have they told you that in a separate
20      criminal case Ms. Shroff and Federal Defenders represent a
21      defendant named Ahmad Khan Rahimi, who was convicted of
22      terrorism offenses at a trial that occurred earlier this fall,
23      in October of 2017?
24              THE DEFENDANT:  Yes, I have been made aware of that.
25              THE COURT:  OK.  And your attorneys have discussed
```

Hcmnalmc

1    that fact with you, correct?

2             THE DEFENDANT:  Yes.

3             THE COURT:  Now, earlier this week, the government

4    submitted two letters to the Court and to your attorneys, and

5    they describe a different defendant in a case, a criminal case

6    in the Eastern District of New York.  That's the court right

7    across the river in Brooklyn.  I am going to call that

8    defendant Defendant 1.

9             Have you read both of the government's letters of

10   December 19?

11            THE DEFENDANT:  I have, your Honor.

12            THE COURT:  And have you discussed those letters with

13   your attorneys Ms. Shroff and/or Ms. Levine?

14            THE DEFENDANT:  I haven't really got a chance to

15   discuss the letter once I got it, just briefly.

16            (Counsel conferred with the defendant)

17            THE DEFENDANT:  Briefly, I have.

18            THE COURT:  OK.  But your intention would be to

19   discuss it more fully with them?

20            THE DEFENDANT:  That's correct.

21            THE COURT:  Could you move the mic a little closer to

22   you.  Thank you.  All right.

23            Have your attorneys informed you that other lawyers,

24   not Ms. Shroff and not Ms. Levine, but others lawyers from

25   Federal Defenders represent Defendant 1?

Hcmnalmc

1            THE DEFENDANT:  Yes.

2            THE COURT:  And do you understand that the fact that

3    Ms. Shroff and Federal Defenders represent Ahmad Khan Rahimi

4    may put them in a position where their duties to Mr. Rahimi

5    potentially conflict with the duties to you?

6            THE DEFENDANT:  I understand.

7            THE COURT:  Do you understand that, similarly, the

8    fact that Federal Defenders represent Defendant 1 may put

9    Federal Defenders in a position where the duties of that

10   organization to Defendant 1 may conflict with Federal

11   Defenders' duties to you?

12           THE DEFENDANT:  Yes.

13           THE COURT:  OK.  I am going to list now a number of

14   contexts or times or parts of the case where the potential

15   conflict, at least in theory, could affect their representation

16   of you, and then I am going give you some more specific

17   examples, but just to put it at a large level, the areas in

18   which a lawyer's conflict like this at least potentially could

19   affect the representation, affect a whole lot of different

20   potential situations, to begin with, whether you should guilty

21   or go to trial, whether you should seek to cooperate with the

22   government or not, what defenses you should raise at trial,

23   whether you should testify at trial, which witnesses should be

24   cross-examined, and what questions they could be asked, which

25   witnesses, if any, you may call, and your lawyers might ask

47

Hcmnalmc

