USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 2/15/2018

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
:
UNITED STATES OF AMERICA,                         :
:
        -v-                                       :        S1 16-CR-398 (PAE)
:
SAJMIR ALIMEHMETI,                                :        OPINION & ORDER
:
                        Defendant.                :
:
------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

Trial in this case is scheduled for May 2018. This decision resolves the Government's

motion for partial closure of the courtroom during the testimony of certain undercover officers

who are expected to testify and for various other measures aimed at protecting these officers'

identities from public exposure. For the reasons that follow, the Court grants the Government's

motion in large measure, but with certain modifications aimed at assuring press access to this

aspect of the upcoming trial.

I.      **Factual Background**

        A.      **The Indictment**

        Sajmir Alimehmeti is charged in a two-count superseding indictment with (1) knowingly

and intentionally providing and attempting to provide material support to a foreign terrorist

organization ("FTO"), namely, the Islamic State of Iraq and al-Sham ("ISIS"), in violation of 18

U.S.C. §§ 2339B and 2; and (2) attempting to fraudulently procure a United States passport to

facilitate an act of international terrorism in violation of 18 U.S.C. § 1542. Dkt. 70. Trial was

originally set to commence January 29, 2018, but has been adjourned to May 2018 to

accommodate the substitution earlier this month of defense counsel.

## B.     Relevant Factual Allegations[1]

The Government expects to establish, *inter alia*, the following at trial.

### 1.     Background to Alimehmeti's Introduction to the Undercover Officers

Alimehmeti is a 24-year-old U.S. citizen who was born in Albania. Before his arrest, he was a resident of the Bronx, and, according to the Government, had become a supporter of ISIS. In 2014, Alimehmeti was twice denied entry into the United Kingdom. Materials confiscated from him after the second attempt include terrorist propaganda, images of jihadist fighters, and ISIS's black flag. In 2015, Alimehmeti began to amass the sort of weapons, such as combat knives, that could be used in a "lone wolf"-style terrorist attack.

### 2.     Alimehmeti's Dealings with Undercover Officers

Relevant to this motion, in September 2015, Alimehmeti was introduced to two undercover officers ("UC-1" and "UC-2"). Over the course of several months, UC-1 and UC-2 developed relationships with Alimehmeti. They met with Alimehmeti in multiple locations, including his apartment. They observed an ISIS flag displayed on one of the apartment's walls. In his dealings with the UCs, Alimehmeti repeatedly expressed his support for ISIS, played ISIS propaganda videos for them, and communicated to them his desire to join ISIS in Syria.

In February 2016, UC-2 introduced Alimehmeti to UC-3, an undercover FBI employee posing as an ISIS supporter. On May 9, 2016, UC-2 showed Alimehmeti a photograph of UC-3 in a desert waiving an ISIS flag. UC-2 told Alimehmeti that UC-3 had joined ISIS. Alimehmeti expressed his excitement and desire to join UC-3.

---

[1] This statement of facts is drawn from the Government's publically filed omnibus motion *in limine*. Dkt. 72 ("Gov. MIL"). The Court recites these allegations solely to provide context for the motion *in limine*.

On May 16, 2016, UC-2 and Alimehmeti met again, this time in Queens. UC-2 told Alimehmeti about "UC-4," an alleged associate of UC-3's who was actually another undercover FBI employee. UC-2 told Alimehmeti that UC-4 was traveling to New York City from Florida on his way to Syria to join UC-3 and ISIS.

On May 17, 2016, UC-2 introduced Alimehmeti to UC-4 at a Manhattan restaurant. Alimehmeti asked UC-4 about his route to Syria. UC-2 asked Alimehmeti if he would help UC-4 get supplies for his journey. Alimehmeti agreed and assisted UC-4 in purchasing a cellphone, flashlight, bag, and compass. Alimehmeti also helped UC-4 download encrypted messaging applications to his phone that he could use to communicate with other ISIS supporters, and gave UC-4 his contact information with the expectation that UC-4 would pass that information on to the individual facilitating UC-4's travel. At some point during the day, Alimehmeti told UC-4 that he wanted to travel to Syria as well, and that he had saved $2,500 to make the journey. At the end of the day, Alimehmeti accompanied UC-4 to the airport so UC-4 could begin his journey to join ISIS.

Alimehmeti's interactions with the UCs were recorded on audio and in some instances videotape.

On May 24, 2016, the FBI arrested Alimehmeti.

## II. Procedural Background to this Motion

### A. The Government's Motion

On December 8, 2017, the Government filed an omnibus motion *in limine*, Gov. MIL, and the defense filed its own motion, Dkt. 74. In a decision issued on January 7, 2018, the Court resolved the pending *in limine* motions, save the Government motion at issue here. Dkt. 96.

As to that motion, the Government seeks an order imposing 10 protective measures. Each is aimed at minimizing the risk of exposing the identities or appearance of the undercover

officers, some or all of whom are expected to testify at trial. The measures the Government seeks were set out in a proposed order, which would provide for the following:

(1) *Partial courtroom closure*: "During the testimony of the UCs, only the Court, essential courtroom personnel, the defendant, the defendant's counsel, and the Government's trial team [will be] permitted to be present in the courtroom." During "[t]his partial closure of the courtroom," "a live audio broadcast of the UCs' testimony [will] be made available to the public at another location in the courthouse"; and "transcripts of the UCs' testimony [will]. . . be made publicly available as soon as feasible after their testimony."

(2) *Nondisclosure of UCs' identities*: "Public disclosure of the true identities of the UCs in connection with the trial of this matter [will be] prohibited."

(3) *Pseudonymous UC testimony*: "The UCs [will be] permitted to testify under the pseudonyms that they used during the investigation of this matter instead of their true names."

(4) *Non-public entry to courthouse by UCs*: "The UCs [will be] permitted to enter and exit the courthouse through non-public entrances on the dates of their testimony, and the courthouse staff and [the] U.S. Marshals Service [are ordered to] assist the Government to make the necessary arrangements for the use of such non-public entrances by the UCs."

