**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------X

**UNITED STATES OF AMERICA**

     **-against-**

**SAJMIR ALIMEHMETI**

                *Defendant.*

-------------------------------------------------------X

No. 16 Cr. 398 (PAE)

**MEMORANDUM IN AID OF SENTENCING**
**ON BEHALF OF DEFENDANT SAJMIR ALIMEHMETI**

Susan G. Kellman
Sarah Kunstler
Carlos Santiago

*Attorneys for Sajmir Alimehmeti*
25 Eighth Avenue
Brooklyn, NY 11217
(718) 783-8200
sgk@kellmanesq.com

## TABLE OF CONTENTS

*INTRODUCTION*................................................................................................................ *1*

*THE OFFENSE CONDUCT*............................................................................................... *1*

*THE PIMENTEL LETTER*.................................................................................................. *2*

*OBJECTIONS TO THE PRE-SENTENCE INVESTIGATION REPORT* ................................ *3*

*THE APPROPRIATE SENTENCE FOR MR. ALIMEHMETI*................................................ *3*

    **1.**   **The History and Characteristics of the Defendant** .................................. **7**

        **a.**   **Mr. Alimehmeti's Early Childhood** ................................................ **8**

        **b.**   **Immigration to the United States** .................................................. **9**

        **c.**   **Adolescence, Neighborhood Violence and Struggle for Belonging** ............................ **11**

        **d.**   **Mr. Alimehmeti's Criminal History**.............................................. **14**

        **e.**   **Mr. Alimehmeti's Embrace of Islam and Developing Extremism** ............................ **17**

        **f.**   **Mr. Alimehmeti's Efforts to Build an Adult Life in New York** ................................ **20**

    **2.**   **The Nature and Circumstances of the Offense** ........................................ **21**

    **3.**   **Mr. Alimehmeti's Conduct While Incarcerated** ..................................... **22**

    **4.**   **Mr. Alimehmeti's Age and Vulnerability at the Time of the Offense** ........................ **24**

    **5.**   **The Conditions of Mr. Alimehmeti's Confinement**.................................. **26**

        **a.**   **Case Law** ........................................................................................ **28**

        **b.**   **Calls for Limiting Solitary Confinement** .................................. **29**

        **c.**   **Support in Social Science**.............................................................. **31**

        **d.**   **Additional Considerations for Those Convicted of Federal Terrorism Charges** ...... **33**

        **e.**   **Analysis** ........................................................................................ **35**

    **6.**   **An Analysis of Sentences Received by Similarly Situated Defendants**........................ **36**

        **Cases Surveyed** ...................................................................................... **39**

    **7.**   **Intervention and Rehabilitation Possibilities** ......................................... **43**

*CONCLUSION* ................................................................................................................ *46*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
**--------------------------------------------------------X**

**UNITED STATES OF AMERICA**

      **-against-**                **No. 16 Cr. 398 (PAE)**

**SAJMIR ALIMEHMETI**

               *Defendant.*
**--------------------------------------------------------X**

### MEMORANDUM IN AID OF SENTENCING
### ON BEHALF OF DEFENDANT SAJMIR ALIMEHMETI

### INTRODUCTION

      This memorandum is submitted on behalf of SAJMIR ALIMEHMETI in support of his prayer for a below-guidelines sentence. We respectfully submit that such a sentence is warranted based on Mr. Alimehmeti's history and characteristics, including his age, the conditions of confinement, as well as the nature and circumstances of the offense, and is "sufficient, but not greater than necessary," to comply with the purposes set forth in 18 U.S.C. § 3553(a).

### THE OFFENSE CONDUCT

      On February 21, 2018, Mr. Alimehmeti entered a guilty plea to Counts One and Two of a two-count indictment, accepting responsibility for his conduct. As Mr. Alimehmeti acknowledged before this Court, with respect to Count One, he attempted to provide material support to a terrorist organization by trying to aid another person in his efforts to travel to Syria to join ISIS. With respect to Count Two, in October 2015, Mr. Alimehmeti told the passport officer in Manhattan that he lost his passport, which was not true. He did this hoping to get a clean passport that might make it easier for him to travel to Syria where he hoped to join ISIS. At the time he participated in these

crimes, he knew that ISIS was a terrorist organization, and that his actions were unlawful.

## THE PIMENTEL LETTER

Mr. Alimehmeti pleaded guilty, not long after the undersigned counsel were appointed, pursuant to a letter provided by the government under the parameters set forth in *United States v. Pimentel*, 932 F.2d 1029, 1034 (2d Cir. 1991), to attempting to provide material support or resources to a foreign terrorist organization, in violation of Title 18, United States Code, Sections 2339B and 2 (Count One) and to making a false statement in an application for a passport in order to facilitate an international act of terrorism in violation of Title 18, United States Code, Section 1542 (Count Two). Count One carries a range of imprisonment from 0 to 20 years. Count Two carries a range of imprisonment from 0 to 25 years.

The government's *Pimentel* letter assumes a guideline calculation driven beyond the statutory maximum by the Terrorism Enhancement set forth in Guidelines Section 3A1.4(b). This results in an advisory Guidelines sentencing range of 360 months to life. However, pursuant to U.S.S.G.§ 5G1.1(c), because the statutorily authorized maximum sentence for Counts One and Two is 540 months' imprisonment, the government's calculation of the applicable Guidelines range, is 360 to 540 months' imprisonment.

Because Mr. Alimehmeti pleaded guilty pursuant to a *Pimentel* letter, and not a plea agreement, nothing precludes Mr. Alimehmeti from challenging the government's calculation of the Guidelines. Further, Mr. Alimehmeti is free to identify potential grounds for departure under the Guidelines, or to present information to the Court relevant to sentencing under 18 U.S.C. §3553(a) that would justify a variance from the applicable Guideline sentence.

## OBJECTIONS TO THE PRE-SENTENCE INVESTIGATION REPORT

Probation has recommended a 360-month sentence,  a recommendation anchored in the 360-540 months sentence fixed by the Sentencing Guidelines. This Guideline term was driven largely by the application of U.S.S.G. § 3A1.4, the "Terrorism" enhancement. Were it not for this enhancement, the applicable guidelines range for Mr. Alimehmeti would have been 78-92 months.[1]

For the reasons outlined below, we object to Probation's recommended sentence, which fails to properly reflect §3553(a) considerations and ignores the history and characteristics of this defendant as well as sentences received by similarly situated defendants.

Our specific objections to the Pre-sentence Investigation Report ("PSR"), including an objection to the application of U.S.S.G. § 3A1.4 are filed simultaneously in a separate submission.

## THE APPROPRIATE SENTENCE FOR MR. ALIMEHMETI

Sajmir Alimehmeti is 25 years old and a naturalized American citizen. He was born in Tirana, Albania to a secular Muslim family that, fleeing the poverty and instability of a crumbling communist regime, immigrated to the United States when Sajmir was 7 years old. He grew up in poverty in a neighborhood in the Bronx, where shootings and physical violence were all too frequent, and where he was exposed to marijuana at age 12, was held up by switch-blade wielding gang members at age 13 and had joined a gang by age 15. At age 16, Sajmir pled guilty

---

[1] This is based on a Count One offense level of 28, a Count Two offense level of 8, a one-point enhancement for the grouping of the two offenses, and a 3-level reduction for acceptance of responsibility, which results in an offense level of 26. With an adjusted offense level of 26, and a Criminal History Category of III, Mr. Alimehmeti would be facing 78-92 months.

to his first felony. That year, Sajmir also entered a mosque for the first time, where he found

peace for the first time in his life. Soon after, he went to prison, where his faith deepened.

By the time Sajmir was released from prison in 2013, at age 19, he was committed to

Islam and its teachings. But as a young believer who had not grown up with religious instruction

or surrounded by a religious community, he had little understanding of his chosen religion, and

was anxious to learn all that he could.

So Sajmir, a young person struggling with belonging and identity, went online looking

for answers. He watched video after video and listened to talk after talk, becoming angrier and

more radicalized, through a process known as "identity fusion[2]," through which an individual

personal identity is gradually overshadowed by a radicalized group entity, leading to a total

endorsement of the narrative proposed by the extremist group.

It was at this point that Sajmir was targeted and befriended by agents, posing as ISIS

supporters, who would begin building the case against him. Following their investigation, in May

of 2016, Sajmir was arrested at his family's apartment in the Bronx and charged with attempting to

provide material support to ISIS. At the time of his arrest, he was 22 years old.

There is no question that Sajmir was a deeply troubled young man. But there is also no

question that the government played a role in fueling his radical beliefs and provided him with the

opportunity to show his willingness to help undercover agents travel to join ISIS. In doing so, the

government has not made our country safer. Nor has it addressed the problem of homegrown

radicalization, which attracts vulnerable and disaffected young men like Sajmir Alimehmeti who

---

[2] This concept is discussed in further detail below and in the mitigation report prepared by Melanie
Carr.

have experienced severe challenges in their lives are looking for belonging and purpose.

As a society, we have begun to acknowledge that the mass incarceration that has resulted from our nation's "War on Drugs" was misguided and rooted on perceived dangerousness of African American individuals.[3] We now reject those racist notions and have come to see the harm that they caused on communities, as well as our society as a whole. In the context of terror prosecutions, the equivalent is the Muslim man, who through the lens of our society, has been construed as inherently espousing a dangerous ideology, incapable of rehabilitation and reform. Indeed, these types of terrorism cases are not exceptional; nor are they limited to offenders who identify as Muslim. Rather, they are rooted in the same pattern of behavior that causes disaffected youth to join cults, gangs, or white supremacy groups. In these organizations, these isolated individuals find meaning in common purpose, albeit one that is antithetical to the goals of society at large.

Across the world, United States government-funded programs are working to counteract the radicalization and recruitment of vulnerable youth. Indeed, other countries have obtained a far more sophisticated understanding of the causes and solutions to terrorism than our own government.  Instead of locking these individuals up and throwing away the key, governments in countries such as the United Kingdom, Denmark, Indonesia, Malaysia, Saudi Arabia, Algeria, Egypt, Jordan, Yemen, and Singapore, some, where terrorism has been a more widespread issue than here, have instituted programming that has led to decreases in the number of young Muslim

---

[3] *See* Sameer Ahmed, *Is History Repeating Itself? Sentencing Young American Muslims in the War on Terror*, 126 YALE L.J. 1520 (2017).

men joining ISIS, as well as promoted better integration of these men into society.[4]  Yet on U.S

soil, we remain focused on the traditional criminal justice tools of arrest, prosecution, and

incarceration. The sentencing structure for people convicted of federal terror crimes is mean to

incapacitate, keeping offenders locked away as long as possible, rather than to consider how we

might work to help those individuals rehabilitate and rejoin society.

Sajmir's arrest could have been the beginning of something positive; an intervention, the

start of a deradicalization process. But instead of a helping hand, the United States government

extended an iron fist. Over the past two years Sajmir has been held in the most oppressive form

of solitary confinement available in the Special Housing Unit at the Metropolitan Correctional

Center in Manhattan. Stripped of virtually all human contact and communication and deprived of

all sensory experience, Sajmir's narrowly circumscribed existence bears little resemblance to a

human life.

