UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

       -v.-

SAJMIR ALIMEHMETI,
      a/k/a "Abdul Qawii,"

                   Defendant.

S1 16 Cr. 398 (PAE)

# THE GOVERNMENT'S SENTENCING MEMORANDUM

GEOFFREY S. BERMAN
United States Attorney
Southern District of New York
for the United States of America

Emil J. Bove III
George D. Turner
Assistant United States Attorneys
   *Of Counsel*

**Table of Contents**

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ..................................................................................................................... 3

   I.   Offense Conduct ........................................................................................................ 3

      A.   Alimehmeti's Thwarted Attempts to Travel Overseas in 2014 ............................. 4

      B.   Alimehmeti's Efforts to Radicalize Others and Contacts with Other
          ISIS Supporters ................................................................................................ 12

      C.   Alimehmeti's Stockpiling of Weapons and Combat Gear at His Bronx Apartment .... 15

      D.   Alimehmeti's Attempt to Fraudulently Obtain a Passport for Traveling
          Overseas to Join ISIS ....................................................................................... 18

      E.   Alimehmeti's Meetings with the UCs and Attempt to Assist a UC to Travel
          to Syria to Join ISIS ......................................................................................... 21

      F.   Evidence Recovered from Alimehmeti's Bronx Apartment ................................ 23

      G.   Alimehmeti's Post-Arrest Efforts to Radicalize Inmates at the MCC ................. 28

   II.   Procedural History .................................................................................................. 31

APPLICABLE LAW ............................................................................................................. 32

DISCUSSION ...................................................................................................................... 33

   I.   The Applicable Guidelines Range is 360 to 540 Months' Imprisonment ...................... 33

      A. The Terrorism Enhancement Applies ................................................................. 33

      B. The Defendant's Assault Conviction .................................................................. 37

      C. The Guidelines Recommendation ...................................................................... 38

   II.   The Court Should Impose a Guidelines Sentence .......................................................... 39

      A. The Nature and Seriousness of Alimehmeti's Conduct and the
      Need for Just Punishment Warrant a Guidelines Sentence ................................... 39

      B. A Guidelines Sentence Is Necessary to Protect the Public from
      Further Terrorism Crimes of Alimehmeti ........................................................... 43

      C. The Defendant's Mitigation Report and Personal Circumstances Do Not
      Support a Variance ............................................................................................. 45

      D. A Guidelines Sentence Will Not Create Unwarranted Sentence Disparities ........... 49

      E. A Guidelines Sentence Is Necessary To Afford General Deterrence and To Promote
      Respect for the Law ........................................................................................... 51

   CONCLUSION ................................................................................................................ 53

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum related to the sentencing of Sajmir Alimehmeti, which is scheduled for December 6, 2019 at 9:30 a.m.  For the reasons set forth below, the Government respectfully submits that, as recommended by the Probation Office, a sentence within the applicable Guidelines range of 360 to 540 months is appropriate.

Alimehmeti has an escalating history of violent crime dating back to 2010.  He bragged about radicalizing prisoners while incarcerated based on state convictions in 2011 and 2012, and developed a network of terrorists and ISIS supporters by 2014.  That year, Alimehmeti was twice barred from entering the United Kingdom in an effort to travel onward to ISIS-controlled territory, and lawful searches by U.K. authorities during the second attempted trip revealed a trove of terrorist propaganda that laid bare Alimehmeti's deadly intentions.  Undaunted by law enforcement intervention in the U.K., Alimehmeti remained committed to jihad in 2015.  He converted his Bronx apartment into an ISIS outpost with a large ISIS flag prominently displayed on the wall of the main room, wrote his own will in hopeful anticipation of terrorist martyrdom, submitted a false passport application in an effort to obtain a valid travel document that did not display the U.K. rejection stamps, and started to amass military-grade knives that could be used in a lone-wolf attack in the United States should he be unsuccessful in his efforts to reach an ISIS battlefield.

By late 2015, New York's Joint Terrorism Task Force, including FBI, NYPD, and local law enforcement, intervened to mitigate and monitor the threat posed by Alimehmeti and to protect the public.  In May 2016, after a careful and thorough investigation that revealed, among other things, Alimehmeti talking about his desire to travel to Syria and execute non-Muslims by cutting off their heads, the agents deployed a sting technique by using undercover officers to present Alimehmeti with another opportunity to facilitate travel by others to support ISIS abroad.

Consistent with the evidence of years of terrorist predisposition, Alimehmeti immediately and emphatically embraced the opportunity to support ISIS by escorting an undercover through New York City, helping him obtain equipment to fight for ISIS, bringing him to the airport, and asking to be connected with the undercover's travel facilitator so that Alimehmeti, too, could go.

A substantial sentence would be warranted based on that conduct alone. But Alimehmeti was not done. Following his May 2016 arrest, he worked with other incarcerated terrorists to compile and distribute terrorist propaganda from their discovery materials in an effort to recruit and radicalize others. The Government subsequently intercepted letters by Alimehmeti and others, which show Alimehmeti referring to himself as an "ISIS balla." The letters also indicate that Alimehmeti and another terrorist discussed an unspecified "plan" while incarcerated that became infeasible once additional security restrictions were imposed, that Alimehmeti destroyed a "book" he believed would be incriminating at sentencing, and that—despite his arrest and guilty plea—he still hopes to achieve martyrdom through an act of terrorism. Perhaps not surprisingly given this intercepted correspondence, in a defense submission that exceeds 100 pages in aggregate, Alimehmeti fails to meaningfully express remorse or to renounce ISIS and terrorism. Accordingly, a Guidelines sentence is appropriate to protect the public, achieve deterrence, reflect the seriousness of this conduct, and to promote respect for the law.

2

## BACKGROUND

### I.  Offense Conduct

As reflected in the Presentence Investigation Report, dated May 14, 2018 ("PSR"),[1] Alimehmeti engaged in a determined and terrifying effort, over an extended period, to serve and support ISIS.  Alimehmeti, now 26 years old, was born in Albania, came to the United States when he was a child, and became a naturalized U.S. citizen.  When Alimehmeti was about 18, following two convictions for violent crimes under New York law, he devoted himself to ISIS and its radical Islamic terrorist ideology.  He began consuming massive quantities of online ISIS propaganda glorifying ISIS's mission of death, destruction, and brutal violence; developing relationships with fellow ISIS supporters in the United States and abroad; and planning his travel overseas to join and fight for ISIS.  In 2014, Alimehmeti twice attempted to travel to the United Kingdom, with the intention of continuing on to Syria to join ISIS.  Both times, he was denied entry by U.K. authorities, who inspected his luggage and electronic devices, which contained materials demonstrating Alimehmeti's support for ISIS and terrorism.  He was turned back, but not deterred.

Thwarted in his efforts to travel overseas, Alimehmeti began stockpiling military-style weapons and tactical combat gear at his Bronx apartment, where he hung a large ISIS flag on the wall.  As he amassed those weapons—in accordance with ISIS's directive to its followers to carry

---

[1] Alimehmeti does not dispute the factual recitation of his offense conduct set forth in the PSR. (*See* PSR at 25; Def. Ltr. re Objections to PSR, dated Nov. 21, 2019 (Dkt. No. 128)).  The offense conduct summarized in the PSR and herein is culled principally from recorded meetings and communications between Alimehmeti and undercover law enforcement officers ("UCs"), the content of electronic devices seized from Alimehmeti, searches of Alimehmeti's email, social media, and other online accounts, interceptions of Alimehmeti's cellphone, and evidence recovered during a search of Alimehmeti's residence after his arrest.

out attacks at home if they could not travel overseas—Alimehmeti also actively sought to radicalize others, to recruit others to join him in serving ISIS and terrorism.

After identifying Alimehmeti as a national security threat, the Federal Bureau of Investigation ("FBI") and New York City Police Department ("NYPD") introduced undercover agents to Alimehmeti, in an effort to monitor and neutralize him.  Over the course of the ensuing months, Alimehmeti met with the UCs, made abundantly clear his commitment to serve ISIS— either through joining ISIS overseas or carrying out a lone-wolf attack here in New York City— and he ultimately attempted to assist one of the UCs to travel to Syria to train and fight with ISIS. Alimehmeti was arrested, and his Bronx apartment searched.  Law enforcement found a cache of weapons and combat gear, the ISIS flag, and electronic devices with an enormous volume of ISIS propaganda.

Alimehmeti did not stop even when he was arrested and incarcerated.  While housed at the Metropolitan Correctional Center ("MCC"), he worked with other inmates, including Ahmad Khan Rahimi, the terrorist who bombed the Chelsea neighborhood in Manhattan in fall 2016 (the "Chelsea Bombing"), to radicalize other inmates by disseminating terrorist propaganda within the prison, including manuals on how to carry out a terrorist attack.  He also exchanged letters with Rahimi reiterating his commitment to ISIS, terrorism, and martyring himself for the cause.

### A.  Alimehmeti's Thwarted Attempts to Travel Overseas in 2014

By approximately 2012, Alimehmeti abandoned his Albanian street gang in favor of a radical and more violent terrorist ideology that he endorsed while incarcerated for state crimes. (*See* Def. Mem. Ex. A, Nov. 20, 2019 "Mitigation Report" of Melanie Carr (the "Carr Report") 18-23; *see also* PSR ¶¶ 78, 91).  One member of Alimehmeti's network was Mohamed Mamdouh,

4

an inmate at the Fishkill Correctional Facility in Fishkill, New York.  Mamdouh plotted to blow up synagogues in Manhattan, and pled guilty to terrorism crimes in New York State court in February 2012.  Between approximately August 2011 and October 2012, when Alimehmeti was serving state sentences for robbery and assault (*see* PSR ¶¶ 76-81), and Mamdouh was incarcerated for his terrorism crimes, Alimehmeti and Mamdouh were housed in the same complex at the Rikers Island Correctional Center ("Rikers").

After Alimehmeti was released, on or about August 10, 2014, he visited Mamdouh at the Fishkill jail.  Below is a picture of the two men at the jail on the day of the visit, in which both Alimehmeti and Mamdouh made the finger-pointing gesture commonly used by ISIS supporters to symbolize their allegiance to ISIS:



Approximately four days later, on August 14, Alimehmeti traveled to Albania via Turkey.  (*See* Ex. B at 4-5 (U.K. report relating to Dec. 2014 interview of Alimehmeti)).

