RESTRICTED (when complete)                                    MG 11 (T)

# WITNESS STATEMENT
CJ Act 1967, s.9; MC Act 1980, ss.5A(3)(a) and 5B; Criminal Procedure Rules 2005, Rule 27.1

**Statement of** ▮▮▮▮▮  URN: ☐ ☐ ☐ ☐

Age if under 18   **Over 18**   (if over 18 insert 'over 18')   Occupation: **Detective Constable**

This statement (consisting of: ....**9**...... pages each signed by me) is true to the best of my knowledge and belief and I make it knowing that, if it is tendered in evidence, I shall be liable to prosecution if I have wilfully stated anything in it which I know to be false, or do not believe to be true.

Signature: ▮▮▮▮▮   Date: 01/03/2016

Tick if witness evidence is visually recorded ☐   *(supply witness details on rear)*

I am Detective Constable ▮▮▮ and I am currently attached to the Counter Terrorism Command SO15 within the Metropolitan Police Service. At the time of the incident to which I refer, I was based at Terminal 3 Heathrow Airport London.

My duties include using the powers contained in Schedule 7 of the Terrorism Act 2000 (TACT) to examine persons travelling through the UK's international ports and borders to make a determination of whether they appear to be concerned in the commission, preparation or instigation of acts of Terrorism.

A person who is being examined under Schedule 7 of the Terrorism Act is under a lawful duty to comply with certain requests made by the examining officer, namely: to give the examining officer any information in his possession which the officer requests; to give the examining officer on request either a valid passport which includes a photograph or another document which establishes his identity; to declare whether he has with him documents of a kind specified by the examining officer and to give the examining officer on request any document which he has with him and which is of a kind specified by the officer.

These lawful obligations are set out in two information notices (a Schedule 7 leaflet, and the Notice of detention form) which are provided at set points during the course of a Schedule 7 examination in order to ensure that the person is aware of their duties and rights.

The Code of Practice for Examining Officers under the Terrorism Act 2000 as amended by the Anti social Behaviour, Crime and Policing Act 2014 sets out the criteria for selecting a person for examination by stating that the decision must be based on the threat posed by the various terrorist groups active in and outside the United Kingdom. Paragraph 2 of Schedule 7 TACT and the aforementioned Code of Practice state that an examining

Signature: ▮▮▮▮▮   Signature witnessed by: ..................................

2006/07(1): MG 11(T)                RESTRICTED (when complete)

Continuation of Statement of ▮ ..................................................................................

officer may question a person whether or not he suspects that the person is or has been concerned in the commission, preparation or instigation of an act of terrorism, and that an examining officer may stop that person for the purposes of determining whether this appears to be the case.

On Thursday 18th December 2014 I was on duty working at Terminal 3 London Heathrow Airport within the airside office near to immigration control.

At about 9:45am a male passenger who I now know to be Sajmir ALIMEHMETI (dob ▮ was referred to me by UK Border Force officers who controlled the passport desks. I was informed that the passenger had arrived via Delta Airlines flight DL401 from JFK airport New York USA. ALIMEHMETI had come to notice as he had tried to enter the United Kingdom the previous month at Manchester airport but was refused due to a link to terrorism but no further details were known.

I decided that in the case of ALIMEHMETI it was necessary to use my powers under Schedule 7 TACT in order to assist in a determination of whether ALIMEHMETI appeared to be a person who is or has been concerned in the commission, preparation or instigation of acts of terrorism. Therefore at 10:00am I began the examination of ALIMEHMETI and he was escorted to an interview room in the Terminal arrivals area so that he could be questioned for the purposes of the examination. He was wearing a white skull cap and white robes under which he wore grey tracksuit bottoms and a white T-shirt.

Upon walking into the interview room at 10:02am, I told ALIMEHMETI he was being detained for the purpose of the examination. I gave him a Public Information Leaflet to read which I exhibit as JCC/4. After having given him a chance to read it, I verbally read out the form to him so I could ensure he understood the contents.

Once I was assured ALIMEHMETI was acquainted with the examination process, I provided him with a Notice of Detention form (which applies only where the person has been formally detained for examination and again sets out their lawful duties under Schedule 7) and again read through it with him to ensure that he understood his rights and obligations. I then offered him the form to sign to the effect that he understood the contents. He obliged and signed the form. This I exhibit as JCC/5.

