# LAW OFFICES OF SUSAN G. KELLMAN
25 EIGHTH AVENUE • BROOKLYN, NEW YORK 11217
(718) 783-8200 • FAX (718) 783-8226 • SGK@KELLMANESQ.COM
FELLOW, AMERICAN COLLEGE OF TRIAL LAWYERS

December 4, 2019

**VIA ECF**
Honorable Paul A. Engelmayer
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

           Re:   Sajmir Alimehmeti
                 16 Cr. 398 (PAE)

Dear Judge Engelmayer:

      We respectfully submit this letter in response to the government's sentencing submission, which contains a number of inaccuracies. We also write to submit two letters of support received after we filed our submission.[1] Nothing in this letter is intended to minimize Sajmir Alimehmeti's very serious criminal conduct or detract from his acceptance of responsibility for his conduct.

**There is no evidence that Mr. Alimehmeti planned to travel to Syria from the U.K.**

      The government asserts that "In 2014, Alimehmeti twice attempted to travel to the United Kingdom with the intention of continuing on to Syria to join Isis." (Govt. Memo at 3.) There is no question that Mr. Alimehmeti tried to enter the U.K., as outlined in PSR ¶¶ 13-17, with camouflage pants and shirts and nunchucks (October 24, 2014) and terrorist propaganda on his devices (December 18, 2014). However, there is no evidence that he did so with the intent of using the U.K. as a gateway for travel to Syria.

      In support of its argument, the government points to (1) text messages that the government purports to be between Mr. Alimehmeti and the woman he hoped to marry, Safa Ayub Faizi, about traveling from Tunisia to Libya;[2] (2) the fact that he exchanged text messages – unrelated to travel – with someone he met in the Turkish airport on a trip to Albania; (3) the fact that he didn't tell U.K. authorities who interrogated him (on October 24, 2014) that he was interested in getting married; and (4) inconsistencies in his story noted by U.K. authorities when he attempted to enter in December of 2014.

---

[1] *See* letters from Mr. Alimehmeti's mother and cousin, attached as Exhibits G and H.
[2] The messages they refer to are actually between Sajmir and Nourhene Chaalia (a resident of Libya), and not Sajmir and Safa Faizi (a resident of the U.K.). Further, it is unclear what connection, if any, this conversation has to Libya. *See* Exhibit I, attached – selection from Skype chat between Sajmir and Ms. Chaalia.

December 4, 2019
Hon. Paul A. Engelmayer
Page 2 of 8

      As part of discovery, the government turned over 1687 pages of chats between Safa and Mr. Alimehmeti between 8/24/2014 and 11/2015. As Ms. Carr reports,

> Safa and Sajmir at times shared videos and other ISIS recruitment materials, which served to reinforce their growing radicalization. Still, Sajmir expressed ambivalence about making any actual plans. At one point, Sajmir told Safa that he did not want to go to Syria anymore, and Safa told him she did not want to marry him. Safa was Sajmir's first love, and he could not stand to lose her. Her chats reflect that she was putting pressure on Sajmir to commit to joining the Caliphate after they married.

(Exhibit A, at pp. 35-36.) Despite these shared beliefs, there is no evidence that the two ever made a serious plan to travel to Syria (or anywhere) and join ISIS together[3]. In contrast, they discuss their love for one another – and their desire to marry and be together – constantly. This is underscored by the letter of support we received from Safa. (See Exhibit B.)

**There is no evidence Mr. Alimehmeti was planning a "lone-wolf" knife attack**

      There is no question that our client purchased knives online, and that he had two knives in his apartment at the time of his arrest. (*See* Govt. Ex. A, Item 15.) Yet over the course of an 8-month undercover investigation (from September of 2015 until May of 2016) there is nothing in any of the DD5s or recordings prepared by the undercover officers that Mr. Alimehmeti ever planned a knife attack, on U.S. soil, or anywhere in the world. During this time, Mr. Alimehmeti spent countless hours with the undercovers, who befriended him, bought him meals, encouraged and validated his extremist beliefs and were even trusted witnesses at his wedding. The undercovers collected all the evidence they could to build a case against him, grilling him ad nauseum about his extremist beliefs. At no time, did Mr. Alimehmeti ever mention a plan to carry out a "lone-wolf" attack, using knives or any other weapon.

