```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4               v.                            16 CR 398 (PAE)

 5   SAJMIR ALIMEHMETI,

 6               Defendant.
                                              Sentence
 7   ------------------------------x

 8                                            New York, N.Y.
                                              December 6, 2019
 9                                            10:05 a.m.

10   Before:

11
                     HON. PAUL A. ENGELMAYER,
12
                                              District Judge
13
                            APPEARANCES
14
     GEOFFREY S. BERMAN
15        United States Attorney for the
          Southern District of New York
16   BY:  EMIL J. BOVE III
          GEORGE TURNER
17        Assistant United States Attorneys

18   SUSAN KELLMAN
     SARAH KUNSTLER
19        Attorneys for Defendant

20
     Also Present:
21   Carlos Santiago

22

23

24

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1                (Case called)

2                THE DEPUTY CLERK:  Counsel, please state your

3     appearance for the record.

4                MR. BOVE:  Good morning, your Honor.  Emil Bove and

5     George Turner for the government.

6                THE COURT:  Good morning, Mr. Bove.  Good morning,

7     Mr. Turner.

8                MS. KELLMAN:  Good morning, your Honor.  Susan Kellman

9     for Sajmir Almehmeti.  My client is on his way to the

10    courtroom, your Honor.

11               THE COURT:  Very good.  Good morning, Mr. Almehmeti.

12    Good morning, Ms. Kellman.  I'll wait Mr. Almehmeti.

13               MS. KELLMAN:  And, your Honor, I'm joined at counsel

14    table today by Sarah Kunstler and Carlos Santiago who is with

15    the mentoring program of the Southern District.

16               THE COURT:  Very good.  Good morning, Ms. Kunstler.

17    Good morning to you, Mr. Santiago.

18               You may all be seated, and good morning as well to the

19    members of the public who are here.

20               All right.  I'll note for the record that

21    Mr. Almehmeti is here.

22               Good morning, Mr. Almehmeti.

23               THE DEFENDANT:  Good morning.

24               THE COURT:  When I took the bench, I simply took the

25    role of the attorneys and welcomed the attorneys, and welcome

1    to you too.

2              THE DEFENDANT:  Thank you.

3              THE COURT:  We're here today to impose sentence in the

4    case of the United States of America v. Sajmir Almehmeti.

5              On February 22, 2018, Mr. Almehmeti pled guilty to

6    both counts of the superseding indictment.  Count One charges

7    him with providing material support to ISIS which has been

8    designated by the secretary of state as a foreign terrorist

9    organization.

10             Count Two charges him with submitting a false passport

11   application so as to enable him to obtain a new passport to

12   facilitate the provision of personnel, including himself, to

13   ISIS.

14             In preparation for today's proceeding, I have reviewed

15   the government's Pimentel letter and the transcript of the plea

16   proceedings.  I've also familiarized myself with the history of

17   this long-running case.  I've also reviewed the presentence

18   report dated May 14 of last year, including its recommendation

19   and addendum.

20             I've also received the following additional

21   submissions:

22             The defense sentencing submission dated November 21

23   and the accompanying letter setting out the defense objections

24   to the presentence report; the government's submission dated

25   December 1 which included, among other attachments, a disc with

1    videos and still photographs; and the defense reply submission

2    dated December 4.

3         Have the parties received each of these submissions?

4    And are there any others?

5         MR. BOVE:  We have, Judge.  And there are no others

6    that I'm aware of.

7         MS. KELLMAN:  Yes, your Honor.  We have.  I don't

8    believe there are any others.

9         THE COURT:  Thank you.

10        Ms. Kellman, have you read the presentence report?

11        MS. KELLMAN:  Yes, your Honor.

12        THE COURT:  Have you discussed it with your client?

13        MS. KELLMAN:  Yes, I have.

14        THE COURT:  Mr. Almehmeti, have you read the

15   presentence report?

16        THE DEFENDANT:  Yes.

17        THE COURT:  Have you discussed it with your lawyers?

18        THE DEFENDANT:  Yes.

19        THE COURT:  Have you had the opportunity to go over

20   with them any errors in the report or anything else that should

21   be taken up with the Court?

22        THE DEFENDANT:  Yes.

23        THE COURT:  Government, have you reviewed the

24   presentence report?

25        MR. BOVE:  We have, Judge.

1          THE COURT:  Let's put aside for the moment the

2   calculation of the sentencing guidelines where I'm mindful

3   there are a range of disputes.

4          Are there any objections to the report regarding its

5   factual accuracy, other than what is in paragraph 81?

6          MS. KELLMAN:  No, your Honor.  Well, other than the

7   imposition of the -- the enhancement.

8          THE COURT:  Sorry.  Other than the guidelines

9   calculation, just focusing on facts.

10          MS. KELLMAN:  Paragraph 81, just what's in that.

11          THE COURT:  I think your letter just deals with

12   paragraph 81.

13          Right?

14          MS. KELLMAN:  May I have just a minute.

15          (Pause)

16          MS. KELLMAN:  That's all, Judge.

17          THE COURT:  Given the parties' consent, I will agree

18   to delete the details that are set out in paragraph 81.  You

19   can confer with Mr. Smallman after this just to make sure that

20   the mechanical execution of that command accords with your

21   collective views.  But I understand what you're trying to

22   accomplish, and I'm fine with that.  So we'll get rid of the

23   descriptive detail in paragraph 81.

24          MS. KELLMAN:  Thank you, your Honor.

25          THE COURT:  Hearing no objections to the balance of

6

1    the report, I will adopt the factual recitations set forth in

2    the presentence report as amended with respect to paragraph 81.

3          The presentence report will be made a part of the

4    record in this matter.  It will be placed under seal.  In the

5    event an appeal is taken, counsel on appeal may have access to

6    the sealed report without further application to this Court.

7          Counsel, it appears to me that you've all filed

8    publicly your sentencing submissions.

9          Let me just confirm that you've done so.

10          MR. BOVE:  Yes, Judge.

11          MS. KELLMAN:  Yes, your Honor.

12          THE COURT:  Let's turn now to the sentencing

13    guidelines.  The Court of course is no longer required to

14    follow the sentencing guidelines, but I am required to consider

15    the applicable guidelines in imposing sentence.  To do so, it's

16    necessary that the Court accurately calculate the sentencing

17    guidelines range.

18          Now, in this case, there was not a plea agreement, and

19    the parties have not stipulated to any particular calculation

20    of the guidelines, and the series of submissions I've received

21    reflect a variety of different calculations as to how the

22    guidelines apply.

23          The government's original Pimentel letter calculated

24    an offense level of 37, a criminal history category of VI, and

25    a guideline range of 360 months to 540 months' imprisonment.

1          The government's sentencing letter argues for an

2    offense level of 42, a criminal history category of VI,

3    yielding the same guideline range.

4          The probation department calculates an offense level

5    of 38 and a criminal history category of VI, again, yielding

6    the same guideline range.  And finally, the defense argues for

7    an offense level of 26 and a criminal history category of III,

8    yielding a much lower guideline range of between 78 and 92

9    months' imprisonment.

10          I've given a lot of thought to the guidelines

11    disputes, and I'm prepared to rule on them.  I'm going to now

12    read into the record, in at a little bit of length I'm afraid,

13    a bench decision explaining my application of the guidelines.

14          As to the chapter 2 calculations, these are

15    undisputed.  On Count One, there is a base offense level of 26

16    under Section 2M5.3 and a two-level upward adjustment for an

17    offense involving dangerous weapons making the offense level

18    28.  On Count Two, the base offense level under Section 2L2.2

19    is 8.

20          The parties' main area of disagreement is whether the

21    so-called "terrorism enhancement" of Section 3A1.4 applies

22    here.  That enhancement applies where "the offense is a felony

23    that involved or was intended to promote a federal crime of

24    terrorism."

25          The government and the probation department conclude

1   that it applies.  Al met I says that it does not.  I hold that

2   the terrorism enhancement applies to both counts.

3        The key term in Section 3A1.4 is a federal crime of

4   terrorism, and it is defined by Title 18, U.S. Code, Section

5   2332b(g)(5) as an offense that "is calculated to influence or

6   affect the conduct of government by intimidation or coercion or

7   to retaliate against government conduct" and that violates at

8   least one of many enumerated statutes, including the statute at

9   issue in Count One, Title 18, U.S. Code, Section 2339B."

10        So as to Count One, Alimehmeti's conduct here clearly

11   involved a federal crime of terrorism.  The Second Circuit has

12   held that a defendant who violates one of the enumerated

13   statutes satisfies the involved prong of Section 3A1.4 so long

14   as the defendant had the specific intent to commit an act

15   calculated to influence government through fraud or coercion.

16   Citing here *United States v. Awan*, 607 F.3d 306 at 317 (2d Cir.

17   2010).

18        Here, the government has shown by at least a

19   preponderance of the evidence, if not way more, that Almehmeti

20   had the specific intent of providing his material support in

21   order to influence a government.

22        Almehmeti clearly intended to provide support to

23   others whom he thought were going to travel to Syria to join

24   ISIS.  See the presentence report, paragraphs 22 to 34.

25        For example, he took one undercover officer to

1    purchase supplies such as hiking boots, a cell phone, a

2    compass, a bag, and a flashlight and provided advice on such

3    purchases.

4         Almehmeti also downloaded encrypted communication apps

5    on the undercover's phone and instructed him how to use such

6    apps.  And finally, Almehmeti drove the undercover to obtain

7    travel documents before taking him to the airport before

8    purportedly taking a flight to Syria.

9         Almehmeti also expressed a desire to travel with the

10   undercover to join ISIS, stating -- and I'm quoting the direct

11   words used --  "I'm ready to fucking go with you, man.  You

12   know I would.  I'm done with this place.  There are kuffar

13   everywhere."  That's paragraph 28 of the PSR.  "Kuffar" is a

14   derogatory term that refers to nonbelievers.  These facts

15   demonstrate that Almehmeti was aware of the undercover's

16   purported affiliation with ISIS and that his actions were

17   aiding and that cause.

18        The terrorism enhancement also applies to Almehmeti's

19   passport offense.  For offenses that are not enumerated ones,

20   the terrorism enhancement can apply provided that the defendant

21   in committing that offense "intended to promote" a federal

22   crime of terrorism.  That is under Section 3.A14(a).

23        To show that, the government must show that Almehmeti

24   intended to encourage the material support of ISIS.  The

25   government does not have to show that Almehmeti himself

1    committed an enumerated crime or that his offense was

2    "calculated."  Citing again *Awan*, 607 F.3d at page 314.

3         Here, the fact that Almehmeti lied on his passport

4    application in order to facilitate the material support of ISIS

5    is clear from the facts set out in the presentence report.

6         The purpose of Almehmeti's lies on the passport

7    application was to obtain a new passport, and the reason that

8    that was needed was self-evident.  His old one had two sets of

9    rejection stamps from the United Kingdom on it that would

10   likely prevent him from successfully exiting the United States

11   and traveling to join ISIS.  That's in paragraphs 35 to 38 of

12   the presentence report.

13        Almehmeti stated in a recorded call that he wanted to

14   reach ISIS territory which he called an "amusement park" via

15   route from Albania to Turkey to Syria.  That's in paragraph 39.

16        And he told undercover officers that he wanted the

17   passport so that he could join ISIS.  The passport, he said, is

18   "not about Albania and Europe.  You know, it's about other

19   places.  I want to travel, you know what I mean."  Paragraph

20   40.

21        When Almehmeti was contacted by a friend who said that

22   she was "going away soon on holiday," which was code for

23   joining ISIS, Almehmeti told her that he could not join because

24   he didn't "have a P," referring to a passport, but that he

25   "obviously wanted to go."  Paragraph 41.

1      This evidence makes clear that Almehmeti lied in an

2      attempt to obtain a passport for the purposes of traveling to

3      join and lend his support to ISIS with all that that meant.

4      The terrorism enhancement adds 12 levels to Count One,

5      bringing the offense level on it to 40.  And it brings the

6      offense level on Count Two to 32.  It also moves Almehmeti from

7      criminal history category III to VI.

8      Now, I want to briefly explain why I'm not persuaded

9      by the defenses' three arguments why the terrorism enhancement

10     should not apply.

11     First, Almehmeti argues that Section 3A1.4 applies

12     only to terrorism directed at the United States government, not

13     foreign governments, and that his conduct was directed to Syria

14     only.

15     That argument fails, in my judgment, for two

16     independent reasons:  First, I find that Section 3A1.4 applies

17     to acts of terrorism directed toward both the United States

18     government and foreign governments.

19     That is evident from the text of 18 U.S. Code, Section

20     2332b(g)(5)(A) and its surrounding chapter, Chapter 113B, as

21     various courts have recognized.  See, for example,

22     *United States v. DeAmaris*, 406 F. Supp. 2d, 748 at 750 to 751,

23     a case out of the Southern District of Texas 2005.

24     As this and other courts have recognized, in this

25     chapter of Title 18, Congress used the term "government" in

1    several different ways and was very precise in its respective

2    uses of the term.

3          In some settings, Congress used the term "government"

4    without a modifier, as it does in the provision at issue, and

5    there are a number of other examples in Title 18 of that.

6          In others Congress narrowed the meaning of

7    "government" by adding to it general terms of limitation such

8    as "facility" as in government facility.  In other situations,

9    Congress distinguished between a "foreign government" or "the

10   government of another state" or "the United States government."

11         The different uses and modifications of the word

12   "government" within Chapter 113B and even within Section 2332b

13   itself, show that Congress intended its use of the term

14   "government" alone in the provision at issue here to refer to

15   more than just the United States government.

16         The Second Circuit has implicitly so found.  On more

17   than one occasion, the Circuit has affirmed terrorism

18   enhancement applicability to defendants who sought to influence

19   foreign governments.  See, for example, *Awan* 607 F.3d at 317 to

20   318 involving the Indian government and *United States v.*

21   *Stewart*, 590 F.3d 93 at 144 and 150, (2d Cir. 2009), a case

22   involving the Egyptian government.

23         Other circuits have explicitly held that the terrorism

24   enhancement applies as well to conduct aimed at foreign

25   government's.  See, for example, *United States v. Khan*, 938

1    F.3d 713 at 718 (5th Cir. 2019), and *United States v. Assi*, 428

2    F. App'x 570 at 574 to 75.  (6th Cir. 2011).  I don't adopt

3    that analysis.

4            Almehmeti states that there is no evidence that the

5    Sentencing Commission specifically focused on this question.

6    Be that as it may, the text controls.  There is no indication

7    of the commission's contrary intent.

8            In any event, even if Almehmeti's construction were

9    correct, the terrorism enhancement would still apply to him

10   here, and that's because I find that Almehmeti's conduct was

11   also directed to the United States.

12           As reflected in the presentence report, in 2015, after

13   Almehmeti twice failed to enter the United Kingdom in fall 2014

14   and following a late 2014 ISIS speech that promoted lone wolf

15   attacks domestically on non-Muslims, he began to hoard knives

16   and other weapons in his Bronx apartment.  PSR, paragraphs 14,

17   15, and 18.

18           He purchased, among other things, spike knives, a

19   military-style survival knife, a folding knife, a pocket chain

20   saw, a face mask, handcuffs, and steel-knuckle gloves.

21           In fall 2015, he told undercover officers that ISIS

22   supporters should do "you know what I mean," which I read to

23   refer to staging attacks at home as well as abroad.

24           And in February 2015, Almehmeti, whose self-proclaimed

25   nickname was, "The Dentist," publicly stated that if there were

1   an ISIS compound in Texas, that he would "brush his teeth

2   there," the most logical implication, in context, being that he

3   would commit violence there.

4          Further, in 2016, Almehmeti offered to take an

5   undercover officer whom he thought was an ISIS supporter poised

6   to travel to Syria to his apartment for supplies, although

7   ultimately that did not come about.  PSR paragraph 31.

8          Almehmeti's stockpile of weapons, coupled with his

9   statements, suggests preparation for a potential attack in the

10  United States.  The stockpiling of weapons served no other

11  conceivable purpose, and the weapons could not conceivably have

12  been taken out of the United States.

13         Almehmeti's second argument is that the Sentencing

14  Commission failed to consider empirical data when drafting the

15  terrorism enhancement, and so the Court should disregard it or

16  give it little weight.

17         Almehmeti relies for this argument on the decision in

18  *United States v. Kimbrough* by the Supreme Court, 552 U.S. 85

19  (2007) which involved the guidelines for crack cocaine.

20         And as the Court noted there, the Commission had

21  failed to consider empirical data or national experience when

22  developing the crack cocaine guidelines.

23         As Almehmeti fairly notes, at least one district court

24  has found that the Commission did not similarly consider

25  empirical data when it prepared the terrorism enhancement.