```
 1    those witnesses, what arguments to the jury might be made, or
 2    what arguments to the Court might be made, and, in the event
 3    that there is a conviction or a guilty plea, what arguments
 4    might be made at sentencing.
 5              I've described really more or less the entirety of the
 6    steps at issue in the case.  Those are all areas that could be
 7    affected by this potential conflict in theory.
 8              Do you understand?
 9              THE DEFENDANT:  I understand.
10              THE COURT:  I should add that right now pending in
11    front of me is a decision on what is called a motion *in limine*,
12    whether to admit or not some of the evidence that Mr. Turner
13    has just described, that is, the fact that certain discovery
14    material from other people's cases was found allegedly in your
15    possession and certain discovery material from your case was
16    allegedly found in their possession.
17              So the potential conflict could affect the way in
18    which Federal Defenders makes arguments to me about that issue.
19              Do you understand that?
20              THE DEFENDANT:  Yes.
21              THE COURT:  To be a little more precise, were you able
22    to follow the discussion that Mr. Turner and I were having
23    earlier as we tried to identify some of the more concrete ways
24    in which this potential conflict might affect your
25    representation?
```

Hcmnalmc

1      THE DEFENDANT:  Yes, your Honor.

2      THE COURT:  OK.  I am just going to elaborate.

3      One possible way is that it might be that the lawyers

4 for Federal Defenders might have an incentive to protect

5 Mr. Rahimi.

6      Do you understand that?

7      THE DEFENDANT:  Yes.

8      THE COURT:  So, in theory, they might try to suggest

9 that any sharing of these materials, if it occurred, was

10 attributable to -- let me back up.

11      An independent attorney might have an interest in

12 saying that Mr. Rahimi and Mr. Rahimi alone let's say was

13 responsible for the sharing of these discovery materials with

14 you, but because Federal Defenders represents Mr. Rahimi, they

15 might go easy on Mr. Rahimi and not try to argue that he was

16 the source of that.

17      Do you understand that?

18      THE DEFENDANT:  Yes.

19      THE COURT:  That could come up in a different number

20 of contexts.  It could affect the way they submit their legal

21 briefs to me.

22      Do you understand that?

23      THE DEFENDANT:  Yes.

24      THE COURT:  It might affect the arguments they make to

25 the jury about who was responsible for the fact of the material

Hcmnalmc

1      being shared across the cases if that happened.

2                Do you understand that?

3                THE DEFENDANT:  Yes.

4                THE COURT:  It might affect the way witnesses are

5      questioned.  Understand?

6                THE DEFENDANT:  Yes.

7                THE COURT:  And at least in theory, it might affect --

8      your lawyers might want to consider calling Mr. Rahimi as a

9      witness in this case.  It seems unlikely, but it could in

10     theory happen.

11               Do you understand that?

12               THE DEFENDANT:  Yes.

13               THE COURT:  But if that were to happen, they might be

14     conflicted from calling him or they might need to have a

15     different lawyer handle that part of the case.

16               Do you understand that?

17               THE DEFENDANT:  Yes.

18               THE COURT:  I realize that seems improbable, and it

19     would seem unlikely that Mr. Rahimi would himself ever submit

20     to such testimony given privileges that he has, but I'm

21     identifying all of these as potential areas.

22               Understood?

23               THE DEFENDANT:  Yes.

24               THE COURT:  All the same things that I just talked

25     about as to Mr. Rahimi, the same issues could occur with

Hcmnalmc

1    respect to Defendant 1; that is, that Federal Defenders might

2    in one way or the other try not to make Defendant 1 look bad,

3    and so they might blame it solely on you that there was any

4    sharing between you and Defendant 1 of any such material.

5              Do you understand that?

6              THE DEFENDANT:  Yes.

7              THE COURT:  Relatedly, as I discussed with Mr. Turner,

8    it's possible that your attorneys would be a little less

9    aggressive or less aggressive in representing you because they

10   would be concerned about this issue, that they might be accused

11   of using privileged information they'd gotten either from their

12   representation of Mr. Rahimi or from their representation of

13   Defendant 1.

14             Do you understand that?

15             THE DEFENDANT:  Yes, your Honor.

16             THE COURT:  Now, I think I'm speaking for everyone

17   here in saying that, so far as we all know now, all of these

18   issues only occur in the context of the sharing of prison

19   information.  There has been no suggestion to me that either of

20   these other two clients of Federal Defenders in any way are

21   connected with any of the other issues in your case.

22             Do you understand?

23             THE DEFENDANT:  Yes.

24             THE COURT:  Mr. Turner, is that correct, that all of

25   the discussions we are having solely are relevant to the

Hcmnalmc

1  discovery-sharing issue, correct?

2          MR. TURNER:  That's correct, Judge.

3          THE COURT:  Ms. Shroff, is that a fair summary, to the

4  best of your knowledge?

5          MS. SHROFF:  Yes, your Honor.