(5) *Obscuring of images of UCs in publicly available materials*: "Any videos, photographs, or other images of the UCs that are shown in open court, or otherwise made available to the public, [will] . . . be altered to pixelate or otherwise obscure the UCs' faces"; however, "this measure [will] . . . not apply to materials viewed only by the Court, essential courtroom personnel, the jury, the defendant and his counsel, and the Government's trial team."

(6) *Prohibition on photography or sketching of UCs during their testimony*: "The use of all non-official recording and photographic devices and methods, including sketching, [will be] prohibited during the UCs' testimony."

(7) *Prohibition on eliciting identifying information relating to UCs*: "The defense [will not be permitted to] elicit at trial, during cross-examination of the UCs or otherwise, personal identifying information relating to the UCs."

(8) *Prohibition on testimony regarding UCs' participation in unrelated matters*: "The defense [will not be permitted to] elicit at trial, during cross-examination of the UCs or otherwise, information about the UCs' participation in other investigations or undercover activities unrelated to the defendant."

(9) *Prohibition on testimony about UCs' means and methods*: "The defense [will not be permitted to] elicit at trial, during cross-examination of the UCs or otherwise, information relating to operational aspects of the means and methods used by law enforcement to record the defendant's communications, such as the installation, placement, location, and concealment of recording devices."

(10) *Limits on dissemination of 3500 material relating to UCs*: The 18 U.S.C. § 3500 and *Giglio v. United States*, 405 U.S. 150 (1972) material relating to the undercover officers will "be used by the defense only for purposes of the defense of this action; . . . be maintained in a safe and secure manner solely by the defendant's counsel of record ("counsel"); . . . not be possessed by the defendant outside the presence of counsel; . . . not be otherwise disclosed in any form except as set forth . . . below; and . . . be returned to the Government at the conclusion of trial or when the resolution of any appeal has become final." Such material "may be disclosed, in addition to the defendant and the defendant's counsel . . . , only to the following persons[:] . . . investigative, secretarial, clerical, and paralegal or student personnel employed full-time or part-time by the defendant's counsel; . . . independent expert witnesses, investigators, or advisors retained by the defendant's counsel in connection with this action; and . . . such other persons as hereafter may be authorized by the Court upon motion by the defendant."[2]

Gov. MIL, Exhs. B & C.

In seeking partial closure of the courtroom, the Government emphasizes its interest in keeping secret the true identities of its UCs. Gov. MIL at 54. Those identities are classified in relation to this and other terrorism investigations. *Id.* Revealing those identities, the Government asserts, would put the safety of the UCs and their families at risk, and hamper the Government's ability to use these UCs to investigate future terrorism cases. *Id.* The Government invokes the same interest in support of the other relief it seeks; these steps, it states, are aimed at safeguarding the identities of the UCs from disclosure, deliberate or inadvertent. *Id.* In support of these arguments, the Government filed *in camera* a classified memorandum and exhibits.

**B.      The Parties' Ensuing Submissions**

---

[2] The Government also requested that such persons who are permitted to view the 3500/*Giglio* material not further disclose that material in any form.

On December 12, 2017, a conference was held to address, *inter alia*, the pending motion. The Court expressed concern that, to the extent the Government sought to exclude Alimehmeti's family from the courtroom, such a prohibition was inconsistent with case law permitting partial closures of courtrooms during UC testimony.

On December 19, 2017, the Government filed a letter stating that it no longer sought to exclude Alimehmeti's close family from the courtroom during the UCs' testimony. Dkt. 80.

On December 21, 2017, Alimehmeti filed an omnibus response to the Government's motion *in limine*, which briefly discussed—and opposed in substantial part—this motion.[3]

That same day, the Court filed an order highlighting for the public and the press the fact that the Government was seeking a partial courtroom closure, and attaching the order proposed by the Government. Dkt. 85. The Court scheduled a hearing for January 2, 2018 to give the public and press an opportunity to comment on the proposed closure. *Id.*

On December 27, 2017, Alimehmeti filed a classified opposition to this motion.

**C.      The January 2, 2018 Public Hearing**

On January 2, 2018, the Court held a public hearing on the Government's motion. Two members of the press spoke.

John Riley from Newsday stated that the press has an interest in reporting not only what was said in court, but also on the reactions of persons present (including the defendant, the jury, and counsel). Riley stated that an order excluding the press from the courtroom would prevent the press from making such visual observations, even if a live audio feed of the witnesses' testimony were provided in a separate courtroom. Riley proposed that the Court authorize a

---

[3] This was filed at Dkt. 87, struck following a letter request from Alimehmeti, Dkt. 92, and later refiled on January 3, 2018 with redactions, Dkt. 95.

member of the press who regularly covers the courthouse to be present as a "pool" reporter who would report to other members of the media the observations he or she had made in court. Riley represented that such a reporter could be trusted not to disclose the officers' identifying characteristics. Riley further proposed that the Court order that the exhibits used during UC testimony simultaneously be displayed in the off-site courtroom in pixelated form.

Katie Zavadski from the Daily Beast stated that the press and public have a particular interest in this case, including because of the Government's use of undercover officers to build their case. She stated that she supports Riley's proposals, including to permit a "pool" reporter to be present during the UCs' testimony. She stated that in past cases involving UC testimony, members of the courthouse's press pool have responsibly declined to disclose the identity of testifying UCs, much as they have refrained from reporting names and identifying characteristics of potential jurors during jury selection. Zavadski also expressed concerns about imperfections in the technology used to stream testimony into an adjoining courtroom, including that witnesses and counsel may sometimes speak from a place or in a manner that the microphone does not pick up. She asked the Court to consider, in lieu of closing the courtroom, using a screen that would hide the testifying UC from the public's (but not the jury's) view during testimony, or allowing the UCs to testify with their faces covered by a niqab or its equivalent.