Sajmir's conviction does not need to be the end of the story, for Sajmir Alimehmeti, or

countless other vulnerable youth in this country who are susceptible to extremist ideologies. Mr.

Alimehmeti is more than a young person vulnerable to terrorist recruitment. He is also a young

person deserving of an intervention process that replaces extremist rhetoric with alternative

narratives, and one that promotes the development of critical thinking skills over ideology.

Given Sajmir Alimehmeti's history and characteristics and the nature and circumstances of

his involvement in the instant offense, we submit that a sentence substantially below the Guideline

---

[4] *Id.* at 1553.

range, with post-release access to intensive rehabilitative and support services, is "sufficient, but not greater than necessary, to comply with the purposes" of the sentencing factors outlined in 18 U.S.C. § 3553(a)(1).

## 1. The History and Characteristics of the Defendant

Melanie Carr, a mitigation specialist appointed by this Court at the request of defense counsel, prepared a report (hereinafter the "Carr Report") based primarily on interviews conducted with Mr. Alimehmeti, a review of the discovery material and court documents in his case, a series of Mr. Alimehmeti's social history records, interviews with family members, friends, and others who are familiar with his life history, and a review of relevant government reports, policy papers, media, and historical sources. Mr. Alimehmeti's life history, summarized below, is related in richer detail in the Mitigation Report, which is attached as Exhibit A to this submission.

Sajmir Alimehmeti is 25 years old. He will be 26 at the time of his sentence before your Honor. Sajmir was born in 1993 in Tirana, Albania and is the second of two children born to Vjollça and Zyber Alimehmeti. His older brother, Erald Alimehmeti, is 28. Sajmir's father, Zyber, was 52 years old when Sajmir was born; his mother, Vjollça, was 38. Vjollça and Zyber met and married in 1990, in the aftermath of the four-decade reign of communist dictator Enver Hoxha (*See Carr Report,* attached as Exhibit A, at 5-6.) As Ms. Carr relates in her report:

> During Hoxha's 1946-1985 reign, Albania was isolated from the outside world. Hoxha banned foreign trips and contacts to anyone abroad…thousands of Albanians were sent to forced-labor camps, where they toiled under extreme conditions on government mining and construction projects.

(Exhibit A, at 5.) Wealthy families – like the family of Zyber Alimehmeti – were viewed as potential enemies of the regime. Zyber's family home in Tirana was seized, and his parents

tortured. In 1966, fearing for his life, 25-year-old Zyber made plans to escape the country, but he was arrested before he was able to leave. He "was tried for treason and sentenced to death, a sentence that was later commuted to 25 years… Zyber served over fifteen years at Spaç Prison, a re-education and forced-labor camp primarily for political prisoners. He was later transferred to another prison called Qafe Bari." (Exhibit A, at 6.) He was released in 1987, after 21 years in prison, at the age of 46.

Sajmir's mother, Vjollça, grew up in Kavajë, a small city about two hours southwest of Tirana. As Ms. Carr relates:

> Vjollça did not have an easy life. The country was very poor during the communist era, and droughts and famines spread throughout the region. The Sigurimi, secret police, suppressed political activity by interrogating and imprisoning anyone believed to oppose the government. Government officials encouraged neighbors, friends, and family to record conversations and inform on one another, which led to increasing paranoia, fear, and mistrust within families and communities.

(Exhibit A, at 7.) Perhaps as a result of the environment in which she was raised, Ms. Carr notes that Vjollça currently presents as confused, paranoid and emotionally volatile, characteristics that are documented throughout Sajmir's school and probation records, and likely point to a longstanding undiagnosed mental disorder.  (Exhibit A, at 7.)

### a. Mr. Alimehmeti's Early Childhood

Sajmir and his brother Erald were born into extreme poverty. In her interviews with Ms. Carr, "Vjollça recalled her difficulty in finding enough food to feed her babies. She reported that she breastfed Erald throughout her pregnancy with Sajmir. After Sajmir was born, Vjollça breastfed Sajmir and Erald both, because the family could not find enough food to feed Erald anything aside from breast milk." (Exhibit A, at 8.) When Sajmir was nine months old, he nearly

died from blood loss after he was severely burned with scalding milk. (*Ibid*.) Then, at the age of five or six, he almost drowned after falling into the deep end of a swimming pool. (*Id.* at 9.)

In 1997, when Sajmir was three and Erald was five, the government of Albania collapsed. Military and police officers left their posts, and riots filled the streets. United Nations peacekeeping forces arrived in April of 1997, and established an uneasy peace that led to elections, but protests, political assassinations, and unrest continued. (*Id.* at 9-10.) Schools were closed, and Vjollça and Zyber kept their children at home as much as possible, afraid of the violence just outside their door. After schools reopened, Sajmir attended kindergarten and part of first grade in Tirana. "His first-grade report card from Udha e Shkronjave shows that he received top marks in all his subjects, except for Logic. His teacher commented that he was loving, caring, systematic, funny, and tireless." (*Id.* at 10.)

#### b. Immigration to the United States

After the chaos created by the collapse of the Albanian government in 1997, Zyber and Vjollça decided to leave Albania to seek a better life for their children. They entered the lottery for a United States visa and some three years later, in July of 2000, immigrated to Boise, Idaho, where a distant cousin of Zyber's lived and was able to serve as their sponsor. When Zyber was unable to find work, the family briefly returned to Tirana; they soon returned to the United States and moved to the Bronx, New York, where they were sponsored by acquaintances from Albania. (*Id.* at 10-11.)

Sajmir's family settled in the Norwood neighborhood of the Bronx, in an apartment at 3464 Knox Place, in the same building as their sponsors.  The sponsors also helped Zyber find a minimum-wage job at an elevator parts factory. (*Id.* at 11.) Speaking no English, the family kept to themselves. As Ms. Carr points out:

> Whereas there is a sizable Albanian community in the Pelham Park area of the Bronx, there were very few Albanians in Norwood. Sajmir and his brother were the only Albanian children in their apartment building, and were among few in the surrounding area. The Alimehmeti family were not members of any religious or cultural community in the Bronx, and, lacking the ability to speak English, they kept to themselves. Over time, Zyber learned to understand some English, but was never able to speak the language himself. He relied on co-workers, friends, and others to translate for him. Vjollça took ESL courses to learn English, but still struggles to fully express herself in English. During Sajmir's childhood and adolescence in the Bronx, the family lived largely in isolation, aside from intermittent contact with a few family members who remained in Albania.
> (*Id.* at 11.)

Hit hard by the crack epidemic in the 1990s, during Sajmir's childhood, Norwood was a poor community that became an increasingly dangerous neighborhood plagued by gang violence and illegal drug sales.

In 2001, Sajmir and Erald were enrolled at P.S. 280 on Steuben Avenue and Mosholu Parkway in the first and third grades, respectively. Sajmir and Erald attended ESL (English as a Second Language) classes and struggled to fit in. Ms. Carr writes:

> The students at P.S. 280 were predominantly black and Hispanic, with a small percentage of immigrant children from Eastern Europe and Asia. There were only a handful of Albanian students in the entire school, and none of the teachers spoke any Albanian. Sajmir and Erald … didn't fit in with other immigrant groups, the vast majority of whom were from Caribbean countries. With no language, cultural, or religious similarities with their classmates, they had trouble developing friendships.

(*Id.* at 12.) By the second grade, Sajmir was fluent in English, but he continued to have problems making friends. In Albania, Sajmir had been a "happy, friendly student who made friends easily." In the Bronx, "students made fun of his long hair, his foreign clothing, and his broken English." There were discipline problems at the school; children cursed at their teachers in the classroom and "[f]ights were common among students, on and off school grounds." (*Id.* at 12-13.) Nevertheless,

Sajmir wanted to make friends and be a part of his community. Ms. Carr writes:

> Sajmir tried to gain acceptance by being helpful to his teachers and classmates. He drew a self-portrait around the third grade, and it included the caption, "The most important thing about Sajmir is that he is helpful. Sajmir helps people when they are in trouble. He stands up for them when somebody is making fun of them. But the most important thing about Sajmir is that he is helpful."
> (*Id.* at 13.)

### c. Adolescence, Neighborhood Violence and Struggle for Belonging

Concerned about the fights and discipline issues at P.S. 280, Vjollça moved Sajmir to P.S. 51, a smaller school on Jerome Avenue. He did better, there, at first, but by the fifth grade, his grades were in decline. Ms. Carr reports:

> Sajmir tried to emulate the popular kids who didn't care much for school. They hung out late in the parks, challenged each other to fights, argued with teachers, and cut school regularly. At least one teacher noticed that Sajmir's schoolwork did not match his potential, noting on his report card: 'Sajmir needs someone to hold him closely accountable. Special Talents: Sports / writing / drawing.' … He was never enrolled in any activities outside of school, despite the number of city sports, arts, and other enrichment programs that could have been available to him at the time. Instead, he spent most of his free time playing in local playgrounds, unsupervised.

(*Id.* at 14-15.)

In sixth grade, at age 12, Sajmir was befriended by a man who went by the nickname "Child" who lived in Sajmir's apartment building. Child, a man in his late twenties, let Sajmir come to his apartment to play video games instead of going to school. Child and his girlfriend introduced Sajmir to marijuana, and let Sajmir smoke with them. Ms. Carr reports:

> Sajmir liked how marijuana made him feel calmer and less afraid of what was going on around him, so he began smoking weed more often. He occasionally brought marijuana to school with him to smoke in the middle of the day, beginning in the sixth and seventh grade.

(*Id.* at 15.) Sajmir spent more time with Child and his friends and with a group of older teenagers in

his neighborhood. Ms. Carr reports:

> By the end of junior high, Sajmir's interest in keeping up his grades had lapsed.
> From the age of 13, he smoked weed on a daily basis and hung out with older
> teens in the park or outside his apartment building, late into the night. His parents
> provided limited supervision, and did not seem aware or concerned about how he
> was spending his time.

(*Id.* at 15.)

During Sajmir's childhood, his neighborhood was a battleground for two warring

gangs; the Dekalb Avenue Crew and the MMOB ("Mosholu Money Over Bitches").[5] (*Id.*

at 16-17.) As a young adolescent, Sajmir experienced gang violence and intimidation

first-hand. Ms. Carr reports:

> When Sajmir was walking to middle school one morning, he stopped a block
> away from his home to talk to a local drug dealer he knew. A member of the
> MMOB came around the corner and pulled out his gun, pointing it at Sajmir and
> the drug dealer. The young man was about to shoot at them, but a family
> including young children happened to walk by at that moment and disrupted the
> situation.