Beginning in at least the following month, September 2014, Alimehmeti made plans to fly to the United Kingdom to meet with a female associate, ██████████ ("Female-1"), and travel

5

onward toward ISIS-controlled territory in the Middle East.  For example, British authorities seized the following communications from Alimehmeti's phone ("Cellphone-1"), which reflect communications on the day after Alimehmeti returned to the United States from Albania (*see* Ex. B at 4):

| Sept. 20, 2014 | Female-1 | Listen i want to Know How u CAN go from tunisia to dawla?[2] |
| Sept. 20, 2014 | Female-2[3] | the only way i know is from turkey but u might not be able to even go with out visa |
| Sept. 20, 2014 | Alimehmeti | And How to get a visa? |
| Sept. 20, 2014 | Female-2 | It s with the passport Stuff? |
| Sept. 20, 2014 | Female-2 | yup |
| Sept. 20, 2014 | Alimehmeti | u deff need a passport |
| Sept. 20, 2014 | Alimehmeti | before u even try |
| Sept. 20, 2014 | Alimehmeti | download kik on ur phone nd ill give u a conact with a muj to help u |

In this group chat, Female-1 asked Alimehmeti and Female-2, in substance about traveling from Tunisia to ISIS territory in adjacent Libya.[4]  Female-2, in turn, responded that the only travel route she was aware of required transit through Turkey, presumably to Syria.  Alimehmeti then instructed Female-1 to download "kik," an encrypted messaging application so that he could connect Female-1 with a "muj," *i.e.*, "mujahideen" member of ISIS, who could help with her travel plans.  Alimehmeti subsequently sent Female-1 a Kik username associated with a British member of ISIS known as "Abu Abdullah Al-Habashi."  ISIS propaganda outlets later announced that Al-

---

[2] Alimehmeti and others used the term "dawla" to refer to ISIS-controlled territory.

[3] ███████████████████████████████████████

[4] By approximately October 2014, ISIS fighters declared victory after an attack in Derna, Libya.

Habashi—who had previously posed in a photograph with a decapitated Syrian soldier—was killed in Syria.[5]

Days later, Alimehmeti exchanged messages with an associate he met in Turkey while traveling to Albania in August 2014, who had traveled to Libya as Alimehmeti and Female-1 were hoping to do:

| Sept. 28, 2014 | Alimehmeti | Its brother harith |
| Sept. 28, 2014 | Alimehmeti | From the airport |
| Sept. 28, 2014 | Alimehmeti | In Turkey |
| Sept. 28, 2014 | Male-1 | I know brother |
| Sept. 28, 2014 | Alimehmeti | Whats going on |
| Sept. 28, 2014 | Alimehmeti | How s Libya |
| Sept. 28, 2014 | Male-1 | Am in libya know [sic] |

On October 24, 2014, Alimehmeti flew from the United States to the United Kingdom—on a one-way ticket—to meet with Female-1 before traveling to ISIS territory.  (PSR ¶ 14; *see also* Carr Report at 36).   When Alimehmeti arrived at Manchester Airport, however, U.K. border authorities denied him entry after they found camouflage attire and nunchucks in Alimehmeti's luggage.  (PSR ¶ 14).  Alimehmeti later claimed to U.K. authorities that the purpose of the October 2014 trip was to "meet" Female-1 and "travel onward to Albania and reside there where he could help run the family businesses."  (Ex. B at 5).  Although Alimehmeti now claims that he "saved up his earnings" to pay for the ticket, he told U.K. authorities that "his parents paid for his flights."  (*Id.*).  "A[t] no time did ALIMEHMETI tell officers in Manchester that he was interested in getting

---

[5] *See* Vikram Dodd, British jihadi reportedly killed in Syria fighting for Isis, *The Guardian* (Nov. 21, 2014), *available at* https://www.theguardian.com/world/2014/nov/21/british-jihadi-killed-syria-kobani-islamic-state-isis.

married," and he did not mention Female-1.  (*Id.* at 7).  In November 2014, Female-1's father indicated that Alimehmeti "was not that well known to him."  (*Id.*).

On December 18, 2014, Alimehmeti attempted to enter the United Kingdom, this time via Heathrow Airport.  (PSR ¶ 15).  Prior to the trip, on or about December 14,  Alimehmeti sent Female-1 an "invitation letter" with the instruction that it "would be better if you got it notarized [a]nd signed it."



On December 16, an associate of Alimehmeti known as "Ibrahim," who was using a phone number with a New Jersey area code, asked if Alimehmeti, "did u get the doc from them?"  Alimehmeti confirmed that he had a "a copy i printed out" and that "the notary wont be a problem" because the letter "still looks like original."  Apparently after sending a copy of the "invitation letter" to Ibrahim, Alimehmeti asked, "It looks good tho right?"  Ibrahim responded, "should be good."

During an interview at Heathrow on December 18, Alimehmeti presented a signed, purportedly notarized copy of the "invitation letter" bearing headers and footers reflecting that the document was transmitted via email on December 15.



In connection with the interview, U.K. authorities imaged Alimehmeti's cellphone, *i.e.*, Cellphone-1, and laptop computer ("Laptop-1"; together, the "U.K. Devices"). U.K. authorities inspected those devices at the airport, and they discovered that Alimehmeti's U.K. Devices contained, among other things, images of ISIS flags and terrorist attacks conducted with improvised explosive device ("IEDs"). (PSR ¶ 15). U.K. authorities again denied Alimehmeti entry, with the interviewing officer concluding:

> Due to the amount of inconsistencies in the story provided during examination, the messages posted by [Female-1] on facebook and the texts between her and ALIMEHMETI,

the images viewed on his mobile phone and the items carried in his luggage on both occasions of travel to the UK, I strongly suspect that it was ALIMEHMETI's intention to meet with [Female-1] without her famil[y's] full knowledge and that they both could be planning to abscond to Syria.

(Ex. B at 8).

U.K. authorities provided copies of the electronic images of the U.K. Devices to the FBI, which forensically examined the images. Exhibit A to this sentencing submission is a disc containing a small sampling of the vast collection of pro-ISIS and terrorism-related materials found on Alimehmeti's electronic devices during the investigation. The U.K. Devices contained an array of materials demonstrating Alimehmeti's allegiance to ISIS and its terrorist ideology, including the following:

- Photographs of Alimehmeti with the black and white flag of ISIS—which the FBI later seized from his apartment—and making the ISIS finger-pointing gesture (*see* Ex. A, Items 1-2), including the photographs of Alimehmeti below:

 

- Audio files of lectures by Anwar al-Awlaki promoting radical jihadist ideology, terrorism, and martyrdom. Al-Awlaki, who was killed in a drone strike in 2011, was a leader of al Qaeda in the Arabian Peninsula ("AQAP"), al Qaeda's branch in Yemen and a designated foreign terrorist organization. ISIS supporters commonly find inspiration in al-Awlaki's teachings. Alimehmeti's recordings of al-Awlaki included titles such as "Jihad = Fighting-Anwar Al Awlaki.mp3"; "On the Command of Jihad-Anwar Al Awlaki.mp3"; and "The Punishment of Those Who Don't Participate in Jihad-Anwar Al Awlaki.mp3". (*See* Carr Report at 29 and n.53).

10

- ISIS propaganda, much of which is brutally violent, glorifying ISIS and its leaders, terrorist agenda, anti-Western ideology, and military exploits; promoting the killing of non-believers; and calling for Muslims around the world to join ISIS and serve its cause. These videos depict, among other things, ISIS fighters carrying out attacks with assault rifles and IEDs, and executing prisoners and civilians by shooting them in the head or beheading them. (*See* Ex. A, Items 3-4). The ISIS propaganda videos on the U.K. Devices included "The Flames of War," one of ISIS's most notorious propaganda videos, which was disseminated by ISIS's official media outlet, al Hayat Media Center. (*See* Ex. A, Item 4). The video glorifies attacking and executing innocent civilians, and spews anti-American vitriol, as reflected in the images from the video below:





- <u>Additional terrorist propaganda</u> videos that specifically promote and encourage followers to achieve martyrdom by carrying out "suicide operations," that is, perpetrating suicide

11

attacks against innocent civilians.  (*See* Ex. A, Items 5-6).  For example, one such video consists of an Arabic audio recording, with English subtitles, of remarks attributed to a particular radical Islamic cleric, justifying suicide bombing.  (*See* Ex. A, Item 6). The filename of the video includes the phrases "Suicide Bombing In Islam" and "Al Qaeda type Martyrdom Operations."



## B.  Alimehmeti's Efforts to Radicalize Others and Contacts with Other ISIS Supporters

Over the course of 2015 into 2016, Alimehmeti continued to communicate—via phone, Internet, and encrypted messaging applications—with a network of fellow ISIS supporters in the United States and abroad.  During those communications, Alimehmeti further demonstrated his allegiance to ISIS and its violent jihadist principles, his support for terrorist attacks carried out in the name of ISIS, and his desire to make *hijra* to fight with ISIS abroad.[6]  For example, shortly after the November 13, 2015 suicide bombing and mass shooting attacks in Paris, France, resulting

---

[6] ISIS supporters use the term "hijra" or "hijrah"—which traditionally refers to the flight of Muhammad from Mecca to Medina to escape persecution—to refer to an obligation to migrate to ISIS-controlled territory to join ISIS and wage jihad.

in the deaths of 130 people, for which ISIS claimed responsibility, Alimehmeti posted a comment

on a social networking site stating that he was "happy" about the attacks:

> **Question:** #prayforparis
> **Answer:** I'm actually happy with what happened. Alhamdulillah
> **Type:** anonymous
> **Asked from IP address:** 69.115.200.173
> **Asker login:** Abdul_Qawiy
> **Asker email:** haarith.alalbaani@gmail.com
> **Recipient login:** Gemstoneafro
> **Reported at:** 2015-11-15 16:46:32 UTC

On March 22, 2016, during a phone conversation with another ISIS supporter, Alimehmeti

similarly stated that he "wanted to celebrate" the suicide bombing attacks that had been perpetrated

earlier that day in Brussels, Belgium, resulting in the deaths of 32 people, for which ISIS claimed

responsibility.