During my explanation of the examination process, I asked ALIMEHMETI whether he wanted to consult with a solicitor, he declined this offer and signed to this effect.

Continuation of Statement of ▮

Signature: ▮   ature witnessed by: ..........................................................

2003(1)

Continuation of Statement of ▮▮▮▮▮ ..........................................................................

At the start of the examination process and in order to assist in determining if ALIMEHMETI was a person who is or has been concerned in the commission, preparation or instigation of acts of terrorism, he was searched whereby all documents and relevant materials in his possession were photocopied. I exhibit these copies as JCC/3.

I also took a full set of finger and palm prints via the Livescan electronic system. The fingerprints submission reference was LANA7F0001030T and I exhibit them as JCC/1. These were submitted for searching alongside various counter terrorism indices.

In addition I tasked DS 216181 to take an evidential set of photographs of ALIMEHMETI and a sample of DNA in the form of mouth swabs so that they could also be submitted and searched alongside various counter terrorism indices. Ten (10) images were taken and these were exhibited as AOR/1 - AOR/10. The DNA barcode was 32831881 and is exhibited as AOR/11.

I tasked PC 197369 to download and examine ALIMEHMETI's mobile phone which included the SIM card and memory card within the phone. This was done in a separate room whilst I continued to conduct the examination.

I also seized ALIMEHMETI's lap top computer and sealed it in an exhibit bag D44159477. This I exhibited as JCC/2. I tasked PS 226480 to examine and downloaded this within 7 days and I ensured its return to Mr ALIMEHMETI as specified by Schedule 7 of Terrorism Act 2000.

ALIMEHMETI's bags were searched and two items of camouflage clothing were found within. They consisted of two fleece hoodie type garments in complete camouflage print.

I then began the questioning phase of the examination where my contemporaneous notes were made in a book 500.

Mr ALIMEHMETI told me his date of birth as ▮▮▮▮▮ His home address he provided as ▮▮▮▮▮ ▮▮▮▮▮ Bronx New York 10467. He provided his mobile phone number as ▮▮▮▮▮ 7306. His email was provided as sajmir.alimehmeti@gmail.com. He stated he had a Facebook account in the name of Abu Uthman and this was registered under a further email address of harith.alalbaani@gmail.com.

ALIMEHMETI was asked to provide me with some details about his background and family. Sajmir ALMIEHMETI told me he was originally born in Tirana Albania. He lived with his father Zyber (74yrs appx),

Signature: [signature] 197001   Signature witnessed by: ..........................................................

2003(1)

Continuation of Statement of ..................

mother Vjollca (60 yrs appx) and older brother Erald.

The family were relatively successful as they have two businesses a mini market and a Café. The businesses still run but the operation is leased to other parties.

In 2000 the family successfully won an immigration lottery to enter the United States of America. Mr ALIMEHMETI's father wanted his sons to have a good education which could be provided in the USA. ALIMEHMETI stated there were no other reasons for the family wanting to leave the country. They were under no threat or political pressure.

The family were located in Bronx New York where ALIMEHMETI spent his formative years. He recalls being at Elementary school on the day of 9/11 and that his mother had to collect him early from school. He described it as a sad day and that it was an attack on the United States and on innocent people.

ALIMEHMETI completed Elementary school and studied in High School taking his General Equivalency Diploma (GD) rather than graduating. He left school aged 17 years.

When pressed ALIMEHMETI revealed that soon after leaving High School he went to prison for two years having been convicted of Robbery and Assault. He spent 14 months on Rykers Island and the remainder at Greene State Prison. Mr ALIMEHMETI was adamant he did not experience any radicalisation during this period.

Upon release ALIMEHMETI was on parole. He did not do much with himself until June 2013 when he became an assistant plumber with a company named Bletsas Plumbing and Heating Co. This employment involved working on a construction site mostly lifting and carrying heavy piping up and down steps and ladders. In June 2014 ALIMEHMETI left this job. He stated that he found it too difficult in the changing weather.

I then began to ask Mr ALIMEHMETI questions about his travel history. He told me that his family planned to return to Albania in order to manage the businesses and return to New York. His older brother decided he was going to stay and live in Albania.