      Lacking evidence of any planned attack, however, the government relies on the following: (1) at the time Mr. Alimehmeti ordered the knives, knife attacks "were becoming increasingly prevalent" among ISIS supporters his age (Govt. Memo at 17); (2) a theoretical, non-specific conversation with the undercovers in which Mr. Alimehmeti expressed the opinion that an ISIS supporter would be justified in carrying out an attack where ever he is if he is prevented from traveling abroad (Id. at 17-18); and (3) terrorist propaganda material encouraging ISIS supporters to commit lone-wolf attacks in their homelands which appears

---

[3] If Mr. Alimehmeti really wanted to travel to Syria, he had an opportunity to do so right before his first attempted trip to the U.K. In August of 2014: one month before he attempted to enter the U.K. to visit Safa, Mr. Alimehmeti travelled back and forth from the U.S. to Albania to visit family. In each direction, he had a stopover at the Istanbul airport.

December 4, 2019
Hon. Paul A. Engelmayer
Page 3 of 8

to have been published at the time of – or after – Mr. Alimehmeti's arrest. Significantly, none of the described materials were among the trove of propaganda materials the government found on Sajmir's hard drives.[4]

**The government's "intervention"**

The government characterizes it's investigation as an "interven[tion] to mitigate and monitor the threat posed by Alimehmeti and protect the public." (Govt. Memo at 1.) This investigation was accomplished through undercover officers who presented our client with an "opportunity to facilitate travel by others to support abroad." (Id.) The government further takes umbrage at their perception that our sentencing submission suggests that Mr. Alimehmeti "was somehow victimized or radicalized by law enforcement".

To be clear: we do not believe that Mr. Alimehmeti was victimized or radicalized by the undercover officers. Clearly, he held radical beliefs long before the officers entered his life and the choice he made to engage in criminal conduct in this case was his own. Nonetheless, we question government's strategy of using older officers, presenting themselves as learned mentors and fellow extremists, to validate and inflame the pre-existing radical beliefs of our client, an impressionable young adult, grooming him for criminal conduct which he then undertook at their request and with their full-throated encouragement.

It is respectfully submitted that there is another way for government to address "budding" radicalism – especially among young people – a way which the United States has been slow to acknowledge, much less embrace. And that way is a different sort of intervention than the course of action the government took in this case. Rather than planning a "sting" to catch Mr. Alimehmeti in a criminal act, the government could have steered him toward a different path. Or even after such a sting, with criminal charges and a lengthy prison sentence hanging in the balance, they could have offered Mr. Alimehmeti an alternative. They could have intervened, as law enforcement now routinely do in countries including the United Kingdom, Denmark, Indonesia, Malaysia, Saudi Arabia, Algeria, Egypt, Jordan, Yemen, and Singapore, by referring Mr. Alimehmeti to programming, or to help him find better mentors who could guide him away from destruction. Or they could make intensive deradicalization services available in prison or in programs that offer these routes as alternatives to incarceration.

We do not dispute that our client continued to show radical inclinations after his arrest, or that he shared inflammatory materials with another inmate[5]. It is irrational to think

---

[4] *See* Govt Memo, fn. 8, p.p. 15-16. One was published in October of 2016, and the other was published in May of 2016.
[5] Further, our client's exchange of letters with that same inmate happened while Mr. Alimehmeti was held in solitary confinement on 9 South, and the other inmate was being

December 4, 2019
Hon. Paul A. Engelmayer
Page 4 of 8

that his arrest and imprisonment, without treatment of any kind, would have been sufficient to unwind the years of extremist indoctrination and propaganda to which he was exposed. But approaching Mr. Alimehmeti, 22 years old at the time of his arrest, as someone worth rehabilitating, rather than as someone beyond redemption. Indeed, the government's approach in all of these cases has been morally repugnant, especially since the government has no answer as to what is to become of men like Mr. Alimehmeti when they rejoin society one day.