1   Citing *United States v. Alhaggagi*, 372 F.Supp.3d 1005 at 114.

2   (N.D. Cal. 2019().

3           The problem for Almehmeti is that such an argument was

4   made to the Second Circuit in the case of *United States v.*

5   *Salim*, 690 F.3d 115 at 126 to 127 where the Second Circuit in

6   2012 rejected the argument and affirmed the district court's

7   application of the terrorism enhancement.

8           *Kimbrough*, in other words, leaves a district court

9   free to vary from the guidelines, if warranted under the

10  Section 3553(a) factors, and that is really where Almehmeti's

11  argument best fits.

12          But it doesn't require, as Almehmeti argues, a court

13  to forego the terrorism enhancement in calculating the

14  guideline range which is a first step before I turn to the

15  3553(a) factors.

16          Indeed, in *Salim*, the Second Circuit, in addressing

17  this very argument, stated that "we have never held that a

18  district court is required to reject an applicable guideline.

19  At most, the judge may give a non-guidelines sentence where she

20  agrees with the weight the guidelines assign to a factor."

21  *Salim*, 690 F.3d 126.

22          Even if *Salim* left room for the court not to apply the

23  adjustment where the facts support it, this would not be a

24  persuasive case in which to do so, given the evidence that

25  Almehmeti had in mind and took at least initial steps to

1   further terrorism at home and abroad.

2          Furthermore, the terrorism enhancement is not flawed

3   in a way the crack guideline was obviously flawed insofar as it

4   failed to assign rationally related weights to crack versus

5   powder cocaine.

6          As the Second Circuit has noted, *Kimbrough*'s holding

7   in that context is not license "to disregard its circuit

8   court's interpretation of a particular guideline."  Citing

9   *United States v. Carr*, 557 F.3d 93 at 106 (2d Cir. 2009).

10          Here, the Second Circuit has, time and again, in its

11   words "expressly upheld the lawfulness of the terrorism

12   enhancement."  Citing *United States v. El*-Hage, 589 F. App'x 29

13   at 31, note 2 (2d Cir. 2015).

14          And the Circuit has also specifically found that the

15   Sentencing Commission had a rational basis in fashioning that

16   guideline to increase both a defendant's offense level and his

17   criminal history category.

18          It has reasoned as to the latter that "even terrorists

19   with no criminal behavior are unique among criminals in the

20   likelihood of recidivism, the difficulty of rehabilitation, and

21   the need for incapacitation."  Citing *United States v. Meskini*,

22   319 F.3d 88 at 92 (2d Cir. 2003.)

23          to be sure, the Circuit has recognized that a district

24   court that feels that the terrorism enhancement overrepresents

25   3553(a) factors "always has the discretion to depart downward

1    at sentencing" by assigning a lower criminal history category.

2    The same cite, to *Meskini*.

3           While I respect very much the arguments for a

4    variance, including that Almehmeti did not complete any act of

5    terror and including various background mitigating facts ably

6    chronicled by the defense, I do not find this to be an

7    exceptional case meriting a criminal history departure.

8           Almehmeti is already in criminal history category III.

9    And his many acts and statements indicative of his intent to

10   promote terrorism implicate the reasoning the Circuit used in

11   *Meskini* as to why a bump up in a defendant's criminal history

12   category is justifiable.

13          Almehmeti relatedly challenges the enhancement on the

14   ground that it results in double-counting with respect to his

15   offense level in that his starting offense level for material

16   support to a terrorist organization is then "enhanced for

17   terrorism itself."

18          But in fact, the enhancement, although applicable in

19   many material support cases, does not apply to literally all.

20   As the Second Circuit has noted, "a conviction for material

21   support of a terrorist organization does not necessarily imply

22   that the defendant committed an act of terrorism.  Not all

23   material support for terrorism is calculated to affect

24   government conduct."  Citing *United States v. Banol-Ramos*, 516

25   at F. App'x 43 at 47 (2d Cir. 2013).

1          The Fifth Circuit similarly recognized this in *Khan*,

2     938 F.3d at 716 to 18, disputing that material support is "an

3     intrinsically terrorist crime."  Likewise, the Sixth Circuit in

4     the *Assi* case, 428 F. App'x 572-73, noted that it is "possible

5     to be guilty of providing material support to a foreign

6     terrorist organization but not qualify for the terrorist

7     enhancement."

8          As for the Second Circuit, without explicitly

9     addressing the claim of improper double-counting, it has

10    repeatedly affirmed the application of the enhancement to

11    sentences involving violations of the material support statute.

12    Citing *Banol-Ramos*, 566 F. App'x at 42, and *United States v.*

13    *Kaziu*, 559 F. App'x 32 at 34 to 35 and 39 (2d Cir. 2014).

14         Finally, as to Almehmeti's third argument, it is that

15    the terrorism enhancement prevents the Court from engaging in

16    individual, particularized sentencing.  He argues that it is

17    blind to important facts, such as that inchoate crimes like his

18    that did not involve concrete plans for an attack are much less

19    serious than terrorist plots that advanced further.

20         The short answer is that these facts of course are

21    highly relevant to the just and reasonable sentence here.  I

22    have taken and will take such factors and the other mitigating

23    ones regarding Almehmeti personally that the defense has very

24    ably mustered into account in my overall analysis under Section

25    3553(a).

1          But that is no reason to disregard the terrorism

2     enhancement in calculating the threshold guideline range, which

3     is no more than a starting point for the Court's sentencing

4     analysis.

5          Of course, there are matters of degree and gradations

6     among terrorist acts.  There is, for example, quite a

7     difference between blowing up a building or crashing an

8     airplane or taking hostages on the one hand and purchasing

9     supplies for potential future use in an as-yet unplanned attack

10    on the other.

11         But that is true of almost all enhancements.  Among

12    the fact patterns they fit, they fit some especially squarely.

13    The fact that the enhancement would apply more clearly in the

14    case of a concretely planned or executed terror attack is not a

15    reason to hold it inapplicable in others.  A concrete plan of

16    attack is not an element of this enhancement.  The defense's

17    arguments have a proper place, but it is under Section 3553(a),

18    not in the calculation of the guidelines.

19         All right.  That concludes my discussion of the

20    terrorism enhancement.  I'm now going to turn to the parties'

21    second dispute regarding the guidelines calculation.  This will

22    be brief.

23         The parties disagree whether the two-level obstruction

24    of justice enhancement of Section 3C1.1 of the guidelines

25    apply.  The government argues that it does and that it should

further result in denying Almehmeti the three-level reduction

for credit for acceptance of responsibility on account of his

guilty plea under Section 3E1.1.  As to this issue, I hold with

the defense that the obstruction of justice enhancement does

not apply.

Section 3C1.1 applies where "a defendant willfully

obstructed or impeded or attempted to obstruct or impede the

administration of justice with respect to the investigation,

prosecution with respect to the investigation and prosecution

or sentencing of the instant offense of conviction."

When the obstruction is destruction of evidence, the

enhancement applies where the destroyed evidence "is material

to an official investigation or judicial proceeding."  That's

application note 4D.

The government also must show or thus must show that

the obstruction was both willful and material.  Citing

*United States v. Zagari*, 111 F.3d 307 at 328 (2d Cir. 1997).

The government argues that the obstruction enhancement

applies because Almehmeti wrote in a letter to a fellow inmate,

after pleading guilty and finding out that he was being

investigated for disseminating ISIS propaganda within the MCC,

stating that he had "got rid of" a "book."

The fellow inmate who appears to have given Almehmeti

the book wrote that Almehmeti, if caught with the book, should

say that it was "not his 100 percent" or "they will use against

1   him."  The government interprets this to mean that the book, if

2   not destroyed, would have been used against Almehmeti at

3   sentencing.

4          I understand the government's purpose in making the

5   argument.  It's not an unreasonable argument to make.  But in

6   my judgment, these spare facts are not sufficient to warrant

7   the obstruction enhancement for several reasons.

8          First, it is really ultimately conjectural if the book

9   was material to this case.  For evidence to be material, it

10  must have believed "tend to influence or affect the issue under

11  determination."  That's application note 6.

12         The government, for understandable reasons, has not

13  been able to show what the book is, what it contained, or how

14  it could have potentially impacted Almehmeti's sentence.  And

15  the guideline range for that sentence is extremely high.

16  Indeed, it effectively is the max, with or without the

17  enhancement.

18         Second, the government does not offer a coherent

19  theory as to why Almehmeti had any duty to preserve it or

20  produce it.  The book was not under subpoena.  The government

21  doesn't allege that Almehmeti was subject to some form of

22  preservation order such that he was required to keep and not

23  destroy the written communications he received or generated in

24  his cell.  The government has not pointed to any authority

25  along these lines.

1          Put a little differently, the government's interest in

2    such materials is understandable, but it does not mean that

3    Almehmeti did anything legally wrong or engaged in conduct

4    meriting the obstruction enhancement when he destroyed a book

5    sent to him.

6          Accordingly, I find that the obstruction enhancement

7    does not apply.  And that, in turn, disposes of the

8    government's argument that Almehmeti is disqualified from the

9    three-level credit for acceptance of responsibility.

10          I find, with the probation department and Almehmeti,

11   not to mention the government's earlier Pimentel letter which

12   preceded the alleged act of obstruction, that he merits that

13   credit on account of his guilty plea.

14          The final guidelines' calculation issue is whether

15   Counts One and Two should be grouped together under Section

16   3D1.2 of the guidelines.  I find that they should be grouped.

17          Section 3D1.2(b) calls for the grouping of counts

18   where such counts "involve the same victim and two or more acts

19   or transactions connected by a common criminal objective or

20   constituting part of a common scheme or plan."

21          The government agrees with this citing its memo at 38.

22   And that is ultimately because Almehmeti's conduct underlying

23   the two counts really does represent a common scheme or plan.

24          They each were intended to support ISIS abroad.  Count

25   One involved Almehmeti's provision of material support to ISIS

by helping get the undercover to get to Syria to fight for

ISIS.  And Count Two involves his lying on a passport

application to allow Almehmeti himself to travel to

ISIS-controlled territory and there to support ISIS.

In the plea proceeding, in fact, the government

specifically connected the two counts in this way.  Citing the

transcript at 10 to 11.

Because the two offenses group, Almehmeti's offense

level is set by the higher of the two counts, here, Count One.

The group's resulting offense level was 37, 27 for the base

level, plus 2 for the weapons enhancement, plus 12 for the

terrorism enhancement, minus 3 for the acceptance of

responsibility credit.

Viewed in combination with Almehmeti's criminal

history category of VI, that yields a guideline range that

would ordinarily be 360 months to life imprisonment.

But because the two offenses to which Almehmeti pled

guilty have a combined maximum penalty of 45 years'

imprisonment, the effective guideline range is 360 to 540

months' imprisonment.

That concludes my bench decision.  I want to put a few

things on the record though which may be relevant in the event

that either party seeks to appeal the rulings I've just made.

First, the sentence I impose would be the same even if

I adopted the government's calculation of the guidelines.  The

guideline range would be the same, and so would any sentencing

analysis.

          The difference between an offense level of 37 and an

offense level of 42 has no bearing whatsoever on my assessment

of the just and reasonable sentence.  It is ultimately really

the defendant's conduct, not the guidelines' take on things,

that is dispositive to me here.

          Second, the sentence I impose would be the same even

if I adopted the defense's view that the terrorism enhancement

does not apply.  To be sure, that enhancement makes a huge

difference in the guidelines recommendation.

          But in the context of this case, the factors that

point towards a very long sentence are really primarily the

defendant's conduct and, secondarily, his criminal history.

          The high guideline range that the terrorism

enhancement yields is one way of expressing and capturing the

destructive and alarming conduct in which the defendant

engaged.

          But one does not need the guidelines here to see that.

One does not need the guidelines here to see that

Mr. Almehmeti's conduct was terrifying and, in any real world

sense of the term, terroristic.

          The facts overwhelmingly reflect the defendant's

promotion and support of ISIS at home and abroad.  And these

facts are indelible.  So, for the record, whether or not the

1    terrorism technically fits -- and I think it clearly does -- I

2    would impose the very same sentence.  This aspect of the

3    guidelines calculation is of no moment here.

4            All right.  Having taken care of the guidelines, the

5    issue now involves departures, which is to say within the

6    narrow framework of the sentencing guidelines.

7            No party appears to me to be seeking an upward or

8    downward departure, again, within that framework, although the

9    defense of course is seeking a substantial downward variance to

10   a ten-year sentence.

11           Am I correct though, just to be careful about this,

12   that no party is seeking formally a departure?

13           MR. BOVE:  We are not, Judge.  Thank you.

14           MS. KELLMAN:  That's correct, Judge.

15           THE COURT:  Then having reviewed the presentence

16   report and the parties' submissions, I find that no departure

17   is available as a matter of law.

18           Having taken care, at some length I'm afraid, of those

19   peremptories, we now turn to the heart of the matter.

20           Mr. Bove, does the government wish to be heard with

21   respect to sentencing?

22           MR. BOVE:  Yes, Judge.  Thank you.

23           I think that the Court has already touched on many of

24   the most significant features relating to the imposition of an

25   appropriate sentence here, a lengthy one and, from our

perspective, a guideline sentence that is necessary to reflect

the seriousness of this crime, the gravity of it, the threat to

the public that the defendant presents today that was confirmed

by his counsel in writing in a letter yesterday, and to promote

general deterrence in a calculated, measured way but to send an

appropriate message to people who would plot this sort of

violence, who would plan to go abroad to support this

organization or people considering taking up their fight here

in the city and here in the United States.

From our perspective, a balance of all the 3553(a)

factors weigh in favor of implementing the guidelines

recommendation I think, especially after the letter last night,

Judge.

What I'm referring to here is the confirmation.  I

think that the quote from the letter is that Mr. Almehmeti is

"not there yet" with respect to denouncing ISIS and putting

aside the terrorist objectives that he pursued.

That, to me, looms so large in what needs to happen

today and what must happen today in order to protect the public

and achieve specific deterrence.  This man's conduct over the

past five/six years, so starting with the baseline of the

violent crimes that led to the three criminal history points

that you described, reflects an escalating trend of commitment

to ISIS; commitment to violence -- violence against Americans,

violence against basically residents, citizens, officials of

any government that has said anything contrary to the ISIS propaganda and the ISIS speeches that I think it's clear he believes very much in.

And just to talk about the chronology, I think it's clear from the record and from the photograph of that visit with the state inmate, Mamdouh, that the defendant was radicalized in state prison in 2011 and 2012.  That's why he's going to visit this man in 2014 before each of his attempts to go to the United Kingdom.  I think that's where the evidence of a commitment to terrorism really begins.

In 2014, there are the two trips to the United Kingdom where the defendant's entry was rejected that we've talked about, and we tried to contextualize that trip in our sentencing submission.

The first one is in October 2014.  In September of that year, Judge, the defendant is talking to the woman that he was going to visit about how to travel into ISIS territory.

And I think tellingly and critically, at that point in September 2014, he is connected enough to members and supporters of ISIS that he puts the woman in touch with someone who is confirmed to have been a member of ISIS, and that's confirmed in the evidence in this case.

The Kik account that the defendant passed to that woman was posted publicly on a Twitter account with the same user name for the same man.  I'll say Habashi (phonetic).

1          There's a search warrant on that account that reflects

2     other communications by that man that are similar in nature,

3     facilitating travel to go forward into ISIS territory and

4     fight.

5          Your Honor has already talked about the guidance that

6     was coming from ISIS leadership in that time frame.  That's

7     critical context for what the defendant was planning in

8     September and October of 2014.  I think as you think about his

9     mindset, another important point is that August 2014 trip to

10    Albania.

11         There are text messages following that trip where it's

12    clear that the defendant, at least -- I don't want to overstate

13    it but introduced himself to a man in Turkey who had advanced

14    into Libya.  There are probably, I think, in fairness,

15    competing inferences available from those text messages.  I'll

16    acknowledge that.

17         But I think in the context of all the other evidence

18    and the things that the defendant was saying to the woman that

19    he later went to meet, the inference that's supported by the

20    preponderance at this sentencing was that the defendant was

21    communicating with that man who in those messages confirmed

22    that he had made it to Libya about going to fight for ISIS in

23    Libya at a time where ISIS was mounting a major offensive

24    campaign in Libya.

25         So now we're in October 2014.  The defendant gets his

1    first rejection stamp in the United Kingdom.  He comes back,

2    and he's not deterred.  He tries to pay for the record in a

3    better way by getting this invitation letter from the woman's

4    father.  We set out the evidence to the way that that letter

5    was prepared, again, another thing that I want to be measured

6    about, because this evidence escalates.

7         But I think as you look at that, it's clear that the

8    defendant played a very central role in creating that document.

9    He was communicating with someone in the United States about

10   how best to present it to British authorities to facilitate his

11   entry into the United Kingdom.