6          THE COURT:  So all of those are some examples of the

7  potential conflict.

8          Do you understand the examples I've given?

9          THE DEFENDANT:  I understand.

10          THE COURT:  Can you tell me in your own words the

11  potential conflict.

12          Again, I am emphasizing, I'm not saying that this is

13  an actual conflict, and I'm not saying it would in any way by

14  any means necessarily affect a thing that Ms. Shroff or

15  Ms. Levine would do, but it is a potential conflict.

16          Can you tell me in your own words your understanding

17  of the potential conflict?

18          THE DEFENDANT:  I understand that because me, the

19  defendant Rahimi and Defendant 1 are represented by Federal

20  Defenders, that in defending us with this conflict that has

21  arisen with the discovery, the lawyers from Federal Defenders

22  could either choose to side with one of the defendants and that

23  will affect the representation of either me or Rahimi or

24  Defendant 1.  So that might be one possible conflict that I

25  understand.

Hcmnalmc

1              THE COURT:  OK.  In other words -- I think I get that.

2              Do either counsel believe I need to question the

3      defendant further as to his understanding of the potential

4      conflict?

5              MR. TURNER:  No, your Honor.

6              MS. SHROFF:  I do, your Honor.  I think that might be

7      better after Mr. Strazza speaks with Mr. Almehmeti.

8              THE COURT:  I agree.  The question is at this stage do

9      I need to?

10             MS. SHROFF:  No.  I don't need permutations of it.  He

11     would have to be able to articulate how my defense of him could

12     be hampered by my --

13             THE COURT:  Right.

14             I am just asking you, before I proceed on to explain

15     to him his procedural rights, I just want to ask you at this

16     stage -- there will be a second stage.

17             MS. SHROFF:  OK.

18             THE COURT:  Do you believe I need to inquire further

19     as to his understanding at this point?

20             MS. SHROFF:  I think you may want to flesh out how

21     certain defenses would be presented for him versus Mr. Rahimi,

22     how they are at odds?

23             THE COURT:  What do you propose I ask him?

24             MS. SHROFF:  That he should be able to understand that

25     our investigation itself, for example, an investigation of the

Hcmnalmc

1    disks or the hard drive, even that creates a potential

2    conflict, which there may be certain information that we want

3    to learn that would help him, when we learn that information it

4    could hurt Rahimi or vice versa.  So there is an inherent

5    conflict even in the work we would be doing to get to the

6    ultimate answer.  That's what I was trying to flesh out.

7            THE COURT:  OK.  Thank you.  It is a fair point.  It's

8    within the context of I think the broader points that have

9    already been made, but it is a valid point.

10           Ms. Almehmeti, did you hear what Ms. Shroff just said?

11           THE DEFENDANT:  Yes.

12           THE COURT:  In your own words, can you explain to me a

13   little more about the ways in which actions that Ms. Shroff

14   might take or not take could be affected by the fact that she

15   and Federal Defenders represent these other two individuals?

16           THE DEFENDANT:  Yeah.

17           I understand, like Ms. Shroff mentioned during the

18   investigation, they could come up with certain facts of

19   conflict that might hurt me or might hurt Rahimi or could be in

20   my favor and if it's in my favor they won't really be able to

21   use it if it's hurting their other client, Rahimi and vice

22   versa.

23           What I also understand about the conflict is there

24   could be an eventuality where, like, as you mentioned earlier,

25   where the blame might be pointed to Rahimi and that Ms. Shroff

wouldn't really be able to represent me in that eventuality; or

if Rahimi pointed the finger at me, the same:  Ms. Shroff

wouldn't be able to represent me or him without a conflict at

that point.

THE COURT:  In other words, just to be clear, the

government is not going to be allowed to argue, and they are

not going to be arguing that you broke a prison rule by

sharing, a rule by sharing discovery material, if that was what

was found, and they are not going to be arguing that the other

defendants did either.

They are simply going to be arguing, assuming this

evidence is allowed in, that the material from other cases was

found on your computer or your discovery material was found on

other people's computers and that that in turn reflects, for

example, your interest in such material.

But they are not going to be allowed to argue that it

was against a rule.

Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  So, in theory, the defense might have an

interest in arguing that Mr. Rahimi planted this material on

your computer from his case, for example, and Ms. Shroff is

saying in theory she would have an incentive not to hire an

expert who could study whether there was anything to do theory

by inspecting your computer because she wouldn't want to walk

Hcmnalmc

1    into a situation where Mr. Rahimi then would be exposed as

2    having planted things on your computer, that kind of thing.

3              Understood?

4              THE DEFENDANT:  Yes.

5              THE COURT:  Do you understand that in every criminal

6    case, including this one, the defendant is entitled to the

7    assistance of counsel whose loyalty to him is undivided and who