The Court then asked counsel for their views on these proposals. Government counsel opposed permitting even one "pool" reporter into court during the UCs' testimony. Government counsel stated that the possibility that a reporter could expose a UC's identity and endanger the UC justified excluding all reporters from the courtroom. Alternatively, the Government asked that, if a reporter were permitted to attend, that the UCs be permitted to testify in a light disguise. In response, the Court noted that the jury might alert to the difference between a testifying UC's

appearance in court and his or her appearance in the non-pixelated photos and videos that were offered into evidence. This, the Court noted, could give rise to jury confusion or lead the jury to infer—potentially prejudicially to Alimehmeti—that the disguise was in place for purposes of assuring safety. The Court also noted that the press, if allowed in the courtroom, might also see the non-pixilated photos and exhibits in evidence, defeating the purpose of the light disguise. Government counsel agreed with this observation.[4]

Alimehmeti's counsel, for their part, objected to the use of makeup or a screen to conceal the UCs' identity from press present during their testimony. This, defense counsel stated, could signal to the jury that Alimehmeti was dangerous or that the UCs' work in this case had subjected them to particular danger.

Finally, during the hearing the Court also asked the Government to estimate the length of the direct testimony of the testifying UCs. The Government stated that it expected such direct testimony to occupy one and a half to two trial days, or about one third of the Government's direct case.

## III.    Discussion

The relief the Government seeks can be sorted into four categories: (1) steps that would limit the extent to which the courtroom is open and available to the public, (2) steps that would impose limits on cross examination, (3) steps that would provide for the UCs to enter and exit the courtroom by nonpublic entrances, and (4) steps that would limit access to 3500 material. The Court addresses these in turn.

---

[4] Government counsel separately proposed that, as an alternative to permitting a member of the press to attend, the Court, in real time, state for the record how trial participants were reacting. The Court rejected as unworkable, distracting, and prejudicial the proposal that it place on the record such a "play by play" account of trial participants' expressions and actions.

### A.    Courtroom Closure

#### 1.    Governing Law

"The First Amendment . . .  has consistently been read to provide the public and press a right of access to criminal trials." *United States v. Smith*, 426 F.3d 567, 574–75 (2d Cir. 2005) (emphasis omitted).  The Sixth Amendment, in turn, gives a defendant a right to a public trial. *See Presley v. Georgia*, 558 U.S. 209, 213 (2010).  These rights, however, are qualified.  S*ee Bowden v. Keane*, 237 F.3d 125, 129 (2d Cir. 2001) ("Th[e] right to be tried in open court is not absolute.")  As the Supreme Court has explained, "the right to an open trial may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial or the Government's interest in inhibiting disclosure of sensitive information." *Waller v. Georgia*, 467 U.S. 39, 45 (1984).  "Such circumstances will be rare, however, and the balance of interests must be struck with special care." *Id.*

The Supreme Court has established a four-factor test to determine whether an aspect of a trial may be closed to the public.  "[This] test applies whether a closure motion is made by the government over the defendant's Sixth Amendment objection or made by the defendant over the First Amendment objection of the government or press." *United States v. Doe*, 63 F.3d 121, 128 (2d Cir. 1995); *accord Smith*, 426 F.3d at 575.  The four factors are:

> (1) The party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced;
> (2) The closure must be no broader than necessary to protect that interest;
> (3) The trial court must consider reasonable alternatives to closing the proceeding; and
> (4) The trial court must make findings adequate to support the closure.

*Presley*, 558 U.S. at 213–14 (citing *Waller*, 467 U.S. at 48).  These factors are interrelated and are to be considered in tandem:  "[T]he gravity of the interest that must be asserted by the state

depends on the extent of the closure requested." *Bobb v. Senkowski*, 196 F.3d 350, 353 (2d Cir. 1999).

The extent of the permissible closure turns on factors including "the importance of the testimony rendered during closure, the duration of closure, . . . the relationship of those excluded to the complaining defendant," *id.*, and "whether the public can learn (through transcripts, for example) what transpired while the trial was closed," *Bowden*, 237 F.3d at 129 (citing *Ayala v. Speckard*, 131 F.3d 62, 72 (2d Cir. 1997) (en banc); and *Herring v. Meachum*, 11 F.3d 374, 379–80 (2d Cir. 1993)). "Special concerns may apply when the spectators selectively barred from the courtroom are the defendant's family members." *Id.* at 132.

### 2. Discussion

The Court now applies the above principles, addressing the interest served by closure, the extent of the closure, and the available alternatives.

*Interest served by closure*: The Second Circuit has repeatedly recognized the safety and effectiveness of an undercover law enforcement officer as an overriding interest that may justify a courtroom's partial closure. *See*, *e.g.*, *Brown v. Artuz*, 283 F.3d 492, 501 (2d Cir. 2002) ("[The] safety of a police officer working undercover surely constitutes an overriding interest."); *Bobb*, 196 F.3d at 353–54; *Nieblas v. Smith*, 204 F.3d 29, 33 (2d Cir. 1999); *Brown v. Kuhlmann*, 142 F.3d 529, 537 (2d Cir. 1998). As the Second Circuit, *en banc*, has held:

> The state interest in maintaining the continued effectiveness of an undercover officer is an extremely substantial interest, and the trial judge in each case was amply justified in concluding that this interest would be seriously prejudiced by requiring the officer to testify in an open courtroom. There is no requirement that the prosecution must prove that particular individuals likely to attend the trial will disclose the officer's identity. Of course, the defendant himself has an opportunity to observe the officer (a second opportunity, if the defendant is guilty), and might communicate a description of the officer to others, particularly if the defendant is at liberty pending trial. The defendant's right of presence at his trial requires accepting that risk, but the right to a public trial does not require the further risk

that the officer's identity will become known through observation by members of the public who might enter the courtroom and see the officer testifying. The gravity of the state interest in protecting the secrecy of the officer's identity from casual observers and the likelihood that this interest will be prejudiced by the officer's testifying in open court are both sufficiently substantial to justify the limited closure of the courtroom during the officer's testimony.