(*Id.* at 17.) When Samjir was 13, he and a friend were robbed at knifepoint by members

of the Dekalb Avenue Crew. Ms. Carr reports:

> Sajmir and his friend Joshua were held up around the age of 13 by four members
> of the DeKalb Avenue Crew. The men pressed Sajmir and Joshua up against the
> wall. One of them pulled out a switchblade while another lifted his shirt to show a
> gun in his waistband, saying, 'Give us the shit.' The man with the switchblade

---

[5] More detail is included in Ms. Carr's report. As Ms. Carr relates, the neighborhood remains a
haven for gang activity. "Even in recent years, as city crime rates have fallen to record lows, the
NYPD has identified twelve active gangs in Sajmir's immediate neighborhood." (Exhibit A, at 17.)
See also Cruz, David, "Bronx Gang Squad Identifies 12 Gangs Within 52nd Precinct," by David
Cruz, Norwood News, 9/29/2018, available at
https://www.norwoodnews.org/id=26784&story=bronx-gang-squad-identifies-12-gangs-within-
52nd-precinct/

sliced Sajmir in the elbow, leaving a scar that Sajmir still has to this day. Sajmir gave them his Gameboy and Joshua gave them his iPod. Sajmir recalled, "I didn't call the police. It didn't even cross my mind. I talked about it with my friends, but I didn't tell my parents. They're worried enough as it is. They would have tried to keep us inside."

(*Id.* at 17.)

As Sajmir got older, and spent more time in the park and on the street, he witnessed more of the violence endemic to his neighborhood, including a fight in which an MMOB member was stabbed in the stomach, and a neighbor limping home after being shot in the leg. He often heard gunshots outside his home, and on one occasion, a close friend's brother was injured in a drive-by shooting that left him paralyzed. At least two shootings took place in his apartment building when he was at home. (*Id.* at 17-18.)

At age 15, Sajmir joined a gang called the Albanian Boys, Inc. ("ABI"). Ms. Carr reports:

> [Sajmir] recalls, "I didn't feel like I fit in, in my neighborhood. It was all black and Hispanics. I was usually the only white boy. I wanted to be down with a group of all Albanian people. I thought, 'Everybody looks out for each other. If you have a problem, they are gonna take care of it.'" He was "jumped in," an initiation that involves a beating by six older gang members who were considerably larger than he was. Sajmir was kicked in his throat and beaten until his side and chest were black and blue. When the leader called the fight to an end, he accepted Sajmir into the group.

(*Id.* at 18.)

Sadly, the violence in the street was not the end of Sajmir's exposure to violence; he also experienced violence at home. Sajmir's parents beat him and Erald with belts when they misbehaved. (*Id.* at 14.) Erald reported to Ms. Carr that he "picked fights with Sajmir and physically beat him up on a regular basis when they were children and teenagers." According to

13

Ms. Carr,

> These fights went well beyond average sibling rivalry. Many were in fact violent assaults in which young Sajmir was the victim of his older, larger brother's unpredictable and explosive temper, as well as the skills Erald had acquired from his study of martial arts.

(*Id.* at 16.) More detail is provided in Ms. Carr's report.

When Sajmir was 16, and in the 10th grade, he failed all of his classes. It was also the year that his contacts with the criminal justice system began.

### d.  Mr. Alimehmeti's Criminal History

Sajmir Alimehmeti's first arrest took place in January of 2010, when he was 16 years old, and participated in a robbery with an older acquaintance. He pleaded guilty to Robbery in the Third Degree, a felony, in Bronx County Supreme Court, and was initially adjudicated as Youthful Offender, receiving a sentence of five years' probation.

While on Probation for the robbery charge, on October 12, 2010 Mr. Alimehmeti was charged with forcible touching. The details and circumstances of this charge are related in the Mitigation Report.[6] (*Id.* at 20-21.) Mr. Alimehmeti insisted – and continues to insist – that he is innocent of these charges, and that he pled guilty, on the advice of counsel, since he had already spent a year on Rikers Island awaiting trial. His lawyer's advice was based on the fact that if he

---

[6] In particular, Ms. Carr notes (1) that Mr. Alimehmeti was under a strict curfew by Probation at the time, and that the incident allegedly occurred at a time he would have been home; (2) that the complainant, who identified Mr. Alimehmeti from a photo lineup, gave various, inconsistent statements about the events; and (3) that the complainant was noted to be a "stranger" to Mr. Alimehmeti.

entered a guilty plea, he could be released on parole fairly quickly.[7] Following his sentencing, Mr. Alimehmeti was transferred from Rikers to the Ulster Correctional Facility for a few months, then to Greene Correctional Facility for about eight months, before his eventual release. (*Id.* at 21-23.) Recent Changes in New York State Law with Respect to Juvenile Criminal Conduct

Since Mr. Alimehmeti's convictions on these charges, there has been a sea change in our understanding of juvenile maturity and culpability, which began with *Roper v. Simmons*, 543 U.S. 541 (2005), in which the Supreme Court held that the Eighth Amendment prohibits the death penalty for defendants who committed their crimes before the age of eighteen. 543 U.S. at 578, 125 S.Ct. 1183. After determining that there existed a "national consensus" against the death penalty for juvenile offenders, the Court, relying on science and social science, reasoned that, relative to adults, juveniles have a "lack of maturity and an underdeveloped sense of responsibility;" that they "are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure;" and that their characters and personality traits are "more transitory, less fixed." *Id*. at 569-70. The failings of a minor therefore are not the moral equivalent of those of an adult because there is a greater possibility that a minor's character deficiencies "will be reformed." 543 U.S. at 570. Accordingly, *Roper* established the principle that juvenile offenders are not deserving of the most severe punishments because they are innately less culpable than adults. *Id*. at 569-70. ("[J]uvenile offenders cannot with reliability be classified among the worst offenders."). Building

---

[7] Rikers has long been a dangerous place, particularly for juveniles. In June of 2015, Kalief Browder, a juvenile inmate held at Rikers awaiting trial for three years, committed suicide at his mother's home. His supporters say his death was the result of the mental, physical and sexual abuse he sustained in prison. In September of 2018, the City of New York moved all 16 and 17 year-old defendants off of Rikers, ensuring compliance with a 2017 state law that ended the practice of detaining teenagers under 18 in adult jails.

on that logic, *Roper* was followed by *Graham v. Florida*, 560 U.S. 48 (2010) (holding that that juvenile offenders cannot be sentenced to life imprisonment without parole for non-homicide offenses); *Miller v. Alabama*, 567 U.S. 460 (2012) (extending *Graham* to homicide offenses); and *Montgomery v. Alabama*, 577 U.S. ____ (2016) (applying *Miller* retroactively).

These conclusions were based, not just on an evolving standard of decency, but on the scientific study of juvenile brain development. This developing understanding ultimately led New York State to pass the "Raise the Age" law, raising the age of criminal culpability. On April 10, 2017, Governor Cuomo signed legislation raising the age of criminal responsibility in New York State to age 18. Under current New York State law, 16- and 17-year-olds charged with felony offenses are treated as Adolescent Offenders. The majority of these cases are heard by Family Court Judges and result in the provision early intervention services and programs instead of criminal convictions.[8]

We do not mean, by any measure, to minimize Mr. Alimehmeti's prior criminal conduct. But had the "Raise the Age" law had been in place when Mr. Alimehmeti was 16 years old, it is possible that he would have received the help he so desperately needed. Regardless of what might have been, we cannot undo what Governor Cuomo now acknowledges was an injustice and an embarrassment[9] – treating Mr. Alimehmeti as an adult when he was still a child.

---

[8] *See Adolescent Offenders,* New York State Unified Court System Website, available at https://www.nycourts.gov/courthelp/Criminal/adolescentOffender.shtml
[9] Prior to its passage, Governor Cuomo issued a statement in support of the law, stating that "New York should be ashamed to be one of two states in the nation that treat 16- and 17-year-olds as adults for criminal liability." *See* Governor Cuomo's March 7, 2017 statement on the passage of the "Raise the Age" law, available at https://www.governor.ny.gov/news/statement-governor-andrew-m-cuomo-raise-age.

### e.  Mr. Alimehmeti's Embrace of Islam and Developing Extremism

As discussed above, Sajmir Alimehmeti grew up in a secular Muslim family. He became interested in Islam at age 16, a time of great disorder in his young life. As Ms. Carr relates in her report:

> While Sajmir's misdemeanor case was pending, he was invited to pray at a local mosque with an older neighbor. He was at a low point in his life, where he wanted to make a change, but didn't know how. He felt stuck, and going nowhere fast. As noted above, his first experience with prayer was the first time Sajmir had felt good about himself in years. The neighbor gave Sajmir the first chapter of the Quran, which he memorized in one day. He started going to the mosque from time to time. His conversion wasn't immediate, but had begun.

(Exhibit A, at 21-22.)

In prison, Sajmir found himself in the company of practicing Muslims, for the first time in his life. He spent a lot of his time in the chapel, praying, reading, and learning. (*Id.* at 23.) After his release, Sajmir's faith continued to deepen. For Sajmir, Islam was a way out of the drug use, criminality, and pervasive violence of his neighborhood. It gave his life purpose, a set of rules to follow that helped him find stability, and the promise of a welcoming community where he would belong. (*Id.* at 4, 5, 31, 32.)

After his release from prison in August of 2013, Sajmir had difficulty finding a Muslim community where he felt he belonged.  Ms. Carr reports,

> [Sajmir] traveled around the Bronx, to Queens, and even to Staten Island to attend prayer services at several different mosques, but was unable to find a community of faith where he felt welcome.
>  (*Id.* at 28.)

Sajmir ultimately found a community online that resonated with his sense of feeling disaffected and isolated. Unfortunately, the community he found led him down a path of radicalization that

culminated with his involvement in the instant offense.

Shortly after Sajmir's release from prison, in August of 2013, more than 1,400 Muslims were killed in a chemical weapons attack attributed to the government of Syrian President Bashar al-Assad. Images of this attack were used as recruitment tool by ISIS. Ms. Carr reports,

> ISIS recruiters used photos and video from the August 2013 chemical attack near Damascus that killed hundreds of Syrian civilians to provoke young men to action. Though the U.S. and their allies considered a military response to the attack, they ultimately reached a deal with the Assad administration that avoided war. ISIS recruiters portrayed the U.S. and their allies as indifferent to Muslim suffering, and even complicit because they were doing nothing to stop Assad. They promoted themselves as brave fighters who would stand up to the brutal Assad regime, protect Syrian civilians, and avenge their deaths.

(*Id.* at 30.)

The scale of the bloodshed and loss, made real in graphic videos shared around the world, together with ISIS propaganda about the inaction of the U.S. and its allies in the face of this brutality, had a profound effect on Sajmir – and many others. As a disconnected young man searching for belonging and purpose, the attacks were a catalyst for his radicalization, the process of which is discussed in greater detail in Ms. Carr's report.

At the same time he was becoming radicalized online, Sajmir continued to seek out human connections in the real world; namely, he was searching for a young Muslim woman to marry. As Ms. Carr relates in her report,

> [Sajmir's] understanding of his religion made him feel duty-bound to marry and have children; he believed that he should not date or have any sexual contact before marriage. He started looking for a partner online.

(*Id.* at 33.) In the Spring of 2014, Sajmir began communicating with a young woman in Tunisia. Sajmir wanted to marry her, but the young woman's father would not consent to a marriage for

another five to six years because he wanted his daughter to focus on her studies. (*Ibid*.) When that relationship ended, he began communicating online with Safa Ayub Faizi, a young Muslim woman in the United Kingdom. (*Id.* at 34.)