Alimehmeti grew so fervently committed to ISIS and radical Islamic ideology that he began

actively seeking to radicalize others, to recruit and grow ISIS's army of supporters, and to confront

those who disagreed with him in public. Alimehmeti engaged in some of these public-facing

activities with others under the auspices of a group known as the "Islamic Thinkers Society," or

"ITS."[7] He posted photographs of some of his efforts with ITS on Instagram, including with the

ISIS finger-pointing gesture and an October 2015 post with the caption, "Across from the Israeli

consulate in NYC . . . #antiIsrae":

---

[7] According to http://islamicthinkers.com/home/, the Islamic Thinkers Society, or ITS, promotes
the imposition of Shariah law and, "Just as fasting in the month of Ramadhan, and praying the five
daily prayers is obligatory acts of worship to the Creator, Allah (swt) has also made JIHAD an
obligation upon the Muslims." *See* http://islamicthinkers.com/home/?p=198.

 



At times, Alimehmeti found some of the ideas expressed by the ITS to be insufficiently radical. On one occasion in October 2015, he complained about an ITS pamphlet arguing that those who engage in suicide or martyrdom terrorist operations would go to hell, and cited to the group the teachings of purported scholars that "to give one's life to inflict maximum damage to the enemy is not considered suicide."  Alimehmeti was also confrontational with people who challenged the ideology presented by ITS.  In December 2015, when a pedestrian identified himself to the group as a member of the Israel Defense Forces ("IDF"), Alimehmeti responded, "IDF are pussies, hit me and let me get it on camera and I will fight with you."

14

Also in December 2015, Alimehmeti made clear to one of the UCs that being arrested could not prevent him from continuing his mission to radicalize others.  Referring to his prior incarceration based on state convictions, Alimehmeti explained, "I radicalized a few people when I was in jail." (*See* PSR ¶ 49).  He also said that, if he was incarcerated again:  "They're still going to ask to deport me, even if they lock me up. I'll radicalize everybody in the jail, man. You better tell them, you better – you better deport me."  (*Id.*).  When the UC suggested that Alimehmeti would not be allowed to radicalize other inmates because Alimehmeti would be put in solitary confinement, Alimehmeti responded:  "There's still other cells there. I'll – I'll – I'll just, you know, talk to people through the cell doors. . . . I'll radicalize the security guards, man, the correctional officers.  I'll pretend I'm gonna hang myself. Then they come get you, and they have to, they have to stay with you the whole time.  And I'll talk with them the whole time they're staying with me." (*Id.*).

### C.  Alimehmeti's Stockpiling of Weapons and Combat Gear at His Bronx Apartment

In late 2014, around the same time that Alimehmeti began to try to meet Female-1 in the United Kingdom, ISIS released a speech by its now-deceased spokesman, Abu Muhammad al-Adnani, instructing ISIS supporters in the West that, if they were unable to travel overseas to join ISIS, they should carry out lone-wolf attacks in their homelands and kill non-Muslims by any means possible.[8]  By spring 2015, after U.K. authorities thwarted Alimehmeti's efforts to reach

---

[8]  *See*  https://www.counterextremism.com/extremists/abu-muhammad-al-adnani.  The October 2016 issue of *Rumiyah*, an online propaganda magazine published by ISIS, promoted lone-wolf knife attacks, and contained detailed instructions on how to carry out such attacks.  *See* https://clarionproject.org/factsheets-files/Rumiyh-ISIS-Magazine-2nd-issue.pdf, at 12-13.  So too

ISIS's purported caliphate in the Middle East, Alimehmeti began amassing military-style combat knives and tactical gear at his Bronx apartment—weapons and gear that he could use in a lone-wolf terrorist attack against civilians in New York City.  (*See* PSR ¶ 18).

Alimehmeti purchased online and had shipped to his apartment the following items, among others: a military-grade survival knife with a five-inch blade; three tactical knives with four-inch blades; two credit card-sized folding knives; a commando wire pocket saw; a 24-inch pocket chainsaw; a rucksack designed for tactical combat; and a tactical ski mask.  (*See id.*).  Many of these items were later recovered by the FBI during a search of Alimehmeti's apartment following his arrest.

Below are examples, from Amazon.com, of the types of military-style combat knives that Alimehmeti stockpiled at his Bronx apartment:

Ontario 499 Air Force Survival Knife          Cold Steel 53NCT Tanto Spike Knife




---

did a May 2016 issue of *Inspire*, a propaganda publication of AQAP, which contained an article titled, "O Knife Revolution, Head Toward America," encouraging followers to carry out stabbing attacks against civilians in the United States.

Alimehmeti purchased these weapons at precisely the time that lone-wolf knife attacks by ISIS supporters—typically, young men around Alimehmeti's age—were becoming increasingly prevalent. For example:

- On September 23, 2014, an 18-year-old lone-wolf attacker carrying an ISIS flag stabbed two police officers with a knife outside Melbourne, Australia. *See* https://en.wikipedia.org/wiki/2014_Endeavour_Hills_stabbings.

- On October 23, 2014, a lone-wolf ISIS supporter attacked four NYPD officers in Queens, New York, with a hatchet. *See* https://en.wikipedia.org/wiki/2014_Queens_hatchet_attack.

- On December 20, 2014, a 20-year-old ISIS supporter carried out a lone-wolf knife attack near Tours, France, stabbing three police officers while shouting "Allahu Akbar." *See* https://en.wikipedia.org/wiki/2014_Tours_police_station_stabbing.

- On January 8, 2016, two ISIS militants, one of whom was 21 years old, stormed a hotel in Hurghada, Egypt, and stabbed multiple tourists. *See* https://en.wikipedia.org/wiki/2016_Hurghada_attack.

- On July 18, 2016, a 17-year-old lone-wolf attacker with ties to ISIS stabbed multiple civilians with a knife and hatchet on a train near Wurzburg, Germany. *See* https://en.wikipedia.org/wiki/W%C3%BCrzburg_train_attack.

- On November 28, 2016, an 18-year-old ISIS-inspired lone-wolf attacker stabbed numerous people at Ohio State University. *See* https://en.wikipedia.org/wiki/2016_Ohio_State_University_attack.

In the course of meetings with the UCs in fall 2015, Alimehmeti explained that, in accordance with al-Adnani's instructions, ISIS supporters need not make *hijra*, and instead should do "you know what I mean" wherever they are—*i.e.*, carry out attacks in their homelands. Alimehmeti further explained that the so-called "covenant of security"—the concept that a Muslim is forbidden from attacking within the country where he is allowed to live safely and freely—is null and void if one is prevented from traveling abroad, as Alimehmeti had been on two occasions. In other words, Alimehmeti believed, consistent with ISIS's directives, that he would be justified

17

in carrying out an attack here in the United States.  Along the same lines, Alimehmeti obtained a pamphlet, largely consisting of statements by ISIS members, justifying the killing of women and children in the name of ISIS.  (*See* Ex. A, Item 19).  Titled "Blood of Kuffar,"[9] the pamphlet embraced the views that "Allah . . . has made the blood of every kafir legal to spill"; that ISIS supporters should not "differentiate" between "innocent civilians" and "fighting soldiers"; and that it is permissible to "kill the[] women and children" of countries, like the United States, that oppose ISIS.  (*See id.*).

Thus, as of fall 2015, Alimehmeti was deeply radicalized, and fervently devoted to ISIS and its cause.  Twice rebuffed in his efforts to travel overseas, he began preparing for the possibility that he would not be able to achieve his goal of fighting for ISIS in the Middle East, and instead would need to bring the fight to the United States.  As ISIS called on its supporters to carry out lone-wolf knife attacks against civilians in the West, Alimehmeti began amassing a terrifying array of military-style knives at his Bronx apartment.

## D.  Alimehmeti's Attempt to Fraudulently Obtain a Passport for Traveling Overseas to Join ISIS

Law enforcement acted to protect the public by disrupting the threat posed by Alimehmeti and incapacitating him.  In September 2015, as part of that effort, law enforcement introduced two undercover officers ("UC-1" and "UC-2") to Alimehmeti, through certain members of Alimehmeti's network of radical associates at the Islamic Thinkers Society.  Over the course of the ensuing months, Alimehmeti participated in numerous recorded meetings with UC-1 and UC-

---

[9] "Kuffar" and "kafir" are derogatory Arabic terms, commonly used by members and associates of ISIS, to refer to non-believers.

2, including in Alimehmeti's Bronx apartment, where Alimehmeti displayed an ISIS flag on the wall of the main room.  During those meetings, Alimehmeti repeatedly expressed his commitment to ISIS and terrorist ideology, and used his laptop to play ISIS propaganda videos, including videos like "The Flames of War" celebrating terrorist attacks and the beheading of captives.  (*See* PSR ¶ 19).

Alimehmeti also made clear during his interactions with the UCs that he hoped to travel abroad to fight for ISIS, including by explaining several times that his desired position was to execute beheadings for the group.  But Alimehmeti recognized that the rejection stamps in his passport from his failed attempts to enter the United Kingdom would raise suspicions and likely prevent him from successfully making *hijra*.  Alimehmeti therefore attempted to fraudulently obtain a new U.S. passport, without the rejection stamps.  On October 23, 2015, Alimehmeti submitted a passport application, falsely claiming that his existing passport had been lost when he "forgot [it] in [a] bag in a train."  Alimehmeti signed the application, declaring under penalty of perjury that "the information furnished herein is correct and complete."  (*See* PSR ¶¶ 35-36).  During his plea allocution, Alimehmeti admitted that he submitted the false application because he was "hoping to get a clean passport that might make it easier for me to travel to Syria where I hoped to join ISIS."  (Dkt. No. 114 at 18).

Over the ensuing months, Alimehmeti engaged in several recorded and intercepted communications with UCs and associates, during which he described committing the passport fraud and made clear that he intended to use the fraudulent passport to travel to Syria to join ISIS.  *See* PSR ¶¶ 37-42.  For example, on November 23, 2015, during a meeting with UC-4 at Alimehmeti's apartment, Alimehmeti told UC-4 that government agents "tried to question [him]

today about fraud" in connection with his passport application (investigators had in fact questioned Alimehmeti earlier that day).  Alimehmeti told UC-4 that he had falsely claimed his existing passport was "lost because I don't want . . . the rejection stamps."  Alimehmeti then showed UC-4 his purportedly lost passport, which Alimehmeti had stashed at his apartment.  On December 3, 2015, during another recorded meeting with UCs, Alimehmeti again conveyed that he intended to use the new passport for making *hijra* to join ISIS, stating:  "It's not about Albania and Europe. You know, it's about other places. I want to travel, you know what I mean."