In July 2014, ALIMEHMETI's brother and mother returned to Albania. A week later ALIMEHMETI's father also travelled to Albania once he had organised his retirement from work.

On 14th August 2014 when ALIMEHMETI's parole had concluded, he also travelled to Albania. He flew from

Signature: ............ ignature witnessed by: ..................

2003(1)

Continuation of Statement of ......................................................................................................

JFK to Istanbul then took a direct flight to Albania. Whilst on holiday he visited family only and returned to the USA on 19th September 2014 following the same route as his inbound journey.

When asked about his travel to the United Kingdom, Mr ALIMEHMETI first began to explain his aspirations for marriage. He stated that a year ago, whilst in New York, he made it known through two of the mosques he attends that he wanted to get married.

Mr ALIMEHMETI explained that the mosques he attends are: Hamza Mosque which he describes as being situated in the same block as his home address and E QUBA Rochambeau Bronx.

A man ALIMEHMETI knows only as Jafar told him of a family in the UK that had a daughter they were looking to find a husband for. When pressed for further information, Mr ALIMEHMETI became uncomfortable but provided a fuller name for the man he knows as Jafar being Shaykh IBAD WALI. He stated he was simply provided with the girls mobile phone number to which he sent a WhatsApp message. Mr ALIMEHMETI stated that the girls name was Safa FAIZI. According to him the couple struck up a relationship via texts, whatsapp, skype and viber. They would speak about many things but mostly it led to them wanting to marry each other.

Mr ALIMEHMETI stated that through the conversations, he also spoke to Safas mother and sometimes her father but this was difficult due to the fathers limited English. He provided the name of the father as Mohammed Ayub FAIZI but could provide no details of the mother.

Mr ALIMEHMETI stated that he was pleased to meet an English girl as he likes the accent and Safa was pleased with him as he was Albanian origin and she did not want to marry anyone from Pakistan.

Mr ALIMEHMETI explained that this was the reason for him visiting the United Kingdom on 24th October 2014 as he had arranged to meet Safa. He was going to use this trip to get to know her and establish if they were a match. There was no intention to get married at this time. He noted from his visa that he was allowed to stay for six months so had no plans about how long he was going to stay in the UK. His intention was to travel onward to Albania and reside there where he could help run the family businesses.

Mr ALIMEHMETI explained that his flights were paid for by his parents. He booked with Iceland Air as it was the cheapest. He flew from JFK New York to Iceland then onto Manchester airport. Upon arrival at Manchester Mr ALIMEHMETI explained he was detained by immigration and subsequently refused entry. The reason he provided for this was because he was too vague about how long he was staying and he did not have a letter of

Signature

Signature witnessed by:  .......................................................

2003(1)

invitation.

Mr ALIMEHMETI explained that whilst detained at Manchester airport, Safas father arranged a solicitor who was unable to prevent his deportation but advised him to return in a month and for a shorter period of time.

Following this account, Mr ALIMEHMETI explained his visit to the UK on this occasion. It was for the same purpose as before but this time he had a sponsorship letter from Safa's father (included in exhibit JCC/3). He also stated that he now no longer wished to live in Albania as after being returned to the USA he changed his mind and now wished to do a two year course to become a nurse. Mr ALIMEHMETI still wanted to meet with Safa to confirm she was the right girl for him to marry. When asked about the camouflage items in his luggage, he explained that one was for him and the other for Safa. She apparently likes the clothes he wears and Mr ALIMEHMETI felt it would be good to wear the same thing together.

I asked Mr ALIMEHMETI about his religion, he told me that he is a practising Muslim of the Diabandir Hanafir strand. He described himself as peaceful and that he had no interest in extremism. He stated he had no desire to go to Syria or any other conflict zone. Through his mosque he attends Dawah and through this he tries to steer Muslims down the right path of Islam and away from extremism.

ALIMEHMETI tried to study the teachings of the Qur'an in Arabic and as such he began attending religious school in New York Darul Uloom. The teacher of these classes was Shaykh IBAD WALI. ALIMEHMETI found the course too difficult and dropped out after three months.