**The government's submission is unnecessarily inflammatory, painting a dehumanized portrait of a young man as an irredeemable monster.**

As the government highlights at several points in their submission, the defense submission does not include a fulsome disavowal, by our client, of his extremist beliefs. This is because, in all candor, Mr. Alimehmeti is not there yet. Our client cannot perform a transformation that he has not yet made – and it is not in anyone's interest that he feign beliefs that he does not espouse.

The fact that our client has not yet been fully deradicalized – while caged in isolation at the MCC – should not be a surprise to anyone. This, however, does not mean that he is irredeemable or not worthy of meaningful interventions. Over the past two years, we have come to know an alienated, confused, damaged young man. But Sajmir is much more than that. He is also inquisitive, sensitive, compassionate, and humorous. He is a young man yearning to make connections; to understand, and to be understood.

My colleague, Sarah Kunstler, has spent the most time with Sajmir. Over 100 hours at the MCC, through a pain of glass, over the course of the past two years. It took a long time for Ms. Kunstler to reach a place of trust with Sajmir. In the beginning, he said all of the things we expect our clients to say at sentencing when they take responsibility for their criminal conduct. It took time to reach a place of trust where he was comfortable sharing with Ms. Kunstler that he is not quite there yet. That he is not sure what to believe. That he is having a hard time letting go of the beliefs that led him here and has been left with nothing in his isolated cell to fill in the gaps in his intellectual and emotional development. .

---

held under SAMs on 10S.This could only have been accomplished through the assistance of MCC staff to ferry letters from one floor to another, specifically, the assistance of a Lieutenant, who is named in the exchange between the two. While we assume this second, post-indictment "sting" by a BOP officer – who clearly violated the SAMs to collect this evidence against our client – was conducted without the approval or knowledge of the government, it is part and parcel of the strategy used throughout the investigation and prosecution of our client – validating and encouraging his radicalization, rather than intervening, disrupting, or presenting alternatives.

December 4, 2019
Hon. Paul A. Engelmayer
Page 5 of 8

Sajmir was afraid to share this with Ms. Kunstler earlier because in many ways, she was his only lifeline, his only friend, his only connection to another human being who would sit and talk with him. He was afraid that if he shared the rumblings in his head, that he would lose her. That he would lose all of us – Carlos Santiago, my mentee, who has spent over 70 hours with him over the past two years, Melanie Carr, the mitigation specialist, who has spent over 30 hours with him.

The government's letter presents "a damned if you do, damned if you don't" scenario – on one hand, they argue that the fact that our submission doesn't "meaningfully express remorse or renounce ISIS or terrorism" (Govt. Memo at 2, 49.) On the other hand, they argue, that should Sajmir "change course" and express remorse at sentencing, the Court should "view [this] with skepticism." (Govt. Memo at 45.)

It is not lost on Sajmir that saying the right things – even if he didn't believe them – could help him at sentencing. When we started working with him, Sajmir was afraid that sharing the truth of his beliefs could cost him his legal team. That we would stop caring for him. That we would stop visiting him. That we would stop fighting for him. When those things didn't happen, it was a watershed moment. Because when the sky didn't fall – and we didn't leave – Sajmir was able to open himself up – and to be open to us – taking the first steps to meaningful change. Because we, as a team, were able to reach this level of trust with Sajmir, he was able to speak openly with us about the process of his radicalization, which is outlined in our submission and in Ms. Carr's report. (*See* Carr Report, pp. 27-32.) His willingness to think critically about why he came to believe what he did, is cause for great hope.

Sajmir Alimehmeti turned 26 years old last week. He was 16 years old the first time he entered a mosque, and not much older when his new-found faith was perverted, and the process of his radicalization began. He was 21 years old when he first met the undercover officers who built the case against him, and 22 years old when he was arrested. The government calls our arguments based on Mr. Alimehmeti's youth "meritless," reasoning that his age is "squarely in line with ages of other young, male ISIS followers." (Govt. Memo at 45.) This reasoning runs counter to a modern, neuroscientific understanding of brain development, recognized by Supreme Court in series of recent groundbreaking decisions outlined in our prior submission.

You do not need to be a neuroscientist or a Supreme Court justice to understand that youth and poor decision-making can be intimately related, or that the choices a person makes between the ages of 16 and 22 years old need not define the rest of his or her life. Indeed, there is nothing in his history that suggests that Sajmir's views are lifelong or entrenched.