12        The defendant sent that letter, not to the woman's

13   father, but to her.  There are text messages sent out in our

14   sentencing submission where he asks her to go get it notarized.

15        There is an inference here, Judge, we submit, that

16   that signature is forged, forged by the woman who wanted the

17   defendant to join her in the United Kingdom so they could

18   travel onward.

19        But our recommendation and our position on a guideline

20   sentence doesn't rise and fall with that inference, not at all.

21   The defendant goes to the United Kingdom.  I think there is

22   back-and-forth in the submissions about both trips about what

23   the defendant's intent was.

24        I think it's telling, and this is why we provided the

25   report.  The British authorities concluded, based on what was

1    in his phone, based on their investigation, based on their

2    investigation of a woman that he was communicating with and the

3    evidence relating to her radicalization that the defendant's

4    purpose in that second trip was also to meet with her and

5    travel forward into ISIS.

6           That doesn't happen.  The defendant comes back in

7    2015.  Things get worse.  We talked about in our submission --

8    and you have the document.  In May 2015, the defendant wrote

9    his own will in anticipation, hopeful anticipation, of dying on

10   behalf of ISIS in a terrorist attack.

11          That concept of martyrdom is going to come up a little

12   bit when I get to the letters between the defendant and Rahimi

13   because he wanted to achieve that terrorist name in 2018.

14          But in 2015, May, the defendant writes that will.  He

15   also purchases a tactical combat rucksack.  That's one of the

16   early Amazon purchases that were uncovered through the search

17   warrants in this case.

18          During that same year, he establishes his apartment as

19   an ISIS outpost with the flag in his living room.  As

20   your Honor referenced during your written decision, he's

21   talking to undercover officers about conducting beheadings.

22          I think the Court's inference at this point from the

23   defendant's nickname of "The Dentist" and these toothbrushing

24   references is that he was plotting acts of violence.

25          I submit, based on the things that were said and the

1    context in which they were said, that the inference is a little

2    more specific.  It's not just ISIS violence, Judge.

3           This defendant in this courtroom, who is still "not

4    there yet" in 2015, was committed and excited to participate in

5    a very specific, very graphic type of violence associated with

6    this terrorist organization, decapitations, in Texas, as

7    your Honor referenced, and also abroad.

8           His plan for joining ISIS -- and there are cases like

9    this where a defendant wants to go support the organization by

10   providing funds or medical expertise.  The defendant wanted to

11   go conduct beheadings for this organization.

12          In terms of whether or not the defendant was planning

13   an attack or contemplating that in the United States, we think

14   that the evidence of his problems, his inability to travel

15   abroad, is part of the proof that supports that inference.

16          But another thing that I think looms very large in

17   that analysis about whether this man planned and is still a

18   risk of perpetrating violence here in this country is the talk

19   in the meetings with the confidential sources -- excuse me.

20   The undercovers -- about a covenant of security.

21          What does that mean.  It's a concept, as I understand

22   it, Judge, that conveys that when a Muslim feels that the

23   country has aligned or offered him protection, that he has a

24   covenant, an obligation, not to perpetrate violence in that

25   country.

1          The defendant said, time and again to the undercovers,

2     notwithstanding the fact that he had been permitted to emigrate

3     here, that he had been permitted to naturalize, he said, time

4     and again, "I have no covenant with this country."

5          That was a way for the defendant to convey to the

6     undercovers -- let's be clear about this.  These meetings with

7     the undercovers -- it's not just one or two undercover officers

8     and the defendant sitting in a room someplace.

9          There are other supporters, other people who are

10    like-minded also under investigation being targeted by the FBI

11    who are there as well that the defendant is talking to.

12         Some of them he knows better than others.  So he's

13    understandably I think being less explicit than he might

14    otherwise be in close quarters in conversations with people

15    with which he had absolute trust like his brother.

16         But the defendant is pretty clearly saying, I have no

17    covenant with this country, America.  He's saying that while

18    purchasing knives, while purchasing a pocket chain saw.

19         I don't think that we said too much about the pocket

20    chain saw in our submission, Judge.  But when you're thinking

21    about what the defendant had in mind when he referred to

22    himself as "The Dentist" and he's talking about brushing teeth,

23    Judge, the only purpose in the context of this evidence for

24    having bought that weapon -- and on this evidence, it was a

25    weapon -- was to use it.

1          It basically had two hooks or handgrips on each side.

2     And I think in its design it was probably intended to cut trees

3     down or cut wood in a camping trip.  This was a weapon that the

4     defendant intended to use to perpetrate decapitations.  So that

5     is the evidence that is developing in 2015.

6          THE COURT:  Can I just pause you on that just before

7     we leave the equipment that was found in his apartment.

8          Was anything found that offers an insight as to a

9     concrete plan as to how, when, where these would be used?  A

10    map of a location, an email, anything like that?

11         MR. BOVE:  No, Judge.  I think it's a fair point to

12    concede that point.  I'm certainly not here to overstate any of

13    the evidence.  I appreciate, and I agree with the way that you

14    described it in your written opinion as someone who is

15    gathering weapons and other tools in anticipation of some kind

16    of violence, whether that's going to be in the United States or

17    abroad, without any specific plan as of the time that he

18    gathered them.  I think that's fair.

19         THE COURT:  In other cases involving lone wolves, has

20    evidence been found that indicated, for example, the location

21    of an intended plan?

22         I'm trying to figure out what one makes of -- counsel,

23    I'm sorry.

24         I'm trying to figure out what one makes of the absence

25    of that.

```
 1              Is it that that would actually be fairly typical and
 2    that lone-wolf attack would not involve communicating with
 3    somebody else or writing out information or doing recon on a
 4    location?
 5              Or is it something one would ordinarily expect to see
 6    before a lone-wolf attack moved forward?
 7              MR. BOVE:  In our experience, referring to Mr. Turner
 8    and I who were working these cases in 2014 and forward, the
 9    evidence here is consistent with what we've seen elsewhere.
10              And it's consistent with pretty basic concepts of
11    operational security that you would not commit to writing,
12    for example, or even speak in detail in these somewhat broad
13    circles at the ITS gatherings or even with the men who came
14    back to the apartment, speak in detail about your plan.
15              THE COURT:  No.  But you might find evidence of doing
16    recon in a particular venue.
17              MR. BOVE:  I agree.  That's fair.  I do think that
18    ISIS disseminates propaganda about appropriate venues for these
19    attacks.  So they have basically created instruction manuals
20    about the best targets to do this such as they've released
21    materials about the subway system, Times Square, and things
22    like that.
23              Especially in the context of a knife attack, in a lot
24    of ways, the whole point here, Judge, is that you can pick up
25    and go and carry out something like that without much advanced
```

1    planning and strike a soft target.

2            Again, I'm not --

3            THE COURT:  You've answered the question.  Thank you.

4            MR. BOVE:  In 2015, we've talked about the equipment,

5    the passport, the ISIS flag, the beheading conversations, the

6    discussion about a covenant of security.

7            I want to pause here to say a little bit about the

8    investigation, what's going on at this point, because a lot has

9    been said in the defense submission about what might have been

10   in terms of the FBI's approach to this.

11           In this time frame -- and the agents are here, and

12   they participated in this, Judge -- there was an extremely

13   thorough review going on to try to determine -- and not just

14   with respect to this defendant, several targets in this

15   situation -- what level of threat did they pose, how best to

16   approach that situation.

17           Yes.  Here, particularly because of the weapons that

18   were being gathered -- and I think this record has helped in

19   that you have a very good sense of the historical context of

20   what things looked like from the perspective of

21   counterterrorism efforts in 2014 and 2015 based on what ISIS

22   was saying.  We're literally removed from that, although I

23   think events last week in London bring it right back to the

24   forefront.

25           This was a time when the FBI was actively carefully

1    looking at a variety of targets who were consuming ISIS

2    propaganda and thinking about how out to address those threats.

3         To the extent there were situations where it seemed

4    like people were inclined more towards staying on the internet

5    with this than to perpetrating attacks, decisions were made

6    about how to deploy investigative resources and what steps to

7    take.

8         This is a situation where the man is stockpiling

9    weapons in his apartment and talking about carrying out

10   beheadings.  We fully stand by this.  This was not a situation

11   where it was feasible, where it would have been consistent with

12   our obligations to protect the public, to open up a dialogue

13   with Mr. Almehmeti about whether he was willing to stand down

14   from the things that he was saying.  That was just not an

15   option here.  A lot of thought went into when and how the sting

16   aspect of this would be deployed.

17        I know that your Honor has seen sting investigations

18   in a lot of different contexts.  They can be used in different

19   ways with different levels of sophistication.

20        In hindsight, as I look at this record, I think when

21   you look at what was going on in 2014 and 2015, I don't think

22   there was much question that there was probable cause for an

23   arrest, and that would have been consistent with our

24   obligations to protect the public.

25        But instead, the FBI continued to put resources on

1   this in terms of surveillance, trying to get a sense of what

2   was actually going on, is this man actually a threat.

3       Towards the end of it when I think it seemed pretty

4   clear to all of us that he was, that he was trying to go fight

5   abroad, that if that was not available to him, that he was at

6   severe risk of carrying out an attack here, we decided to

7   insert the additional undercovers and give the defendant an

8   opportunity, put an open question to him in May 2016, sir,

9   there is a man coming to New York City.  He is going to travel

10  to fight with ISIS.  Do you want to help him or not?

11      That was the defendant's decision to make.  And I

12  think, from our perspective and the way that these

13  investigations were being carried out at the time, that was

14  important to us to put that to him as an open question,

15  notwithstanding the evidence of predisposition, to make sure,

16  not just could we prove this case at trial, but I submit on

17  behalf of the FBI, this was done in a thoughtful way.

18      How is he going to react to this.  They could have

19  went and arrested him by the end of 2015.  And I think that if

20  the defendant had said in 2016, I'm not interested in that

21  anymore.  That's not my aim, we would have looked at this

22  differently.

23      It would have obviously been exculpatory as to his

24  state of mind, and it would have absolutely borne on our

25  thinking about the case, but that's not what happened.

1          The defendant doubled down when that sting was

2     deployed.  Not only did he fully embrace helping that

3     undercover get to ISIS, he reiterated excitedly that he wanted

4     to go himself.

5          One of the things that he was excited about was that

6     as much trouble as he had had getting a passport through his

7     own passport fraud as charged in Count Two, this concept of a

8     new document facilitator was introduced.  He gives him his

9     phone number, and he was excited about the idea that this man

10    can get him forged documents that will help him travel.

11         There's a paragraph in the PSR that describes the

12    defendant's conversation with his brother, Erald, after that

13    happened.  And he's saying, look.  I think I have another way

14    to get there.

15         The relationship between the defendant and his brother

16    and who the defendant's brother is I think is another important

17    thing for the Court to consider when you're thinking about

18    specific deterrence and the need to protect the public.

19         The defendant's brother, Erald Almehmeti, is another

20    radicalized supporter of ISIS.  Time and again to the UCs

21    during this investigation and to others -- I think there's a

22    recorded call where the defendant talks about waiting until his

23    brother gets out of jail to travel.

24         She's talking about -- the other participant in the

25    call is saying, I'm getting ready to go.

1        And he says, I can't go quite yet because the

2   defendant's brother, Erald, is incarcerated in Albania on

3   weapons charges.

4        The defendant's brother now is at liberty in Albania

5   and, from our perspective, continues to pose a threat in his

6   own right and will also pose a threat in tandem with the

7   defendant here to travel abroad, whether it's ISIS or some

8   other terrorist organization, to pursue jihad based on his

9   terrorist principles.

10        So that's 2016.  The arrest happens.  I think from our

11   perspective, in almost all of these cases, that arrest point is

12   the beginning of the incapacitation, the beginning of the

13   disruption.  The targeting of this particular defendant ends

14   with him being placed in prison, detained.  And it should end

15   the threat.

16        It's extraordinary that that did not happen here and

17   truly superlative for almost any of the cases that we've dealt

18   with.  Your Honor's talked about some of that evidence already.

19        Looking back on it, perhaps we should have been more

20   careful about the security measures in place based on what the

21   defendant said in 2015 about how he -- this is in the PSR.  He

22   would radicalize people in the prison committing to that.

23        I think, as we looked at evidence in real time, that

24   was bluster to us.  Certainly we didn't think the defendant was

25   anticipating being arrested.  He did exactly what he promised

1   to do, Judge, with some of the most dangerous, convicted

2   terrorists that have been around the city in years, including

3   Ahmad Khan Rahimi, both pooling terrorist propaganda that was

4   part of the discovery in that case and distributing it to

5   others.  We flagged this in our submission for you.

6       Rahimi was a pretty sophisticated bomb maker, Judge.

7   Rahimi constructed complicated pressure-cooker bombs.  He

8   manufactured explosives in his house in New Jersey.  He put the

9   chemicals together himself based, in part, on AQAP propaganda

10  but also based in part on education in engineering and other

11  training that he obtained that put him in a position to create

12  these different kinds of devices.

13      To now see, as we do in letters, that they had as much

14  connectivity as they did and were talking about, for example, a

15  plan, what ended up happening here was that there's a period of

16  time where Rahimi and this defendant had an opportunity to

17  discuss attack planning.  And I think that's pretty explicit in

18  the letters that we've submitted to you.  That, to us,

19  escalates the dangerousness posed by Almehmeti to a high level.

20      I anticipate -- I wouldn't be surprised to hear the

21  defense say that's our fault.  Whether or not a mistake was

22  made, the defendant who sits here in this courtroom is the one

23  to be sentenced.

24      This is a man who has communicated clearly very

25  closely, even affectionately, with a defendant who detonated a

1    bomb in this city and tried to murder several police officers

2    when they tried to arrest him.

3         The Court's already talked about the gravity of the

4    mindset reflected in the defendant's writings about destroying

5    evidence.  I think perhaps even more -- not "perhaps."

6         Much more troubling is the defendant's referencing

7    himself as the ISIS Balla, still remaining committed to the

8    organization in one of those letters and, worst of all, sort of

9    the aspiration that he and Rahimi would achieve jihad,

10   martyrdom.

11        So looping back to that will in May 2015,

12   notwithstanding everything that happened, Judge -- the arrests,

13   everything in this letter -- the defendant is still committed

14   to terrorism.

15        Then, again, just last night -- I think in every

16   respect I appreciate the candor from defense counsel on this.

17   I think we'll get a view perhaps about what this means, but

18   defense counsel concedes the defendant is not deradicalized.

19   He's "not quite there yet" with respect to abandoning these

20   concepts, these objectives, and these beliefs.

21        And I think, even if general deterrence was not a

22   factor here, if we just set that aside for a minute, just to

23   protect the public, just to achieve specific deterrence based

24   on what you've seen here, a guideline sentence is appropriate,

25   and it's necessary.

1          But this is now a time in 2019 where ISIS' efforts

2    here and abroad to promote lone-wolf attacks are escalating.

3    We flagged for you one of the pieces of propaganda that

4    purports to send a message to America of violence.

5          And I think it's critical that the Court respond in

6    kind here today.  This is one of the first public sentencings

7    that's going to happen after the attack in London last week, an

8    attack that ISIS has claimed of being of the kind and the type

9    that they're promoting and suggested to people in public

10   channels that this is exactly what we want done.

11         What's important here, Judge, in terms of general

12   deterrence, is that the message be sent that the court system

13   will not wait until someone gets a little bit closer to

14   carrying out an attack here.  And I promise you the FBI will

15   not wait either.

16         When people are found to be planning these types of

17   things, to be of a mindset where they're thinking about them,

18   the London attack illustrates how important it is to disrupt

19   that activity and incapacitate the people who are involved in

20   it as quickly, as swiftly, and fairly as possible.

21         And I think that's a huge part of today's sentencing,

22   is sending that message that that is an appropriate law

23   enforcement objective and that courts recognize and that

24   your Honor recognizes -- and you'll make the decision

25   obviously -- that this is something that is appropriately

1    incapacitated and targeted in this way.

2            A lot has been said in the submissions about

3    deradicalization programs.  I submit that is not a mitigating

4    feature of this sentencing, the availability of the programs,

5    whether the FBI may have chosen a different approach or not.

6            I'm trying to lay out for you why we took the approach

7    that we did here.  I pointed to you the quotes from some of the

8    research that's cited in the defense submission that indicates

9    that this is still a very early field of study and a very early

10   concept to think about whether this is even possible.

11           Your Honor cited the *Meskini* opinion where the Circuit

12   talked about how difficult it is to get people to walk away

13   from this kind of ideology, to deradicalize them, how this type

14   of crime in that way is different than almost any other when

15   you're thinking about how to achieve specific deterrence.