8    is not subject to any factor that might in any way intrude on

9    the attorney's loyalty to his interests?

10             THE DEFENDANT:  Yes.

11             THE COURT:  Do you understand that you are entitled to

12   an attorney who has only your interests in mind and not the

13   interests of another client?

14             THE DEFENDANT:  Yes.

15             THE COURT:  Do you understand that you have the right

16   to object to continued representation by Federal Defenders

17   based on the existence of a conflict of interest?

18             THE DEFENDANT:  Yes.

19             THE COURT:  Have you received any inducements,

20   promises, or threats with regard to your choice of counsel in

21   this case?

22             THE DEFENDANT:  No.

23             THE COURT:  Do you understand that one danger to you

24   in this situation is my inability and the lawyer's inability to

25   foresee all of the potential conflicts that could arise because

Hcmnalmc

1    of Federal Defenders' representation of you on the one hand and

2    of Rahimi and Defendant 1 on the other?

3            In other words, we have all done our business today to

4    try to imagine what the conflict could be, but something could

5    come up that we just can't perceive right now.

6            Do you understand that?

7            THE DEFENDANT:  I understand.

8            THE COURT:  It is important that you understand that

9    no one, including the Court, as hard as we're all trying here,

10   can predict with any certainty the course that this case will

11   take, and no one, including me, can foresee all the ways in

12   which you could at least in theory be disadvantaged by the fact

13   that the Federal Defenders represent those other people as well

14   as you?

15           Do you understand that?

16           THE DEFENDANT:  Yes.

17           THE COURT:  Do you understand that you have a right to

18   consult with an attorney who is free from any conflict of

19   interest in this case and that I will give you the opportunity

20   to do that if there's any aspect of this issue or the

21   information that we've covered today that you wanted to discuss

22   with a conflict-free attorney?

23           THE DEFENDANT:  Yes.

24           THE COURT:  I will adjourn the remainder of this

25   proceeding, and it's my preference that I do that so that you

Hcmnalmc

1    can consult with a conflict-free attorney, a lawyer who doesn't

2    work at Federal Defenders, about the potential conflict of

3    interest that I've described today, and I will appoint free of

4    charge an attorney to consult with you for that purpose.

5              Would you like me to do that?

6              THE DEFENDANT:  Yes, your Honor, I would like that.

7              THE COURT:  Good.  I will do that.

8              We have the great fortune ever having Mr. Strazza,

9    Anthony Strazza here today.  He is among the lawyers who is

10   court certified, meaning he has been approved by a board of

11   judges in this district as among the lawyers who gets appointed

12   in criminal cases to represent defendants, so he is learned and

13   knowledgeable in this area, and I'm appointing Mr. Strazza,

14   therefore, for the limited purpose of being your conflict-free

15   counsel.

16             He's not here to represent you at trial.  He's here

17   simply to guide you independently on the issues presented.

18             Mr. Strazza, you can come forward, and I want to thank

19   you for your service.

20             MR. STRAZZA:  Thank you, your Honor.

21             THE COURT:  What I am going to do, then, is direct

22   that Mr. Strazza with dispatch begin conferring with

23   Mr. Almehmeti about these issues.

24             I would encourage you, Mr. Strazza, to speak with

25   government counsel and defense counsel so that you understand

Hcmnalmc

1    the history of the case, the nature of the charges, and where

2    this issue fits in.

3            I will give you my perspective in a moment to the

4    extent it helps educate you, but I would urge you to speak with

5    the very thoughtful lawyers in this case so that you can factor

6    in what they have told you and to your appreciation of the

7    broader case because it's been pending for a little while.

8            MR. STRAZZA:  Yes, your Honor.

9            THE COURT:  OK.  We have next scheduled in this case a

10   conference on January 2 at 2 p.m.

11           The purpose of that conference is counsel are aware is

12   twofold:  One is to take up, to give notice to the members of

13   the public an opportunity for the members of the public to

14   comment on the pending motion by the government for a partial

15   courtroom closure as to the testimony of certain personnel;

16   and, second, to the extent the Court has factual issues about

17   the pending motions *in limine*, it is a forum in which I can

18   raise issues with counsel before those issues are resolved.

19           It would be my suggestion that we meet before the 2

20   p.m. conference, but that same day, to make these efficient for

21   everybody for the purpose of having a continuation of the

22   *Curcio* proceeding.

23           I propose that we meet at 1 p.m. that day.

24           Does that work for counsel?

25           MR. STRAZZA:  It works for me.

Hcmnalmc

1              MR. TURNER:  Yes, your Honor.

2              MS. SHROFF:  May I just have a second with

3    Mr. Strazza?

4              THE COURT:  Yes.

5              MR. STRAZZA:  Your Honor, if I may, I think I just

6    wanted to announce this to the Court, that date and time would