*Ayala*, 131 F.3d at 72. Applying these principles, this Court, in granting a request for partial courtroom closure in a violent gang case, has similarly recognized as "extremely substantial" the Government's interest in safeguarding the identity, and thereby protecting the safety, of working undercover officers. *United States v. Urena*, 8 F. Supp. 3d 568, 571 (S.D.N.Y. 2014).

That interest applies with respect to the UCs here. In its classified, *ex parte* submissions, the Government has advanced and substantiated additional reasons—specific to this matter and these UCs—that make it imperative to protect the identities at issue. The Court will elaborate upon these reasons in a classified, *ex parte* addendum to this opinion that it intends to file shortly.

*Extent of the closure*: The proposed partial closure here would be for the entirety of the testimony of the four UCs, whose testimony on direct examination, the Government estimates, will last approximately one and a half to two trial days.

The Government proposes two steps to assure a degree of immediate public access to the content of this testimony notwithstanding the exclusion of the press and public. First, it proposes that an audio feed of that testimony be live-streamed to a different room within this courthouse during the period of partial closure. Second, the Government proposes to make available to the public and the press an unredacted copy of the transcript of each UC's testimony promptly.

The Court adopts these recommendations. With respect to the latter, the Court directs that updated transcripts of testimony be made available to the press and public both promptly

after the end of each UC's testimony and upon the adjournment of each day in which UC testimony was heard, whether or not the UC remained on the stand at the close of the day.

In addition to these steps, the Court directs that the following three steps be taken. Each measure, the Court concludes, will temper the adverse effects of the partial closure while not materially increasing any risk of exposure of the UCs' identities. First, as the Government has agreed is appropriate under the governing case law, the defendant's close family is also to be allowed to attend the trial during the UCs' testimony. Second, to the extent that exhibits are utilized during a UC's testimony, these exhibits are promptly to be made available to the press and public, including to those persons observing the trial in a different room of the courthouse, with leave to the Government to pixelate or otherwise obscure the images or other identifying characteristics of the witnesses as may appear in videos, photographs, or other such exhibits. Third, the Court will permit at least one representative from among the District's press pool to be present for each UC's testimony, so as to assure press exposure to visual observations (*e.g.*, of trial participants' reactions) that only a person physically present in court can make.[5]

With these modifications, the closure is, in the Court's assessment, narrowly tailored to the needs at hand. To be sure, in two respects, the proposed closure is more significant than in some other cases in which a courtroom has been closed during UC testimony. First, the UCs' testimony will be central to events at Alimehmeti's trial. In some cases in which closure has been approved to safeguard a UC's identity, the UC's testimony was "merely corroborative" of the decisive trial evidence. *See, e.g.*, *Kuhlmann*, 142 F.3d at 538. Here, in contrast, the

---

[5] As the two journalists attested at the January 2, 2018 hearing on the issue of closure, members of this District's press pool have historically respected the Government's interest in not revealing undercover officers' identities. This Court has confidence that any reporter(s) whom this District's press corps designates to serve as a pool reporter during the UC testimony at this trial will similarly respect this vital interest.

Government's case, as shown above, is largely built on Alimehmeti's interactions with the UCs. And while these interactions appear to have been largely if not wholly memorialized on tape, these tapes will presumably be authenticated and played during the UCs' testimony, and that testimony will contextualize and explain the recorded events. Second, the length of the closure sought here is relatively substantial. In some cases in which closure has been approved during a UC's testimony, a single UC has testified, and this testimony has covered only a short period. This Court so noted in approving a partial closure during a UC's testimony, lasting two to three hours, in a violent gang case. *See, e.g.*, *Urena*, 8 F. Supp. 3d at 571 ("The Government proposes to close the courtroom during only the testimony of one witness."). In contrast, here, the closure would cover the examinations of four witnesses, whose combined direct testimony the Government estimates will span a day and a half or two, or fully one-third of its direct case.

That said, with the provisions above aimed at assuring alternative modes of access, the Court is persuaded that the partial closure here is narrowly tailored. The public will be able to hear the audio testimony of the UCs in real time in a courtroom in this building. The public will be able to hear and see, either contemporaneously or nearly so, the exhibits offered and (in the case of tapes) played during this testimony. And the public will have access to, through the reporting of an SDNY press pool member, any visual observations of trial participants noted by the reporter. The closure is as limited as can be given the imperative of safeguarding UC identity and safety.[6]

---

[6] The closure is thus a far cry from the complete courtroom closure that occurred during the testimony of an undercover officer addressed in *Brown v. Andrews*, 180 F.3d 403 (2d Cir. 1999), *vacated*, 220 F.3d 634 (2d Cir. 2000). The state court there completely closed the courtroom for the testimony of an undercover officer who had conducted the buy and bust operation on which the case centered. *Id.* at 405–07. On post-conviction review, a panel of the Second Circuit held this closure improper. The decision was vacated in anticipation of *en banc* review, but the case was dismissed after the state acknowledged error.

And the Government's interest in closure in this case is compelling, even relative to the standards set in other cases approving courtroom closures during UC testimony. Of necessity, the Court's ability to elaborate in this opinion—as opposed to the classified supplement that it will file—is constrained where the Government has made its showing of the need for closure in classified filings. But this much the Court can publicly and confidently say: The UCs here are sophisticated professionals who by role, training, and experience serve to ferret out terrorist plots. Were their identities or physiognomies to become known, the UCs' lives would be endangered and they would be unable to continue their lines of vital work. And the UCs' compelled early retirement from this role would in turn compromise important national security interests. The history of this city and nation during the past quarter century underscores the gravity of the threat posed to civil society by terrorism. And the history of prosecutions in this and other areas of violent crime underscores the vital role that skilled and proactive UCs play in exposing and intercepting deadly plots. A system of criminal justice that was so inflexible as effectively to require exposure of UCs as an incident to prosecution would soon run dry of UCs, crippling the Government's ability to bring many cases in this area. As the Second Circuit case authority canvassed above reflects, the law, while requiring that closures be no greater than necessary, is supple enough to accommodate the vital interest in preserving UCs' anonymity. The factual record in this case compellingly reflects such an interest.