In her letter to the Court, Safa describes Sajmir as an "understanding person" who "would always be there for [her] while [she] was going through tough times." (Exhibit B.) Safa suffers from anxiety and depression, and describes how Sajmir would always check in with her to see how she was doing, calming her down during panic attacks. She describes him as "the most kind-hearted person" she knows, and shares the support he provided her in 2015, when her father was in a medically-induced coma after suffering severe burns. "I don't think I would have been able to cope if I didn't have Sajmir," she writes, "and until this day I'm thankful for having someone like him in my life." (Exhibit B.)

Like Sajmir, Safa was "showing signs of radicalization" before she began communicating with Sajmir. (Exhibit A, at 34.) As Ms. Carr reports,

> [Safa] had become interested in Islamic mysticism in late 2013, and her online explorations led her down radical extremist rabbit holes. She reported, 'I was newly practicing my faith. I was searching, finding myself. I was just exploring around.' UK authorities later reported that she was 'vulnerable to jihadist propaganda.' (UK immigration records on Sajmir) As a rebellious teenager, Safa sometimes fantasized about joining ISIS. Safa's mother contacted police in February, 2014, to express her concerns about her daughter, who was still in high school at the time, posting comments on Facebook that glorified Jihad and Martyrdom. A teacher at Safa's school referred her to a UK counter-terrorism program called Prevent.

(Ibid.)

In October and December of 2014, Sajmir twice tried to travel to the United Kingdom to visit Safa. Each time, he was denied entry due to the contents of his luggage and electronic devices.

In April of 2015, "Safa and her father tried to travel to the United States, but were stopped by authorities. Safa's father was approved, but Safa was denied a visa, due to her own online posts and associates, the local police flags about her, and her links to Sajmir." (*Id.* at 36.)

### f. Mr. Alimehmeti's Efforts to Build an Adult Life in New York

Sajmir and Safa ultimately gave up on their relationship, and Sajmir took steps towards building an adult life for himself in New York. On the advice of a friend, who "suggested to him that the Muslim community needed funeral directors who could provide culturally-appropriate services," Sajmir applied to study funerary science at the American Academy McAllister Institute of Funeral Service in Manhattan. (*Id.* at 37.) Ms. Carr reports,

> [Sajmir] hadn't attended school full-time since he was 16 years old, and he was now 21. He did his best to attend faithfully and study diligently …. By the end of the summer semester, he received an A in Principles of Mathematics, a B in three classes (Professional Ethics; the History of Funeral Service; and Death and Human Development), a C in Intro to Science, and a D in Communication Skills. He had also gotten himself a job at Elegant Furniture, around the corner from his home, where he helped the owner assemble and deliver furniture. He worked part-time, whenever he was not in class.

(*Id.* at 38.)

In 2015, as he was beginning his studies, Sajmir's parents and brother all moved back to Albania, leaving him alone in the Bronx at age 21. Sajmir's father, Zyber, who was suffering from a heart condition, left first, convinced he would get better medical care in Albania. His brother, Erald, soon followed. His mother, Vjollça, returned to Albania in June of 2015, when her brother fell ill, and then stayed on to care for Zyber, whose health had deteriorated. (*Ibid.*)

Alone in New York, Sajmir continued his search for a wife. He met Eldina Kolenovic, a devout Muslim and Brooklyn resident, online. An in-person meeting with Eldina and her parents

followed, in early January of 2016. Eldina's parents wanted the couple to wait to get married so they could get to know each other first. Sajmir's mother was against the relationship because she wanted Sajmir to marry a fellow Albanian. Sajmir and Eldina wed in secret on January 18, 2016. (*Id.* at 41.)

As Sajmir and Eldina grew beyond the secrecy of their marriage, "Sajmir finally felt like a member of a family." (*Id.* at 41.) Eldina's brother-in-law offered to help Sajmir a job as a super in a building in Flushing, Queens, a position that never materialized. Sajmir continued to take classes at McAllister, with the hope of working part-time and going to school part-time, but dropped out in February of 2016, after Eldina's parents became hostile to their relationship. His plan was to secure full-time employment and a new apartment so that Eldina and her parents would be comfortable with the marriage and Eldina would be permitted to live with him. (*Ibid*.)

## 2. The Nature and Circumstances of the Offense

The nature and circumstances of Mr. Alimehmeti's criminal conduct are laid out in the Mitigation Report and the Pre-Sentence Investigation Report, and are presented here in summary.

After Mr. Alimehmeti's thwarted efforts to travel to the United Kingdom, law enforcement began surveilling his activities. In September of 2015, he was befriended by undercover officers who pretended to share his extremist beliefs. These men presented as mentors, men in their thirties who were secure in their extremist beliefs. They "pursued an intensive, fast friendship with [Sajmir], buying him dinner … and otherwise showing him kindness." (*Id.* at 39-40.) The agents filled a void in Mr. Alimehmeti's life. He believed in them and trusted them so thoroughly that he asked them to serve as witnesses at his wedding – and they gladly obliged.

On October 23, 2015, Mr. Alimehmeti attempted to get a "clean" passport he could use to

travel to Syria to join ISIS by claiming that his previous passport had been mistakenly left in a bag on a train, and signed an application in which he declared under penalty of perjury that the information he provided was correct and complete.

On May 17, 2016, at the direction of his best friends, the undercover officers, Mr. Alimehmeti help a third man – the officers' purported friend "Omar" – prepare for a supposed trip to Syria to join ISIS. One of the government officers picked Sajmir from his home in the Bronx and drove him to Manhattan to meet with "Omar" at a restaurant. Mr. Alimehmeti told them that he had money saved for his own travel to Syria, but he needed a passport because his name was already "in the system." The undercover agent abruptly cut the meeting short, but first asked Sajmir to accompany Omar on a few errands and help him get around the city. Sajmir agreed, but asked the agent for the use of his Metro Card as he did not have any value left on his own. That afternoon, Sajmir (1) accompanied Omar to a sporting goods store, a cellphone store, and a military surplus store, where he helped Omar pick out boots, a cellphone, a compass, a bag, and a flashlight; (2) accompanied Omar on the subway to a hotel in Queens where Omar claimed he was going to meet someone who would give him travel documents and instructions; and (3) accompanied Omar to JFK for Omar's trip.

For this conduct, Mr. Alimehmeti was arrested a week later, on May 24, 2016, at his family's home in the Bronx. He has been incarcerated at the Metropolitan Correctional Center ("MCC") since his arrest.

### 3.  Mr. Alimehmeti's Conduct While Incarcerated

Mr. Alimehmeti's arrest and incarceration on terrorism charges resulted in the abrupt loss of many of his close relationships. His friends, who had no idea of his interest in ISIS, were

interrogated by the FBI. (*Id.* at.44) After his arrest, they wanted nothing to do with him. Mr.

Alimehmeti also experienced the betrayal of his best friends, the uncover agents. His wife, Eldina,

hung on the longest, maintaining contact with him for a few months before abruptly disappearing

from his life in August of 2016.  (*Id.* at 44-45.) On September 2, 2016, Mr. Alimehmeti's father

passed away in Albania.

> Devastated by these losses, Mr. Alimehmeti tried to stay busy. Ms. Carr writes:

> Sajmir tried to focus his energies on positive endeavors. He signed up for classes
> in Business Acumen, Entrepreneurship, and Basic Bookkeeping. He began
> meeting with a spiritual advisor and completed the Focus Forward program, a
> twelve-week course focused on education and life skills. He also completed self-
> improvement programs called Lead by Example & Reverse the Trend; From The
> Inside Out: Taking Personal Responsibility For The Relationships In Your Life;
> Inside Out – Parenting; Commercial Driving License Preparation.

(*Id.* at 45.) (*See* also Programming Certificates and letters from Focus Forward and Lead

By Example & Reverse the Trend, attached as Exhibit C.)

There is no denying that Sajmir has struggled with isolation and belonging while in prison,

and has not fully been able to disengage from the radical teachings that led to his conviction. In the

Fall of 2017, he shared his discovery with another inmate charged with terrorism, resulting in his

placement in administrative segregation in a Special Housing Unit ("SHU") in November of 2017,

and the authorization of Special Administrative Measures ("SAMS") in March of 2018.  Further,

shortly after his move to administrative segregation, Mr. Alimehmeti  (who was housed on 9

South) exchanged letters with the same inmate (who was housed on 10 South), an exchange

facilitated by an MCC Lieutenant. Copies of these letters (five letters from the other inmate and

two responses from Sajmir) were turned over to counsel by the government.

As addressed in further detail below, we ask the Court to view Mr. Alimehmeti's conduct in the context of his history and circumstances, and more specifically, his age and vulnerability to extremist recruitment.

### 4. Mr. Alimehmeti's Age and Vulnerability at the Time of the Offense

The changing understanding of juvenile brain development and culpability mentioned above also provides a lens with which to view Mr. Alimehmeti's conduct in this case. While at age 22, Mr. Alimehmeti was technically an adult when he committed the crimes to which he pleaded guilty before your Honor, he was also at an age at which the brain is still developing.

The Supreme Court's conclusions in *Roper*, *Graham*, *Miller*, and *Montgomery* were largely informed by the work of Dr. Laurence Steinberg. Dr. Steinberg, a Distinguished Professor of Psychology at Temple University, was the lead scientist for the American Psychological Association ("APA") in drafting the APA's amicus briefs in those cases. In a declaration filed in *Miller/Montgomery* re-sentencing proceedings in *U.S. v. Joseph Wang* (E.D.N.Y., 90 Cr. 533), Dr. Steinberg summarized fifteen years of relevant research in the area. (*See* Steinberg Declaration, attached as Exhibit D.) According to Dr. Steinberg, "[e]xtensive studies demonstrate that "important neurobiological development is ongoing throughout the teenage years and continuing into the early twenties." (Exhibit D at p. 11.) "Deficiencies in judgment" are "exacerbated by the presence of peers" leading to a "disproportionate amount of adolescent risk-taking." (*Id.* at 7.) The peak age for "adverse outcomes of risk-taking" is "the late teens and early 20s on a wide range of behaviors, including driver deaths, unintended pregnancy, [and] arrests for violent and non-violent crime." (*Id.* at 8.)

Dr. Steinberg describes a "maturational imbalance" between "the reward system and the self-control system" of the developing brain. (*Id.* at 9.) "Although the development of the prefrontal cortex is largely complete by the late teens, the maturation of connections between this region and regions that govern self-regulation and the brain's emotional centers continues beyond the early 20s and may not be complete until the mid-20s." (*Id.* at 9-10.) Young people tend to have difficulties "resist[ing] coercive pressure from others… [and] making decisions in situations that are emotionally arousing, including those that generate negative emotions, such as fear, threat, or anxiety." (*Id.* at 6-7.) They are "more likely than adults to accede to the wishes of others and, especially, to comply with the recommendations of authority figures, often failing to consider the full ramifications of their decisions." (*Id.* at 7.)

Mr. Alimehmeti's age – and our evolving understanding of juvenile brain development – are important factors in assessing his vulnerability to extremist recruitment, as well as the appropriate sentence for a newly observant young Muslim who succumbs to influences intended to target and exploit such vulnerabilities. In her report, Ms. Carr highlights a 2017 UNESCO report,[10] which details precisely how extremist recruiters use the Internet and social media to do just that, creating appealing platforms, producing and sharing false information, and creating a sense of intimate connection and dialogue to create strong interpersonal bonds with young people who already feel isolated and disengaged in their everyday lives. (Exhibit A at 26.)