Alimehmeti also discussed his plans to travel to fight with ISIS with other associates. During a call on November 29, 2015, he referred to ISIS territory as an "amusement park" and indicated that he was waiting for "my brother," "who's in a situation where he . . . can't quite go right now," *i.e.*, Albanian prison.  On December 22, 2015, a female ISIS supporter ("Female-3") told Alimehmeti during a call that she was "going away soon . . . on holiday"—a coded reference to traveling to join ISIS.  Female-3 informed Alimehmeti that she planned to join ISIS in Libya, stating that "we're not going to 'S-town'" (referring to Syria), but rather "we're going to 'L-town'" (referring to Libya).  Female-3 asked Alimehmeti if he wanted to join her.  Alimehmeti replied: "I can't . . . You know why . . . I don't have a 'P'"—referring to a clean passport without rejection stamps—but "obviously I want to go."  During a recorded call in February 2016, Alimehmeti complained that his new passport had not been issued yet, explained that "you can only hold it in for so long" and keep "just hiding in general" in the United States.  Approximately one month later, Alimehmeti displayed a world map in his apartment to a UC and others, and discussed travel routes to Syria through Afghanistan and Turkey.

### E.   Alimehmeti's Meetings with the UCs and Attempt to Assist a UC to Travel to Syria to Join ISIS

In February 2016, UC-2 introduced Alimehmeti to another undercover FBI employee ("UC-3"), posing as an ISIS supporter.   On May 9, 2016, during a recorded meeting at Alimehmeti's apartment, UC-2 showed Alimehmeti a photograph of UC-3 waiving an ISIS flag in a desert-like location, and indicated that UC-3 had successfully reached Syria and joined ISIS. Alimehmeti expressed excitement and conveyed that he wanted to be put in contact with the "connections" who had purportedly facilitated UC-3's travel to join ISIS.   (*See* PSR ¶ 21).

About a week later, in an effort to assess Alimehmeti's levels of risk, terrorist threat, and commitment to violence, the FBI presented him presented with an opportunity to help another purported ISIS supporter make *hijra* to Syria to join ISIS.   On May 16, 2016, during a recorded meeting in Queens, UC-2 told Alimehmeti that an associate of UC-3—who was, in fact, another undercover FBI employee ("UC-4")—would be arriving in New York City from Florida the following day, for the purpose of traveling to Syria to join UC-3 in the Islamic State.   Alimehmeti expressed excitement, and asked if he (Alimehmeti) could travel with UC-4 to join ISIS.   (*See* PSR ¶ 22).   Later during the meeting, Alimehmeti played an ISIS propaganda video that featured a particular *nasheed* (a type of Islamic music) and showed the brutal decapitation of a captive.

The next day, May 17, 2016, UC-2 introduced Alimehmeti to UC-4 at a restaurant in Manhattan.   Alimehmeti asked UC-4 about the route that UC-4 would take to reach Syria.   UC-2 asked if Alimehmeti would assist UC-4 by taking UC-4 to obtain supplies, and then to the airport, in preparation for UC-4's travel.   Alimehmeti agreed to do so.   Alimehmeti also explained that he had saved $2,500 for his own travel to join ISIS, but that he first needed to obtain a passport in a

different name, since he was already "in the system."  Alimehmeti also explained to UC-4 that he (Alimehmeti) wanted to make *hijra* to Raqqah, as opposed to other locations where ISIS had a presence, such as Iraq or Libya, because Raqqah was the "heart" of ISIS's operations.  Alimehmeti added that he and his brother "had our own plan" to travel from Albania to Raqqah, but that those plans had been foiled when his brother, Erald Alimehmeti, was arrested in Albania.  (*See* PSR ¶¶ 23-25).  Previously, in August 2015, Erald was arrested in Albania after he assaulted Albanian police officers and was found to be in possession of a firearm; Erald was later sentenced to more than three years in prison and released in 2019.

Alimehmeti then took UC-4 to several different stores, at which Alimehmeti helped UC-4 to select and purchase supplies for traveling to join ISIS, including boots, a cellphone, a compass, a bag, and a flashlight.  Over the course of that day, Alimehmeti also advised UC-4 about the most secure encrypted messaging applications to use when communicating with other "brothers" (*i.e.*, ISIS supporters).  Alimehmeti told UC-4 that he used a particular encrypted communications platform, and that it must be secure, because if it was not, he "would be done."  Alimehmeti further advised UC-4 that even when using encrypted applications, "don't say things straight up."  At one point, Alimehmeti suggested that they visit his Bronx apartment so that he could give UC-4 additional supplies that Alimehmeti had stored there, but he ultimately decided not to take UC-4 to his apartment because of the timing of UC-4's purported flight.  After they obtained supplies, Alimehmeti took UC-4 via subway to a hotel in Queens to meet with the individual who purportedly had secured UC-4's travel documents.

While Alimehmeti waited in the hotel lobby for UC-4 to return, Alimehmeti downloaded multiple encrypted messaging applications onto the cellphone that he had helped UC-4 purchase

for the trip.  Alimehmeti also wrote his contact information on a piece of paper and asked UC-4 to give it to the purported facilitator.  Earlier that day, Alimehmeti had made clear to UC-4 that he was eager to travel to Syria himself to join ISIS, stating: "I'm ready to fucking go with you, man . . . you know I would . . . .  I'm done with this place.  There are kuffar everywhere."  After the purported meeting with the facilitator at the Queens hotel, Alimehmeti accompanied UC-4 to John F. Kennedy International Airport, so UC-4 could begin the journey to the Islamic State.  (*See* PSR ¶¶ 25-34).

On May 19, 2016—two days after attempting to facilitate the travel of UC-4 to Syria to join ISIS—law enforcement intercepted a call between Alimehmeti and his brother Erald, who was incarcerated in Albania on the weapons and assault charges referenced above.  Alimehmeti informed his brother that he had found a job as a superintendent at a building, but that he was "not going to be needing that," because he had found another way, through UC-4's purported document facilitator, to obtain travel documents for traveling overseas to join ISIS.  The defendant stated to his brother:  "You know that thing [referring to a passport] that I don't have that you need, you know? . . . I don't even need it. . . . I'm not saying I, I don't need one. I like, I still need one, but I know where I can get one [referring to the document facilitator]. . . A friend of mine [referring to UC-4] just did it two days ago."  Alimehmeti was ready to act on his goal of making *hijra* to join ISIS in Syria.

### F.  Evidence Recovered from Alimehmeti's Bronx Apartment

Several days later, on May 24, 2016, the FBI arrested Alimehmeti.  Law enforcement searched Alimehmeti's Bronx apartment pursuant to a judicially authorized search warrant.  (*See* PSR ¶ 43(.  During the search, law enforcement found and seized, among other evidence, an array

of combat knives and gear that Alimehmeti had stockpiled at the apartment; the ISIS flag that Alimehmeti had displayed in the apartment; $2,400 in cash—as described above, Alimehmeti told UC-4 that he had saved $2,500 for traveling to Syria to join ISIS; and Alimehmeti's passport, which he claimed had been lost when he fraudulently attempted to obtain a new passport.  Below is a photograph from Alimehmeti's apartment at the time of the search:



Law enforcement also recovered from Alimehmeti's apartment a cellphone ("Cellphone-2") and a laptop ("Laptop-2"; together, the "Apartment Devices").  Searches of the Apartment Devices revealed an array of materials further demonstrating Alimehmeti's fervent devotion to ISIS and terrorist ideology, including the following:

- ISIS propaganda films, like those found on the U.K. Devices, which glorify and promote ISIS and its brutally violent mission of murder and destruction—the videos that Alimehmeti sought out, downloaded, consumed, and absorbed as he radicalized and then plotted his service to ISIS.  (*See* Ex. A, Items 7-10).  Below are still images from certain of the videos glorifying, among other things, the establishment of ISIS's purported caliphate ("Khilafah"), ISIS fighters carrying out combat missions, and the execution of innocent civilians:

 



  

- Audio files consisting of *nasheeds* celebrating, among other things, violent jihad, mujahideen, the establishment of ISIS, and Usama bin Laden.  For example, the file names of two such *nasheeds* recovered from Alimehmeti's electronic devices are "Establishment Of The Caliphate" and "Sheikh Usamah" (a reference to bin Laden).

- Pro-ISIS manifestos and publications that promote ISIS and terrorism, justify the beheading of non-believers, demonize America and the West, and celebrate terrorist attacks carried out in the name of ISIS.  (*See* Ex. A, Items 12-14).  For example, one document recovered from Alimehmeti's devices includes a photograph depicting a group of prisoners about to be beheaded by ISIS fighters, and states:  "[B]eheading the disbelieving Jews,

25

Christians . . . who do what they do to the Muslims, it is obligatory to terrorize them and grow fear in their hearts. So their heads can be cut off with no respect." (Ex. A, Item 12). Another of the ISIS propaganda documents downloaded by Alimehmeti and recovered from his devices justifies and celebrates the Paris and Brussels terrorist attacks discussed above. The document instructs, among other things, that a "kafir's blood is permissible to spill." (Ex. A, Item 14).

- A photograph (Ex. A, Item 15) of some of the military-style knives that Alimehmeti amassed at his Bronx apartment, along with sheaths to carry them on his person for a potential attack:



- A photograph (Ex. A, Item 16) of Alimehmeti, with the ISIS flag in the background, wearing combat gear and making the finger-pointing gesture symbolic of allegiance to ISIS:



- A copy of a will prepared by Alimehmeti, dated May 5, 2015, indicating that he expected to die, requesting that his belongings be distributed according to Sharia law, and stating: "I advise my family, friends, and all of my beloved ones, when the news of my death reaches them, to supplicate to Allaah, asking His Forgiveness and Mercy for me." (Ex. A, Item 17).

- A chilling video, created by Alimehmeti, that mimics Alimehmeti carrying out a suicide bombing. (*See* Ex. A, Item 18). The video, screenshots of which are below, shows Alimehmeti with an image of a fuse attached to his head, shouting "Allahu Akbar" as he is engulfed in a loud explosion:

27

 

### G.  Alimehmeti's Post-Arrest Efforts to Radicalize Inmates at the MCC

Since his 2016 arrest, Alimehmeti has been incarcerated at the MCC.  While housed at the

MCC, Alimehmeti assisted another MCC inmate, Ahmad Khan Rahimi—who has been sentenced

to multiple terms of life imprisonment for carrying out the Chelsea Bombing, and convicted under

New Jersey law of attempting to kill several of the officers who arrested him—in an effort to

radicalize other inmates at the facility by sharing and disseminating terrorist propaganda materials

that Alimehmeti and Rahimi had received in discovery.  (*See* PSR ¶ 44).