Whilst ALIMEHMETI remained detained in the examination room, I conducted some further enquiries. I established that on Mr ALIMEHMETIs mobile phone, there were a number of images of Islamic State Flags and IED explosions which appeared to have been downloaded from the internet and other such video clips.

There was also a screenshot of a text conversation with "Jannah" which refered to the Taliban attack on a Pakistani school killing 141 children on 16th December 2014. "Jannah" states "this made me cry" to which the reply recorded as from ALIMEHMETIs phone states "but it was an army school LOL".

I made further enquiries with officers in the North East Counter Terrorism Unit (NECTU). They verified to me that they conducted a schedule 7 TACT examination of ALIMEHMETI on 24th October 2014. At that time it was established that an address of 162 Durham Road, Bradford, West Yorkshire BD8 9HU which ALIMEHMETI stated he was to reside during his stay in the UK, was known to them as a young female believed to be vulnerable

Signature:

ignature witnessed by:

2003(1)

to extremist radicalisation resided. The female was named as Safa and information showed that she had posted on her facebook page comments glorifying Jihad and Martyrdom. It was Safas mother who contacted Police and expressed her concerns.

Additionally at no time did ALIMEHMETI tell officers in Manchester that he was interested in getting married nor to returning to the United States. He stated to them that he knew the family through a mutual friend named Shaykh IBAD WALI. Also at no time during his examination in Manchester did ALIMEHMETI mention Safa.

It was confirmed that on this occasion also, ALIMEHMETI had camouflage clothing consisting of trousers and woollen tops in his baggage as well as nunchuka (rice flails) and a dozen pairs of weight training gloves.

NECTU explained to me further that in November 2014 they spoke to Safas father Mohammed Ayub FAIZI regarding ALIMEHMETIs intention to visit the United Kingdom. Mr Faizai stated that ALIMEHMETI was not that well known to him, he had no intention of meeting him at the airport and if ALIMEHMETI did arrive, he would have found him accommodation but he would not be staying at the family home. Mr Faizai stated he did not know Shaykh IBAD WALI.

These developments and inconsistencies in ALIMEHMETIs story caused me concern. It was apparent that the change in Safa and signs of radicalisation which began in February 2014 coincided with her text/Skype relationship with ALIMEHMETI. In addition there were inconsistencies with the sponsors' story to NECTU officers and the letter provided for this trip.

I was concerned about the material found on ALIMEHMETIs phone and the likely hood of more on his laptop once this was examined.

He had clearly adapted his method of entry into the UK by changing the airport he arrived, his story and scaled down the material in his luggage.

I returned to the examination room and put these aspects to ALIMEHMETI. Previously he was polite and co-operative answering all questions put to him. However, when confronted with the inconsistencies in his story and concerns I had, his body language noticeably changed and he became uncomfortable although still attempted to answer questions put to him which was his obligation under the Terrorism Act.

With regards the images on his phone, ALIMEHMETI stated he likes to educate himself as to what is going on

Signature:                                  ignature witnessed by:

2003(1)

Continuation of Statement of ▮▮▮ .................................................................................

and must have downloaded these images when he viewed them. It was pointed out to him that he had previously explained he had no interest in these aspects. Again ALIMEHMETIs body language showed him to be uncomfortable. He fidgeted and changed his seating position several times. His face reddened around his cheeks and neck.

With regard to the screenshot and text from "Jannah", ALIMEHMETI confirmed that this was the name he gave to Safa. He stated the comment he made in the text meant no ill will but he could not explain it any further.

Due to the amount of inconsistencies in the story provided during examination, the messages posted by Safa on facebook and the texts between her and ALIMEHMETI, the images viewed on his mobile phone and the items carried in his luggage on both occasions of travel to the UK, I strongly suspected that it was ALIMEHMETIs intention to meet with Safa without her families full knowledge and that they both could be planning to abscond to Syria.

At 12:56pm my examination with ALIMEHMETI concluded. The examination lasted 2 hours and 54 minutes. I fully reported my findings and recommended further enquires be conducted both in the United Kingdom and the United States of America.

ALIMEHMETI was further interviewed by UKBF regarding immigration matters where it was decided to refuse him entry to the United Kingdom. He was deported back to the United States via Delta Airlines at 5pm on 18th December 2014.

Signature: ▮▮▮   Signature witnessed by: ...................................................

2003(1)