The government's call for a guidelines sentence in this case not only ignores the contemporary understanding of brain development and decision-making that informs sentencing

today, it also rings hollow in light of the sentences the government has conceded and/or advocated for – in similar cases across the country. The Court need look no further than the cases the government cites in support of its argument that a guidelines sentence will not create unwarranted sentencing disparities, cases which offer no such support. (Govt. Memo pp. 49-50.) All but one of these cases – all of which involved defendants who were further along the path to traveling overseas to join ISIS – resulted in sentences of 15 years.[6] Yet in its 53-page memo, the government has not persuasively explained why Mr. Alimehmeti's conduct warrants a sentence that is more than twice as long.

What the government is asking for here amounts to the type of unwarranted sentencing inflation that Judge Calabresi cautioned against in his concurrence in *United States v. Pugh*, 937 F.3d 108 (2d Cir. 2019) a recent case in which the Court of Appeals reversed the Guideline sentence of a terrorism defendant convicted attempted material support for traveling to Turkey to join ISIS, and obstruction of justice for destroying hard drives containing terrorist material in the airport in Istanbul. While the sentence was reversed on procedural grounds (the Circuit found that the district court did not give sufficient reasoning for its sentence), Judge Calabresi suggested that it might also be substantively unreasonable:

> But is it really justifiable, because of this conduct, to turn Defendant's 15-year sentence into a 35-year one? …This is not to downplay the seriousness of Defendant's crime … But Defendant here was sentenced to 35 years. And the additional term of 20 years of imprisonment seems incongruous … Indeed, it looks as though the court imposed the sentence it did based on the heinousness of Defendant's attempted terrorism and simply used the obstruction conviction as a means to go beyond the statutory maximum of that terrorism count.

*Pugh*, 937 F.3d at 125.

This is precisely what the government is asking the Court to do here. It's 53-page memorandum, filled with inflammatory language and unsupported suppositions concerning crimes it imagined that Mr. Alimehmeti *might* have been planning, asks the Court to impose a guidelines sentence of 360-540 months. Just as obstructing justice by destroying evidence is a serious crime, passport fraud is a serious crime. But it is a serious crime wholly within the landscape of the material support count charged in Count One, and as such, does not increase the gravamen of Mr. Alimehmeti's offense by a magnitude of two.

The disproportionality of such a sentence for Mr. Alimehmeti is further highlighted by a recent sentence imposed in the Northern District of Ohio in *United States v. Elizabeth Lecron*, 19 Cr. 00004 (JCG), a case that the United States Attorney Justin E. Herdman has said he hopes will serve as a model to pursue white supremacists or other domestic

---

[6] One resulted in a sentence of 20 years.

December 4, 2019
Hon. Paul A. Engelmayer
Page 7 of 8

extremists.[7] In the case of Ms. Lecron, a 24-year-old white supremacist who was plotting to murder innocent patrons of a local Ohio bar, and had purchased components to assemble a pipe bomb to carry out her plans. Yet in that case, the government *agreed* to a 15-year sentence.[8]

      Ms. Lecron and Mr. Alimehmeti were both radicalized as young people. Like Ms. Lecron, Mr. Alimehmeti made numerous statements, to undercover agents and online espousing violent radical beliefs. But unlike Mr. Alimehmeti, Ms. Lecron had had purchased components to build a pipe bomb and had targeted a local bar. The fact that Mr. Alimehmeti is Muslim, and his views involved a radical interpretation of Islam, does not make him any less redeemable, or make his youth an aggravating, rather than a mitigating factor. His conduct, while unquestionably serious, did not pose the kind of direct threat to American lives that Ms. Lecron's conduct represented.[9]

      Your Honor, the government may represent the United States in your courtroom. But this is our country too. And while we are Sajmir Alimehmeti's lawyers, we also have an interest in the safety of our families and communities. But where the government views Sajmir as a weapon of mass destruction, and the Court's only reasonable course of action is one of neutralization or incapacitation, we see something else: a young man struggling with his beliefs who is capable of change.