16           There are some anecdotes where this concept of

17   deradicalization has perhaps worked to the benefit of the

18   public or to the defendant.  The defense cites this *Doe* case,

19   obviously very different, Judge.  The defendant in that case on

20   the day he was arrested took a step towards deradicalization

21   that the defendant still hasn't taken today.

22           And it has to be said -- and I want to say it in a

23   careful way because it's anecdotal, but this is a, fact that

24   Khan in London last week murdered the counselors in his

25   deradicalization program.

1          This is something that's got to be looked at extremely

2     carefully and thoroughly.  And in the context of an individual

3     sentencing, that's just not the place to do that.

4          We are here today for a sentence of Sajmir Almehmeti

5     based on what he did dating back to 2013, based on the person

6     he is today, someone who has admittedly not walked away from

7     these terrorist objectives based on the threat that he still,

8     as he sits here, poses to the public and based on the need to

9     deter others from this kind of conduct, to do our part to try

10    and protect the people of the city and to protect other targets

11    of ISIS all over the world.

12         So for all of those reasons, based on everything that

13    the defendant did before he was arrested and certainly what you

14    have seen from him since then, we submit that a guideline

15    sentence is appropriate.

16         THE COURT:  All right.  Thank you, Mr. Bove.  A very

17    helpful and thoughtful presentation.

18         Ms. Kellman, do you wish to be heard?

19         MS. KELLMAN:  Thank you, Judge.

20         THE COURT:  And then, just for counsel's and

21    everyone's benefit, it's my anticipation, after hearing from

22    the defense and the defendant, that we'll take a comfort break

23    for everyone before I impose sentence.

24         Go ahead.

25         MS. KELLMAN:  Thank you, Judge.

1        Your Honor, what I hear a little bit from the

2   government is a little bit like you're damned if you do and

3   you're damned if you don't.  The government comments that it

4   was appropriate for counsel to put in our letter yesterday that

5   we didn't think our client was quite there.

6        If we had said that he was there, then the government

7   would say, it's unbelievable.  Given all his history, it's

8   unbelievable.  But we tried to be candid with the Court, and I

9   think we're always candid with your Honor.

10       But when you're caught in the damned if you do and

11  you're damned if you don't, it's a little hard to know how you

12  get to whatever the truth is or whatever truth there is.

13       One of the things that gives us confidence in our

14  client is that he has grown over these last four years under

15  the worst of circumstances.  He's not 19 anymore.  He's not 21.

16  He's not 22.  He's 26.

17       He's prepared now to think more critically about what

18  he says and what he does, and that gives us hope.  We hope that

19  we'll be able to, through this discussion and through our

20  papers, that we'll be able to persuade your Honor that there's

21  a lot more than the talk that went on here that leads to the

22  whole person and the way in which the Court can deal with this.

23       Now, I understand obviously it's the government's job

24  to represent the United States in this courtroom.  But

25  Mr. Almehmeti's team here, his legal team -- we're not in such

1   a different position.  We live in this city.  We have families

2   in this city.  We want to make sure that our city is safe.  We

3   take our role very seriously.

4         Obviously we're advocates.  But at the same time,

5   we're able to, I think -- I hope -- analyze the information

6   that your Honor has before you in a different way.  I heard, in

7   a very artful and articulate way, a presentation by the

8   government that wasn't as over the top as their written

9   submission.

10        But what it was was, in its own way, an apology.  Why?

11  Because it was talk, and it was talk, and it was talk.  And it

12  was let's do this, and let's do that.  But nothing escalated.

13  And nothing escalated over more than a year's time.  And that

14  matters.

15        And it matters for a number of reasons, because at the

16  time these agents met Sajmir Alimehmeti in the beginning, he

17  was young.  He was confused about his own identity.  He was

18  alienated from his family, isolated from his family.  His

19  family was overseas at the time.  He was young and on his own

20  in a community where he didn't feel accepted.

21        He had begun to undertake the teachings of the Muslim

22  faith in good faith in a legitimate mosque and felt comfortable

23  about it and felt a connection that we all need.

24        He didn't have family around him all the time, and he

25  felt the connection with this individual who took him to the

1  mosque who was a serious fellow, and he got more and more

2  involved.

3          He explained -- and we put it in our papers.  He

4  explained to the extent in which he felt a place that he

5  belonged in.  He responded to the prayer.  He felt comfortable

6  in it, and he found a place.  He began to grow a beard.  He

7  began to dress differently, and he began to get mocked.  And

8  this caused a real confusion in a young man who has no place to

9  go for advice about this.  He reacted.

10          When you have someone who is young and confused and

11  alienated, isolated, and looking for a place to belong, and

12  enter the FBI who really were everything he was looking for,

13  somebody, adults, to connect to, adults who seemed to have an

14  answer, adults who were able to sway him one way or another.

15          We included in our submission to your Honor

16  Judge Weinstein's statement of reasons in the *John Doe* case.

17  In that particular case, the agents similarly saw the

18  beginnings of similar kind behaviors, and they were concerned

19  about it.

20          And this individual, John Doe, lived in Brooklyn, I

21  believe, with his family.  The agents, rather than setting him

22  up and trying to effectuate some terrorist kind of activity --

23  they went to visit his home.  They went to visit his paints.

24  They had a sitdown with him and his parents and said, this is

25  the wrong path.  Get your act together.  Don't do this because

1    this will get you in trouble.

2         Now, did it help?  No, it didn't, at least not in the

3    first instance because John Doe did travel to Syria.  He did

4    join ISIS, and he did take training, military training.  He

5    carried a weapon.  He fought in a particular battle.

6         So why do I raise this.  Well, for several reasons,

7    first, when he got to Syria, one of the things he saw were

8    suicide belts, and it freaked him out.  And he saw that the

9    things he believed, the things he read on the internet that

10   were all so attractive were not true.

11        He didn't know what to do.  He didn't know how to

12   extricate himself, but he called the FBI.  And I wonder -- and

13   we'll never know, but I wonder if the reason he called the FBI

14   was because the FBI had reached out to him.  The FBI had said

15   to him, don't go down this path.

16        And when he got down the path and he saw that it was

17   everything they said it would be and he didn't belong there, he

18   felt comfortable enough to call the government, to call the

19   FBI, and say, I need help.

20        And they helped rescue him.  When he came here, he was

21   a different person.  He had seen the truth of what was there,

22   not what is on the internet, which is there for the purpose of

23   fishing and attracting as many adherents as they can.

24        In a different case, Judge, I had the opportunity to

25   look at some of the videos that were put out by ISIS adherence.

1    And one was a young man who was probably between 20 and 22/23,

2    a very nice-looking man.  He was sitting on a rock in front of

3    a lake.  The sun was setting, mountains in the background.  It

4    was quite a beautiful scene.

5          It was Canada.  It said that it was Syria, but it was

6    actually Canada, and it was a stock photo.  And he was talking

7    about how beautiful it is here in Syria and how wonderful it

8    is, and he goes to work every day and comes home to his

9    beautiful family.  And all he does during the day is work which

10   is fighting.  Then he comes home and has a lovely dinner and

11   has a lovely evening with his children.

12         For somebody who wants to belong and look at this

13   beautiful sunset and these beautiful mountains, if you want to

14   go to Canada, knock yourself out.  That's what's available

15   there.

16         That's what targets young people who don't have a

17   mission, that don't have the support that they need to have

18   somebody say, you know, you're out of your mind, or this is the

19   wrong path, like the FBI tried to do in that other case.

20         Judge Weinstein spent some time talking and in fact

21   called witnesses at this young man's, John Doe's, hearing.  And

22   he asked the experts, what do you do with someone who has gone

23   down this path, who has actually gone to Syria and joined up,

24   pledged an oath?  What do you do to somebody who's gone down

25   this path?  Who are these people that go there and get swept up

1    in this?

2          The experts all agreed that they were people who were

3    insecure, immature, and easily manipulated.  And there you have

4    it, a young man who is on his own basically, who is easily

5    manipulated, who is insecure, has feelings of alienation and

6    wants more than anything and in fact is desperate to belong.

7          Then Judge Weinstein asked what the best path for

8    deradicalization is.  And the answer was not incapacitation

9    because incapacitation turns people into monsters.

10         The answer was a strict regimen of programming,

11   programming that includes deradicalization and training,

12   programming that included limited access to the internet,

13   programming that included creating a safety -- they called it a

14   cocoon, a safety cocoon that had triggers so that if the

15   individual moved in any of the wrong directions, there would be

16   a stopgap that would let the probation department or whoever

17   was supervising him know that he was moving in the wrong

18   direction.

19         Because one person failed at deradicalization in the

20   government's example doesn't mean that it doesn't work, and

21   these experts are saying that in fact it does work and that

22   with the proper restraints, with the proper limits, with the

23   proper guidance, that it can work and that it's far better than

24   turning people into monsters.

25         I wanted to spend a little bit of time, Judge, talking

1    about some of the other sentences that have been doled out

2    around the country.  I'd say one other thing with respect to

3    the supervision, and that was that this one expert also said --

4    actually, I believe this was Judge Weinstein -- said that it

5    was important to avoid needlessly destroying a human life but

6    encouraging a person and teaching a person how to live within

7    the law.

8            This is a young-enough man that he has all the

9    potential of his life ahead of him.  To put him in jail for, as

10   the government suggests, 30 or 40 or 45 years, what comes out

11   at the other end, if he's still alive, is not a human being who

12   is capable of in any way, shape, or form adhering to the kinds

13   of civility and law-abiding way of life that we would expect.

14           The government voices a concern about avoiding a

15   sentencing disparity and therefore argues for a guideline

16   sentence of 360 to 540 months.

17           But in the cases that they cite, the very cases that

18   they cite -- if I remember, Judge, three of the four cases that

19   they cite were individual defendants who actually traveled to

20   Syria and actually joined ISIS.

21           Of those four, three of them received I believe

22   15-year sentences.  Three of them received 15-year sentences.

23   More importantly --

24           THE COURT:  Was the statutory maximum above 15 years?

25           MS. KELLMAN:  That's correct, Judge.

1          THE COURT:  Sorry.  The statutory maximum though was

2     15 years?

3          MS. KELLMAN:  Yes.  That's correct.

4          THE COURT:  So do we know if there had been statutory

5     headroom whether the sentence had been longer?

6          MS. KELLMAN:  Well, I can say that there is guidance

7     on this from the Second Circuit because very recently in the

8     *Pugh* case, Judge Calabrese -- the sentence below was 15 years,

9     because that was the maximum, plus 25 years for obstruction of

10    justice.

11         So the district court stacked the sentences, and

12    Judge Calabresi said, now, I think this is really not the way

13    to go because all you're doing is extending, creating a

14    statutory way to extend what is a 15-year sentence, and it's

15    inappropriate.

16         He sent it back for resentencing.  And the defendant

17    hasn't been resentenced yet.  So I can't tell you what the

18    result will be.  Clearly, the Circuit had that in its mind and

19    also the fact that Congress decided that 15 years is an

20    appropriate sentence for this kind of behavior.

21         And to tack on additional matters -- when you consider

22    the difference between a passport fraud and terrorism, the

23    government has decided -- or Congress has decided -- 15 or 20

24    years now is an appropriate sentence but 25 for a false

25    passport.

1          In fairness, think about the passport issue itself.

2    How hard would it have been for these agents to just get a

3    passport.  If this kid wanted to really go to Syria, get him a

4    ticket, drive him to the airport.  And when he gets out of the

5    car and he goes to the gate to board a plane, you arrest him.

6    There are cases where that's exactly what the agents did.

7          A lot of what the government said here today was they

8    went as far as they thought was safe.  They went as far as they

9    could, but that's just not the case.

10         The case is they did exactly what this young man

11   needed.  They wrapped themselves around him, they gave him

12   something to hold on to, and they let him talk his heart out,

13   and they helped him talk his heart out.

14         They gave him these topics, and he bought into the

15   topics.  And he went all over the place with them.  One thing

16   he didn't do was anything, anything but talk.

17         The government spends a considerable amount of time on

18   this lone-wolf idea.  And I saw that it piqued your Honor's

19   interest.  But I would say several things about it:

20         First, while there were conversations, as the

21   government points out, around the time, ISIS conversations

22   about lone-wolf attacks, here you have a young man who they say

23   had an arsenal.  But nobody ever said to him, let's plan

24   something.  Let's try to do something.  And he never did

25   anything with those weapons.

1              There is a case that's very recent --

2              THE COURT:  May I just ask you though:  Is there a

3    benign explanation for what was found in his apartment?

4              MS. KELLMAN:  The benign explanation is maybe he's a

5    nut.  Maybe he collects knives.  I have a client who is a

6    white-collar tax evader.

7              THE COURT:  Ms. Kellman, I appreciate the valid point

8    that there was no concrete plan.  I get that.  I'm trying to

9    understand if there is any way of looking at anything that was

10   found in his apartment as anything other than an early step

11   towards a plan.

12             I'm giving you a chance if there is some other way of

13   looking at a pocket chain saw, mask, and all those knives.  If

14   there is some other way of looking at this as ISIS relevant,

15   this is your chance.

16             MS. KELLMAN:  I don't know if it is ISIS relevant.  I

17   know that he did a robbery years earlier when he was 16 years

18   old I think, and he had a weapon then.  He had a knife.

19             THE COURT:  A chain saw?

20             MS. KELLMAN:  He didn't have a chain saw.

21             THE COURT:  Look.  I'm being direct with you.  The

22   circumstantial evidence of the full set of what was collected

23   sure looks like it was the first step, even if second and third

24   steps weren't taken, towards an attack.  If there is some other

25   way of looking at the purpose beyond collecting those, I want

1    to hear it from you.

2              MS. KELLMAN:  I would answer your Honor this way:  The

3    government makes it clear -- and I think we all understand --

4    he was never getting those weapons out of the United States.

5    So it must have been an attack that he was thinking about

6    inside the United States.

7              Is there any conversation that supports that?  No.  Is

8    there anything on the internet that he says, I'm about to do

9    this or I hope to do this or I'm going to do this?

10             And in the *Lacrom*  (phonetic) case which we pointed

11   out to your Honor, there we have an incident where the

12   defendant there is 24 years old.  She is all over the internet

13   about mass murder.  She wants to pay homage to the Columbine

14   shooters.

15             She speaks of nothing but mass murders and how she

16   wants to be a mass murderer, and she buys all the things that

17   she needs to make a pipe bomb.  She has extensive firearms in

18   her home.

19             So you say, well, that's just what he was doing,

20   collecting all these things, but she was talking about it.  She

21   was sharing it with people.  It wasn't a secret.

22             You had agents surrounding this individual who could

23   have easily pulled him in that direction if he wanted to go in

24   that direction.  There were times when he was in front of other

25   people.  There were times when they were alone with him.

1          Let's be clear about this.  This young man trusted

2     these agents, and we know he trusted them.  First of all, he

3     would have adhered to almost anything.  He wanted that

4     connection.  He wanted to belong.  But when he got married, he

5     asked them to be the witnesses at his wedding.  He had nobody

6     in his life except these guys.  These were his guys.

7          If he planned to do an attack, it's impossible to me

8     to imagine a circumstance where he wouldn't have run it by his

9     good buddies who were interested in ISIS and interested in

10    supporting ISIS.  I can't see that scenario.

11         In the *Lacrom* case where this woman did publish all

12    over the internet the name of the bar she was going to blow up,

13    the people that she was going to kill.  And she amassed

14    everything she needed to do it.

15         It wasn't just the amassing.  It was the planning, the

16    communicating of the specific event.  We can talk about London

17    to try to prejudice everybody, but I know you are way smarter

18    than that.

19         The bottom line is there was no plan.  I can't tell

20    you why he had the knives.  But I can tell you that if there

21    was a plan, if he intended to do something with them, the

22    agents would have known that and he would have put it on the

23    internet.  He would have told people what he was about and what

24    he was going to do, and you have none of that, Judge.

25         By the way, this woman who was planning an attack, a

1  target, with a bomb, with everyone that she needed, the

2  government agreed that 15 years was an appropriate sentence.

3  The government agreed to that.

4         They could have charged her with whatever they wanted.

5  They had weapons.  The government could have charged her with

6  20 different things.  There was no indication that she

7  cooperated, but the government agreed to a 15-year sentence.

8  There you have the lone-wolf attack, and you have the planning.

9  You have everything but it actually being carried out.

10        Here you had something more because you had the

11  ability to have these agents find out if there was going to be

12  a planned attack as opposed to imagining it or being afraid of

13  it or being hypothetical about it.

14        Your Honor, since 911, there have been 862

15  terrorism-related convictions in this country.  435 of them

16  were material support convictions.  And the average sentence

17  across the country -- this is important, Judge -- for

18  returnees, not for people who sit at home talking nonsense but

19  for returnees, people who have gone overseas to fight and come

20  back -- the average sentence is 8 1/2 years to 10 years, not

21  360 to 540 months.  And these people were returnees.