7    work.  With the caveat that I would be able to -- that we would

8    be able to speak today at the appropriate location in this

9    building and then again January 2 before the 1 o'clock

10   conference, again in this building.

11             THE COURT:  "We" meaning?  Who is the "we"?

12             MS. SHROFF:  Myself and the client?

13             THE COURT:  Right.  In other words, you are available?

14             MR. STRAZZA:  I will not be able to go see him where

15   he's being housed in between today and January 2.  I don't

16   think that is a problem because I'll have sufficient time to

17   speak with him today, and I will have sufficient time to speak

18   with him again on January 2.

19             THE COURT:  Will you have some other means of

20   communicating with him in between by phone?

21             MR. STRAZZA:  Yes.

22             THE COURT:  OK.  Look, I leave it to you as a

23   professional to make the judgments about what time is

24   available, but I need to tell you obviously that this is an

25   important issue, and I will be asking Mr. Almehmeti whether

1    he's had enough time with you to work through the issues.

2              MR. STRAZZA:  Sure.

3              THE COURT:  I am not going to micromanage the how and

4    the when you speak, but I do obviously ask you, in taking this

5    on, to treat it with what I know will be great professionalism

6    but also with dispatch.

7              MR. STRAZZA:  Yes, your Honor.

8              THE COURT:  All right.  Let's schedule the

9    continuation of this for 1 p.m. on January 2.

10             Mr. Smallman has passed me a note that may have some

11   practical suggestions on where you can meet today.  I will

12   leave that for when I adjourn this.  I will leave that for you

13   Mr. Smallman, the marshals, and perhaps Ms. Shroff to work

14   through those mechanics.

15             But let me just offer the following thoughts from the

16   Court's perspective may, which be helpful for you in this case.

17             Jury selection is scheduled for January 29, and the

18   substance of the trial, that is a Monday, is scheduled for the

19   week following.

20             As I perceive the conflict, it is limited to a

21   discrete issue, which has only very recently arisen in the

22   case.

23             As I think you have gotten wind of somewhat today,

24   relatively recently the government has become aware, it

25   represents that Rule 16 discovery material from this case was

found on other defendants' either electronic devices or

possession, and, vice versa, some such material from their

cases was found in the possession or on the devices of

Mr. Almehmeti, so it is alleged.

This is subject of a pending motion *in limine*, which I

won't resolve until obviously I have resolved the conflict

issue.  There is not any broader allegation that there is any

conflict here.  It's really limited to this discrete evidence.

To further narrow the issue at hand, I had a

conference in this case with counsel a little over a week ago

as we considered the motions *in limine* that had then been filed

by the government, but as of then had not been responded to by

the defense, and I was trying to get a preview and understand

what the motions were about.

As we discussed this motion, I expressed considerable

concern with the government that if this evidence were received

of the communications being on people's computers, it would

devolve into a dispute about whether Mr. Almehmeti broke a rule

or regulation or restriction on discovery sharing by letting

another defendant see Rule 16 material from his case or that

some other defendant broke a rule in sharing information with

him or that the recipient in either situation broke a rule.

The government I think recognized the

trial-within-a-trial possibility that I was worried about,

which is there would be debates back and forth about fault and

Hcmnalmc

1   who knew what about the rules.

2           I was, without ruling on it, signaling that I saw some

3   countervailing Rule 403 issues in allowing that evidence to

4   turn into a discussion about rule breaking.

5           Mr. Turner's cocounsel, Mr. Bove, took that issue off

6   the table.  In effect at the conference the government took off

7   the table the idea that they would be arguing that there had

8   been any rule violation in the sharing.

9           So, if this evidence is permitted to be received,

10  *i.e.*, if I grant in part or in whole the government's motion *in*

11  *limine*, there will be no hint or way, shape, or form of any

12  fault here, and the jury will not be permitted to speculate

13  about whether anyone broke any rule in sharing the material.

14  So far as the jury is concerned, it's a permissible thing to

15  do.

16          The issue, therefore, will be whether the fact of the

17  material being shared in either direction is probative of, for

18  example, the defendant's interest in the subjects covered by

19  that material, *e.g.*, ISIS, ISOL, that sort of thing.

20          So, as you are considering the conflict issues here, I

21  think one thing you ought to be aware of is I'm not going to be

22  inviting debate about fault or rules breaking.  The proffer of

23  relevance has to do with the defendant's interest in the

24  materials, not his breaking any such rule.

25          That may have significant relevance to whether or not

1   there really is a deep-seated conflict between these two

2   clients in your estimation.  It is for you to gauge this.

3           But, notwithstanding the tenor of a few of the