*Alternative measures*: The partial closure on the terms outlined above is superior to the alternatives that either been proposed or identified.

One alternative would be to have the UCs testify in disguise (such as using a niqab to cover the UC's head or light makeup to conceal a UC's features). One reporter who commented at the public hearing suggested testimony in disguise, although this option was opposed by both

the Government and the defense. For several reasons, the Court rejects this approach, whatever form the UC's disguise might take. Trial testimony by disguised witnesses might compromise Alimehmeti's ability directly to confront his most central accusers at trial insofar as any disguise impedes Alimehmeti's (or the jury's) ability to assess the witnesses' comportment on the stand. This arrangement is in tension with the Constitution's guarantee to a criminal defendant of the right "to be confronted with the witnesses against him," U.S. Const. amend. VI, and "a face-to-face meeting with witnesses appearing before the trier of fact," *Coy v. Iowa*, 487 U.S. 1012, 1016 (1988). Beyond that, there are practical problems with such an arrangement, including its capacity to prejudice Alimehmeti. The jury's ability to evaluate the credibility of a disguised officer could itself be compromised. *See Ayala*, 131 F.3d at 71 (2d Cir. 1997) ("Disguising the witness risks lessening the jury's opportunity to observe the witness's demeanor and assess credibility."); *Urena*, 8 F. Supp. 3d at 572; *see also United States v. Hernandez*, No. S1 12 CR 809 PKC, 2013 WL 3936185, at *2 (S.D.N.Y. July 29, 2013) (rejecting the use of a screen or disguise). And because the jury would likely discern the fact of a UC's disguise—including to the extent the UC presented differently in the court than in a video recording—the jury might infer a potential for danger or retaliation against the UC, and draw negative inferences adverse to Alimehmeti. *See* Memorandum and Order, *United States v. Pugh*, 1:15-cr-00116-NGG ("*Pugh*") (E.D.N.Y. Feb. 24, 2016) (rejecting, for similar reasons, in-disguise testimony in favor of closed-courtroom testimony with public streaming audio). In contrast, the partial closure will permit Alimehmeti to confront, and the jury fully to size up, the UCs. And because the fact of restricted public access to the courtroom during the UC testimony will not be announced and need and will not be evident to the jury, there is limited risk of its drawing an inference adverse to Alimehmeti.

Another alternative, also proposed by a journalist at the public hearing, would be for the UCs to testify from behind a screen.  That arrangement has much the same downsides as the proposal of testimony in disguise.  Depending on the placement of the screen in the courtroom, it might inhibit Alimehmeti's ability to scrutinize and confront the UCs while they testified.  And even if Alimehmeti and the jury could view the UCs unmediated, the screen unavoidably would be visible to the jury, raising questions of danger and retaliation in their minds, to Alimehmeti's detriment.  *Cf. Ayala*, 131 F.3d at 71–72 (suggesting that a screen that blocked the testifying officer from public view only could nevertheless "risk[] implying to the jury that the family or friends of the defendant in attendance are likely to be dangerous"); *Urena*, 8 F. Supp. 3d at 572.  Notably, Alimehmeti's counsel forcefully opposed either the disguise or the screen option.

A third option, proposed by the defense, would be merely to prevent a courtroom sketch artist from sketching the UCs' likenesses.  But that proposal, while obviating the most obvious means of public reproduction of the testifying UC's facial features, would not provide adequate protection to the UCs.  It would do nothing to prevent, for example, ISIL supporters from attending court in this publicized case and registering the UCs' appearance, with potentially devastating consequence to the UCs in future endeavors.[7]  The classified, *ex parte* supplement to this opinion will supply further, particularized, reasons why this proposal is fatally problematic.

For these reasons, the Court will permit the four UCs in this case to testify in a courtroom closed to the public, with the critical qualifications addressed above: that the audio of their

---

[7] Judge Garaufis, imposing a partial courtroom closure in *Pugh*, noted the particular risk to UCs who work in terrorism investigations.  He noted that ISIL "has been encouraging sympathizers to kill specific persons within the United States" and that "in June 2015 alone, there were three separate attempts by ISIL-inspired individuals to attack law enforcement officials."  *Pugh*, at 10.  This risk, he noted, is enhanced in high-profile cases, because ISIL "draws its targets from personnel mentioned in news articles."  *Id.*

testimony is to be live-streamed to a public location in the courthouse; that any exhibits offered or played during the UCs' testimony are, to the extent possible, to be made available contemporaneously to the public and press; that unredacted copies of each UC's testimony promptly be made available to the public and press; that Alimehmeti's close family be permitted to attend; and that at least one member of the District's press pool also be permitted to attend the testimony of each UC. For similar reasons, the Court also grants the Government's request to alter, pixelate, or otherwise obscure the visage of the UCs in any exhibit made available to the public and press. *See Pugh*, at 1, 10.[8]

### B. Undercover Officer Testimony and Cross Examination

The Confrontation Clause of the Sixth Amendment guarantees a criminal defendant the right to cross-examine adverse witnesses. *See Smith v. Illinois*, 390 U.S. 129, 129–31 (1968). That right, however, is not absolute. "[T]he Confrontation Clause guarantees only an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *United States v. Owens*, 484 U.S. 554, 559 (1988) (quoting *Kentucky v. Stincer*, 482 U.S. 730, 739 (1987)) (alteration in original) (emphasis in original). "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *United States v. Crowley*, 318 F.3d

---

[8] The Court's resolution of this motion effectively moots the Government's request that courtroom sketching of the UCs be prohibited. For avoidance of doubt, the Court—consistent with the representations of the reporters who spoke at the public hearing—expects that the pool journalist(s) who attend trial during the UCs' testimony, while otherwise free to take notes, will not sketch the UCs.