---

[10] *See* Alava, Séraphin, et al. *Youth and Violent Extremism on Social Media: Mapping the Research*. United Nations Educational Scientific, and Cultural Organization (UNESCO), 2017 (hereinafter "UNESCO Report"), available online at https://unesdoc.unesco.org/ark:/48223/pf0000260382

Through the use of these tactics, the individual identities of young, vulnerable Muslims are subsumed by a sense of collective identity. According to the UNESCO report,

> Researchers have referred to processes such as 'identity fusion' whereby an individual personal identity is gradually overshadowed by radicalized group identity. This leads to a total endorsement of the narrative proposed by the extremist group. The process is even faster with those young people who are 'lone actors' who are already struggling with needs for belonging and who may construct a fantasy of belonging to terrorist groups.[11]

As an increasingly isolated young person searching for meaning, belonging, and identity, Mr. Alimehmeti was highly susceptible to these tactics.

**5.   The Conditions of Mr. Alimehmeti's Confinement**

Since November of 2017, Mr. Alimehmeti has been held in solitary confinement in the Special Housing Unit ("SHU") at the Metropolitan Correctional Center ("MCC") in Manhattan. On March 5, 2018, at Mr. Alimehmeti was placed under Special Administrative Measures ("SAMS"), which have occasioned further restrictions, notably, the requirement that a lieutenant be present every time the slot on his door was opened for meals, or for every move outside of his cell, non-contact visits between Mr. Alimehmeti and his counsel, sequestration from other SHU inmates, and a total prohibition on communication with any other inmate.

> As Ms. Carr writes,
>
> Sajmir was only 21-22 years old when he committed the offenses that he has acknowledged. He is now 26 and is growing up in prison. He has lost everything, and nearly everyone in his life. Due to the SAMs, the only person allowed to visit him is his mother, when she visits once or twice a year from Albania. When she is in Albania, he is allowed to speak with her for fifteen minutes, twice a month. The calls are scheduled in advance, recorded, and monitored in real time.
>
> He spends all day, every day, in an 8 by 10-foot cell. Two cameras in the cell are

---

[11] UNESCO Report, at 17.

always watching him, even when he uses the bathroom. Every thirty minutes, an officer comes to the door and shines a flashlight into the cell. There is a bed, a desk, a chair, a stool, a shower, and a sink. There is a window, but it does not open, and the glass is frosted over so that he cannot see out of it. Meals come through a slot in the door three times a day. Days and weeks go by when Sajmir does not speak to anyone at all. At night, it is difficult to sleep. The heavy metal doors are always slamming, officer radios beep and blare, and heavy keys jangle.

In theory, from Monday through Friday, Sajmir can leave his cell to go to recreation, for one hour per day. However, staffing shortages often interrupt this schedule for days at a time. The recreation room is slightly bigger than Sajmir's cell. It has an exercise bike, an elliptical machine, a chair, and a television. There is no bathroom, no food, and no water. In the winter, the room is freezing cold, because the window is required to be left open. Sajmir reports that sometimes the staff forgets to come bring him back to his cell after his hour in the recreation room. Once, he was stuck there for 8 hours with no food, no water and no access to a bathroom. Some days, he opts not to go for fear of that happening again.

(*Id*. at 46-47.)

For nearly two years, Mr. Alimehmeti has been hermetically sealed away from human contact and from the outside world. Should he receive a Guidelines sentence, as calculated by the government, his punishment, which will likely continue to be served in isolation, will be significantly more onerous than a corresponding sentence served by an inmate in general population. Accordingly, Mr. Alimehmeti's conditions of confinement, both before and after sentencing, clearly serve as bases for the Court to grant a significant variance or departure from the estimated Guidelines range.

In *United States v. Carty*, the Second Circuit recognized that pre-sentence confinement conditions are a permissible basis for downward departures. 264 F.3d 191, 196 (2d Cir. 2001 (*per curiam*). And several district courts in this district, both before and after *Carty*, have based downward variances and departures on the condition of pre-sentence confinement.

As set forth below, social science studies, case law and, increasingly, the American

populace recognize that indefinite or long-term solitary confinement is every bit as agonizing as physical torture. The Guidelines do not adequately account for these conditions. However, the Court should take them into account when determining the appropriate sentence because, as explained below, every day spent in indefinite, long-term, solitary confinement is more agonizing, dehumanizing and punishing than a day served in the general population.

   a.  **Case Law**

   In 2015, writing separately in *Davis v. Ayala*, Supreme Court Justice Anthony Kennedy called for review of the widespread practice of keeping prisoners in extended solitary confinement. *Davis v. Ayala*, slip op., No. 13-1428, 576 U.S. (2015) at *4 (Kennedy, J., concurring). Noting that the prisoner in that case had likely been held virtually incommunicado in a cell the size of a parking space for twenty-three hours a day for twenty years, Justice Kennedy wrote:

> There is no accepted mechanism . . . for [courts] to take into account, when sentencing a defendant, whether the time in prison will or should be served in solitary. So, in many cases, it is as if a judge had no choice but to say: 'In imposing this capital sentence, the court is well aware that during the many years you will serve in prison before your execution, the penal system has a solitary confinement regime that will bring you to the edge of madness, perhaps to madness itself.' Even if the law were to condone or permit this added punishment, so stark an outcome ought not to be the result of society's simple unawareness or indifference.

*Id.* at *3.

   Courts in this circuit have noted that long-term or indefinite solitary confinement has devastating effects on the mind. *See, e.g.*, *United States v. Bout*, 860 F. Supp. 2d 303, 308-09 (S.D.N.Y. 2012) (Scheindlin, J.) (internal quotation marks omitted) (noting that "[s]olitary confinement is generally intended as short term housing" and that "it is well documented that long periods of solitary confinement can have devastating effects on the mental well-being of a

detainee"). Accordingly, excessive solitary confinement has been used by the courts of this circuit as a basis to vary or depart from the Guidelines. In *United States v. Brooks*, No. 07-CR-187 (E.D.N.Y. Oct. 23, 2008) (Sifton, J.), the defendant was restricted to his cell in the SHU at the MDC for ten months. The defendant was locked in his cell for twenty-three hours a day and allowed only one hour per day of outdoor exercise in a cage. He had no contact with other inmates and had restricted commissary, family and religious visiting. He reported that solitary confinement "was the equivalent of *'no touch torture*,*'* was stressful, depressing, and has caused him to suffer from memory loss." *Id.* (emphasis added). In granting the defendant's motion for a reduction in sentence, Judge Sifton relied on psychological studies. *Id.* Judge Sifton found that, even without a psychiatric evaluation, the ten months the defendant had spent in solitary confinement had had a profound impact on the defendant's mental health. Accordingly, compared to the MDC's general population, the conditions of the defendant's confinement "were severe and fell upon him in a disproportionate manner relative to the MDC general population." *Id.*

**b.  Calls for Limiting Solitary Confinement**

In July of 2015, then-President Obama reported that he had asked the Attorney General to review the overuse of solitary confinement in American prisons, stating:

> The social science shows that an environment like that is often more likely to make inmates more alienated, more hostile, potentially more violent. Do we really think it makes sense to lock so many people alone in tiny cells for 23 hours a day, sometimes for months or even years at a time? That is not going to make us safer. That's not going to make us stronger. And if those individuals are ultimately released, how are they ever going to adapt?[12]

---

[12] *See* President Barack Obama, Remarks at the NAACP Conference (July 14, 2015), https://www.whitehouse.gov/the-press-office/2015/07/14/remarks-president-naacp-conference.

One of the most unexpected criticisms of solitary confinement came from former New York City Correction and Police Commissioner Bernard Kerik. Mr. Kerik, who spent four years in federal prison after a corruption conviction, experienced first-hand the ravages of solitary confinement. Mr. Kerik was told by prison officials that they were placing him in solitary confinement for his own protection, and he remained in isolation for ninety days. Describing isolation for administrative purposes as cruel and unusual punishment, said:

> It is mind-altering. . . . . . You hallucinate; you talk to yourself. No one understands what it's like until you've been there, and we, in this country, use it way too much. . . . You create monsters in prison, and sometimes we forget they've got to go back to society. Most people that are in prison are returning back to society. Do we want them returning back to society warped?[13]

These calls for reform echo the conclusions of the international community regarding solitary confinement. In 2011, United Nations Special Rapporteur of the Human Rights Council on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("Special Rapporteur") concluded that the use of solitary confinement is acceptable in only "very exceptional cases, for as short a time as possible, and only as a last resort."[14] The Special Rapporteur concluded that international law—the International Covenant on Civil and Political Rights ("ICCPR") and the Convention Against Torture ("CAT"), in particular—prohibits prolonged solitary confinement, that

---

[13] *See* Bernard Kerik on *America's Forum* (Newsmax TV broadcast Apr. 1, 2015), http://www.newsmax.com/Newsmax-Tv/bernard-kerik-solitary-cruel-unusual/2015/04/01/id/635837/#ixzz3kcU7oy5D.

[14] See *e.g.*, Juan E. Méndez (Sp. Rapporteur of Hum. Rts. Council on Torture), *Interim Report of the Special Rapporteur of the Human Rights Council on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, U.N. Doc. A/66/268 (Aug. 5, 2011), available at http://bit.ly/1NqohLd (quoting "Istanbul Statement on the Use of and Effects of Solitary Confinement," *Torture*, Vol. 18, No. 1, 2008, 66).

prolonged solitary confinement constitutes torture or cruel and inhuman punishment and that even

fifteen days in solitary confinement constitutes a human rights violation. *Id.* at 19-25.[15] And yet, at

the MCC, it is business as usual – either because there is insufficient staff, or overcrowding or – as

a society, we have just stopped caring about other human beings.

   **c.   Support in Social Science**

      Observational studies practically unanimously demonstrate the damage that prolonged stays

in solitary confinement do to the mind—sometimes permanently. In 2015, the Center for

Constitutional Rights ("CCR") settled its class-action lawsuit against California state officials,

which it filed on behalf of inmates at Pelican Bay State Prison who had spent more than ten years in

solitary confinement claiming that their prolonged isolation violated their Eighth Amendment

rights. *Ashker v. Brown*, No. 09-CV-5796 (N.D. Cal.)[16] As part of that lawsuit, the CCR relied on

reports by mental health experts showing not only the intense deleterious effects of prolonged

---

[15] The CAT defines torture as:

> any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

CAT, art. 1, para. 1; *see* S. Exec. Doc. No. 100-20, Resolution of Advice and Consent to Ratification (Oct. 27, 1990), available at http://1.usa.gov/1PMqMaJ

[16] On September 1, 2015, the parties notified the court that they had reached a settlement. Paige St. John, *California agrees to move thousands of inmates out of solitary confinement*, L.A. Times (Sep. 1, 2015), http://www.latimes.com/local/lanow/la-me-ln-california-will-move-thousands-of-inmates-out-of-solitary-20150901-story.html. Pursuant to the agreement, California will transfer nearly 2,000 inmates out of solitary confinement and into the general population and will end the practice of keeping inmates in isolation based on gang membership. *Id.*

solitary confinement on both mental and physical health, but also that, like post- traumatic stress disorder, these effects persist long after the inmate is released from solitary.