When law enforcement learned of Alimehmeti's and Rahimi's efforts to radicalize other

inmates in fall 2017, searches were conducted of their cells and storage lockers at the MCC (the

"MCC Searches").  The searches revealed that Alimehmeti had in his storage locker, to which no

inmate other than Alimehmeti had access, a hard drive that was produced to Alimehmeti in

connection with pretrial discovery.  The drive contained, among other things, terrorist propaganda materials that had been produced in discovery to Rahimi, not Alimehmeti.  Rahimi and Alimehmeti were working together to disseminate those materials to other inmates, by burning discs containing the materials and providing the discs to the inmates.  The materials included multiple issues of *Inspire*, AQAP's propaganda publication, including an issue that provided detailed instructions on how to build a pressure-cooker bomb, celebrated the Chelsea Bombing, and encouraged followers to kill civilians through lone-wolf attacks in the West.  (*See* PSR ¶ 45).

In the course of the MCC Searches, law enforcement also seized a laptop from Rahimi, which had been provided to Rahimi for the purpose of viewing his discovery.  The FBI's forensic analysis of that laptop showed that the laptop had been connected to the above-described hard drive seized from Alimehmeti's locker, and that the laptop had been used to open files on the drive. This was further evidence that Rahimi and Alimehmeti were sharing and combining their discovery materials—which contained a wide array of terrorist propaganda materials recovered from their electronic devices, including instruction manuals on how to carry out attacks—in a concerted effort to radicalize other inmates, that is, to cultivate and develop the next wave of attackers.  (*See* PSR ¶ 46; *see also id.* ¶ 47 (disc confiscated from MCC inmate during MCC Searches contained large volume of terrorist propaganda, some of which originated from discovery produced to Alimehmeti, some of which originated from discovery produced to Rahimi, and none of which had been included in the discovery produced to the inmate)).

The fact that Alimehmeti embarked on a mission, with Rahimi, to radicalize other inmates after his arrest is consistent with his statements to one of the UCs.  (*See* PSR ¶ 49).  Alimehmeti told UC-4 that he would seek to radicalize other inmates if he was arrested, and that is exactly

29

what Alimehmeti did.  As a result of Alimehmeti's conduct at the MCC, the Attorney General imposed Special Administrative Measures ("SAMs") on Alimehmeti, to prevent him from communicating with other inmates and individuals outside the prison, given his demonstrated desire and ability to radicalize and recruit for ISIS while incarcerated.

In or about early 2018, after law enforcement learned of Rahimi's and Alimehmeti's efforts to radicalize other inmates and intervened as discussed above, the two terrorists engaged in a deeply disturbing exchange of letters, attached as Exhibit C.  In the course of those letters, which were intercepted at the MCC and obtained by the Government, Alimehmeti and Rahimi communicated about having shared discovery materials and disseminated them to other inmates. After law enforcement started executing searches within the MCC, they seemed particularly concerned about a "book" in Alimehmeti's possession.  (*See, e.g.*, Ex. C at 9).  Alimehmeti wrote that the "book" was included in his "legal work," and "I'm not sure if they even saw it."  (*Id.* at 11).  Alimehmeti proposed that Rahimi tell authorities, "you have read it before and you knew most of it by memory . . . gave it to me, but I rewrote it since your hand writing isn't that good," and added, "I got rid of it anyway just in case."  (*Id.* at 11-12).  Rahimi warned that Alimehmeti's ("A-Q") "idea is no good about saying my hand writing is bad and his is good" and that he wanted to "completely take [Alimehmeti] away from the book" because "if he says is his they will use against him."  (*Id.*).

In the course of the letters, Alimehmeti and Rahimi also made alarming references, in coded terms, to a "plan" they had hatched together while in prison.  (Ex. C at 5).  Alimehmeti lamented that the "plan" was "useless" as a result of them each being placed in the Special Housing Unit ("up in here") because they "can't do much."  (*Id.* at 11).

Finally, Rahimi wrote to Alimehmeti that he "ask[ed] Allah don't let me die in prison, <u>I want to kill a Jew first</u> and die in the battle," explaining that "I love jihad, I hate the kuffar." (Ex. C at 3 (emphasis in original)).  In a responsive letter to Rahimi, Alimehmeti referred to himself as "ISIS Balla"; stated "I'm trying to get 0-15 [years]"; and wrote:  "May Allah grant all of us Shahada and unite us in Dunya and in Jannah Al-Firdaws." (Ex. C at 11).  "Shahada," "Dunya," and "Jannah al-Firdaws" are Arabic terms referring to martyrdom, the temporal world, and paradise, respectively.  Thus, Alimehmeti was expressing his hope that he, Rahimi, and their fellow Islamic extremists would achieve martyrdom—that is, die for the cause—and be united in paradise for their efforts.

## II.    Procedural History

Alimehmeti was arrested on May 24, 2016, pursuant to a complaint charging him with attempting to provide material support to a designated foreign terrorist organization, *i.e.*, ISIS, in violation of Title 18, United States Code, Section 2339B (Count One), and passport fraud, in violation of Title 18, United States Code, Section 1542 (Count Two). (Dkt. No. 1).  On June 7, 2016, a grand jury returned an indictment charging Alimehmeti in the same two counts. (Dkt. No. 8).  Following motion practice pursuant to Rule 12 of the Federal Rules of Criminal Procedure and the Classified Information Procedures Act, trial was scheduled for February 5, 2018.   On November 28, 2017, a grand jury returned a superseding indictment (the "Indictment"), which modified Count Two to allege that Alimehmeti committed the charged passport fraud to facilitate an act of international terrorism, namely, his travel overseas to join and fight for ISIS, thereby increasing the statutory maximum penalty on Count Two to 25 years' imprisonment, *see* 18 U.S.C.

§ 1542.  (Dkt. No. 70).  In January 2018, the Court granted Alimehmeti's request for substitute counsel, and adjourned the trial date to May 7, 2018.  (Dkt. Nos. 97, 107).

Prior to trial, on February 21, 2018, Alimehmeti pled guilty to both counts in the Indictment, without a plea agreement.  (Dkt. No. 114).  The Court set a sentencing date of June 7, 2018.  The Court subsequently granted several defense requests to adjourn sentencing, resulting in the current sentencing date of December 6, 2019.

## APPLICABLE LAW

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).  After that calculation, a sentencing judge must consider the seven factors outlined in 18 U.S.C. § 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant"; the four legitimate purposes of sentencing, as set forth below; "the kinds of sentences available"; the applicable Guidelines range itself; any relevant policy statement by the Sentencing Commission; "the need to avoid unwarranted sentence disparities among defendants"; and "the need to provide restitution to any victims."  18 U.S.C. § 3553 (a)(1)-(7); *see Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)     to afford adequate deterrence to criminal conduct;

(C)     to protect the public from further crimes of the defendant; and

> (D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553 (a)(2).

## DISCUSSION

## I.   The Applicable Guidelines Range is 360 to 540 Months' Imprisonment

The Court should reject the defendant's objections to the terrorism enhancement, *see* U.S.S.G. § 3A1.4, apply the obstruction enhancement based on the defendant's efforts at the MCC to destroy a document relevant to the Government's investigation of his distribution of terrorist propaganda in the facility, *see id.* § 3C1.1, and deny a reduction for acceptance of responsibility based on that and related conduct by the defendant while incarcerated in this case, *see id.* § 3E1.1. The resulting offense level of 42 and Criminal History Category VI establish a capped Guidelines range of 360 to 540 months' imprisonment.

### A.   The Terrorism Enhancement Applies

In a letter dated November 21, 2019, the defendant presents a series of meritless arguments in support of an objection to the terrorism enhancement, U.S.S.G. § 3A1.4. (Dkt. No. 128). Although the Court has authority to vary from the applicable Guidelines range, Alimehmeti's challenges to the enhancement should be rejected.

Alimehmeti first argues that Section 3A1.4 is not applicable because his conduct "did not involve targets or victims from or in the United States" and "was not directed at the United States government." (Dkt. No. 128 at 4). The Guideline applies because Count One "involved," and Count Two was "intended to promote," a "federal crime of terrorism" as defined in 18 U.S.C. § 2332b(g)(5). U.S.S.G. § 3A1.4(a). By arguing that the term "government," 18 U.S.C.

§ 2332b(g)(5)(A), means "United States government," Alimehmeti seeks to impose a limitation on the statutory term that has no basis in the text. That is why he finds no case in support of his position, and is forced to acknowledge that the Second Circuit "has approved the application of the terrorism enhancement in cases involving a foreign government without discussing the significance of the fact that the United States government was not involved." (Dkt. No. 128 at 3 n.2).

Even if Alimehmeti's interpretation was sound—and it is not—the evidence demonstrates that his crimes were, in fact, intended to intimidate and retaliate against the United States based on perceived harms to ISIS and other Muslims. From the start, Alimehmeti embraced the anti-American teachings of Anwar al-Awlaki (*see* Carr Report at 29), who promoted terrorist attacks against civilians in the United States and elsewhere, and Abu Muhammad al-Adnani, the former ISIS spokesperson who called for terrorist attacks in the West, including in the United States, just prior to Alimehmeti's first attempt to enter the United Kingdom in 2014. Alimehmeti was "emotionally moved by ISIS campaigns" in "conflict zones" such as Syria and in Iraq where American forces were deployed and fighting ISIS members, among others. (Carr Report at 30; *see also id.* ("ISIS recruiters portrayed the U.S. and their allies as indifferent to Muslim suffering, and even complicit because they were doing nothing to stop Assad.")). Through his actions, he sought to intimidate and retaliate against America and other Western governments operating against ISIS in those "zones." Alimehmeti's motivation to intimidate and retaliate against the United States is further reflected in his conversations with the UCs and others regarding the lack of a "covenant of security" with the United States and other western governments, which he used as an argument in the group to justify planning and participating in acts of violence in this country.