      It is for this reason that we respectfully request that your Honor impose a sentence of 10 years in this case, with a lengthy term of supervised release to follow. Ten years is a s It will put Mr. Alimehmeti behind bars for many years to come, years in which we hope the BOP finally implements some kind of deradicalization programming that will help him develop the tools he needs to succeed upon his release.ubstantial sentence. But it is also a

---

[7] Zapotosky, Matt. *Ohio woman who corresponded with Dylann Roof and plotted mass violence pleads guilty to terror charge*. The Washington Post, August 19, 2019. "Justin E. Herdman, the U.S. attorney for the Northern District of Ohio, said he had never used the terrorism charge outside of an international context in his seven years as a national security prosecutor, from 2006 to 2013. But in Lecron's case, he said, he was able to do so because it involved explosives. Herdman said he's hopeful that other prosecutors might consider similar charges in domestic extremism cases." Available online at https://www.washingtonpost.com/national-security/ohio-woman-who-corresponded-with-dylann-roof-plotted-mass-violence-pleads-guilty-to-terror-charge/2019/08/29/9f8533b6-ca90-11e9-be05-f76ac4ec618c_story.html

[8] Ms. Lecron was sentenced on November 20, 2019.

[9] Like Elizabeth Lecron, Mohamed Mamdouh, mentioned by the government in their submission, planned a violent attack on U.S. soil. According to the government, Mamdouh "plotted to blow up synagogues in Manhattan, and pled guilty to terrorism crimes in New York State court in February 2012." (Govt. Memo at 5) He was sentenced to five years in prison. *See* https://www.reuters.com/article/us-usa-crime-terror/man-sentenced-to-five-years-for-role-in-nyc-synagogue-bomb-plot-idUSBRE93P17N20130426

December 4, 2019
Hon. Paul A. Engelmayer
Page 8 of 8

sentence that shows mercy, a sentence that recognizes that there is hope for Mr. Alimehmeti, that we believe in him enough not to lock the door and throw away the key for decisions he made between the ages of 16 and 22. In short, it is a sentence that is "sufficient, but not greater than necessary" to meet the goals of sentencing in this case.

                Respectfully submitted,

                /s/

                Susan G. Kellman
                Sarah Kunstler
                Carlos Santiago
                Attorneys for Sajmir Alimehmeti

CC:    AUSA Emil Bove
        AUSA George Turner
        USPO Ross Kapitansky

# EXHIBIT G

Vjollca Alimehmeti
34-64 Knox-Place Apt.6g
Bronx, NY 10467
Date: 11/25/2019

Hon. Paul Engelmayer
USA District Judge
Foley Square, New York, NY 10007

Dear Judge Engelmayer

My name is Vjollca Alimehmeti. I'm the mother of Saimir Alimehmeti. Actually I work in a small private business in Albania. I graduated with a Bachelor Degree in Computer Science in December/2010 at Monroe College.
As a mother, I'm aware that my son pleaded guilty, but I want to state here that my son is a good person, despite the mistakes he made in certain circumstances he was in.
What happened to my son was unusual, and in that moment I'm writing, I still can't believe it. It seemed to me, it was the worst nightmare I have ever seen. Sajmir comes from a family with good values, that always have operated its life with these basic principles:
Be honest and faithful, Be brave and courageous, Don't hurt anyone, Never give up, Be respectful.
He has always been very peaceful, loyal and lovely boy.
When I would send Saimir to kindergarten, as soon we knocked on the outdoors, all the kids just would see him coming in, would run towards him, jelling with love: Saimir, Saimir, …… competing with each other, than who would be the first to embrace him.
He is very supportive. When I went to pick up Saimir from kindergarten, his teacher along with kindergarten's director said to me the best words for him in front of the whole class. Their words made me feel so proud for my son.
What had happened that day? One of the children of the kindergarten had injured his knee.