22        There is a Defendant Abood which we cited in our brief

23  who claimed that he went to Syria to fight against Asaad, but

24  the internet told a different story.  All over the internet, he

25  was pledging allegiance to ISIS and saying that he was going

1   there to fight for ISIS.  So his story in the courtroom was not

2   accurate.

3        He was charged with making false statements, and he

4   was sentenced to four years, even though he traveled to Syria

5   with a false purpose.  The internet told what his real purpose

6   was, and he was sentenced to four years.

7        Then there's Special Agent Greene, the federal agent

8   who fell in love with an ISIS fighter and moved to Syria to be

9   with him, to support him.  She returned to the United States

10  when she saw the horror of what was happening there.  And she

11  was sentenced to two years.

12       There's another individual who, as we cited in our

13  brief, Kodaimati, who also traveled to Syria and lied about the

14  reasons that he went, and he was sentenced to eight years.

15       May I have just a minute, Judge.

16       (Pause)

17       MS. KELLMAN:  Your Honor, at page 41 of our first

18  submission, example number 10, there's a specific case in the

19  district of California, Adam Dandach.  There is an individual

20  who is very similar to our case.

21       The defendant was 22 years old.  He was initially

22  charged with falsely claiming that he lost his passport and

23  later indicted for attempting to travel to Syria in support of

24  terrorism.  He communicated with two people in Syria about his

25  proposed travel, and he made two attempts to join ISIS, to

1    travel there and to join ISIS.

2            Now, the government says now so did this young man.

3    But the reality is if you read 1,600 pages' worth of texts, you

4    see that the purpose of his travel to the UK at least was to

5    meet his love, to meet Safa who he had been communicating with

6    through thousands of text messages.

7            In fact, the government says oh, it's probably a

8    forgery because her father wasn't asked to be involved.

9    In fact, her father drove 4 1/2 hours from their home to the

10   airport with Safa to meet this young man.  So the father was

11   involved, and the family was involved.

12           In this particular case, the defendant also engaged in

13   post-arrest obstruction seeking his family's help for the

14   posting on the internet.  At the end of the day, Judge, he was

15   charged with making a false statement and material support, and

16   he was sentenced to 15 years.  He faced a maximum of 25 years.

17   So there's that.

18           Another thing that I wanted to talk about, Judge, is

19   how other countries handle these cases, and I think it's

20   important.  In its own way, it's sort of depressing when we

21   think about how we handle these cases in the United States.

22           We don't have a solution for this kind of situation.

23   So by incapacitating someone and sending them to jail for the

24   rest of his life, which effectively is what these sentences

25   are, the proposed sentence is, makes it look like we don't have

1    a problem, or it makes it look like we handle it.

2            But in reality, all we're doing is destroying human

3    life.  In this case, they're asking you to destroy human life

4    that hasn't doesn't done anything except -- we live in

5    Manhattan -- talk trash and collect a lot of weapons.  But what

6    he was going to do with them is something we can't answer.

7    It's a blank we can't fill.

8            In this particular case, Judge, I don't think that the

9    Court could fairly assume a potential lone-shark attack or

10   anything potential that this individual was going to do with it

11   because there you had agents that he didn't hold back from.  If

12   there was anything he had a plan in, he could have discussed it

13   with them, and he didn't.

14           By the way -- I don't know that this matters, but all

15   of these knives were purchased on Amazon legitimately.  So

16   maybe that's another question.  But another thing I wanted to

17   say is returnees -- and that's so far what we're talking about

18   here because these sentences that are not nearly as what the

19   government suggests here have all been cases of returnees.

20           But returnees in other cases, the United Kingdom,

21   France, Germany.  Their statutes punish people up to ten years

22   for material support kind of cases.  In the Netherlands there

23   was a whom who aided terrorists on a regular basis.  That

24   should be troubling in its own right.

25           Indonesia and Malaysia treat these kinds of cases less

1  severely than we do in the United States.  And all of these

2  countries have taken the position that incapacitation may not

3  be the best approach.

4          To me, Judge, one of the most shocking things that I

5  learned as I was preparing for this sentencing was that in

6  Saudi Arabia, they have something called a jihad prison.

7          And their first step towards handling individuals like

8  Mr. Almehmeti is deradicalization training.  And they have a

9  separate jail, this jihad prison where -- this is the way they

10  describe it.  They have lavish apartments where they house

11  these individuals, and their families have free access to visit

12  because part of the deradicalization process involves getting

13  the family involved in the grassroots so that they live in

14  these apartments, not with their family.  But they are

15  encouraged, in fact required, to have all kinds of interactions

16  with their family.  And the focus is on rehabilitation.

17          As I read this, I thought was it a primer in early

18  childhood.  One of the things that they said is the most

19  successful is rewarding good behavior.  They're young men.

20  They're young men who really haven't gotten where they want to

21  be as adults.  And, duh, rewarding good behavior.  That's what

22  they do in Saudi Arabia.  They don't look to incapacitate

23  everybody.

24          Sometimes, Judge, just the assurity of what happens in

25  our own prison system on a person-by-person level tells more

1      than generalizations.  I want to point out one case to your

2      Honor that we cite in our brief.  It's Ali Ahmed.

3              He lived in Sweden.  He traveled from Sweden to

4      Somalia where he joined al-Shabaab.  He received military

5      training.  He fought in a battle, at least one battle, against

6      Ethiopia.

7              Now, we say why would we care about Ethiopia.  We

8      funded that war.  We funded Ethiopia.  We funded the government

9      in exile of Somalia against whom al-Shabaab was fighting.

10             I got a photo the other day, a letter and a photo,

11     from Mr. Ahmed who was sentenced to 11 years.  The government

12     had agreed to a 15-year sentence, and Judge Gleeson gave him a

13     15-year sentence.

14             But I got a letter from him the other day and a

15     photograph.  In the photograph, he's very proudly holding up

16     his GED certificate.  Wow.  He's got his high school diploma

17     now.

18             Why is that absurd?  Because he couldn't get good time

19     unless he got his GED diploma.  He has a college degree in

20     Sweden, and he's fluent in four languages.  And now he has his

21     high school diploma too because nobody cares that he doesn't

22     need his GED.  He can't get his good time without it.

23             But now they're saying that he was traveling overseas

24     and he joined al-Shabaab; that he fought on behalf of

25     al-Shabaab.  And the government agreed that a 15-year sentence

was appropriate for this young man.  He was sentenced to 11

years in prison.

          The Tamil Tigers case that's we cited in our brief --

the vast majority of them were sentenced to time served which

essentially was between three and five years.

          I spoke just a little while ago, your Honor, about the

*Pugh* case where it was a 15-year material support case and a

20-year obstruction count.  Judge Calabresi specifically said,

can one really justify turning a 15-year sentence into a

35-year sentence.  It looks like the district court used the

second count as a means of extending the statutory maximum.  He

sent it back for resentencing.

          Sometimes I get ahead of myself, and then when I look

at my notes, I'm there already.

          Your Honor, in the government's submission, they speak

to several particular things that they suggest should drive

your Honor's thought process here.  They say that there was the

potential that Mr. Almehmeti would attempt to go to Syria.

          I think I have addressed that earlier.  I think that

if he was interested in going to Syria, that was certainly the

kind of thing that the agents could have found out about and

could have accomplished.

          I don't mean send him there but gotten him up to the

point where he's at the airport and he's ready to board a

plane, and you arrest him then because you then you know what

1    he's doing.  There is nothing in the day-to-day everyday

2    communications that he has with these agents that make it clear

3    that that's what his interest was.

4           I want to be clear, Judge.  I don't mean to be harsh

5    about the agents or what they did here.  They were doing their

6    job, and I understand that.  But I think that the difference

7    between what happened in the John Doe case and what could have

8    happened in this case is worthy of repeating because the FBI

9    doesn't have to make everybody a target.

10          This was a young man who they had to see very quickly

11   needed them way more than they needed to convict him of a crime

12   of terrorism.  You could have gotten this kid to do virtually

13   anything because he didn't have a direction.  He didn't know

14   where he wanted to be or who he wanted to be.

15          There are days when we talk to him where he sounds

16   like he can conquer the world, and he's bright.  He's

17   articulate.  He's sometimes funny.  He's also terrified.

18          He doesn't know where his life is going and what his

19   life is going to be about.  He's terrified about the effect

20   that this is going to have on his mother.  His mother is here

21   today.  He didn't want her to come because he was afraid that

22   it would be painful for her.

23          The government also speaks, your Honor, about the

24   pattern of escalating violence and this young man's criminal

25   history.  I'm not going to spend a lot of time on it, but he

1    has a YO and a misdemeanor conviction.  And I think that saying

2    that the YO and the misdemeanor leads to terrorism is as

3    ridiculous as saying marijuana leads to heroin addiction.

4         He went down this road as a result of a number of

5    different reasons.  Maybe the simplest explanation at the very

6    beginning is he sought out Islam.  He felt comfortable in

7    Islam.

8         He wasn't comfortable in his neighborhood, and then he

9    was mocked for the beard and mocked for the hair and mocked for

10   the clothing.  He tried to find other people who were

11   like-minded.

12        There's a retired brigadier army general who does a

13   lot of private counseling in Muslim communities.  He says that

14   the question that he's asked most by Muslim parents is how do

15   we protect our kids.  How do we prevent them or protect them

16   from getting on the internet and seeing this.

17        The answer he gives -- and I don't mean any offense,

18   Judge.  The answer he gives is masturbate.  Let them

19   masturbate.  The answer, to me, was shocking.  But he says that

20   these are strict homes, and these are kids without direction.

21   And they want to go on the internet, and they want to look at

22   porn.

23        But they know they're not allowed to do that, and they

24   know the punishment at home for that.  So they wander.  What

25   they find are pictures of a guy in Canada who they think is in

1   Syria who is fishing for people who are looking for young kids

2   who are looking for a place to belong.

3           And they found him.  They found him, and I'm not

4   saying obviously the FBI didn't start this.  He started this.

5   He started this by being on the internet and by fishing himself

6   and by buying into the things that he heard.  The agents saw

7   it, heard it, and grabbed onto it.

8           Your Honor, very briefly, I just want to add a couple

9   of things.  I just did a bit of workup for the Court in terms

10  of the cost.  I don't mean the cost of this young man's life

11  but just the cost to the United States in terms of housing

12  individuals.

13          The average inmate costs $32,000 a year.  With a

14  30-year sentence, which is the low end of the guidelines here

15  and not the statutory maximum at all, we're talking about 30

16  years costing just a million dollars, $960,000.

17          But with a secure inmate, just as Mr. Alimehmeti would

18  be, the cost is $70,000 which over a 30-year period, again, not

19  the maximum, would be at a cost of over $2.3 million.

20          Now, if this individual or individuals generally in

21  this situation were treated differently in terms of being able

22  to be supervised strictly and be able to be deradicalized in a

23  meaningful kind of way, supervision right now costs $4,000 a

24  year.

25          Over ten years, we're talking about $40,000.  Over 20

1    years, we're talking about $80,000.  The amount of therapy that

2    you could buy for $80,000 or the amount of therapy you could

3    buy for $2.3 million would probably take care of every

4    individual who is in this same situation.

5          But for $2.3 million, we'll house him away for the

6    next 30 years.  And we'll create a monster, as opposed to

7    having a human being who maybe can function much more

8    effectively as he's older and given the guidance that he didn't

9    have when he needed it.

10          I just want to spend a minute, Judge, on the living

11   conditions at the MCC.

12          THE COURT:  I took that point.  You don't need to

13   recapitulate that.

14          MS. KELLMAN:  One of the reasons that I raised it,

15   Judge, is because Ms. Kunstler and I have spent the last

16   several years just working with Adam Johnson who has been

17   trying his best to help us to eliminate things like why doesn't

18   he have glasses.

19          He now has glasses.  They're just glass.  There is

20   nothing in them.  There is no prescription in them.  He wanted

21   glasses.  It took us three years to get glasses.  They don't do

22   anything.

23          I said, do you wear them to read or for distance?  He

24   said it doesn't matter because they're just glass.  Mold and

25   showers and the cold and hot water don't mix.  That's just kind

1  of torture.  There's never quiet because the guards outside his

2  room all night are talking on their phones and socializing with

3  each other because it's quiet.

4          Four years of living like that is a cost.  It's a cost

5  emotionally.  Like I said, I don't want to belabor it, but I

6  say it because you take those four years and you make it 10

7  years or 15 years or 30 years, and you've created a monster.  I

8  don't mean you.

9          I think that Mr. Almehmeti, Judge, is a young man who

10  is desperate to make connections.  He's desperate to make the

11  right connections.  And with proper guidance, he can make the

12  right connections.  He's a young man who seems to me is

13  desperate to understand the world around him and desperate to

14  be understood by the world around him.

15          I don't envy your Honor's position.  I know that this

16  is probably the hardest thing that you do, making a difference

17  in really a young man's life and obviously balancing all of the

18  factors that the Court has to consider, including deterrence,

19  protecting the public, protecting this individual from

20  committing further crimes.  I don't have to recite them for

21  your Honor.  We can all say them backwards and forwards.

22          But I really believe that Ms. Kunstler pointed out to

23  me that there is a concept that psychologists use.  It's called

24  anchoring, what anchoring is when you attach your idea to a

25  particular fact, and everything works from that fact.

1          But that fact could be erroneous to begin with, and

2     that fact here is 360 to 540 months.  So the government says

3     30/40 years.  And I say how about ten.  And now we're in a

4     negotiation.

5          Then you say maybe 30 is too much.  Maybe 10 is too

6     little.  So maybe 20 years.  But that is anchored -- that

7     discussion is anchored to the guidelines.

8          When I wrote that, I wasn't thinking about it, but the

9     reality is what is the best thing for our community, our

10    community at large, and for this young man.  I submit to your

11    Honor that the best thing here is not to make up a number that

12    means nothing but to try to come up with a plan that helps this

13    young man get his life back.

14          THE COURT:  Let me ask you one question about that.

15    The sentence here will clearly be a combination of a term of

16    imprisonment followed by supervised release.

17          What is the condition of supervised release that

18    responds to the deradicalization imperative?

19          MS. KELLMAN:  The first is the way that the experts

20    have laid is out, your Honor -- I think we have it in our

21    submission as well -- is that it has to be strict.  It has to

22    be lengthy.  It can adjust as time goes on as appropriate.

23          But it starts with no internet access.  It moves into

24    limited internet access.  It's never unmonitored internet

25    access.  It's regular reporting obviously, bracelet, GPS, all

1    the kinds of things that make it virtually impossible --

2              THE COURT:  I guess the question is the way to

3    formulate it in the judgment here, understanding that there

4    will be a period of time before that portion of the sentence

5    kicks in.

6              I suppose that it is sufficient to say that the

7    defendant will participate in a program of deradicalization

8    under the supervision of the probation department.  I don't

9    know what technology will be when the defendant gets out.  It

10   seems to me foolish for me to choreograph it beyond that.

11             Does that sound right to you?

12             MS. KELLMAN:  Yes, Judge.  As long as the first part

13   is not too long.

14             THE COURT:  I can't promise that.

15             Anything further, Ms. Kellman?

16             MS. KELLMAN:  Yes.  I think Ms. Kunstler would like to

17   speak briefly.

18             MS. KUNSTLER:  Briefly, your Honor.

19             THE COURT:  Ms. Kunstler, briefly.

20             MS. KUNSTLER:  Your Honor, I just wanted to speak as

21   the person who spent the most time with Mr. Almehmeti over the

22   past few years.  And I wanted to speak particularly to the "not

23   there yet" comment that the government fixated on in their

24   presentation.

25             Getting to that place with Mr. Almehmeti was reaching

a place of trust.  And it was reaching a place where being
afraid that we would abandon him, being afraid that it would
make us think less of him, being afraid that it wasn't the
right thing to say.

        And it was a really big deal getting there.  I think,
frankly, a lot of defendants say what we want them to say.
They perform that role.  Whether they mean it or not, who
knows.  They know what they're supposed to say at sentencing.

        Mr. Almehmeti knew what he was supposed to say, but he
wanted more than that.  He wanted to engage honestly.  He
wanted to be open with us about the path he took.  All of these
are terrific signs, the whole process that Ms. Carr goes
through in her report and that we talk about in our sentencing
memo about how he got there and what motivated him.

        It wasn't just what Ms. Kellman said, that he had a
beard and people looked at him funny.  It was really being
seduced by propaganda.  It was the chemical attacks and
bombings that were attributed to Asaad that radicalized a lot
of young people because those bombings were used as powerful
tools of propaganda.  These were images of atrocities of
children and families who were injured.

        Ms. Carr in her report goes through how that is used
as a tool, how those feelings of horror and empathy and
sympathy, like good feelings that young people have, are then
used and perverted.