4   questions or comments I have made, I am not going to be

5   allowing this chapter of evidence to turn into a issue of

6   fault.

7           There might in theory though be an issue of causation

8   in that I suppose, for example, Mr. Almehmeti might say, look,

9   I allowed him to see my computer, but I didn't ask him to put

10  on my computer material from his case or something like that.

11          So, you could have a situation in which it is alleged

12  that the sharing outstripped that which was permitted, or there

13  could be an argument that the computer was simply obtained

14  without the knowledge or consent of Mr. Almehmeti, but the

15  notion of rules breaking is out of the case.

16          I think that has significant relevance for the

17  imaginable areas of potential conflict, and I wanted to set

18  that out for you now.

19          There's no suggestion, as you can tell, that either of

20  the other defendants has any other hand in the facts or issues

21  in the case.  This conflict issue solely relates to the

22  presence on respective devices or computers or records of

23  material that had been in the discovery possession of other.

24          MR. STRAZZA:  I understand.  Thank you.

25          THE COURT:  Hopefully that's helpful for you in

1    bracketing the issue.

2              All right.  Yes.

3              MR. TURNER:  One possible subsidiary point, your

4    Honor, is that, as we noted in our letter of the 19th, the

5    government is no longer seeking to disclose to the jury the

6    identity of Rahimi or details regarding the offenses that he

7    committed in connection with our presentation of proof on this

8    issue at trial.

9              THE COURT:  Thank you.

10             Sorry, Ms. Shroff.  You will have a chance to speak

11   with counsel.  I just want to make sures a hearing what is

12   being said.

13             That is important, Mr. Strazza.  One of the issues

14   that came up at the earlier conference involved the nature of

15   the people in question, *i.e.*, crimes that they were charged

16   with, the status of their cases.  I believe at that prior

17   conference I expressed concern of 403 issues that might arise

18   if the defendant were associated with other people who were

19   alleged to have done bad things.

20             That is more a 403 issue than a conflict issue, but I

21   think it's relevant to your consideration.

22             What the government is saying is that they are not

23   going to elicit the who, the name of the other defendant, or,

24   for that matter, the litigation context, the crimes with which

25   those two people were charged or the status of the proceedings

Hcmnalmc

1    as to them.

2              Is that correct, Mr. Turner?

3              MR. TURNER:  Yes.  We would reserve the right to find

4    a middle ground with respect to a general characterization

5    perhaps of the offenses of the which the other unnamed inmate

6    is there for, but not anything disclosing the identity of

7    Rahimi or the particular acts that he engaged in.

8              THE COURT:  OK.  I'm obviously not weighing in on the

9    substance now, but, in any event, the people are off the table,

10   the specifics of those crimes are off the table, and what may

11   be further off the table may or may not be even a general

12   description of the crimes charged.

13             The relevant point is what's germane here is the

14   materials found on the respective devices.  I understand why,

15   to the extent that Almehmeti discovery materials found on

16   somebody else's computer, it may be necessary to make clear

17   that that person wasn't charged with postal theft as opposed to

18   something that is more in this space, but I am not expecting

19   that there will be any articulation before the jury of

20   specifics.

21             MR. STRAZZA:  Thank you, your Honor.

22             THE COURT:  Hopefully that also brackets your tasks.

23             Ms. Shroff is there something you want to say?

24             MS. SHROFF:  No, your Honor.  I can talk about the

25   crux of the conflict with Mr. Strazza rater on.

Hcmnalmc

1        THE COURT:  Good.  With that, is there anything

2    further from the government.

3        MR. TURNER:  One very last point, your Honor.

4        THE COURT:  Yes.

5        MR. TURNER:  Just for the avoidance of any ambiguity

6    on this, earlier today at Ms. Shroff's request we did agree

7    that the sealed letter that we submitted in conjunction with

8    our publicly filed letter on December 19 relating to Defendant

9    1 and providing some more information regarding Defendant 1 has

10   been shared with Mr. Strazza at this point so he has access to

11   that for purposes of the consultation.

12       THE COURT:  For avoidance of doubt, I am authorizing

13   the parties in their collective judgment to share with

14   Mr. Strazza any sealed, as opposed to classified, information

15   in the case.  There is no reason any of that classified stuff

16   has anything to do with this issue, but with respect to sealed

17   material, if either of you believes that it is important for

18   him to see some of that material for the purposes of

19   facilitating his review of the conflict issue -- I am not sure

20   there would be anything more other than that letter -- I'm

21   authorizing you on an attorneys'-eyes-only basis to share that

22   with him.  Each of you is independently authorized to do that.

23   OK.

24       With that, anything further from the government?

25       MR. TURNER:  No, your Honor.

Hcmnalmc