401, 417 (2d Cir. 2003) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)) (alteration in original).

The Government here seeks leave for the UCs to testify under pseudonyms and an order that would preclude the defense from eliciting, during cross examination or otherwise, the names or identifying characteristics of the UCs. This Court has approved pseudonymous testimony by a UC as a means of protecting a UC's safety and ability to continue to work as such, *see Urena*, 8 F. Supp. 3d at 572–574, as have other courts, *see, e.g.*, *United States v. Hernandez*, 2013 WL 3936185, at *3 (testify under alias); *Washington v. Walsh*, No 08 Civ. 6237(DAB), 2010 WL 423056 (S.D.N.Y. Feb. 5, 2010) (testify by badge number); *Alvarado v. Burge*, No. 5 Civ. 1851(AKH), 2006 WL 1840020, at *2 (S.D.N.Y. June 30, 2006) (badge number); Memorandum and Order, *United States v. Naseer*, 1:10-cr-00019-RJD, at 4–6 (E.D.N.Y. Jan. 26, 2015) (alias). Such restrictions on testimony are equally reasonable here, particularly insofar as the information that they preclude the defense from publicly eliciting—a UC's identity—is neither exculpatory as to Alimehmeti nor evidently relevant at trial. *See Urena*, 8 F. Supp.3d at 573 ("Moreover, nothing about UC-188's real name goes to his credibility or knowledge regarding the subject of his testimony.").[9] And Alimehmeti does not object to entry of such relief here. The Court therefore adopts these restrictions.

A separate issue is presented by the Government's request to preclude cross-examination of the UCs about: (1) the operational means and methods used by law enforcement to record the

---

[9]The Government does not seek to preclude Alimehmeti's defense counsel—who is security-cleared—from learning the UCs' actual names or undertaking appropriate diligence as to them (*e.g.*, investigating whether there is public-record impeachment material as to them). *See Urena*, 8 F. Supp. at 573 (precluding cross-examination on UC's true name while noting that defense had access to that name and all *Giglio* material associated with the UC); *United States v. Hernandez*, 2013 WL 3936185, at *3 (same).

defendant's communications during the investigation and (2) information pertaining to the UCs' participation in other investigations and undercover activities. These requests raise issues under Federal Rules of Evidence 402, which requires that evidence be relevant to be admissible, *United States v. Shvartsman*, 317 F. App'x 68, 70 (2d Cir. 2009), and 403, which requires that relevant evidence be excluded if its probative value "is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence," *Crowley*, 318 F.3d at 417 (2d Cir. 2003) (quoting Fed. R. Evid. 403).

Here, one discrete aspect of the means by which UCs' conversations with Alimehmeti were recorded is clearly relevant: the fact that these recordings were made surreptitiously, *i.e.*, without Alimehmeti's knowledge. The fact that Alimehmeti spoke without notice that his words were being recorded has obvious bearing on the jury's assessment of Alimehmeti's intentions, sincerity, and candor while engaging with the UCs. That the conversations in which Alimehmeti made allegedly incriminating statements were recorded without his knowledge is also potentially relevant to the defense of entrapment that Alimehmeti's counsel has stated she may pursue. The Court will therefore permit counsel to elicit the fact that the recordings of Alimehmeti's dealings with the UCs were made without his knowledge. While the Government has not been explicit on this point, the Court does not understand the Government to seek to preclude this fact.

As to all other aspects of the means and methods by which Alimehmeti's dealings with the UCs were recorded, however, the Court is unpersuaded, on the present record, that these are relevant. Alimehmeti has failed to explain why the particular placement of an audio or video recording device, or the manner or timing of its installation, or its make or model has any bearing on issues of guilt or innocence. *Cf. United States v. Crumley*, 565 F.2d 945, 951 (5th Cir. 1978)

(Sixth Amendment right to cross examination not infringed by ban on questions as to location of a track sheet used to identify stolen cars). These logistical niceties do not speak to Alimehmeti's culpability. The type of the recording device used, or the manner of its installation, do not shed light, for example, on whether Alimehmeti in fact sought to purchase supplies for UC-4's trip to Syria. And the place where a recording device was hidden is irrelevant to what Alimehmeti's intentions were in purchasing any such supplies or in pursuing travel abroad (*i.e.*, did he so act with the goal of supporting ISIS?).

The Court therefore precludes such lines of examination under Rule 402. Further, even if the investigative means and methods had some scant probative value, the Court would exclude such evidence under Rule 403. An inquiry at trial into the details of law enforcement recording methods would invite the jury to pass judgment on the propriety of such investigative techniques. A particular juror might, for example, be disquieted about law enforcement officers' presence and actions taken in a subject's home to install a device and the enforcement initiatives pursuant to which such investigative steps were taken. Those matters, however, being irrelevant to the defendant's innocence or guilt, are not fit subjects for the jury's consideration, with the Court— whose role it is to determine whether evidence has been lawfully obtained—having permitted such recordings to be received in evidence. Inquiry into such subjects would therefore invite confusion, delay, and distraction, and enhance the risk of unfairly prejudicing the Government at trial, with no offsetting probative value.[10]

_____

[10] In addition, admitting in a public trial evidence of the means and methods the Government's operatives use to record subjects in undercover operations could badly damage law enforcement's ability to build and bring future terrorism cases. *See United States v. Morison*, 844 F.2d 1057, 1078 (4th Cir. 1988) (upholding exclusion of intelligence information from criminal trial on the ground that "[s]uch evidence would add little or nothing to defendant's defense but could be of great damage to our intelligence capabilities"). However, the Court does not rely on the potential harm to future cases in holding that Rule 403 requires exclusion of such

In so holding, the Court reserves for Alimehmeti the right to seek reconsideration of this ruling under Rules 402 and 403. As trial takes shape and as new defense counsel freshly evaluates the case, it is conceivable the counsel will be be able to articulate in concrete form a reason why a discrete aspect of the UCs' investigative methodology with respect to the recordings of Alimehmeti is in fact germane. To be sure, the Court is skeptical that such methodology will prove relevant: To the extent, for example, that Alimehmeti may seek at trial to show that particular recordings are of poor quality or were made from a vantage point that led them to capture less than a full conversation, the Court expects that these points can be made without exposing investigative methodology. Should defense counsel seek to pursue this issue further, the Court expects any application for reconsideration to be made with ample advance notice.