Dr. Terry Kupers, a psychiatrist with an expertise in studying prisoners, interviewed twenty-four prisoners or ex-prisoners who spent ten or more years at the Pelican Bay SHU.[17] Dr. Kupers identified a syndrome found in 100 percent of the prisoners he interviewed that he termed "SHU Post-Release Syndrome."[18] Dr. Kupers found that, even after being released, the prisoners reported the same symptoms that would have afflicted them in the SHU: "intense anxiety, disordered thinking and paranoia, problems concentrating, problems with memory, compulsive acts, despair, suicidal thoughts or actions, severe insomnia, nightmares, . . . [a] tendency . . . to numb their feelings and isolate themselves even more than SHU confinement required, and . . . mounting despair."[19] Some of these prisoners suffered from symptoms that emerged only *after* being transferred out of the SHU.[20] Those symptoms included:

- Disorientation immediately following release.

- Anxiety in unfamiliar places and with unfamiliar people, and the daily life events that had been ordinary prior to SHU confinement become unfamiliar events following release from SHU.

- A tendency to retreat into a circumscribed, small space, often a bedroom or cell.

- A tendency to greatly limit the number of people one interacts with, usually limited to close family members and a few friends.

- Hyperawareness of surroundings, for example a need to sit facing the door to a room or with one's back to a wall.

---

[17] *See* Kupers Report at 2, available at http://bit.ly/1Ys6N2I
[18] *See* Kupers Report at 42.
[19] *See* Kupers Report at 42.
[20] *See* Kupers Report at 42-46.

- Heightened suspicion of everyone who comes close, especially strangers.

- Difficulty expressing feelings.

- Difficulty trusting others, even one's spouse or immediate relative.

- Problems with concentration and memory, beginning in the period of SHU confinement and continuing after release, making it difficult to accomplish tasks and to work.

- A sense of one's personality having changed. The most often reported form of this change is a change from a relatively outgoing, friendly individual with a sense of humor prior to SHU confinement, to a more serious, guarded, and inward individual following release from the SHU.

- In some but certainly not all cases, there is a tendency to resort to alcohol and illicit substances to lessen the pain and make the confusion and anxiety more bearable.[21]

These symptoms can persist for years later and are also characteristic of post-traumatic stress disorder.[22]

### d.   Additional Considerations for Those Convicted of Federal Terrorism Charges

Sajmir Alimehmeti has been held in solitary confinement by the BOP for two years. Since March of 2018, his isolation has been mandated by SAMs memoranda signed by the Attorney General and the Deputy Assistant Attorney General. SAMs present another level of restriction and deprivation beyond solitary confinement. As discussed above, 10-South is unduly punitive, and the BOP's treatment of the Mr. Alimehmeti has at times amounted to neglect. His experience on 10-South has been corroborated by Human Rights Watch.[23]

---

[21] *See* Kupers Report at 44-45.

[22] *See* Kupers Report at 45.

[23] *See* Human Rights Watch, *Illusion of Justice: Human Rights Abuses in U.S. Terrorism Prosecutions* ("*Illusion of Justice*") at 116-17. (July 2014), available at http://bit.ly/1MAox6G

Mr. Alimehmeti's SAMs conditions were renewed in March of 2019, and will remain in effect until March of 2020, and may well be renewed year after year throughout the duration of his sentence. Because he will be subject to the SAMs after he is sentenced, the BOP will likely designate him to one of three facilities: the ADX, the United States' only supermax prison, or one of the two severely restrictive Communication Management Units ("CMUs") in either Marion, Illinois, or Terre Haute, Indiana.[24] This is an additional factor for the Court to consider in fashioning a sentence that is sufficient, but not greater than necessary.

The ADX, sometimes known as the Alcatraz of the Rockies, has been described by one of its former wardens as a "clean version of hell."[25] Human Rights Watch, in conjunction with Columbia Law School's Human Rights Institute, reported on life at the ADX:

> For two days a week, a typical ADX prisoner spends the entire day secluded to his single cell, which measures between 75 and 87 square feet, depending on the unit. He is deprived of almost all human contact during these periods, except for perfunctory, impersonal exchange with correctional staff. On the other days, the prisoner remains confined this way for 22 or 23 hours a day, but is given an hour of indoor recreation, alone in a room completely bare but for a pull-up bar; or an hour of outdoor recreation, in a cement enclosure so small that he is only able to take a few steps in each direction.[26]

Inmates at the ADX who are subject to SAMs are housed in the Special Security Unit, known as "H Unit."[27] Inmates housed on H Unit are held in solitary confinement for twenty-two to twenty-four hours per day and they receive half the amount of out-of-cell recreation as do inmates in the ADX's general population.[28] When they are allowed recreation time, "inmates pace alone in

---

[24] *See Illusion of Justice* at 134-35.

[25] *Illusion of Justice* at 135 (internal quotation marks omitted).

[26] *Illusion of Justice* at 135-36.

[27] *See Illusion of Justice* at 146.

[28] *Ibid.*

an outdoor cage, or an indoor room slightly bigger than their cell."[29] The cells on H Unit are so

small that inmates "reportedly eat their meals within an arm's length from their toilet."[30] One

inmate described "non-stop hunger strikes' at the H Unit since 2002, when it was created."[31]

The CMUs are not as suffocating as the ADX. But "other than ADX, the CMUs are the

most restrictive facilities in the federal system." *Rezaq v. Nalley*, 677 F. 3d 1001, 1009 (10th Cir.

2012). CMU inmates "are constantly surveilled and their communication with the outside world is

heavily restricted (including with their families)."[32] According to one former CMU inmate:

> The recreation area at the Marion CMU is 'all kennels on concrete,' ............. In
> the recreation area, 'the ceiling was a chain-link fence and dome of razor wire. So
> there was open sky but there was razor wire and dead birds between you.'[33]

The CMUs' restrictiveness presents obstacles to inmates seeking medical treatment, legal

materials or work and education programs.[34]

**e. Analysis**

In the past two years, Mr. Alimehmeti has had no physical contact with anyone except

when he is shackled by BOP staff or the U.S. Marshals. If the SAMs are not lifted or modified, he

will be held in this extraordinary condition for the duration of his sentence. Were the Court to

sentence Mr. Alimehmeti to the statutory maximum, he could be held in extreme isolation for

forty-five years. In just a fraction of that time, according to all of the experts who have addressed

the effects of solitary confinement, Mr. Alimehmeti will suffer profound deprivations that may

---

[29] *Ibid.*

[30] *Ibid.*

[31] *See Illusion of Justice* at 147.

[32] *See Illusion of Justice* at 138.

[33] *See Illusion of Justice* at 139.

[34] *Ibid.*

have lasting consequences. Moreover, it is impossible to say what damage has already been wrought since many symptoms of extreme isolation do not emerge until *after* the inmate has reintegrated into the community.[35]

For the foregoing reasons, the Court should grant a substantial downward variance, recognizing that Mr. Alimehmeti has already been punished by the extreme conditions of his confinement and that, because of the SAMs, he will continue to serve his sentence under these torturous conditions.

### 6. An Analysis of Sentences Received by Similarly Situated Defendants

In the mid-1990s, the United States adopted two federal statutes, 18 U.S.C. §§ 2339A and 2239B, criminalizing the material support of a designated foreign terrorist organization. *See* Charles Doyle, Cong. Research Serv., R41333, *Terrorist Material Support: An Overview of 18 U.S.C. §2339A and §2339B* (2016). These material support statutes have been interpreted broadly, giving the government substantial leeway to prosecute individuals who, like Mr. Alimehmeti, attempt to provide assistance to another person in aid of that person's effort to travel to a foreign country intending to join a foreign terrorist organization. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 33–34 (2010) (upholding 18 U.S.C. §§ 2339A while noting the far-reaching nature and the political complexity of the term "material support").

In sentencing Mr. Alimehmeti, the statute instructs this Court to consider, among other things, the need to avoid unwarranted sentencing disparities among defendants with similar records

---

[35] *See* Kupers Report, *supra*, at 42-46.

who have been found guilty of similar conduct. See 18 U.S.C. § 3553(a)(6). A review of the sentences that are generally imposed in material support cases across the country demonstrates that individuals convicted of the same offense as Mr. Alimehmeti largely receive sentences at or below 10 years.

As of February 2018, ISIS-related material support prosecutions in the United States have had a 100% conviction rate.[36] There have been at least 862 individuals prosecuted for terrorism-related charges since the September 11, 2001 attack on the United States.[37] Of these 862 prosecutions, 435 involve a charge of providing material support to a terrorist organization and ten were for receiving military training from a terrorist group.[38]

In 2012, the United States Sentencing Commission reported that the mean sentence imposed between 2008 and 2012 for providing material support to designated foreign terrorist organizations or for terrorist purposes was 111 months, a calculation that makes no distinction between defendants who pled guilty and those who were convicted after trial.[39]  In 2017, the Center on National Security at Fordham Law School released a report analyzing the first 144 ISIS-related cases to proceed in U.S. Courts.[40] Of the 77 ISIS-related convictions at the time the report was issued, 12 were found guilty by trial and the remaining 65 pleaded guilty. Most of the convicted

---

[36] Alexander Meleagrou-Hitchens et al., *The Travelers: American Jihadists in Syria and Iraq*, The George Washington University Program on Extremism at 8 (Feb. 2018)

[37] Trial and Terror, The Intercept, https://trial-and-terror.theintercept.com/ (last updated July 20, 2018).

[38] *Ibid*.

[39] *See* United States Sentencing Commission, *Quick Facts: Offenses Involving National Defense* (2012), at p. 2, available at http://bit.ly/1HkM5xv

[40] Karen J. Greenberg et al., *The American Exception: Terrorism Prosecutions in the United States – The Isis Cases*, Center on National Security at Fordham Law (Sept. 2017).

individuals had been sentenced, resulting in an overall average prison sentence of 14.5 years. The average sentence for those pleaded guilty was 11.2 years.[41] And a 2018 study by the George Washington University's Program on Extremism found twelve cases of Americans who returned to the United States after travelling to join a jihadist group in Syria or Iraq since 2011.[42] Eight returnees have been convicted or pled guilty to criminal charges; the average sentence was approximately ten years in prison.[43]

      In the Statement of Reasons prepared by the court in *United States v. John Doe*, 14 Cr. 612 (JBW), the Honorable Jack B. Weinstein, Senior United States District Judge for the Eastern District of New York, used the 2018 George Washington University Study to delve into the sentences received by the eight returnees. Judge Weinstein's Statement of Reasons is attached hereto, as Exhibit E.  Judge Weinstein noted that the three returnees charged with material support –Abdirahman Sheik Mohamud, Mohamad Khweis, and Sinh Vinh Ngo Nguyen – received the longest terms of incarceration; sentences of 22, 20, and 13 years, respectively. (CITE.) Abdirahman Sheik Mohamud traveled to Syria in 2014, received training from ISIS soldiers and plotted to kill American troops upon his return to the United States.[44] Mohamad Khweis "sold his belongings and left his stable, secular family behind to join ISIS. He regretted his decision as soon as he arrived in Syria and escaped just three months later." (CITE.) And Sinh Vinh Ngo Nguyen traveled to Syria

---

[41] *Id*. at 3-4.
[42] Meleagrou-Hitchens et al., supra, at 2.
[43] *Id*. at 76.
[44] Since 2011, Mohamud is apparently the only jihadist traveler that has returned from Syria or Iraq with the intent to commit a domestic terror act. Meleagrou-Hitchens et al., *supra*, at 71.

for five months, where he fought with rebel forces against the Assad regime and tried, unsuccessfully, to join Al Qaeda.[45] (CITE.)