34

In October 2015, Alimehmeti told one of the UCs and other men that he was "very excited" about news of American deployments to fight ISIS because he expected there would be English-language videos released by ISIS "with American soldiers blaming their parents and their country for the trouble they found themselves in."  He then joked about the large number of trees that would need to be felled to make coffins for the American soldiers.  In January 2016, while Alimehmeti was standing with others in public at an ITS table, a pedestrian asked the men, in substance, why they had not traveled to Syria if they supported ISIS.  Consistent with the lectures of al-Awlaki, al-Adnani, and others, Alimehmeti responded that he "hates" the United States but "can't leave" because the United States "took his passport."[10]  In a similar setting about two weeks later, Alimehmeti remarked to passersby on the street, "Death to America" and "Death to Obama."  During a February 2016 meeting in Alimehmeti's apartment, Alimehmeti explained to several men that ISIS had asked its supports to "fight were they are, if they are unable to make" *hijra*. Alimehmeti then joked that if his associates set up a compound in Texas, he would "like to brush teeth" there, which was Alimehmeti's code for beheadings and the basis for his self-announced nickname, "The Dentist."  During all of this, in 2015 and 2016, Alimehmeti hoarded knives and other weapons in his apartment, which he could only have planned to use to conduct an attack in the United States as he knew he would not be able to travel with them.

These statements and actions are illustrative of the intent with which Alimehmeti acted when he tried to travel abroad to fight for ISIS and helped UC-4 prepare to do the same, as charged

---

[10] Relatedly, Ms. Carr explained that Alimehmeti "resented the U.S. government for preventing him from pursuing a future with [Female-1]," and it is clear from other evidence that the future in Alimehmeti's mind was on an ISIS battlefield.  (Carr Report at 37).

in Count One, and submitted a false passport application to facilitate his material support of ISIS, as charged in Count Two.  The record is therefore more than sufficient to sustain a finding that Alimehmeti intended "to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," 18 U.S.C. § 2332b(g)(5)(A), and to apply the terrorism enhancement, U.S.S.G. § 3A1.4.

There is no authority for Alimehmeti's assertion that the enhancement "must be applied sparingly" in the context of the types of crimes at issue here.  (Dkt. No. 128 at 6).  "[T]he Sentencing Commission 'unambiguously cast a broad[] net" when drafting the terrorism enhancement.'"  *United States v. Stewart*, 590 F.3d 93, 172 (2d Cir. 2009) (Walker, J., concurring in part and dissenting in part) (quoting *United States v. Mandhai*, 375 F.3d 1243, 1247 (11th Cir. 2004)).

> The import of this enhancement "could not be clearer": It reflects Congress' and the Commission's policy judgment "that an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time."

*Id.* at 172-73 (quoting *United States v. Meskini*, 319 F.3d 88, 91-92 (2d Cir. 2003)).  And if, as Alimehmeti suggests, his crimes were limited to the "inchoate," the Guidelines provide for an adjustment elsewhere.  *See* U.S.S.G. § 2X1.1(b).  The three-level adjustment under Section 2X1.1 is unavailable to Alimehmeti, however, because "the circumstances demonstrate that the defendant was about to complete all such acts but for apprehension or interruption by some similar event beyond the defendant's control."  *Id.* § 2X1.1(b)(1); *see also* U.S.S.G. § 4A1.3.

Finally, citing *Kimbrough*, Alimehmeti challenges the process by which the Commission enacted the terrorism enhancement.  (Dkt. No. 128 at 5-7).  While the Court has discretion to

36

consider this as a basis for a variance, *Kimbrough* did not suggest that the Commission's "institutional role" and expertise was limited to enacting Guidelines based on empirical data. Rather, the Court noted that the Commission's role also includes the ability to promulgate Guidelines based on "national experience, guided by a professional staff with appropriate expertise." 552 U.S. 85, 109 (2007). Here,

> Congress and the Sentencing Commission had a rational basis for concluding that an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time. Thus, the terrorism guideline legitimately considers a single act of terrorism for both the offense level and the criminal history category.

*United States v. Meskini*, 319 F.3d 88, 92 (2d Cir. 2003). "Considering the serious dangers posed by all forms of terrorism, the Guidelines are in no way irrational in setting the default for criminal history at a very high level, with downward departures permitted in exceptional cases." *Id.* (citing U.S.S.G. § 4A1.3). Accordingly, the terrorism enhancement is grounded in sound findings by Congress and the Sentencing Commission related to the relatively severe culpability and risks posed by terrorism offenders. By it terms, the enhancement applies in this case and, as discussed in more detail below, the sentencing recommendation resulting from the application of the enhancement sets forth an appropriate range of imprisonment for the Court's consideration.

### B.     The Defendant's Assault Conviction

The Government does not oppose Alimehmeti's request to strike paragraph 81 of the PSR. (Dkt. No. 128 at 1). For purposes of sentencing, the pertinent facts with respect to this conviction are that, while serving a five-year term of probation related to a 2010 robbery conviction (*see* PSR ¶ 76), and as a member of a violent Albanian street gang (*see id.* ¶¶ 78,

91), the defendant admitted to committing an assault and other crimes under New York law.  *See*

New York Penal Law § 120.00.[11]

### C.    The Guidelines Recommendation

The Government respectfully submits that the Guidelines range should be calculated as

follows:

- Pursuant to U.S.S.G. § 3D1.2(b), Counts One and Two are grouped because they were connected by a common criminal objective and part of a common scheme or plan.

- Pursuant to U.S.S.G. § 3D1.3(a), the offense level applicable to the Group is the offense level, determined in accordance with Chapter Two and Parts A, B, and C of Chapter Three, for the most serious of the counts comprising the Group, *i.e.*, the highest offense level of the counts in the Group, which is Count One.  (*See* PSR ¶ 40).

- Pursuant to U.S.S.G. § 2M5.3(a), the base offense level is 26.  (*See id.* ¶ 55).

- Pursuant to U.S.S.G. §§ 2M5.3(b)(1) and 1B1.1 App. n.1(e), because the offense involved the provision of "dangerous weapons," *i.e.*, military-grade knives and a similarly lethal "pocket saw," the offense level is increased by two.  (*See id.* ¶ 56).

- Pursuant to U.S.S.G. § 3A1.4(a), and for the reasons stated above, the offense level is increased by 12.  (*See id.* ¶ 57).

- Pursuant to U.S.S.G. § 3C1.1—because the defendant (1) willfully obstructed and impeded, and attempted to obstruct and impede, the administration of justice with respect to the sentencing of the instant offenses of conviction, and (2) the obstructive conduct related to one of the defendant's offenses of conviction, *i.e.*, his material support of ISIS as charged in Count One—the offense level is increased by two.  *See id.* app. n.4(D). Specifically, Alimehmeti wrote to Rahimi after he pleaded guilty that he "got rid of" a "book" after learning of the investigation into his dissemination of terrorist propaganda at the MCC, which Rahimi believed could have been "use[d] against" Alimehmeti at sentencing.  (Ex. C at 9, 12).

---

[11] Section 120.00 states:  "A person is guilty of assault in the third degree when: 1. With intent to cause physical injury to another person, he causes such injury to such person or to a third person; or 2. He recklessly causes physical injury to another person; or 3. With criminal negligence, he causes physical injury to another person by means of a deadly weapon or a dangerous instrument."

- Because of the enhancement pursuant to U.S.S.G. § 3C1.1, no reduction pursuant to U.S.S.G. § 3E1.1 is appropriate. *See* U.S.S.G. § 3E1.1 app. n.4. While the acceptance reduction may be applied in "extraordinary cases," the only thing extraordinary about the circumstances here are that, in addition to destroying the document, Alimehmeti also wrote to Rahimi that he had discussed a terrorist "plan" while incarcerated together, continued to be the "ISIS Balla," and hoped that "Allah [will] grant all of us shahada," *i.e.*, martyrdom through an act of terrorism. (Ex. C at 11).

Accordingly, based on an offense level of 42 and Criminal History Category VI, *see* U.S.S.G. § 3A1.4(b), the Guidelines recommend a sentence of between 360 months and life imprisonment, which is capped by the aggregated statutory maximum sentence of 540 months. The Court can, and should, fashion a Guidelines sentence by imposing the statutory maximum sentences on Counts One and Two to run consecutively. U.S.S.G. § 5G1.2(d); *see also* 18 U.S.C. § 3584(b).

## II. The Court Should Impose a Guidelines Sentence

The Probation Office recommends a Guidelines sentence, which is consistent with the application of the statutory sentencing factors for the reasons set forth below.

### A. The Nature and Seriousness of Alimehmeti's Conduct and the Need for Just Punishment Warrant a Guidelines Sentence

Alimehmeti's conduct is terrifying and abhorrent. The depraved nature and extreme seriousness of his conduct, and the need to impose just punishment, warrant a significant sentence of incarceration within the applicable Guidelines range. *See* 18 U.S.C § 3553(a)(1), (a)(2)(A). Alimehmeti, after immigrating to this country as a child and becoming a naturalized U.S. citizen, chose to devote himself to a brutally violent terrorist group that is dedicated to murdering U.S. citizens and attacking U.S. interests, here and abroad. As detailed above, he sought out, downloaded, consumed, and absorbed copious amounts of ISIS propaganda—shockingly violent videos and other materials that glorify ISIS and its repugnant mission of death and destruction,

39

and encourage followers, like Alimehmeti, to join the group overseas or carry out terrorist attacks at home.  He actively sought to radicalize others, to convert and create new ISIS followers who would join him in advancing the group's mission, and he continued to do so even after he was arrested in this case.  He worked towards traveling overseas to join and fight for ISIS, while also stockpiling weapons at his Bronx apartment as he prepared to carry out a lone-wolf attack if he was unable to make *hijra* to join ISIS overseas.  And he assisted another individual, who he understood to be a fellow ISIS supporter, to travel to Syria to join ISIS.

As the May 2015 will recovered from his apartment makes clear, Alimehmeti expected to die in service of ISIS, whether on the battlefield overseas or in a suicide attack on the homeland. He was willing to give up everything, including his life, to further ISIS's mission of hate, terror, and violence.  Through skillful investigative work, the FBI and NYPD disrupted Alimehmeti, and prevented him from either joining ISIS or carrying out an attack.  In short, and as the Probation Department recognized, Alimehmeti's conduct—his relentless and multi-faceted mission to serve and support ISIS and terrorism over several years—is of the utmost seriousness and warrants a Guidelines sentence.  (*See* PSR at 27-28 ("The advisory guidelines are extreme, but we believe based on the nature and circumstances of the offense they are reasonable.")).