Saimir as good nurse, had cleanse the blood from his friend's knee, treated it with medicine, even had joked with him:
"hey don't cry like that", "have nothing to worry about", "it will hurt a little", "tomorrow, you'll come with healed knee", "beating" his shoulders kindly.
This is my son, who is the same and today days, like a good doctor in war time, who doesn't divide the wounded soldiers into adversary and non adversary, and treat them not as a soldier, but as his patients, as a human being with the same devotion and professional care.
Saimir is a leader. He would be the first to assist his teachers in kindergarten and in first grade, Albania and later on in the USA, in organizing the holidays.
Always, Saimir will be there for help.
My son is an artist. While he was in kindergarten, his dad enrolled him and his brother in a private painting course, where the both of them did very well. Twoo of their best paintings, their professor sent for competition at an international children's exhibition. Saimir is a thrifty boy. He can be a mechanic, electrician or plumber. Since, he was a second grader he would fix its bicycle, a kitchen pipe …..etc.
Saimir is a loyal, lovely young man. When I was sick, he would care for me, making me massage with cold compresses to my forehead to lower the temperature. The same care he would take and for his father too.
As soon his father got home from work, Saimir would bring to his daddy, a basin with warm and salted water by saying:
"daddy put your legs within this basin, so that fatigue to go away".
He embraced both of us lovingly by saying: "you're the best parents in the world"
Saimir is very intelligent.
He has been an excellent student in first grade Albania, where he did only 6 months, because we had to come to the USA as the winner of American lottery. He had a classmate, who was behind with his lessons. Saimir helped him kindly to advance his studies. For this kind gesture, the teacher and his classmate's mother said the best words in front of the whole class.

Dear Judge Engelmayer

These are the Reasons, why I'm asking You for leniency, to have a better understanding what wonderful person Saimir is, and giving him a second chance, You're allowing him to move forward with his goals for a bright and promising future.
Thank you for your consideration and your time reading this letter!!!!!

With Respect
Vjollca Alimehmeti

EXHIBIT H

To whom it may concern,

I am Ervis Bali.  Saimir is the son of my paternal aunt.  I work at the Call-Center in Durres.

I am writing this letter in the hope (undecipherable) of helping you to see what kind of person Saimir is, regardless of the mistakes he has made.

I have known Saimir since he was a little boy.  During that time I have appreciated lots of aspects of his personality.

Saimir has always been unusually well behaved, honorable, respectful, and mindful towards people who came into contact with him.

Saimir was raised within a family that has high human values, very appreciated by all the people that know this family well, and are in contact with them.

I can (undecipherable), can tell you without any doubt that Saimir is very sorry for the mistakes he made.  I am certain that he will learn from this bitter experience and (undecipherable), and that he will never do something like this again.  Regardless of the mistakes he has made, the son of my paternal aunt deserves a second chance, and I hope and believe that you are ready to give him something like that.

I thank you for reading this letter. .you can contact me at this number

Respecfully
Ervis Bali

Ervis Bali (Signature)

Atij/Asaj qe mund ti interesoje

Jam Ervis Bali. Saimiri eshte djali i halles time. Aktualisht punoj ne Call-Center, Durres.
Jam duke e shkruar kete leter me shprese qe t&apos;ju ndihmoje Ju te shikoni se çfare personi eshte Saimiri, pavaresisht nga gabimet qe ai beri.
E kam njohur Saimirin qekur ishte nje djale i vogel. Gjate kesaj kohe, kam çmuar shume aspekte te personalitetit te tij.
Saimir, gjithmone ka qene jashtezakonisht i sjellshem, i ndershem, i respektuar dhe i vemendshem ndaj atyre qe ishin ne kontakt me te.
Saimir eshte rritur ne nje familje me vlera te larta njerezore, e vleresuar nga te gjithe qe e njohin nga afer kete familje, dhe jane ne kontakt me to.
Une mund t&apos;ju them pa asnje dyshim, se Sajmir eshte shume i penduar per gabimet qe beri. Jam i sigurte qe Ai do te mesoje nga kjo eksperience e hidhur dhe s&apos;do te beje kurre me nje gje te tille.
Pavaresisht gabimeve qe beri, djali i halles time meriton nje shans te dyte, dhe une shpresoj dhe besoj qe Ju do te jeni te gatshem ti jepni atij nje te tille.
Ju Faleminderit qe e lexuat kete leter..per me shumë info ju mund te me kontaktoni ne numrin ████████

Me Respect
Ervis Bali

EXHIBIT I