1           Getting to a place with our client where he was open

2    with us about what he was exposed to and how it made him feel

3    was opening to us to participate with him in a dialogue about

4    what's real and what's fake and what's true and what's not and

5    what's good and what's bad.

6           These are just conversations that our client is open

7    to.  These are conversations that our client is willing to

8    have.  These are conversations that he's ready for.

9           It was not easy to get there, but this is work that

10   it's important to do.  Whatever sentence your Honor imposes, a

11   lengthy term of incarceration is just a barrier between the

12   next time our client gets to have that conversation with

13   another person.  And I think that's a real shame that our

14   Bureau of Prisons doesn't have that, that we don't offer that,

15   that, frankly, we've taken this long.  It's almost 20 years

16   since 911, and we're now thinking about the kinds of tools we

17   need here to really make a difference in peoples' lives.

18          Your Honor, we agree that your sentence should send a

19   message.  The message that we think it should send is a

20   different one though.  Our client is a person who is ready to

21   make change.  He's a person who is willing.  He's a person

22   worth saving.

23          We think your sentence should balance the

24   considerations it needs to balance with also a message of hope

25   and with a message of a belief in this young person who can get

 1   there and is starting to get there.

 2          THE COURT:  All right.

 3          Ms. Kunstler, let me just pause and thank and commend

 4   you -- I'll have more to say in my remarks -- just for an

 5   unusually thoughtful and detailed sentencing submission and

 6   particularly as to the point that you made about the defendant

 7   not being there.

 8          I very much admired the nuance and honesty that came

 9   with that statement.  I certainly have plenty of cases in which

10   a much more cheerful and emphatic pronunciation is made.

11          And there are times it's authentic, and there are

12   times when one has reason to doubt it.  I appreciated that

13   there was gray and nuance here.  In turn, that confirmed the

14   honesty of the statement.

15          MS. KUNSTLER:  Thank you, your Honor.

16          THE COURT:  Thank you.

17          Mr. Almehmeti, do you wish to make a statement?

18          THE DEFENDANT:  No.  Not at this time.

19          THE COURT:  This is your opportunity, because when I

20   take the bench after our break, I will be imposing sentence.

21          THE DEFENDANT:  I understand.  Thank you.

22          THE COURT:  Very good.  Let's break till noon.  It's

23   about 11:51.  At noon I'll take the bench and impose sentence.

24   Thank you.

25          MS. KELLMAN:  Thank you, Judge.

 1          (Recess)

 2          THE COURT:  All right.  Be seated.

 3          Counsel, is there any reason why sentence should not

 4     now be imposed?

 5          MR. BOVE:  No, your Honor.

 6          MS. KELLMAN:  No, your Honor.

 7          THE COURT:  All right.  As I have stated, the

 8     guideline range that I find that applies to this case is

 9     between 360 and 540 months' imprisonment.

10          Under the Supreme Court's decision in *Booker* and the

11     cases that have followed it, however, the guideline range is

12     only one factor that a court must consider in deciding the just

13     and reasonable sentence.

14          The Court must also consider the other factors set

15     forth in the sentencing statute, Title 18, U.S. Code, Section

16     3553(a).  These factors include:

17          The nature and circumstances of the offense and the

18     history and characteristics of the defendant; the need for the

19     sentence imposed to reflect the seriousness of the offense, to

20     promote respect for the law, and to provide just punishment for

21     the offense; the need for the sentence imposed to afford

22     adequate deterrence to criminal conduct; the need for the

23     sentence imposed to protect the public from further crimes of

24     the defendant; and the need for the sentence imposed to provide

25     the defendant with needed educational or vocational training,

1    medical care, or other correctional treatment in the most

2    effective manner.

3           The Court must also avoid unwarranted sentence

4    disparities among defendants with similar records who have been

5    found guilty of similar conduct.

6           The Court is also required to impose a sentence

7    sufficient but not greater than necessary to comply with the

8    purposes that I've just summarized.  And here I find that the

9    sentence I'm about to pronounce is sufficient but not greater

10   than necessary to satisfy the purposes of sentencing that I've

11   just reviewed.

12          Mr. Almehmeti, I've given a great deal of thought and

13   attention to the appropriate sentence in your case in light of

14   the appropriate purposes of sentencing as reflected in the

15   statute.

16          I am quite well familiar with your case.  Your case

17   came close to trial in late 2017.  I resolved a number of

18   pretrial motions.  Through that process, I acquired familiarity

19   with your case.  And I have carefully read and reread the

20   parties' sentencing submissions.

21          This case is very troubling and very complicated.  I

22   do feel, however, well-equipped to assess the many factors at

23   issue, many of which are competing with one another.

24          I should say at the outset that the sentencing

25   submissions I received from both sides, the defense and the

1    government, were absolutely first rate, as were your

2    presentations today.

3           You've each made the arguments in support of your

4    respective positions with great force and eloquence and

5    integrity.  I thank both sides for the superb and truly

6    thoughtful submissions that I received.

7           Here are my thoughts.  Under Section 3553(a), one set

8    of factors that I am to consider involves the seriousness of

9    the defendant's offense, the need for the sentence I impose to

10   reflect just punishment, and the need for the sentence I impose

11   to promote respect for the law.  In other words, the sentence

12   must fit the crime.

13          Your conduct, Mr. Almehmeti, the conduct set out in

14   the presentence report and the conduct for which you're being

15   sentenced, is extremely serious.  And to your counsel's credit,

16   they have not pretended otherwise.

17          The defense submission has instead largely focused

18   and, properly so, on giving the Court a context in which to

19   understand how you came to take the steps that you did relating

20   to ISIS.

21          But I think it is worth reviewing in detail what you

22   did, and I do so because it underscores how alarming your

23   actions were and how deep a potential threat they posed, both

24   to our society and to people abroad.

25          I'm incorporating by reference all the facts set out

1   in the presentence report, and I will also from time to time

2   draw on the elaboration on those facts contained in the

3   government's sentencing submission which, in turn, draws on the

4   Rule 16 discovery in this case with which I have become well

5   familiar.

6          And what I'm going to do is describe certain aspects

7   of your conduct that illustrate these concerns, and what I

8   particularly want to make clear is the difference between

9   thought and conduct.

10          In cases involving terrorism and the dissemination of

11   terroristic propaganda, the defense is sometimes made that the

12   defendant did no more than express himself or traffic in ideas.

13          That defense has not been explicitly made here.  The

14   defense has duly noted that your actions as of the time of your

15   arrest fell far short of planning an actual terrorist attack,

16   either at home or abroad.

17          Nevertheless, it is important to focus just on what

18   your conduct was.  So what was it.  In your plea allocution,

19   you admitted providing material support to ISIS, a foreign

20   terrorist organization, by trying to aid another person, the

21   undercover, in his efforts to travel to Syria to join ISIS.

22          You also admitted lying in your passport application

23   for a new passport for yourself so that you too could

24   ultimately travel to Syria to join ISIS.

25          But as the presentence report reflects, the actions

1    that you undertook tending to promote ISIS and tending to

2    endanger society at home and abroad went well beyond that.

3              First and most strikingly, after you twice were denied

4    entry to the UK, which occurred in October and then in

5    December 2014, you began to stockpile munitions in your home.

6              Beginning in June 2015, you purchased the following:

7    Two cold steel 53NCT Tanto spike knives; an Ontario 499 Air

8    Force survival knife; a credit-card sized folding knife; a

9    24-inch survival pocket chain saw; a Rothco reversible face

10   mask; a set of Smith & Wesson handcuffs; and gloves with steel

11   knuckles.

12             The decision to buy these was yours and yours alone.

13   It wasn't until your apartment was searched in May 2016 that

14   the FBI found your collection of combat knives and

15   military-style equipment.  And of course they found the large

16   ISIS flag displayed over on the wall above in your apartment.

17             They found the laptop computer, the cell phone

18   belonging to you which contained a vast amount of ISIS

19   promotional material, including an array of materials

20   glorifying ISIS fighters.  They included videos of ISIS

21   fighters engaged in combat and beheading prisoners.

22             Because the undercover operation resulted in your

23   arrest, we cannot know -- and we will never know for certain --

24   how events involving these munitions would have played out had

25   you not been arrested.

1          A court can do not more than draw reasonable

2     inferences.  But the rest of the record supplies important

3     clues as to your intentions.  The ISIS propaganda materials

4     found in your procession included extensive propaganda

5     encouraging domestic terrorism in the U.S. and the killing of

6     innocent people here.

7          It includes your glorification of ISIS beheading

8     people.  You possessed copious photographs and literature

9     glorifying these acts, and your statements to the undercover

10    officers were to the same effect.

11         Your attempts to go and fight for ISIS abroad and to

12    assist the undercover in doing so also put in context your

13    decision to stockpile weapons that could be used to restrain,

14    gut, or did he capitate another human being.

15         The timing of your purchases is also relevant context.

16    In late 2014, ISIS released a speech by its then spokesperson,

17    Abu Muhammed al-Adnnai, instructing ISIS supporters in the West

18    that if they were unable to travel overseas to join ISIS, they

19    this carry out lone-wolf attacks in their homelands and kill

20    non-Muslims by any means possible.

21         viewed in light of this evidence, the munitions you

22    were stockpiling in your home were alarming.  Your buying and

23    collecting them says to me you were prepared eventually to use

24    these weapons, most likely offensively and most likely directed

25    towards civilians here in the United States.

1           As you surely appreciated, you were not going to be

2      able to leave the country with a collection of spike knives or

3      a pocket chain saw.  You had no conceivable need in your

4      apartment in the Bronx for handcuffs or a face mask or the

5      chain saw or the knives or steel knuckles.

6           There was no benign use to which these were going to

7      be put.  And it certainly took some real effort and some cost

8      to find and acquire this diverse equipment.

9           The only rational inference is that you were storing

10     up for at least a potential future attack.  And the fact that

11     you began to acquire them after you were twice denied the

12     ability to leave the United States makes your possession of

13     them all the more suggestive.

14          It suggests that you were considering, if you were

15     unable to help ISIS abroad, helping it at home by engaging in

16     some form of domestic attack, perhaps along the lines of the

17     lone-wolf attacks that were on the rise and then being

18     encouraged.

19          In the end, all if this is inference.  The government

20     didn't find evidence of an imminent attack.  It didn't find

21     emails or texts or photos or layouts or recon as to the site of

22     an attack.

23          And of course, to the extent you were preparing for a

24     possible future attack, preparation does not guarantee action.

25     Perhaps in the crucible, you would have stopped short of

1   wearing the mask and using those knives and handcuffs and the

2   chain saw on another human being.

3       Perhaps in the moment, some greater maturity or

4   insightfulness or humanity would have taken hold, or maybe just

5   the fear of apprehension of punishment would have held you

6   back.

7       On the other hand, perhaps you would have attempted

8   unspeakable mayhem in our city.  Others have done so.  One

9   person who has done so is the Chelsea Bomber, Rahimi, with whom

10  you later came to correspond enthusiastically in the MCC about

11  ISIS propaganda.

12      Because you were arrested and incapacitated from doing

13  such harm, we will never now how events would have played out

14  if law enforcement had not gotten wise to you.

15      But your actions, Mr. Almehmeti, speak loudly as to

16  what your intentions at the moment were.  And every indication

17  from your possession of that weaponry and the combat gear and

18  the surrounding circumstances is that you were up to no good.

19      Every indication is that you were on course to wreak

20  havoc.  I find this aspect of your conduct extraordinarily

21  troubling.  Thank goodness that law enforcement stepped in when

22  it did.  They stopped you.  You did not stop yourself.

23      From the perspective of the 3553(a) factors that

24  require just punishment and that require that the sentence

25  imposed reflect the gravity of the conduct in question and

1    promote respect for the law, this dimension of your conduct

2    alone, your ordering and housing weapons usable for death,

3    torture, and decapitation, consistent with a domestic lone-wolf

4    attack at home, points towards a long, long sentence.

5           Separately, you repeatedly attempted to travel

6    overseas with the explicit goal of supporting ISIS.  That makes

7    your crime more serious.  You were stopped first in

8    October 2014 when the authorities found camouflage pants and

9    nunchakus in your luggage in Manchester Airport in the UK.

10          Two months later you tried to enter a different UK

11   airport, Heathrow.  This time it was your cell phone and laptop

12   computer that revealed a number of images of ISIS flags and of

13   improvised explosive device attacks.

14          As reflected in the government's sentencing memo, your

15   communications made clear your intention to move from England

16   toward ISIS-controlled territory in the Middle East.

17          You inquired about how to get from Tunisia to

18   ISIS-controlled Libya.  You sent along a user name on the

19   Kik-encrypted messaging application that was associated with a

20   British member of ISIS who was soon thereafter killed in Syria

21   fighting apparently for ISIS.

22          Despite your admissions as to your purpose for

23   traveling to England, you told the authorities who stopped you

24   in Manchester in October 2014 that you were going to help run

25   the family business in Albania.

1          When you were arrested in Heathrow two months later,

2     the search of your devices revealed a cache of materials

3     reflecting your allegiance to ISIS.  These are the ones

4     captured in Exhibit A to the government's sentencing memo.

5          I've reviewed it.  These include you and others making

6     ISIS gestures; lectures from an ISIS leader promoting

7     terrorism; jihadist ideology; and martyrdom; brutal ISIS

8     propaganda promoting the killing of non-believers; videos of

9     ISIS executing prisoners and civilians by either shooting them

10    in the back of the head while kneeling or beheading them and

11    other videos encouraging followers to achieve martyrdom by

12    carrying out suicide attacks on innocent civilians.

13         The agents searching your home also found the will

14    that you wrote in the event that you lost your life as a

15    terrorist martyr.  They found comments you posted on social

16    media celebrating the November 2015 suicide bombing and mass

17    suicide attacks in Paris, France.

18         They found videos justifying and celebrating suicide

19    bombing.  They found a video that mimics you carrying out a

20    suicide bombing.  It shows you with a fuse attached to your

21    head shouting, "Allahu Akbar" as you were engulfed in a loud

22    explosion.

23         After the undercover operation got underway, you

24    confirmed your commitment to ISIS.  You told the undercovers

25    you wanted to travel to fight along with others on behalf of

1    ISIS.

2           You referred to ISIS territory as an "amusement park."

3    You told one of the undercovers that you liked to watch music

4    videos of ISIS fighters decapitating prisoners because it kept

5    you motivated when you were exercising.

6           You told an undercover that you wanted to get Raaqqah

7    in particularly because it was the heart of ISIS' operations.

8    You agreed to assist the undercover posing as an ISIS supporter

9    to travel to Syria to join ISIS.

10          You showed the undercover a propaganda video showing

11   the brutal decapitation of a captive.  You helped the

12   undercover buy supplies.  You instructed him in using secure,

13   encrypted messaging apps to use when communicating with other

14   ISIS supporters.  You took the undercover to the airport, and

15   you told the undercover you were ready to go to Syria yourself.

16          You told the same thing, apparently by phone, to your

17   brother who incarcerated in Albania on weapons and assault

18   charges.  And of course you submitted the false passport

19   application in Count Two.

20          The old one carried rejection stamps on it.  You

21   sought a new one in an attempt to prevent the authorities

22   thwarting you again from traveling overseas en route to ISIS.

23          I want to take a moment at this point and address the

24   defense's argument in its reply letter of December 4 that the

25   evidence does not show that your goal at the time you attempted

to enter the UK in late 2014 was to reach Syria.  The defense

argues that your intentions in traveling then were to meet

Safa, the woman you loved and sought to marry.

At the risk of stating the obvious, these two

intentions are not mutually exclusive.  And the evidence above

supplies good reason to infer that you intended to travel

beyond England to fight for ISIS.

But even if there were room for doubt about your

intentions when you originally sought to enter England, your

intentions later were crystal clear, both when you assisted the

undercover and when you yourself sought a fresh passport.

The presentence report makes clear that you did so to

enable you to ultimately join ISIS.  I'm referring now to

paragraphs 35 to 42.  After you submitted the false passport

application, you told undercover officers that you had done so

because you "didn't want the rejection stamps from the UK" and

because you needed the new passport to travel not to Albania

and Europe "but to other places ... you know what I mean."

Paragraph 40.

And cryptically, you also spoke to friends on recorded

calls about your desire to travel to ISIS.  Apart from calling

it an "amusement park," you also said, "I don't have a P,"

presumably meaning a passport, "... but I obviously want to

go."

My best assessment is that all along from 2014

1    forward, you were attempting to make it to ISIS.  But even if

2    that intention first arose later in time, it is beyond dispute

3    that that came to be your fervent intention, so much so that

4    you were willing to commit the federal felony of making false

5    statements on a passport application in order to enable you to

6    get there.