```
1              THE COURT:  Anything further from Ms. Shroff?

2              MS. SHROFF:  Your Honor, one matter.  It's not related

3    to the Curcio or anything other than the trial date and

4    Mr. Almehmeti's position.  Just hear me out before --

5    Mr. Almehmeti was recently moved within the MCC.

6    Unfortunately, his legal paperwork has not moved with him.

7              I take this opportunity just for the Court -- I am

8    going to order these minutes anyway for our office to read -- I

9    just ask that the Court recommend to the Metropolitan

10   Correction Center, that to the extent they possibly can, please

11   get Mr. Almehmeti his legal paperwork as soon as possible.

12             THE COURT:  Yes.  I certainly make that

13   recommendation, but I urge you to work with the government on

14   this.  I've had this sort of issue arise time and again, and it

15   almost invariably, when the parties work together, they are

16   able to get the attention of the prison authorities.

17             But I obviously share exactly your objective, and I'm

18   happy to make that recommendation.

19             MS. SHROFF:  Thank you, your Honor.

20             THE COURT:  Anything further from you, Mr. Strazza?

21             MR. STRAZZA:  No.  Thank you.

22             THE COURT:  Let me just adjourn by wishing everybody a

23   healthy and a happy new year.  That goes for all three counsel,

24   that goes for you, Mr. Almehmeti, as well and for the marshals

25   who have been patiently here during this conference.
```

Hcmnalmc

1           Counsel in the next case, I will be out in five

2    minutes.

3           Thank you.

4           (Adjourned)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25