The Government alternatively seeks exclusion of evidence of its investigative means and methods based on the law enforcement privilege. That privilege allows the Government to withhold documents and empowers a court to prohibit cross examination so as "to prevent disclosure of law enforcement techniques and procedures, to preserve the confidentiality of sources, to protect witness and law enforcement personnel, to safeguard the privacy of individuals involved in an investigation, and otherwise to prevent interference with an investigation." *In re Dep't of Investigation of City of New York*, 856 F.2d 481, 484 (2d Cir. 1988) (documents); *see also United States v. Cintolo*, 818 F.2d 980, 1002 (1st Cir. 1987) (cross

---

evidence here, mindful that the Rules of Evidence are predominantly concerned with "ascertaining the truth and securing a just determination" in the trial at hand. Fed. R. Evid. 102; *see also* Paul F. Rothstein, *Federal Rules of Evidence*, Rule 403 (3d ed. 2017) ("the concern expressed by [terms such as 'unfair prejudice'] is a concern about distortion or delay of the fact-finding process, rather than harm to interests outside of the trial, even if those outside interests are interests of someone involved in the trial."); *cf.* 1 *McCormick on Evidence* § 185 at nn. 51–65 (7th ed. 2016).

examination). The party asserting a law enforcement privilege bears the burden of "showing that the privilege applies" to the evidence in question and must demonstrate that the information contained in the evidence in question is the sort "that the law enforcement privilege is intended to protect." *In re the City of New York*, 607 F.3d 923, 944 (2d Cir. 2010) "Such protected information includes information pertaining to 'law enforcement techniques and procedures,' information that would undermine 'the confidentiality of sources,' information that would endanger 'witness and law enforcement personnel [or] the privacy of individuals involved in an investigation,' and information that would 'otherwise . . . interfere[ ] with an investigation.'" *Id.* (quoting *In re Dep't of Investigation*, 856 F.2d at 484).

The law enforcement privilege applies to the recordings here. The methodology used to facilitate recordings between the UCs and Alimehmeti, a subject of an investigation into material support of terrorism, squarely pertains to uncommonly sensitive law enforcement techniques and procedures. *See United States v. Van Horn*, 789 F.2d 1492, 1507–08 (11th Cir. 1986) (privilege covers identity and location of a police observation post and also "the nature and location of electronic surveillance equipment").

The law enforcement privilege is, however, qualified. The Second Circuit has developed a three-factor test governing attempts to obtain disclosure of materials covered by the privilege. *See In re the City of New York*, 607 F.3d at 945. The Circuit articulated that test in the context of a document request made in a civil lawsuit under 42 U.S.C. § 1983. It held that, once the party asserting the law enforcement privilege has shown that the documents at issue contain information that the privilege is intended to protect, there is "a pretty strong presumption against lifting the privilege." *Id.* (quotation omitted). To overcome this presumption, a party seeking disclosure of such materials "must show (1) that its suit is non-frivolous and brought in good

faith, (2) that the information sought is [not] available through other discovery or from other sources, and (3) that the information sought is 'importan[t]' to the party's case." *Id.* (quoting *Friedman v. Bache Halsey Stuart Shields, Inc.*, 738 F.2d 1336, 1343 (D.C. Cir. 1984)).

Although the Circuit's formulation of this test awkwardly fits the instant motion—Alimehmeti is not seeking document discovery in civil litigation—the Court treats the embedded principles as applicable to a dispute over the scope of proper cross-examination, as the First Circuit did in *Cintolo*, 818 F.2d 980.[11]  There, a trial court had barred defense counsel from "grill[ing trial] witnesses concerning the precise location of the electronic surveillance devices hidden in the Prince Street apartment." *Id.* at 1002.  The First Circuit upheld that ruling, finding the qualified law enforcement privilege "entirely appropriate in the context of criminal trials where a defendant seeks disclosure of confidential government surveillance information." *Id.* To rebut the privilege where applicable, the First Circuit held, a defendant must show "authentic 'necessity,'" which "requires a case by case balancing process" and is "controlled by the fundamental requirements of fairness," including "the extent to which adequate alternative means could have substituted for the proffered testimony." *Id.* at 1002.

The standards articulated by the Second Circuit in *In re the City of New York* and the First Circuit in *Cintolo* are thus substantially contiguous.  To overcome the law enforcement privilege, the defendant must show (1) that such evidence is necessary, or at least important, to his case; and (2) that there is not an alternative means to secure and present this evidence to the jury.

---

[11] The Second Circuit has upheld a claim of law enforcement privilege in the context of a criminal prosecution, specifically, in the context of a response to a document subpoena. *See In re Dep't of Investigation*, 856 F.2d at 485.  The Court did not address the context here: an attempt to limit cross examination.

On the present record, Alimehmeti has not made either of these showings here with respect to the evidence of undercover recording means and methods that he seeks the right to elicit at trial. On the contrary, for much the same reasons as discussed earlier in connection with the application of Federal Rules of Evidence 402 and 403, such evidence, on the present record, is entirely irrelevant. And, the public interest in preserving the confidentiality of the sensitive means and methods used by law enforcement in this case to investigate international terrorism is uncommonly strong. Independent of its ruling under Rules 402 and 403, the Court therefore separately precludes cross-examination into these matters as prohibited by the law enforcement privilege. This ruling, too, is subject to Alimehmeti's right to move for reconsideration if a more substantial showing of need, consistent with the standards above, can be made.