Finally, we conducted our own review of *attempted* material support cases under 18 U.S.C. § 2339B in all circuits, as well as material support *conspiracy* cases where defendants travelled or took substantial steps toward travel overseas, with a goal of joining ISIL or another designated foreign terrorist organization. Of the 22 such cases we identified, four involve defendants who cooperated with the government. For this reason, we excluded their sentences from our calculations. Among the remaining 18 defendants, the mean sentence was 133.8 months, or a little more than 11 years, with 50% (9 out of 18) defendants receiving sentences of 10 years or less, five receiving sentences between 11 and 13 years, and four receiving sentences of 15 years. Further, among the four who received 180 month sentences – only two received the statutory maximum. (*See Table A-1*; Attempted Material Support Cases, All Circuits attached as Exhibit F.)

**Cases Surveyed**

1. *U.S. v. Mohamed Bailor Jalloh*, 16 Cr. 163, Eastern District of Virginia, February 10, 2017. Mr. Jalloh, age 26, made several attempts to join ISIL; the first, in his native Sierra Leone, where he met with an ISIL facilitator, the second in Niger where he met with the same facilitator. He also provided $ to a facilitator, to another ISIL figure plotting attacks on the U.S., participated in a plot to murder U.S. military personnel, and purchased an AR-15 for that purpose. Mr. Jalloh pled guilty to one count of attempted material support under 18 U.S.C. § 2339B and was sentenced by Judge Liam O'Grady to 132 months (11 years) in prison. He faced a maximum of 20 years.

2. *U.S. v. Joshua Van Haften*, 15 Cr. 37, Western District of Wisconsin, February 17, 2017. Mr. Van Haften, age 36, was arrested on his way to Syria to join ISIS. Federal anti-terrorism agents were tracking the defendant for some time, before immigration officials

---

[45] Nguyen later planned to travel to Pakistan to train Al Qaeda fighters, but he was arrested in California prior to his departure.

caught him in Turkey in 2014. He was sent back to the U.S., where he was arrested at Chicago's O'Hare Airport. Some of the evidence against him includes an online post swearing allegiance to ISIS, saying "the only thing that matters to me is joining my brothers for the war against America liars." Mr. Van Haften pled guilty to one count of attempted material support under 18 U.S.C. § 2339B and was sentenced by Judge James D. Peterson to 120 months (10 years) in prison. He faced a maximum of 15 years.

3. *U.S. v. Justin Kaliebe*, 13 Cr. 72, Eastern District of New York, January 20, 2016. Mr. Kaliebe, age 18, attempted to travel from the United States to Yemen for the purpose of joining AQAP and waging violent "jihad." The defendant was arrested on January 21, 2013 as he attempted to board a flight from John F. Kennedy Airport ("JFK Airport") in Queens, New York to the Middle East for the purpose of joining AQAP. Evidence included frequent meetings with undercovers in which he expressed this intent. Mr. Kaliebe pled guilty to two counts of attempted material support under 18 U.S.C. § 2339B and was sentenced by Denis R. Hurley to 156 months (13 years) in prison. He faced a maximum of 30 years.

4. *U.S. v. Joseph Hasan Farrokh*, 16 Cr. 64, Eastern District of Virginia, July 15, 2016. Mr. Farrokh, age 29, conspired with co-defendant Mahmoud Amin El Hassan to travel to Syria to join and fight for ISIL. Farrokh and Elhassan had numerous communications, using secure apps, about their plans. Farrokh was arrested as he went down the jet way to catch his flight. He pled guilty to one count of attempted material support under 18 U.S.C. § 2339B and was sentenced by Judge Anthony J. Trenga to 102 months (8.5 years) in prison. He faced a maximum of 20 years.

5. *U.S. v. Mahmoud Elhassan,* 16 Cr. 64, Eastern District of Virginia, February 24, 2017. Mr. Elhassan, age 25, recruited co-defendant Joseph Farrokh to join the Islamic State and aided his efforts to travel to Syria and Iraq to join the terrorist organization. The government believed he planned to join Farrokh at a later date or to continue to operate as a sleeper cell supporting the cause remotely. Mr. Elhassan pled guilty to attempted material support under 18 U.S.C. § 2339B and to 18 U.S.C. 1001 for making false statements to the FBI about his conduct and was sentenced by Judge Anthony J. Trenga to 132 months (11 years) in prison. He faced a maximum of 28 years.

6. *U.S. v. Alaa Saadeh*, 15 Cr. 558, District of New Jersey, May 10, 2016. Mr. Saadeh, age 24, planned to travel overseas to join, and fight for, ISIL. The defendant also helped his brother successfully travel overseas for the same purpose, letting him purchase airline tickets using Saadeh's credit card, removing the SIM card from his brother's smartphone and resetting the smartphone in an effort to avoid detection, and giving his brother contact information for an individual who would facilitate his travel from Turkey to ISIL in Syria. Mr. Saadeh pled guilty to material support under 18 U.S.C. § 2339B and was sentenced by Judge Susan Wigenton to 180 months in prison (15 years). He faced a maximum of 20 years.

7. *U.S. vs. Nicholas Teausant*, 14 Cr. 87, Eastern District of California, June 7, 2016. Mr. Teausant, age 20, was apprehended at the Canadian border allegedly on his way to join ISIS

in Syria, after authorities saw posts he made on social media sites about his desire to conduct violent jihad. Mr. Teausant pled guilty to attempted material support under 18 U.S.C. § 2339B and was sentenced by Judge John A. Mendez to 144 months (12 years) in prison. He faced a maximum of 15 years.

8. *U.S. v. Zacharia Yusuf Abdurahman*, 15 Cr. 49, District of Minnesota, November 14, 2016. Mr. Abdurahman, age 19, and three other men (Hanad Musse, Hamza Ahmed, and Mohamed Farah)—took a Greyhound bus from Minneapolis to New York in November 2014 and were stopped by federal agents as they tried to travel overseas from JFK Airport. Prosecutors said they were part of a group of friends who began inspiring and recruiting each other to join the Islamic State group in the spring of 2014. Some of their friends made it to Syria, but the nine who were prosecuted did not. Three went to trial and were convicted of a conspiracy to commit murder outside of the United States in addition to material support, receiving lengthier sentences. Mr. Abdurahman and three others did not cooperate, pleading guilty to conspiring to provide material support under 18 U.S.C. § 2339B. Mr. Abdurahman and two others (Hanad Musse, age 19 and Adnan Farah, age 19) were sentenced by Judge Michael J. Davis to 120 months (10 years) in prison. All three faced maximums of 15 years. The fourth, Hamza Naj Ahmed, age 21, was charged with an additional count of financial aid, and was sentenced to 180 months (15 years) in prison. Mr. Ahmed faced a maximum of 20 years.

9. *U.S. v. Jaelyn Young*, 15 Cr. 98, Northern District of Mississippi, August 12, 2016. Jaelyn Young, age 19, an American from Vicksburg, Mississippi, attempted to move to Syria with her fiancé Mohammad Dakhlalla, age 22, to join ISIS to work as a medic. Ms. Young and Mr. Dakhlalla engaged in numerous conversations on social media sites with FBI agents disguised as ISIS recruiters. They were apprehended on their way to the airport, and pled guilty to conspiring to provide material support under 18 U.S.C. § 2339B. Ms. Young who admitted to being the mastermind of the plan, was sentenced by Judge Sharion Aycock to 144 months (12 years) in prison. Mr. Dakhlalla was sentenced to 96 months (8 years). Both faced maximums of 15 years.

10. *U.S. v. Adam Dandach*, 14 Cr. 109, Central District of California, July 25, 2016. Mr. Dandach, age 22, was initially charged with falsely claiming he lost his passport, and later indicted for attempting to travel to Syria to support terrorists. Mr. Dandach communicated with two people in Syria, and made two attempts to travel and join ISIL; the first time, a family member took his passport and money so he couldn't go; the second time, he obtained a duplicate expedited passport. Mr. Dandach also engaged in post-arrest obstruction - seeking his family's help in deleting internet postings. And while detained, he composed several pro-terror writings. He pled guilty to attempted material support under 18 U.S.C. § 2339B and making a false statement on a passport application under 18 U.S.C. § 1542, and was sentenced by Judge James V. Selna to 180 months (15 years) in prison. Mr. Dandach faced a maximum of 25 years.

11. *U.S. v. Rahatul Khan*, 14 Cr. 212, Western District of Texas, September 25, 2015. Between March 2011 and January 2012, Mr. Khan, age 24, identified an individual in an Internet chatroom and began assessing that individual for overseas violent jihadist travel. That individual was actually an FBI confidential source. After Khan screened the confidential source, he made arrangements to insert him into an al-Shabaab pipeline. Khan also led a group of individuals in the Austin area who pledged loyalty to the now-deceased Taliban and terrorist leader, Mullah Omar. Michael Wolfe, whose case is discussed below, was a part of Khan's group. Mr. Khan pled guilty to attempted material support under 18 U.S.C. § 2339B and was sentenced by Judge Sam Sparks to 120 months (10 years) in prison. He faced a maximum of 15 years.

12. *U.S. v. Michael Wolfe*, 14. Cr. 213, Western District of Texas, June 5, 2015. Mr. Wolfe, age 23 attempted to travel to the Middle East to lend his support to ISIL. He admitted at his change of plea hearing that in preparation, he applied for and acquired a U.S. passport, participated in physical fitness training, practiced military maneuvers, concealed his preparations, and bough an airline ticket for travel to Europe, which he believed would be the first leg of a trip to the Middle East. Instead, he was arrested on the jet way at the Houston, Texas airport as he attempted to board a flight to Toronto, Canada. Mr. Wolfe was part of a group led by Mr. Khan (see above) that pledged loyalty to a deceased Taliban leader. He pled guilty to attempted material support under 18 U.S.C. § 2339B and was sentenced by Judge Sam Sparks to 82 months (6 years, 10 months) in prison. He faced a maximum of 15 years.

13. *U.S. v. Leon Nathan Davis*, 15 Cr. 59, Southern District of Georgia, July 28, 2015. Mr. Davis, age 37, was arrested at the Hartsfield-Jackson Atlanta International Airport as he attempted to board a flight to Turkey. The defendant had been under investigation for more than a year before he was arrested, after communicating with ISIL members via social media. At the time of his arrest, Mr. Davis was on parole for cocaine trafficking. Mr. Davis was initially charged with possession of illegal firearms by a convicted felon, and reportedly had six rifles, four handguns, and two shotguns, but that charge was later dropped. He pled guilty to attempted material support under 18 U.S.C. § 2339B and was sentenced by Judge J. Randall Hall to 180 months (15 years), the maximum.