The defense sentencing submission largely ignores the nature and seriousness of Alimehmeti's conduct, and with good reason—it is indisputably serious and abhorrent, and powerfully supports the imposition of a Guidelines sentence.  (*See* Def. Mem. at 1-2, 21-22).  The defense instead suggests that Alimehmeti was somehow victimized or radicalized by law enforcement, specifically the UCs who engaged with him beginning in fall 2015.  (*See* Def. Mem. at 4, 21).  That is absurd and offensive, in light of what actually transpired here, as the facts set

forth in the PSR and above make clear.  Law enforcement introduced undercover agents to Alimehmeti in fall 2015.  By that point, Alimehmeti was a fully radicalized ISIS supporter, and had been for more than a year, and the late-2014 seizure of the U.K. devices had long since revealed Alimehmeti's terrorist intentions.  In addition, prior to the FBI's use of the UCs, Alimehmeti had already started to stockpile weapons and combat gear in his Bronx apartment.  And he was actively seeking to radicalize others, in person and online.

Law enforcement introduced the UCs to Alimehmeti to monitor him and disrupt his activities because he posed a grave threat to public safety and national security.  Make no mistake: If law enforcement had not intervened, one of two things would probably have happened. Alimehmeti would have succeeded in his goal of traveling overseas to join and fight for ISIS, taking up arms against American soldiers on the battlefield.  Or, if he continued to be thwarted in his efforts to travel overseas to join ISIS, he was well on his way to carrying out a lone-wolf attack in New York City, in accordance with ISIS's directives to its followers.  Thus, the law enforcement operation, and the ultimate arrest of Alimehmeti, likely saved lives.

Furthermore, that Alimehmeti did not succeed in joining ISIS overseas, or carrying out an attack in the United States, should not inure to his benefit at sentencing.  "[W]e are not relegated to wait[ing] until there are victims of terrorist attacks to fully enforce the nation's criminal laws against terrorism." *Stewart*, 590 F.3d at 175 (Walker, J., concurring in part and dissenting in part) (internal quotation marks omitted).  "Congress has been unmistakably clear that, as a general matter, the achievement of actual harm may aggravate the seriousness of a terrorism crime but that the absence of proven harm *does not mitigate such a crime*."  *Id.* (emphasis added).  Moreover, the fact that Alimehmeti did not ultimately succeed in shedding the blood of Americans, whether

here or abroad, "is in no sense attributable" to him.  *Id.*  Alimehmeti devoted himself to a terrorist group bent on killing Americans despite the fact that this country offered him refuge and the privilege of citizenship.  Alimehmeti failed in his efforts to join ISIS not because he realized the error of his ways, but because he was disrupted by law enforcement.  Indeed, Alimehmeti's conduct just days before his arrest, when he passed his contact information to the individual who was purportedly facilitating UC-4's travel to the Islamic State, underscores Alimehmeti's steadfast intention to join ISIS overseas.  In sum, the fact that law enforcement identified Alimehmeti as a threat, introduced the UCs, and was able to neutralize and disrupt him, is a testament to the work of the FBI and NYPD, and in no sense a mitigating factor for the defendant.

Finally, the defense utterly fails to acknowledge the seriousness of Alimehmeti's passport fraud crime.  The defendant's attempt to fraudulently procure a U.S. passport for the purpose of enabling him to travel overseas to join ISIS is not an afterthought; it is extremely serious conduct that warrants severe punishment and further supports imposing a sentence within the Guidelines range.  Indeed, the 25-year statutory maximum penalty for Alimehmeti's crime of committing passport fraud to facilitate international terrorism (which is higher than the 20-year statutory maximum penalty for the material support offense) underscores the gravity of the conduct.  "For terrorists, travel documents are as important as weapons," and preventing terrorists from using fraudulent travel documents to travel in furtherance of their cause is a significant "challenge for national security in an age of terrorism."  *The 9/11 Commission Report* at 383-84, *available at* https://www.9-11commission.gov/report/911Report.pdf.  In a very real sense, if Alimehmeti had succeeded in fraudulently obtaining a new passport, it would have been as important as any weapon, as it might have enabled to him to successfully travel overseas to join ISIS and wage jihad

against American forces.  It could have been his ticket to killing American soldiers for and in the name of ISIS.

The nature and seriousness of the defendant's crimes—his efforts to provide support to ISIS, and to fraudulently procure a passport in furtherance of his terrorist activities—amply support imposing a sentence within the recommended Guidelines range.

**B.     A Guidelines Sentence Is Necessary to Protect the Public from Further Terrorism Crimes of Alimehmeti**

The evidence in this case establishes that specific deterrence is a particular concern in this case, and that a Guidelines sentence is appropriate to protect the public from Alimehmeti.  *See* 18 U.S.C. § 3553(a)(2)B), (C).

Alimehmeti has two prior convictions that involved physical violence perpetrated after he joined an Albanian street gang.  (PSR ¶¶ 76, 80).  His term of parole, and the relatively brief prison term that followed, were insufficient to deter him.  To the contrary, Alimehmeti emerged from prison with a close terrorist associate, Mamdouh, and rejected members of his former gang in favor of terrorists and supporters of ISIS.   (*See* Carr Report at 23).  Mamdouh counseled Alimehmeti during personal visits prior to both of his 2014 attempts to enter the United Kingdom, and September 2014 electronic communications indicate that Alimehmeti cultivated connections to Male-1, who traveled to Libya around the time of a key ISIS military offensive there, and Habashi, who was later killed in Syria while fighting for ISIS.

In May 2015, Alimehmeti wrote a will in anticipation of dying in the same fashion.  During a recorded call in November 2015, he indicated, in substance, that he was waiting for his brother Erald to be released from prison in Albania before traveling to ISIS territory.  Concerned that he might not be able to make the trip because of problems with his passport, Alimehmeti collected

43

knives and other weapons to use in an attack in the United States based on instructions from ISIS. He frequently joked about his interest in conducting beheadings on behalf of ISIS, was physically confrontational at ITS gatherings with those he deemed non-believers, and on at least one occasion in May 2016 brought one of his knives to a public ITS event.

While Alimehmeti was detained following his arrest, he committed two infractions that appear minor relative to his dissemination of terrorist propaganda in the facility, one of which involved threats of violence. (PSR ¶¶ 7-8). Alimehmeti also aligned with Rahimi, who perpetrated a series of bombings in 2016 and attempted to murder police officers in connection with his arrest. Alimehmeti's relationship with Rahimi is deeply troubling for several reasons, including the opportunity that Rahimi had to impart knowledge to Alimehmeti about the sophisticated bomb-making skills Rahimi displayed while detonating explosives in New York and New Jersey in September 2016. Their prison correspondence, which Alimehmeti never expected to be before the Court at sentencing, makes clear that Alimehmeti remains committed to violence as a means of supporting terrorist objectives. He described himself as an "ISIS Balla," referred to prior terrorist planning with Rahimi while incarcerated, and wrote about aspirations that he, Rahimi, and other incarcerated terrorists would achieve martyrdom. (*See* Ex. C at 11).

Terrorism is a crime with high recidivism rates, and the rehabilitation of terrorists like Alimehmeti is notoriously difficult. *See Meskini*, 319 F.3d at 91-92 (noting the link between "the difficulty of deterring and rehabilitating" terrorists and the conclusion that "terrorists and their supporters should be incapacitated for a longer period of time"). Alimehmeti's willingness to kill innocent civilians and martyr himself for ISIS, his absolute commitment to ISIS at the time of his arrest, and his disturbing conduct since then at the MCC—which is by itself indicative of continued

allegiance to ISIS and terrorist ideology—all powerfully support a single conclusion: the incapacitation of Alimehmeti is an appropriate goal of sentencing. Accordingly, in light of the defendant's criminal history and his conduct in this case, the need to achieve specific deterrence and to protect the public support the imposition of a Guidelines sentence.

### C. The Defendant's Mitigation Report and Personal Circumstances Do Not Support a Variance

The defendant's 48-page sentencing submission and 52-page mitigation report strain without success to portray him as a victim in this case. On balance, the considerations set forth therein do not warrant a downward variance.

Most importantly—and consistent with Alimehmeti's writings to Rahimi—the defense submission lacks any meaningful expression by Alimehmeti of remorse, or a renunciation of ISIS and other terrorist groups. These omissions are glaring, and telling, in light of several other quotes attributed to Alimehmeti in the Mitigation Report. (*E.g.*, Carr Report at 28, 51). The Court should also view with skepticism any subsequent efforts by Alimehmeti to change course at sentencing in light of his written post-arrest commitment to continuing to seek martyrdom and related communications with Rahimi about what they should "say" to authorities relating to their dissemination of terrorist propaganda at MCC. (Ex. C at 11).

The defense cites Alimehmeti's age as a factor that purportedly mitigates the seriousness of his crimes. (*See* Def. Mem. at 24-26). The argument is meritless. Alimehmeti's age is squarely in line with the ages of other young, male ISIS followers who have joined the group and attacked and killed in its name. Alimehmeti chose to radicalize and devote himself to ISIS, and he was prepared to leave his home in the United States, join ISIS on the battlefield, and kill to further its cause. Indeed, he yearned for that opportunity. His devotion to ISIS was not a flight of youthful

fancy.  Alimehmeti began radicalizing at least as early as 2014.  When he was thwarted in his efforts to travel overseas in late 2014, he was not deterred; his commitment to the cause was deep and ingrained, so he pivoted, and began amassing weapons at home in preparation for a potential lone-wolf attack, while still working towards his goal of joining ISIS overseas—including by attempting to fraudulently procure a new passport without the U.K. rejection stamps.

Importantly, Alimehmeti's devotion to ISIS and terrorist ideology was so fervent, he sought to radicalize others.  He even approached civilians on the street—people who were, to Alimehmeti, non-believers or *kuffar*—and attempted to convert them to join Alimehmeti in his radical, extremist mission.  Alimehmeti's conduct at the MCC, where he continued his efforts to radicalize others—working together with a convicted terrorist bomber—further eviscerate any suggestion that Alimehmeti's conduct can be discounted as a youthful diversion.  Alimehmeti's age does not mitigate his conduct, which was determined, prolonged, and continued long after his arrest.  Indeed, Alimehmeti's age is a risk factor.  Because he is a young man, it is imperative that the sentence incapacitate Alimehmeti for a lengthy period to prevent him from resuming his activities in support of radical Islamic terrorism.