7            Continuing on with my review of your conduct, another

8    troubling aspect of it is your circulation of materials

9    promoting ISIS and specifically violence in support of ISIS.

10   That too was a destructive course of conduct.

11           Most recently after you were incarcerated at the MCC,

12   you and Ahmad Khan Rahimi connected.  He of course is serving

13   multiple life sentences for carrying out the Chelsea bombing.

14           The two of you attempted to radicalize other inmates

15   by sharing and disseminating terrorist propaganda materials

16   which you received in discovery.  You attempted to burn discs

17   of these materials.

18           These included an issue of a propaganda publication

19   that gave instructions on how to build a pressure-cooker bomb

20   that celebrated the Chelsea bombing and that encouraged

21   followers to kill civilians through lone-wolf attacks in the

22   West.

23           I'm mindful, Mr. Almehmeti, that it was when you were

24   in prison on earlier charges in the United States that you

25   yourself were apparently radicalized.  That was the point in

1    your life's journey when you committed to ISIS.

2         You befriended, while in the Fishkill Correctional

3    Facility, Mohamed Mamdouh who had plotted to blow up synagogues

4    in Manhattan.  And he pled guilty to terrorism crimes in New

5    York state court.

6         He may have been among the reasons why your allegiance

7    shifted from a local Albanian gang to ISIS while you were in

8    state custody.  After you were released from state custody, you

9    visited Mamdouh in jail in 2014.  There you were captured in

10   the photograph that day making an ISIS hand gesture.

11        Your own radicalization in favor of ISIS while in

12   prison underscores that your circulating such materials to

13   other inmates cannot be written off as an idle act unlikely to

14   produce results.

15        You are proof positive that an effort to convert

16   members of a presumably disaffected prison population to ISIS

17   has the capacity to succeed.  You and Rahimi circulated ISIS

18   propaganda material to cultivate in prison another generation

19   of potential ISIS supporters.

20        Potentially this could have resulted in converts who

21   bought the ideas you were pushing, including converts who had

22   the capacity for violence, whether as lone-wolf or otherwise.

23        Your own words make clear that this was your intent.

24   Earlier, during one of the meetings with the undercover -- this

25   was before your arrest -- you said if you ever were

1  incarcerated -- and quoting now paragraph 48 of the

2  presentence report, referring to you -- "He would seek to

3  radicalize others in the jail and indicated that he had

4  previously radicalized other inmates during his prior period of

5  incarceration resulting from his state convictions."

6          Now, at the time you made that statement, it might

7  have seemed like bragging or hyperbole, but you carried through

8  on your words.  That is reason to take all the more seriously

9  the other pledges and declarations you made along the way,

10  including your resolve to fight and kill and die, if necessary,

11  for ISIS.

12          I could continue to elaborate by developing in more

13  detail these areas of your conduct.  The bottom line though is

14  this:  Over a period of several years in a variety of ways and

15  in a variety of contexts, both alone and in concert with

16  others, both while in free society and while in prison, you

17  took steps to support ISIS' evil, violent mission at home and

18  abroad.  Through a variety of actions, you backed up your

19  statements that you were dedicated to joining and fighting for

20  ISIS.

21          Your actions made clear that you were ready, willing,

22  and able to promote ISIS, to recruit for ISIS, to travel for

23  ISIS, to fight for ISIS, and to kill for ISIS and, if

24  necessary, to die for ISIS.

25          You sought to enlist in Syria for the cause.  You

assisted another to travel there to fight for ISIS, and you

stocked your Bronx apartment with terrifying munitions suited

to a lone-wolf attack on domestic soil of the sort you

frequently celebrated in the communications you collected and

shared.  And your efforts to promote ISIS continued even after

your arrest on these charges in prison.

So from the perspective of the first set of 3553(a)

factors involving the gravity of the offense, I find your

conduct deadly serious, aberrant, and terrifying.

You were a ticking time bomb.  Had you not been

apprehended, there is every reason to assume that grave harm

would likely have come to somebody or perhaps many somebodies,

whether at home or abroad, whether at your hand or the hand of

somebody you abetted or encouraged.

The fact that you were caught before someone got hurt

of called does not make your intentions in preparation more

innocuous.  As a matter of just punishment and as a matter of

making sure that the sentence fits the crime, your conduct

demands a very long punishment well in excess of the ten-year

term that your counsel has sought.

Under Section 3553(a), I am also to consider the

interest in general deterrence.  It refers to the need for the

sentence I impose to send a clear message to other people that

is sufficient to deter them from engaging in similar crimes.

That interest is present here too.

1          As a civilized society, we have an interest in

2    discouraging domestic terrorism and the spread of terror

3    abroad.  To be sure, the literature on general deterrence

4    teaches that general deterrence is primarily a function of the

5    certainty and swiftness of detection of criminal acts.

6          Effective efforts like those by the law enforcement

7    officers in this case to detect and promptly apprehend and

8    prosecute those engaged in promoting terror and terrorist

9    groups are the single best way to deter copycats.

10          The length of the sentences imposed, scholarship

11    teaches, is much less important.  It is not, however,

12    irrelevant.  And I judge there to be a general deterrent

13    interest served by imposition of a sentence sufficiently long

14    to discourage any rational person from thinking that it is

15    worth paying that price.

16          Under Section 3553(a), I also have to consider the

17    need for specific deterrence.  That refers to the need for the

18    sentence I impose to send a message to the specific defendant

19    before me -- and here, meaning you, Mr. Almehmeti -- that is

20    sufficient to deter him from committing future crimes.  I judge

21    that interest to be profound here.

22          In many cases, the defendant before me is a first

23    offender.  In those cases, defense counsel will often argue

24    that the defendant will learn from this first brush with the

25    criminal justice system.

1          The argument made is that the very shock of being

2     arrested and convicted and sentenced, even if the sentence is

3     short, will be a wake-up call for the defendant.  It will

4     discourage him from ever risking his liberty again.

5          And often, as Ms. Kellman, among others, will attest,

6     I have found arguments along those lines to be quite

7     persuasive.  Those arguments, however, are not available to

8     you.

9          You have two prior convictions.  In 2010, you were

10    convicted of robbery in the third degree.  According to the

11    PSR, you and a codefendant grabbed the hood of a victim's coat.

12         Your codefendant punched him in the head several

13    times, later in the face.  He fell to the ground.  You two

14    demanded his property, his credit car, his debit card, his

15    MetroCard, his driver's license, a set of keys, and an

16    unspecified amount of cash.

17         The presentence report reflects that you stated at the

18    time that you were a member of an Albanian gang.  You were

19    sentenced to probation.  It was later revoked in 2012, and you

20    were resentenced to one to three years' imprisonment.

21         And that was for an offense you committed later in

22    2010, an assault in the third degree involving forcible

23    touching.  You were sentenced to concurrent terms of one year

24    imprisonment and 90 days' imprisonment.

25         The important point is that neither of these brushes

with the criminal justice system served as a wake-up call for

you.  I don't know specifically what the judges in those

earlier cases were thinking when they imposed the sentences

that they did.  But I have to assume that they hoped that the

sentence they were imposing on the young man before them would

be sufficient to get his attention and discourage him ever

again from committing crimes.

        Alas, that is not what happened.  You committed the

second crime soon after the first while on probation.  You then

spent a not inconsiderable amount of time in prison, a year or

so, which is substantial for anyone, particularly somebody like

you in your late teens.

        And that didn't deter you either.  After your release,

you then committed this combination of crimes and related

anti-social conduct that I've outlined at length.

        In other words, your prior brushes with the criminal

justice system didn't deter you at all.  The crimes and

relevant conduct for which you're being sentenced today is far

more destructive than any of your prior crime.  It follows that

if there is any hope for the sentence I impose here to truly

get your attention and deter you from committing further

crimes -- and I can't be sure that there is -- it would have to

be much longer than the sentences you've previously served.

        Finally, under Section 3553(a), I have to consider the

interest in public protection or incapacitation.  That refers

to the benefit the free public gets from your being in federal prison where, by definition, you can't commit crimes that endanger them.

That factor is paramount here.  You were caught in the act of attempting to go overseas to fight for ISIS.  You were caught in the act of assisting someone else to go do that.

You were caught in the possession of a cache of weapons and supplies that appeared intended to facilitate a domestic attack.  After being apprehended, you partnered with an infamous lone-wolf terrorist attacker to promote ISIS among criminal defendants in the MCC.  All this conduct unavoidably makes you a clear and present danger to society right now if you were at liberty.

As a judge, applying Section 3553(a), I am charged with assuring the that sentence I impose will reasonably protect the public.  Given what I have just said, how could any sentence, other than a very long one, be up to that challenge.

What reasonable assurance, other than blind hope, could a person have that if released from prison any time soon, you would not be poised to resume these dangerous ways.

Thus far, I've considered at great length, I'm sorry to say, factors that by their nature tend to favor a substantial sentence.  And for all the reasons I've covered, they do warrant quite a long sentence.

I am, however, mindful that there are other factors

1    that must be considered as part of a complete and thorough

2    sentencing analysis.  And these include various factors that

3    favor you in the sentencing equation, factors that point, all

4    other things being equal, towards a lower sentence.  And I want

5    to review them carefully with you now.

6         And in understanding the factors in your life that I

7    find mitigating, I was assisted by the defense's thoughtful

8    sentencing memo and its attachments.

9         These included the quite perceptive mitigation report

10   prepared by Melanie Carr regarding your life history.  They

11   also include the report by Dr. Lawrence Steinberg, a

12   psychologist, addressing, albeit in the context of a different

13   case, the nature of juvenile and young adult development and

14   maturation.  And I also considered letters in support of you

15   and certificates, among other materials.

16        First of all, Mr. Almehmeti, you accepted

17   responsibility for the two crimes with which you were charged.

18   You did so by pleading guilty and by admitting to these

19   offenses.

20        The government is correct that you have not gone much

21   beyond that.  You haven't repudiated ISIS or, for that matter,

22   terrorism.  And your commitment to ISIS is ultimately what

23   motivated these two crimes.  That would have reflected a fuller

24   acceptance of responsibility.  That's unavoidable.

25        And I hope -- I really hope -- that in the future you

1   will reflect back on these events and that you will reject and

2   repudiate a creed that encourages the beheadings of innocent

3   people as a way to make a point.

4          Nevertheless, you did forthrightly admit the crimes

5   with which you were charged.  That makes a difference to me, as

6   it does under the sentencing guidelines.

7          It spared the legal system resources, and it reflects

8   an acknowledgment that you broke the law in these two ways.

9   The sentence I impose will be higher than your counsel has

10  sought by a lot.  You will not be pleased with it.

11         But please know that it will be materially lower than

12  it would have been had you gone to trial and been convicted of

13  these crimes.  Your decision to plead guilty, in other words,

14  was a wise one.

15         To make the point very concrete, had you been

16  convicted at trial of these offenses and had all other

17  information before me at sentencing been the same, my best

18  assessment is that the sentence I would have imposed would have

19  been at least three years longer, if not more.

20         I want you to reflect back on what I just said when

21  you reflect while you're in prison about whether it was worth

22  it to plead guilty.  It absolutely was.

23         Second, under Section 3553(a), I am to consider a

24  defendant's history and characteristics.  At this point, I'm

25  referring to your history, other than your criminal history

1    which I've covered at length.

2            I read with great interest the defense submission and

3    the attached reports.  These gave me insight into background.

4    They helped me understand what some of the factors were that

5    contributed to your embrace of ISIS and the crimes arising from

6    that for which you're being sentenced.

7            I learned that you grew up in Albania and that you

8    came to the United States around age six or seven with your

9    parents.  Your parents were the outsiders in Albania.  Your

10   father had been in prison for his opposition to the regime

11   there, and the regime change when you were age three was

12   tumultuous and chaotic.  There was extreme poverty there, and

13   life was hard.

14           The transition to the U.S. was hard too.  Your parents

15   didn't speak English.  Your family didn't belong to any

16   community, and your family lived significantly in isolation.

17           Schools were bad.  You were mocked by other students

18   for your hair, your clothing, and your broken English, among

19   other things.  There was a lot of fighting.  Classes were out

20   of control, and there was a lot of gang violence in your

21   neighborhood in the Bronx.  There were shootings, physical

22   violence, and drugs.

23           You did not fit in.  You were frequently jumped.  You

24   were held up by switchblade-wielding gang members.  You got

25   drawn into marijuana use early, at age 12 or so.

1          Eventually at age 15, you joined a local Albanian

2     gang, the Albanian Boys, Inc. or ABI, and that gave you some

3     protection but also exposed you to crime.  Your schoolwork and

4     your academics fell apart, and that's when you first committed

5     crimes, the robbery in 2010, the forcible touching in October

6     in 2010.  I note that although you pled guilty, I recognize

7     today you were asserting your innocence to that crime, and I

8     have no occasion to resolve that dispute.

9          You wound up in Rikers Island prison which of course

10    is no place for a minor to be.  After you emerged from state

11    prison with new-found religious beliefs, your parents were not

12    supportive of those.  Your mother spat on the floor once in

13    disdain when you returned from a mosque wearing religious garb.

14         She once threatened to cut your hair while you were

15    sleeping, and you were hurt by their disapproval.  Your parents

16    eventually returned to Albania, but you stayed here, and that

17    may well have deprived you of some positive influences.  Your

18    father was in declining health.  He later died in Albania after

19    you were charged in this case, and I was very sorry to hear of

20    that too.  Your mother, however, is very supportive of you.

21         And I thank you for being here today.

22         She describes you as having been a wonderful person

23    who was always well behaved.  She faults herself for not being

24    present enough in your life perhaps to steer you in a better

25    direction.

1              I learned as well that you've spent a lot of time

2      alone, particularly after your parents left the U.S.  You were

3      living alone in your apartment as of the time of your arrest.

4              You had gotten married in December of 2015, but first

5      your parents and later your wife opposed the relationship.  She

6      appears to have been living with her parents at the time of

7      your arrest.

8              Overall, I can see a young person without strong roots

9      here in a new country and without strong parental guidance that

10     can provide ballast to a young person who is growing up and

11     trying to find his place in the world.  Ms. Kellman quite aptly

12     describes your adolescence as reflecting a "struggle for

13     belonging."

14             All this helps me understand why you might have been

15     susceptible to the call of faith and/or a new ideology as you

16     were exposed to it in state prison and later through online

17     videos.

18             The defense describes you as having taken on the idea,

19     eventually the identity, of a radicalized extremist group and

20     and as having totally endorsed the group's narrative.  That

21     account of your trajectory I find persuasive and

22     understandable.

23             I understand and accept too the defense's observation

24     about how your age made you susceptible to making bad choices.

25     There is a great deal of scholarship that says young men, in

particular in their late teens and early 20's, are still

growing up and that they're more apt than others to make

reckless, bad decisions.  That is particularly so when they are

influenced by older, charismatic figures.

I have seen that dynamic in play in many of my cases,

including those involving urban ethnic gangs.  That may have

been at play at points here too.

That said, I do not buy at all the defense suggestion

that the undercover officers radicalized you.  I'm not buying

that at all.  And the defense's reply memo largely walks back

that suggestion.

You were probably drawn to ISIS and its ideology

before the onset of the sting operation.  The documentary

record reflects that.  Indeed, your desire to support ISIS by

traveling abroad is the reason that led the government to

initiate the sting operation.

The government didn't pick you out of nowhere.  They

didn't pick on you at all.  They focused on you for good

reason.  There was ample predication that you were hungry,

ready, willing, and able to fight for ISIS.

You had gone to the UK twice in an attempt to do that.

Twice you had been stopped and sent back.  The government

didn't do any of that.  This was not a case of entrapment or of

radicalization by the government, period, full stop.

This was an amply justified and well conceived

1    undercover operation.  Yes, it could have been designed in

2    other ways, but the way it was designed was imminently

3    reasonable.  As Mr. Bove said, it gave you a last, clear chance

4    to repudiate ISIS.  Instead, you doubled down on ISIS.

5         The government undercovers had to pose as persons of

6    similar belief in order to gain your trust.  If they had posed

7    as accountants or lawyers, it would have been a fruitless

8    undercover operation.

9         They didn't radicalize you.  You were already there

10   when they entered the picture.  To confirm the point, after you

11   were arrested when they were out of the picture, you went back

12   to promoting ISIS, this time with Rahimi in the MCC.

13        The big picture here as to your background is that

14   your youth, your isolation, your alienation, your limited roots

15   here, and your imprisonment at a young age -- all of that helps

16   me understand the choices you made, first to commit the robbery

17   and now, much more seriously, to commit these much more serious

18   offenses.

19        And I note that your brother was also drawn to crime.

20   That may reinforce the point that the environment in which you

21   came of age was one with lots of influences, bad influences and

22   temptations.