The Court next addresses the Government's application to preclude inquiry at trial into the UCs' participation in unrelated matters. The Court grants that request as formulated: The defense, as yet, has not articulated any basis on which a UC's work on other matters would be relevant here where such matters are unrelated to the investigation into Alimehmeti's conduct. But this ruling, too, is, of necessity, preliminary. The Government has yet to produce its Jencks Act or *Giglio* material for these witnesses. It is conceivable that such material—or other discovery or investigative work by the defense—may enable Alimehmeti's new counsel to articulate a theory why a UC's other work is relevant here. For example, in theory, were the Government's disclosures or the defense's pretrial investigation to reveal a UC's misconduct on an earlier matter bearing on a UC's credibility, latitude to examine the UC as to the circumstances of such misconduct is likely to be given. Defense counsel is at liberty to seek leave of the Court to inquire into such matters upon a proper showing of relevance.

The Court, finally, addresses the Government's application to preclude inquiry at trial as to the UCs' training and work experience. The Court's ruling as to this subject is in accord with the rulings above. The Court, while permitting general inquiry to the nature of the work and objectives of a UC, will preliminarily preclude examination into the specifics of the four UCs' training and experience. On the present record, such matters are irrelevant to the issues to be tried, so as to merit exclusion under Rules 402 and 403, and—depending on the nature of defense counsel's examination—potentially to implicate the law enforcement privilege. This ruling, however, is subject to Alimehmeti's right, on a showing of relevance, to seek leave to inquire into specific matters. Here, too, the Court expects any such application to be made with meaningful advance notice to the Court and opposing counsel.

## C.    Entering and Exiting

The UCs will be permitted to use the nonpublic entrances and exits in the building, including by entering court via a nonpublic entrance. Absent such authorization, there would be a substantial risk that a testifying UC would be observed by members of the public, risking compromising the UC's ability to continue to serve in this role. There is no offsetting interest of the defendant, as the Court will assure that the UCs' use of such entrances and exits will not be apparent to the jury. Such safety measures are commonplace in cases involving UCs. *See, e.g.*, Protective Order, *United States v. Baldassare*, 11-CR-801 (JBW) (E.D.N.Y. July 23, 2012); Dkt. 652, *United States v. Salah*, 03-CR-978 (AJSE) (N.D. Ill. 2006).

## D.    3500 Material

The Court will grant certain aspects of the Government's motion with respect to 3500 and *Giglio* material for the UCs ("3500 Material"). Specifically, the Court grants those aspects of the relief sought that are consistent with the standards commonly governing the production of 3500 material in this District. Such relief, as formulated here by the Government, includes that the

3500 Material (1) "be used by the defense only for purposes of the defense of this action"; (2) "be maintained in a safe and secure manner solely by the defendant's counsel of record"; and (3) "be returned to the Government at the conclusion of trial or when the resolution of any appeal has become final."

Beyond these restrictions, the Government proposes that the 3500 Material "not be possessed by the defendant outside the presence of counsel" and not be disclosed to persons outside the defendant's legal team, including witnesses, except as authorized by the Court. While the Court may well authorize relief substantially along these lines as to at least some of the 3500 Material, the Court denies the present request as premature and potentially overbroad, without prejudice to the Government's ability to pursue such relief anew, this time supported by a more substantial factual showing.

The Court fully appreciates that some 3500 Material for the UCs in this case is likely to merit special use and access restrictions, whether in the form of restrictions on the manner and circumstances of Alimehmeti's access to such material or restrictions on the use by counsel of such materials in dealings with witnesses. But at the same time, some or much of that material may not tend to, in any way, reveal sensitive matters such as the identities or identifying characteristics of the UCs or their *modi operandi*. Much of such 3500 Material may simply, for example, narrate aspects of a UC's direct dealings with Alimehmeti. Or the 3500 Material may include transcripts or summaries of their recorded conversations. The Government has not shed light on the anticipated content, let alone the content it views as problematic, that it expects the 3500 Material to contain. To the extent the Government asks the Court globally to subject all 3500 Material for the UCs to special restrictions, the present record does not justify such blanket treatment.

This ruling is, of course, without prejudice to the right of the Government to make a particularized showing as to why certain items or aspects of 3500 Material merit special restrictions. The Government may, for example, wish to furnish the defense with a redacted version of items of 3500 Material that will be accessible and usable, subject to the restrictions generally applicable to 3500 material in this District as set out above. The Government may seek to persuade the Court, based on a particularized showing, why important interests justify imposing greater restrictions on the defendant's unsupervised access to, or the defense's use of the non-redacted versions of, such materials (*i.e.*, the versions from which sensitive parts have not been redacted). The Court will be receptive to such an approach. To the extent that the Government—upon a particularized showing—may seek to impose limits on Alimehmeti's access to certain 3500 Material, the Court is, further, mindful of the fact that Alimehmeti has been accused of sharing discovery material with other inmates in the MCC. A showing by the Government that such sharing reflected a breach by Alimehmeti of discovery rules or protocols would, of course, strongly favor limiting—or precluding altogether—his unsupervised access to sensitive 3500 Material.

To the extent the Government seeks to preclude defense counsel from reviewing or discussing the content of 3500 Material with defense witnesses, that request is doubly premature. Not only has the Court not yet been given any insight into the content of the 3500 Material—the Court has not been given any insight as to the categories, types, or identities of any potential defense witnesses to whom defense counsel might wish to show such material or as to whom the Government would have a *bona fide* concern of misuse. Upon a showing that the materials contain sensitive information, it may well be proper, as the Government proposes, to shift the burden to defense counsel to justify and seek leave—if necessary, *ex parte*—to show certain

material to defense witnesses.  On the present, undeveloped record, however, the Court is unprepared to rule globally in the abstract that no showing by defense counsel of any 3500 Material to any defense witness can be justified.

## CONCLUSION

For the reasons reviewed above, and as supplemented in a classified filing that the Court intends to make shortly, the Court grants in substantial measure the Government's motion *in limine*, in the manner and subject to the qualifications and conditions stated above.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: February 15, 2018
    New York, New York