Many of the above cases strike similar chords – to each other, and to the case of Mr. Alimehmeti. Overwhelmingly, they are troubled young men,[46] radicalized by extremist online propaganda.

---

[46] According to statistics analyzed by the Center on National Security at Fordham Law for their 2017 report, while the average age for all ISIS-related cases was 27.2, the most prevalent age was much lower, at 20. The median age was 25.5 years old. Greenberg et al., *supra*, at 11.

Like Mr. Alimehmeti, the vast majority of these defendants likely faced Guidelines ranges of 360-life, before the operation of any statutory maximums to cap that number. Yet most of them received sentences that were significantly lower than the statutory maximums. This pattern suggests that these cases, as a group, fall well outside the heartland of cases to which the Terrorism Enhancement was intended to apply. Or perhaps it suggests something else; namely, that no such heartland exists, and the Sentencing Commission's wholesale failure to develop this guideline based upon empirical data, national experience, or some rational policy basis has rendered it essentially meaningless.[47]

### 7.    Intervention and Rehabilitation Possibilities

As Ms. Carr writes in her report, "Radical extremism among young people is not an unalterable or incurable condition." (Exhibit A at 47.) Ms. Carr points to Sajmir's former fiancée, Safa, as an example of a person close to Mr. Alimehmeti who was similarly radicalized and was able to find her way out. Safa, who candidly shared her experience with Ms. Carr, "remembers 2014-2016 as a time period when many of her young friends fantasized about joining ISIS, and spoke about it online." (*Ibid.*)  She describes the ISIS recruitment propaganda that she and Sajmir were exposed to online in the following light:

> They were basically selling a dream, and it was aimed at young people. They said there were shops there with all the chocolate, crisps [potato chips], and snacks. You have your own house.

---

[47] This failure is addressed in a separate submission, which contains our objections to the Presentence Investigation Report.

(*Id*. at 47-48.) Safa was referred to a U.K. diversion program called Prevent, which according to the Home Office, has successfully diverted more that 1,200 people from extremism.[48]

Sadly, no such program was available to Mr. Alimehmeti. Instead, his developing extremist views were validated, normalized, and reinforced by undercover law enforcement officers posing as fellow ISIS supporters, older men who lavished time, attention, and money on him and made him feel like he belonged.

While United States government-funded programs are working to counteract the radicalization and recruitment of vulnerable youth across the world,[49] on U.S. soil, programs aimed at terrorism prevention are just beginning to get off the ground. *Practical Terrorism Prevention*, a 2019 report by the Homeland Security Operational Analysis Center ("HSOAC"), urges federal investment in the design and implementation of prevention policies, arguing that "by building options beyond the traditional criminal justice tools of arrest, prosecution, and incarceration," these programs can "enable action earlier before individuals have taken illegal actions that could pose imminent danger and have lasting consequences both for themselves and others."[50]

---

[48] *Id*. at 48. See also Owen, Jonathan. "Community engagement expert calls for balanced reporting in counter-terrorism debate," PR Week, February 13, 2019. https://www.prweek.com/article/1525585/community-engagement-expert-calls-for-balanced-reporting-counter-terrorism-debate accessed 16 Nov. 2019.

[49] See Trisko Darden, Jessica. *Tacking Terrorists' Exploitation of Yo*uth, American Enterprise Institute, May 2019, available at https://www.un.org/sexualviolenceinconflict/wp-content/uploads/2019/05/report/tackling-terrorists-exploitation-of-youth/Tackling-Terrorists-Exploitation-of-Youth.pdf

[50] Jackson, Brian A., et al. *Practical Terrorism Prevention*, Homeland Security Operational Analysis Center, operated by the RAND Corporation under contract with the Department of Homeland Security, 2019, at p. 36, and Report Summary at xvii. Available at https://www.rand.org/pubs/research_reports/RR2647.html

In the Eastern District of New York, prosecutors piloted an intervention program called the Disruption and Early Engagement Program (DEEP) in 2016. DEEP initially focused on de-radicalization of people who are being prosecuted for terrorism charges. The trajectory of one successful participant in the program is described by Judge Weinstein in the Statement of Reasons attached from *United States v. John Doe*, 14 Cr. 612 (JBW). (*See* Exhibit E.) As part of his work with the program, DOE was asked to mentor a juvenile who was "on a path towards extremism," reducing the risk of the young man joining ISIS.[51]

Having no access to prevention services prior to the conduct to which he pleaded guilty, Mr. Alimehmeti would nonetheless benefit from intervention services, both during his incarceration, and after his release from prison. Unfortunately, no such programs yet exist within the Bureau of Prisons; one of the goals of the HSOAC report was to address the reality that many terrorism convicted offenders are approaching release without the benefit of any such programming.[52] Mr. Alimehmeti is far more likely to have access to comprehensive intervention resources and support in a post-release supervision setting. In his testimony before Judge Weinstein in the John Doe case, Seamus Hughes, the Deputy Director of George Washington University's Program on Extremism, "expressed concern about the potential for former extremists to be re-radicalized in prison and commented on the lack of de-radicalization programs currently in place in

---

[51] Weinstein Statement of Reasons, attached as Exhibit E, at p. 41.
[52] "Significant numbers of terrorism-convicted offenders are approaching release from prison. Programming is being developed and piloted to address their needs and help support their desistance from violence, but those efforts are in their early stages." HSOAC Report Executive Summary at xxiii. Available at https://www.rand.org/pubs/research_reports/RR2647z2.html

America's prison systems. He concluded that supervised release, rather than incarceration, would increase defendant's chances to be rehabilitated." (*See* Exhibit E, at pp. 23-24.)

Perhaps, in recognition of the lack of services within the prison system, and the capacity for change in vulnerable young people radicalized by extremist ideologies, district courts across this country have increasingly imposed sentences far below the applicable guidelines and statutory maximum, while imposing lengthy terms of supervised release.[53]

## **CONCLUSION**

Present counsel was appointed to represent Mr. Alimehmeti on January 25, 2018. Less than a month later, on February 21, 2018, Mr. Alimehmeti pled guilty to both counts of the indictment, pursuant to a *Pimentel* letter, taking full responsibility for his conduct.

---

[53] *See, e.g., U.S. v. Saleh*, 15 Cr. 393 (MKB) (E.D.N.Y.) (Court imposed an 18-year sentence with 10 years' supervised release on a 22-year-old defendant who conducted coordinated attacks on federal law enforcement officers and plotted domestic terror attacks. Government had sought a guideline sentence of 53 years' imprisonment.); U.*S. v. Alhaggagi*, 17 Cr. 387 (CRB) (N.D. California) (Prosecutors sought a 396-month sentence for this 23-year-old defendant who pled guilty to creating social medial accounts for people he thought were members of ISIS. He was sentenced to 188 months and 10 years' supervised release); *U.S. v. Hanad Musse,* 15 Cr. 49 (MJD) (D. Minn) (Imposing a 10-year sentence with 10 years' supervised release on a 21-year old defendant who made numerous attempts to travel to Syria to join ISIS. The government had sought a 15-year sentence and lifetime supervised release); *U.S. v. Justin Kaliebe*, 13 Cr. 72 (DRH) (E.D.N.Y), (Mr. Kaliebe, an 18-year-old who attempted to travel from the United States to Yemen for the purpose of joining AQAP faced a maximum of 30 years and was sentenced to 156 months, with 20 years' supervised release); *U.S. v. Adam Dandach*, 14 Cr. 109, (JVS) C.D. California (22-year-old defendant facing a maximum of 25 years for attempting to travel to Syria to support terrorism and falsely claiming he lost his passport sentenced to 15 years and lifetime supervised release); *U.S. v. Adam Daniels,* 16 Cr. 222 (D. Ohio) (20-year-old arrested at the Columbus airport on his way to join ISIS facing a maximum sentence of 20 years sentenced to 80 months with lifetime supervised release.); *U.S. v. Elizabeth Lecron*, 19 Cr. 0004 (JGC) (N.D. Ohio), (24-year-old defendant facing a maximum of 30 years for planning two terrorist attacks in the Toledo, Ohio area sentenced to 180 months, with lifetime supervised release).

Mr. Alimehmeti's life in solitary confinement bears little resemblance to a human life. Often, counsel is his only human contact. Over the past two years, we have tried to visit him at least once a week, more if possible. But even this – one or two 60-minute conversations a week, over 93 weeks, barely makes a dent in what amounts to almost 16,000 hours of complete isolation. Mr. Alimehmeti tries keeps himself sane by sticking to a routine. He exercises and prays. He listens to the radio. In our visits, he can be friendly and thoughtful. He tells jokes. We discuss movies and television, our favorite foods, places we've been. At times, he waves off concern about his conditions, saying there are people much worse off than he. But the toll it takes is all too apparent. Locked in that tiny room, spending thousands of hours alone, Mr. Alimehmeti has limited opportunities to grow or change.

As Ms. Carr relates in her report, Sajmir dreams of being reunited with his family, of reconciling with his wife, of moving to Albania, of having children and keeping them safe. (Exhibit A at 51.) But from where he is, this dream feels like little more than a dream.

In *United States v. John Doe*, 14 Cr. 612 (JBW), the Honorable Jack B. Weinstein recognized that "[a]bove all, the court must consider how best to protect the public." Beyond that, Judge Weinstein proclaimed that the Court "should avoid needlessly destroying a defendant, but do what it can to encourage him to live a life within the law." (Exhibit E, at 4.) *See also United States v. Reingold*, 731 F.3d 204 (2d Cir. 2013) ("Excessive and unnecessary imposition of suffering and destruction of opportunity for a constructive life as a youngster constitutes cruel and unusual punishment.") (*citing* David Gray, *Punishment as Suffering*, 63 Vand. L.Rev. 1619, 1692–93 (2010)).

We agree that the need to protect the public is paramount. But somewhere between that need, and the cruel and unusual punishment that a guideline sentence would wreak in this case, is the public good of helping Mr. Alimehmeti break free of extremist influences and live a productive, meaningful life. Indeed, in light of the conduct at issue, a sentence that deprives Sajmir of the chance to mature emotionally and intellectually, and rebuild his life, cannot be just.

We urge the Court, after taking into account the other sentencing factors set forth in 18 U.S.C. § 3553(a), that a sufficient sentence is one that varies substantially from the 360-540-month guideline sentence calculated in the PSR or the 360-month sentence advocated by Probation. We respectfully submit that a sentence of 10 years of incarceration, followed by a lengthy term of supervised release during which he is supported by intensive rehabilitative programing, is "sufficient, but not greater than necessary" to meet the goals of sentencing in this case.

Dated:        Brooklyn, New York
              November 21, 2019

                                        Respectfully submitted,


                                        Susan G. Kellman
                                        Sarah Kunstler
                                        Carlos Santiago

                                        25 Eighth Avenue
                                        Brooklyn, New York
                                        11217 (718) 783-8200
                                        sgk@kellmanesq.com


                                        *Attorneys for Sajmir Alimehmeti*


Cc:     AUSA Emil Bove
        AUSA George Turner
        UPSO Ross Kapitansky