While the Mitigation Report establishes that Alimehmeti faced some challenging circumstances as a teenager, many people endure such situations without resorting to violence much less terrorism.  Alimehmeti was able to immigrate to the United States and obtain the privilege of citizenship.  He had "very good" relationships with his mother and father (PSR ¶¶ 92-93), and an opportunity to attend elementary and high school (*see* Carr Report at 18).  Instead, the defendant joined an Albanian street gang when he was approximately 14.  An armed confrontation

with rival Latin Kings in Queens was insufficient, which "could have spiraled out of control at any moment," was insufficient to deter him.  (*Id.*).

In 2010, as a 16-year-old, Alimehmeti participated in a robbery in the Bronx with another member of the gang.  (PSR ¶¶ 76-79).  Defense counsel spills much ink over the manner in which that crime was prosecuted, but Alimehmeti was adjudicated as a Youthful Offender and sentenced to five years of probation.  (*See, e.g.*, Def. Mem. at 16).  "Probation required Sajmir to enroll in summer school, visit the probation office as often as five times a week, and attend programs in substance abuse and anger management at an outpatient counseling center called Vertex, 4-6 times per week."  (Carr Report at 20).  Despite these services, Alimehmeti was remanded in August 2011 based on a violation.  (Carr Report at 22).  In 2012, he pleaded guilty to an assault offense and a violation of his probationary sentence.  (Carr Report at 23).  Similar to the manner in which Alimehmeti claims that he was "pressured" to plead guilty to the prior robbery (*id.* at 19), he argues that he is innocent of the assault as well (Def. Mem. at 19).  With respect to the latter conviction, Ms. Carr writes that Alimehmeti entered the plea because he was advised that he "could be released on parole within a few months."  (Carr Report at 23).  But even if that self-serving claim is true, it only underscores the extent of Alimehmeti's willingness to make false statements to officers of the court in order to obtain release and therefore cuts against his position at sentencing.

Alimehmeti told Ms. Carr that he was "around other Muslims" while incarcerated "[f]or the first time in his life."  (Carr Report at 23).  Alimehmeti indicated prior to his arrest in this case, however, that he "radicalized a few people when I was in jail."  (PSR ¶ 49).  Moreover, in January 2016, Alimehmeti told a UC that jail was "not a bad place in this country" because "they are

essentially giving you free accommodations with decent food and other amenities like TV, books and a gym."

Upon being released in August 2013, Alimehmeti was able to obtain employment and appeared to be a "near-perfect parolee."  (Carr Report at 24).  The Mitigation Report fails to mention Alimehmeti's ongoing relationship with Mamoud, and instead seeks to paint a picture of Alimehmeti being targeted by "ISIS recruiters on the internet."  (*Id.*).  But the  Report does not describe that recruitment in any detail, other than Alimehmeti's consumption of al-Awlaki lectures, and the Government is unaware of any evidence that Alimehmeti was "targeted," as opposed to him seeking out peers who shared his radical views.  Moreover, the UNESCO paper cited in the Mitigation Report to describe the concept of "identity fusion" makes clear that, (i) "[t]he synthesis of evidence shows that, at its best, social media constitutes a facilitating environment rather than a driving force for violent radicalization or the actual commission of violence," and (ii) "radicalization of young people online has yet to attract a critical mass of studies for the research to be credible in its conclusions and recommendations."  (*See* Def. Mem. at 4).[12]

In any event, by the time Alimehmeti was released, he was 20 years old—hardly the "naïve" victim portrayed in the Mitigation Report, and at the expiration of the definition of "adolescence" used by Dr. Laurence Steinberg.  (*See* Def. Mem. Ex. A at 1 n.1).  As an adult, Alimehmeti was not a passive listener with ITS, at mosques, or during meetings with the UCs.  In March 2016, for example, he told a UC about an incident at a mosque in Staten Island during which he "expressed anger" at other Muslims who were indicating that terrorist attacks in Belgium

---

[12] *See* https://unesdoc.unesco.org/ark:/48223/pf0000260382, at 46.

were "evil and wrong," including by "pray[ing] aloud for the Muslim brothers who carried out the attacks."

Finally, defense counsel's arguments regarding the conditions of Alimehmeti's confinement do not suggest that a reduced sentence is appropriate. When Alimehmeti was placed in the Special Housing Unit based on his dissemination of terrorist propaganda in the MCC, he wrote to Rahimi, "I like it here." (Ex. C at 11). Even if that was bluster, the security conditions imposed by the Bureau of Prisons are appropriate under circumstances that Alimehmeti created. It would be ironic if Alimehmeti could engage in dangerous conduct that requires additional security—as his communications with Rahimi and dissemination of terrorist propaganda did—and receive leniency for those efforts.

In sum, while the Government does not dispute that defense counsel has identified mitigating factors at sentencing, Alimehmeti's failure to meaningfully express remorse and renounce ISIS, coupled with his support of ISIS dating back to 2013 and continuing until at least 2018, outweighs those considerations. Whatever the merits of the intervention programs described by defense counsel as an alternative to incarceration in terrorism cases, Alimehmeti's history, conduct, and abiding commitment to terrorism all suggest that incapacitation was and remains the proper course in this case.

### D.    A Guidelines Sentence Will Not Create Unwarranted Sentence Disparities

A Guidelines sentence in this case will not result in unwarranted sentencing disparities. Courts have routinely imposed maximum sentences in cases involving material support of foreign terrorist organizations. *See Stewart*, 590 F.3d at 166 n.4 (Walker, J., concurring in part and dissenting in part) ("Most of these courts chose the maximum material support sentence available

49

to them under federal law . . ."); *see also* 597 F.3d 514, 530-31; *e.g.*, *United States v. Badawi*, *et. al*, No. 15 Cr. 60 (C.D. Cal.) (two defendants each sentenced to statutory maximum of 15 years' imprisonment for conspiring to provide material support to ISIS, where one defendant was arrested at airport attempting to travel overseas to join ISIS and the other defendant had supported and assisted his travel); *United States v. Zea*, No. 13 Cr. 72 (E.D.N.Y.) (defendant sentenced to statutory maximum of 15 years' imprisonment for attempting to travel to Yemen to join al Qaeda in the Arabian Peninsula); *United States v. Pugh*, No. 15 Cr. 116 (E.D.N.Y.) (defendant sentenced to statutory maximum of 15 years' imprisonment for attempting to travel to Syria to join ISIS); *United States v. Saidakhmetov*, No. 15 Cr. 95 (E.D.N.Y.) (defendant sentenced to statutory maximum of 15 years' imprisonment for attempting to travel to Turkey to join ISIS); *United States v. Alaa Sadeh*, No. 15 Cr. 558 (D.N.J.) (defendant sentenced to statutory maximum of 15 years' imprisonment for assisting another individual to travel to join ISIS overseas).

Recently, in *United States v. Raishani*, Judge Abrams sentenced a man who pleaded guilty to the statutory maximum of 20 years' imprisonment for attempting to provide material support to ISIS, in violation of 18 U.S.C. § 2339B. *See* 17 Cr. 421 (RA) (Dkt. No. 62 at 30). In *Raishani*, the defendant voiced support for ISIS for approximately two years, as opposed to the defendant's support of ISIS dating back to at least 2014. (*Id.* at 5). Raishani's offense level was also lower than the defendant's (36 compared to 42). Furthermore, unlike Alimehmeti, Raishani did not have prior convictions involving crimes of violence, he did not commit passport fraud to facilitate his

terrorist activities, and he did not do any of the types of things that Alimehmeti did while incarcerated at the MCC.

A variety of factors unique to this case render the cases cited by Alimehmeti inapposite with respect to consideration of Section 3553(a)(6), including Alimehmeti's criminal history, the duration of his support of ISIS, his amassing of knives and other weapons during the course of that support, and the escalating dangerousness reflected in his behavior at MCC. In *United States v. Doe*, for example, the defendant provided "'extraordinarily significant and highly useful' assistance to the United States government's ongoing counterterrorism efforts," which "'materially contributed to the national security of the United States and its allies.'" 323 F. Supp. 3d 368, 374 (E.D.N.Y. 2018) (quoting letter from Government). In this case, on the other hand, the defendant has done the opposite by aligning with Rahimi in writing—even after being caught—and committing to pursuing martyrdom in the name of terrorism.

### E.    A Guidelines Sentence Is Necessary To Afford General Deterrence and To Promote Respect for the Law

In the sentencing opinion emphasized by Alimehmeti, Judge Weinstein noted that "[g]eneral and specific deterrence play a large part in the court's considerations, particularly given the increasingly common nature of terrorism-related crimes." *Doe*, 323 F. Supp. 3d at 390. The Probation Office is correct that "general deterrence is extremely importance in this case" (PSR at 28), which further supports the imposition of a Guidelines sentence.

ISIS continues to promote lone-wolf attacks by its supporters in the United States, especially following the October 2019 death of ISIS leader Abu Bakr al-Baghdadi. As one example, in early November 2019, Muhrar al-Ansar Media Foundation published a poster with an excerpt from a speech given previously by al-Adnani:



The ISIS poster also included a picture of Steven Sotloff, an American-Israeli journalist murdered by members of ISIS in 2014, just prior to Alimehmeti's first attempt to enter the United Kingdom.

As ISIS tries to send a "message to America" of hatred and violence, the criminal justice system must respond with a general deterrence message of its own that promotes respect for the law based on fair sentences that account for threats posed by these types of offenders, the seriousness of the offenses, and the need to protect the public from members and supporters of this terrorist organization.  The need for such a message is yet another reason supporting a Guidelines sentence in this case, particularly in light of the defendant's post-plea conduct.

## <u>CONCLUSION</u>

For the foregoing reasons, the Government respectfully submits that the Court should

sentence Alimehmeti to between 360 and 540 months' imprisonment—the sentence called for by

the Guidelines, and consistent with the recommendation of the Probation Department—as such a

sentence is sufficient but not greater than necessary to comply with the purposes of sentencing

pursuant to 18 U.S.C. § 3553(a).

Dated:  New York, New York
       December 2, 2019

                           Respectfully submitted,

                           GEOFFREY S. BERMAN
                           United States Attorney for the
                           Southern District of New York

By:           /s/
                           Emil J. Bove III / George D. Turner
                           Assistant United States Attorneys
                           212-637-2444 / 2562