23        However, I do need to say this:  I have had many cases

24   with defendants whose backgrounds were far, far, far worse than

25   yours.

1          You came from an intact family.  Your parents were

2     purposeful people.  They abided by the law.  They weren't

3     perfect, but they ultimately were on your side.

4          You were not born addicted to drugs.  You are not

5     saddled with endemic mental issues.  And while your family had

6     limited means, the level of deprivation was far less than in

7     many cases I've seen, way less than many cases I've had with

8     Ms. Kellman alone.

9          You had obstacles to overcome.  Life did not deal you

10    an easy hand.  But environment and background are not destiny.

11    At various points, you had choices to make.  It was your choice

12    to commit the robbery that put you in prison.

13         And after you were released from prison, it was your

14    choice to embrace ISIS and its various creed.  Nothing about

15    embracing Islam required you also to embrace ISIS.  That was

16    your choice.

17         It was your choice to try to go to Syria via England

18    to fight for ISIS.  It was your choice, when that failed, to go

19    and buy all that weaponry that was later found in your

20    apartment.

21         Nobody told you to buy combat knives, handcuffs, a

22    mask, or a pocket chain saw.  I don't even know where one would

23    go to find a pocket chain saw.  These are choices.  It is the

24    choices we make, far more than our backgrounds, that defines

25    who we truly are.  You are being punished today for your

1    choices, not for your difficult background.  Your background

2    and age made you more vulnerable to radicalization.  But in the

3    end, it was a choice.

4            I have also considered the argument from the defense

5    that your conditions of confinement in the MCC have been hard,

6    in part, on account of the inherent conditions there these days

7    and, in part, on the account of the special administrative

8    measures that have separated you from others.

9            In past cases in which a defendant's conditions of

10   confinement have been unusually hard, whether in foreign

11   prison, awaiting extradition, or at the MDC last year when it

12   became effectively uninhabitable, I and my colleagues have, in

13   calculating the just sentence, often considered each day spent

14   in pretrial confinement as more onerous than a day in a BOP

15   prison whose conditions are more humane.

16           That principle applies here too.  You have spent

17   nearly two years, often in near solitary confinement.  I am not

18   opining on the validity of your designation or of the

19   disciplinary measures that have been taken against you within

20   the BOP.  But I do accept the hard nature of the isolated

21   conditions in which you have been held.  I regard these as

22   mitigating.  I have these firmly in mind today.

23           As to your time in custody, I also note that while you

24   made some bad decisions in custody with respect to Rahimi which

25   I've covered, you've also put your time there to good use.

1          You've obtained a number of certificates, including in

2     business acumen, entrepreneurship, corporate skills, and

3     leading by example.  You completed the Focus Forward program.

4          Focus Forward described you as a great student, who

5     came well prepared to class and enthusiastically joined in

6     discussions.  You were described as an able public speaker who

7     addressed the class on why your father's example inspired you.

8          They applaud you for having a coherent path going

9     forward after your release which is ultimately to operate a

10    funeral home.  And that is an area in which you long have

11    demonstrated an interest, going back to 2015 when you

12    volunteered to work as an assistant at a funeral service

13    institute.

14         I give you credit for having a coherent plan for your

15    life going forward and for making good use of your time in

16    custody.  In that vein, I note that although you were not

17    working at the time of your arrest, you've had some gainful

18    employment in the past, including doing delivery and plumbing

19    and cleaning work.

20         That reflects well on you.  Your experiences and the

21    training you have so far received in prison and which I hope

22    you will continue to receive in prison will situate you well to

23    build a constructive life after your release.  Your decision to

24    put some of your time in prison to good use in the ways I've

25    just described is encouraging to me.

1        In reflecting on your history and characteristics,

2   I've also considered the several letters I've received about

3   you from people who knew you before the arrest and from some

4   who worked with you in programs which ended after your arrest.

5   And I want to review with you briefly excerpts from a couple of

6   those letters now.

7        First of all, from your mother.

8        I just want to make sure I talk to your mother.  Can I

9   just see your hand.  Thank you very much for the beautiful

10  letter that you wrote on behalf of your son, and thank you for

11  coming here today.  I can only imagine how hard this is, and I

12  applaud you for the courage you've shown to be here today.

13       Your mother, Vjollca Alimehmeti, writes:  "What

14  happened to my son was unusual.  And the moment I'm writing, I

15  still can't believe.  It seemed to me the worst nightmare.

16  Sajmir mere comes from a family with good values that always

17  has operated its life with these basic principles, be honest

18  and faithful.  Be brave and courageous.  Don't hurt anyone.

19  Never give up.  Be respectful.  He was always very peaceful, a

20  loyal and lovely boy.  He is a lovely and lovely young man.  He

21  was always there for help.  When I was sick, he would care from

22  me making a massage with cold compresses to my forehead to

23  lower the temperature, the same care he would take for his

24  father too."

25       I also read the letter from what I took to be your

1  cousin, Ragda (phonetic).  I infer that she's a cousin.  She

2  says that you were always unusually well behaved, honorable,

3  respectful, and mindful towards people you came into contact

4  with.  She says that she's certain that you feel sorry for your

5  mistakes.

6        I read the letter as well from your friend and your

7  former fiance Safa.  She says:  "Sajmir and I used to be

8  engaged.  From the time we began speaking, I knew we had a

9  connection. Sajmir was a very understanding person.  He would

10  always be there for me while I was going through really tough

11  times.  He gave me support like no one else had done before.  I

12  felt safe knowing I had him.  Sajmir would constantly check up

13  on me to see how I'm doing and to make sure that I was always

14  okay."

15        These letters remind me, as I'm constantly reminded in

16  this job, that people are complicated.  These are impressive

17  testimonials.  They are from people you should admire.

18        These are people who, by all indications, anyway, have

19  led peaceable lives, embracing good values, not violence or

20  hate.  Their embrace of you gives me a basis for hope that as

21  you mature the positive side and your characteristics and

22  history, that these people see you in you will prevail over the

23  darker impulses on display in the conduct for which you're

24  being sentenced today.

25        On the day a person is sentenced, it is appropriate

1    that they be considered in light of the totality of their life

2    experience, the good as well as the bad.  And I will do so

3    today.

4            Mr. Almehmeti, please know that these letters show me

5    a different side of you than is reflected in your offense

6    conduct.  These letters have been to your benefit today.

7            Finally, in reflecting on the just sentence, I have

8    considered the sentences that other judges have imposed in

9    cases involving, among other things, material support for

10   terrorism.

11           No two cases are alike.  Your case, Mr. Almehmeti,

12   does not find, in my assessment, a perfect comparator or even

13   one that is very close.  The cases in which defendants have

14   traveled or attempted to travel abroad to support terrorist

15   causes and have returned do not, at least on first blush,

16   appear to have had defendants who stockpiled weapons at home.

17   I'm not finding any pocket chain saws there.

18           That, among other points, is a very important

19   distinction.  Many of the cases in which defendants are charged

20   with material support of terrorism who are sentenced to 180

21   months in prison were sentenced at a time when the maximum

22   sentence for that offense was just that, 180 months.  They got

23   the maximum.  Today the maximum for that offense is 240 months.

24           Perhaps some of those defendants would have gotten a

25   higher sentence had the statutory maximum permitted it.  I just

1     don't know.  I did find Judge Abrams' decision in the case of

2     *United States v. Raishani* to be a useful comparison point.

3              I read the sentencing transcript there.  The defendant

4     there was charged with material support of terrorism for which

5     he received a 20-year sentence.  He also received a five-year

6     sentence to run concurrently on a separate conspiracy count.

7              There are areas of similarity and areas of contrast

8     between this case and that.  Among areas of contrast, the

9     defendant there was older than you and, in that respect, more

10    accountable, and he left his family behind to try to go fight

11    for ISIS.

12             On the other hand, the defendant there did not

13    stockpile weapons in his home.  The record there did not supply

14    evidence of any preparation towards potential domestic

15    terrorism.

16             The defendant there did not have any prior

17    convictions, and there is no analogue there to the post-arrest

18    conduct in the MCC in which the defendant, you, and Rahimi

19    tried to indoctrinate other inmates to support ISIS.

20             In the end, my judgment, as I've indicated, is that a

21    very long sentence here is required for all of the reasons I've

22    reviewed.  With due respect for the defense for whom I have the

23    utmost admiration, the ten-year sentence that has been

24    recommended is simply a nonstarter.  It would disserve the

25    interests in assuring that the punishment fit the crime and the

1   paramount interests in specific deterrence and its companion,

2   public protection.

3          As for the 30-year sentence that the probation

4   department and the government each endorse, the government has

5   a minimum.  The probation department has a specific

6   recommendation.

7          I do not find that by any means unreasonable.  As

8   Judge Abrams put the point in *Raishani*, there is no greater

9   danger to society than terrorism.  There is no greater danger

10  to society than that posed by people who think that they can

11  impose their will on others through senseless, incomprehensible

12  violence.

13         In particular, from the perspective of protection of

14  the public of the potential attack by the defendant at home or

15  abroad, a longer sentence would undeniably provide a longer

16  period of protection.

17         But the Court's charge under Section 3553(a) and its

18  parsimony principal is ultimately to impose not just a

19  reasonable sentence but the lowest sentence that could be

20  reasonably fashioned to accommodate the 3553(a) factors.

21         My judgment is that there are lower reasonable

22  sentences than 30 years that can do that.  There is no magic to

23  that number.  It happens to be a round number.  It happens to

24  be the bottom of the guideline range.

25         That does not make it right or wrong.  To treat 30

1    years as somehow presumptive is, in my view -- and I wrote this

2    out, Ms. Kellman, before you used the word "anchoring."

3          It is a classic example of unhelpful anchoring, of

4    unhelpful magnetic attraction to a round number.  The defense

5    is quite right that there are factors here that separate this

6    case from paradigmatic terrorism cases where the guidelines

7    recommend a 30-year to life sentence.

8          In particular, there was no attack here, and there

9    were no concrete plans for an attack.  The defendant was

10   apprehended early in a process that might or might not have led

11   to more serious steps.

12         And the various mitigating factors that I have

13   reviewed, including the defendant's age and the slew of

14   circumstances that made him particularly susceptible to being

15   radicalized separate this case from others.

16         And I'm mindful too, as I said, of the pattern of

17   sentences in material support cases.  Even taking into account

18   that that statute, until recently, permitted only a 15-year

19   sentence, there are cases in which a conviction under that

20   statute was paired with convictions under other that statutes

21   that increased the a judge's headroom.  The cases yielding a

22   30-year sentence or close it where the primary violation is

23   material support are few and far between.

24         The sentence I impose, while very long and a little

25   than twice what the defense recommends, will therefore fall

1   materially below 30 years.  It is a sentence that in my

2   considered judgment and after what I hope is clear is a lot of

3   consideration, fairly balances the 3553(a) factors and is

4   consistent with the broad patterns of sentences in this area.

5   I have considered whether a lower sentence yet can be justified

6   under the 3553(a) factors.  With regret, I concluded it cannot.

7          I will now state the sentence I intend to impose.  The

8   attorneys will have a final opportunity to make legal

9   objections before the sentence is finally imposed.

10         Mr. Almehmeti, would you please rise.

11         After assessing the particular facts of your case and

12   the factors under Section 3553(a), including the sentencing

13   guidelines, it is the judgment of the Court that you are to

14   serve a sentence of 264 months, that is, 22 years, imprisonment

15   in the custody of the Bureau of Prisons to be followed by a

16   period of five years' supervised release.

17         I impose a sentence of 20 years on Count One and 22

18   years on Count Two, those terms to run concurrent.

19         I will recommend to the Bureau of Prisons that they

20   allow you to participate in any deradicalization program that

21   either presently exists or that is developed during the time of

22   your incarceration.

23         As to supervised release, I impose a term of three

24   years on Count One and five years on Count Two.  Those are the

25   maximum terms available, and they are to run concurrently.

1          As to supervised release, the standard conditions of

2     supervised release shall apply.  In addition, you shall be

3     subject to the following mandatory conditions:

4          You shall not commit another federal, state, or local

5     crime.

6          You shall not illegally possess a controlled

7     substance.

8          You shall not possess a firearm or destructive device.

9          You shall refrain from any unlawful use of a

10    controlled substance.

11         And you must cooperate in the collection of DNA as

12    directed by the probation officer.

13         You must also meet the special condition that is set

14    out in the presentence report.  I will recapitulate it in full

15    in the judgment.

16         Briefly though, you are to submit your residence,

17    place of business, vehicle, property, computers, and the like

18    to a search on the basis that the probation department has

19    reasonable suspicion that contraband or evidence of a violation

20    of the conditions of supervised release may be found.

21         Why am I doing that.  Your criminal record before this

22    offense reflected a violation of the terms of release.  Your

23    second offense was committed while you were on parole from the

24    first, and your conduct here reflected, even after your arrest,

25    your condition involvement in deeply anti-social conduct while

1    in prison.

2         I am deeply hopeful that after this long term in

3    prison, you will be in a much better place, the place the

4    defense hopes for you.  But we all have to acknowledge the

5    possibility that you will have temptations after you are

6    released to commit some crime or infraction.

7         It will be useful for you to know that the probation

8    department, while you are on supervised release, has maximum

9    eyes on you.  It will be useful for you to know that they have

10   an opportunity, a maximal opportunity, to review your device,

11   your car, your home, whatever the case may be.  If that holds

12   whatever impulses you may have in check, that will be

13   ultimately to your good and to the good of the public.

14        I have the legal authority to impose a fine.  I'm not

15   going to do so.  I'm persuaded you don't have the ability to

16   pay it.

17        Government, I take it restitution and forfeiture are

18   not sought here?

19        MR. BOVE:  That's correct, Judge.

20        THE COURT:  All right.  I'm also required to impose

21   and do impose a mandatory special assessment of $100 per count

22   or $200 which shall be due immediately.

23        Does either counsel know of any legal reason why this

24   sentence shall not be imposed as stated?

25        MR. BOVE:  No objection. Judge.

1          MS. KELLMAN:  No, your Honor.

2          THE COURT:  Then the sentence as stated is imposed.

3          Mr. Bove, are there any open counts or underlying

4     indictments?

5          MR. BOVE:  There is an underlying indictment, Judge,

6     and we move to dismiss it.

7          THE COURT:  That motion is granted.

8          Mr. Almehmeti, I need to advise you of the following:

9     To the extent you haven't given up your right to appeal your

10    conviction and your sentence through your plea of guilty, you

11    have a right to do those things.  You have right to appeal your

12    conviction and your sentence.

13         If you're unable to pay for the costs of an appeal,

14    you may apply for leave to appeal in forma pauperis.  The

15    notice of appeal must be filed within 14 days of the judgment

16    of conviction.

17         Ms. Kellman, are there any recommendations you would

18    like me to make to the Bureau of Prisons regarding the location

19    or the nature of confinement?

20         MS. KELLMAN:  Your Honor, can I get back to the Court

21    about that midweek next week?

22         THE COURT:  Yes.  Ms. Kellman, I would ask you to get

23    it to me as soon as possible.  Just because of some

24    availability issues on behalf of my deputy and I, we would like

25    to get the judgment out.

1          So if you could reflect on it, if at all possible

2     today, that would be to my benefit.  If you need to do it until

3     next week, of course I'll give you the time.

4          MS. KELLMAN:  I'll do it as quickly as possible.

5          THE COURT:  Very good.  Anything further?  Anything in

6     terms of recommendations in terms of programs or things while

7     he's in the Bureau of Prisons?

8          MS. KELLMAN:  I think your Honor has covered that, but

9     we'll give it to you if there are any.

10          THE COURT:  Very good.  Please do.

11          Anything further from the government?

12          MR. BOVE:  No, your Honor.

13          THE COURT:  Anything further from the defense?

14          MS. KELLMAN:  No, your Honor.

15          THE COURT:  Mr. Almehmeti, I want to wish you all the

16     best.  It is with a heavy heart that I impose the sentence that

17     I do today.  With that said, I hope you remember all the

18     wonderful things that your family members and your former

19     fiance wrote about you.  That is nowhere reflected in the

20     conduct for which you're being sentenced.

21          Please remember that the people who know you best see

22     those good sides of you.  Let that be a light.  Let be that a

23     destination and a guide to your conduct as you go forward.

24          You are a very, very young man.  Trust me.  I know

25     this.  Even with the length of that sentence, when you are

 1   released from prison, particularly if you earn credit for good

 2   behavior, you will be, by my math, in the early part of your

 3   40's.  You've got a long life to live, and I encourage you to

 4   live it and live it well.

 5           We stand adjourned.

 6           MS. KELLMAN:  Thank you, Judge.

 7           (Adjourned)