UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

-v-

SAJMIR ALIMEHMETI,

Defendant.

16 Cr. 398 (PAE)

OPINION & ORDER

---

PAUL A. ENGELMAYER, District Judge:

This order resolves a counseled motion by defendant Sajmir Alimehmeti for compassionate release from United States Penitentiary ADX Florence, pursuant to 18 U.S.C. § 3582(c). For the reasons that follow, the Court denies the motion.

I.    Background

A.   Alimehmeti's Offense Conduct and Guilty Plea

Alimehmeti was charged in two counts. Count One charged him with attempting to provide material support to a designated foreign terrorist organization, ISIS, in violation of 18 U.S.C. § 2339B. Count Two charged him with passport fraud, to facilitate an act of international terrorism, namely, to travel overseas to join and fight for the Islamic State of Iraq and Syria ("ISIS"), in violation of 18 U.S.C. § 1542.

The Court incorporates here the summary of Alimehmeti's offense conduct as set out in the presentence investigation report. *See* Dkt. 116 ("PSR").

In brief, in 2014, Alimehmeti, after his release from prison from convictions for a violent robbery and assault, *id.* ¶¶ 76–78, began a series of repeated attempts to travel abroad to join ISIS. In October 2014 and again in December 2014, Alimehmeti attempted to enter the United Kingdom on route to ISIS-controlled territory in the Middle East but was denied entry each

time—the first after border authorities found camouflage clothing and nunchucks in his luggage, the second after inspection of his devices at the airport uncovered a large collection of images of terrorist attacks conducted with improvised explosive devices and ISIS flags. *Id.* ¶¶ 14–15. Alimehmeti's devices contained terrorist propaganda, including graphic videos of beheadings of prisoners and civilians, audio files of lectures promoting radical jihadist ideology, and photographs of Alimehmeti with ISIS's flag and making a gesture commonly used by ISIS supporters to show their allegiance. *Id.* ¶¶ 16–17.

In 2015, after his efforts to reach the ISIS caliphate were thwarted, Alimehmeti began to stockpile, in his Bronx apartment, military-style weaponry and gear that could be used in a lone-wolf terrorist attack in New York City. The items Alimehmeti purchased included a military-grade survival knife with a five-inch blade; two tactical knives with four-inch blades; a credit-card sized folding knife; a 24-inch pocket chainsaw; a set of metal handcuffs; a pair of tactical gloves with steel knuckles; and a tactical ski mask. *Id.* ¶ 18. Many of these items were later recovered from the search of Alimehmeti's apartment following his arrest. *Id.* ¶ 43. At the same time, Alimehmeti continued to attempt to join ISIS after his failed attempts to enter the United Kingdom. To avoid suspicions being raised by the stamps in his passport showing that he had been denied entry, Alimehmeti fraudulently attempted to obtain a new U.S. passport to travel by falsely claiming that he had lost his existing passport. *Id.* ¶¶ 35–42.

Between 2015 and 2016, Alimehmeti cultivated relationships with fellow ISIS supporters in the United States, expressing support in his communications for terrorist attacks carried out in the name of ISIS and conveying his desire to fight with ISIS abroad, known as making *hijra*. In a call in November 2015, Alimehmeti referred to ISIS territory as an "amusement park"; in another such call, a female supporter of ISIS conveyed in coded language to Alimehmeti that she

planned to join ISIS in Libya. *Id.* ¶¶ 39–41. When she asked Alimehmeti if he wanted to join her, he responded that, "You know why . . . I don't have a 'P'"—referring to a clean passport without rejection stamps—but that "obviously I want to go." *Id.* ¶ 41.

In September 2015, law enforcement, in an attempt to disrupt and gain insight into Alimehmeti's activities, introduced undercover officers (the "UCs") to Alimehmeti. During the ensuing months leading to his arrest in May 2016, Alimehmeti participated in numerous recorded meetings with the UCs, including in his apartment, where he displayed an ISIS flag on the wall, described his desire to travel abroad to fight for ISIS and execute beheadings for the group, and used his laptop to play ISIS propaganda videos celebrating terrorist attacks and the beheadings of captives. *Id.* ¶¶ 19–21. In October 2015, he submitted a passport application, falsely claiming under penalty of perjury that his passport had been lost. *Id.* ¶ 35. In ensuing communications with the UCs, he confessed his passport fraud and made clear that he intended to use the fraudulent passport to travel to Syria to join ISIS. *Id.* ¶¶ 36–42. In May 2016, Alimehmeti agreed to assist a UC whom he understood intended to travel to Syria to fight for ISIS. He took the UC to several stores to select and purchase supplies for traveling to join ISIS, and advised the UC as to the most secure encrypted messaging applications to use when communicating with other ISIS supporters. *Id.* ¶¶ 22, 25–30.

Alimehmeti was arrested on May 14, 2016. Before his arrest he had told a UC that, if he were ever incarcerated, he would seek to radicalize other inmates and correctional officers. *Id.* ¶¶ 48–49. Consistent with this pledge, after his arrest, Alimehmeti assisted a fellow inmate at the Metropolitan Correctional Center ("MCC"), Ahmad Khan Rahimi, to disseminate, to other MCC inmates, terrorist propaganda that had been provided to them in discovery in their respective cases. *Id.* ¶ 44–47. Rahimi was charged with and later convicted for his role in

3

carrying out the September 2016 bombing in the Chelsea neighborhood of Manhattan. *Id.* ¶ 44 & n.3. In November 2017, a hard drive in Alimehmeti's locker at the MCC was found to contain terrorist propaganda materials that had been produced in discovery to Rahimi, including ones describing how to build pressure-cooker bombs, celebrating Rahimi's Chelsea bombing, and encouraging followers to kill civilians through lone-wolf attacks in the West. *Id.* ¶ 45. Rahimi's MCC laptop, in turn, showed that it had been used to connect to and open files on Alimehmeti's hard drive. *Id.* ¶¶ 45–46.

Alimehmeti's collusion with Rahimi came to light shortly before his trial was scheduled to begin, in late January 2018. On January 5, 2018, the Court ruled that Alimehmeti's post-arrest sharing of terrorist propaganda with Rahimi would be admissible at trial, to show the durability of his support for ISIS and to rebut a defense claim of a lack of predisposition. Dkt. 96. After this ruling, Alimehmeti's counsel withdrew. *See* Dkt. 97. On February 21, 2018, Alimehmeti, represented by new counsel, pled guilty to both counts of the Indictment, without a plea agreement. Dkt. 114.

### B. Alimehmeti's Sentencing

Sentencing was held on December 6, 2019. *See* Dkt. 133 ("Sent. Tr."). The Court calculated an offense level of 37 and a criminal history category of VI. These yielded a guideline range that—but for the statutory maximum sentence of 45 years' imprisonment— would have been between 30 years and life imprisonment. *Id.* at 23. The Court imposed a below-Guidelines sentence of 22 years' imprisonment, emphasizing at the outset of the hearing that the predominant bases for the lengthy sentence were Alimehmeti's offense conduct, which consisted of "promotion and support of ISIS at home and abroad" and which the Court termed "destructive," "alarming," "terrifying," and "terroristic," and his criminal history. *Id.* at 24.

4

The Court elaborates below on its bases for the sentence imposed, in the course of discussing its present assessment of the 18 U.S.C. § 3553(a) factors. In addressing these factors, the Court emphasized the gravity of Alimehmeti's offense conduct. He had provided material support to a foreign terrorist organization, both by attempting to aid the UC in his efforts to travel to Syria to join ISIS, and in repeatedly trying to do so himself, including by means of passport fraud. *Id.* at 77; *see also id.* at 88 ("Your actions made clear that you were ready, willing, and able to promote ISIS, to recruit for ISIS, to travel for ISIS, to fight for ISIS, and to kill for ISIS, and, if necessary, to die for ISIS."). Within the United States, Alimehmeti had stockpiled munitions, including combat knives, spike knives, handcuffs, gloves with steel knuckles, and a survival pocket chain saw, plus videos glorifying ISIS fighters engaged in combat and beheading prisoners. *Id.* at 78. The Court judged this conduct alarming, because it indicated that Alimehmeti was prepared eventually to use these weapons, "most likely offensively and most likely directed towards civilians here in the United States." *Id.* at 79; *see also id.* at 80 ("The only rational inference is that you were storing up for at least a potential future attack. And the fact that you began to acquire them after you were twice denied the ability to leave the United States makes your possession of them all the more suggestive."); *id.* at 81 ("Every indication is that you were on course to wreak havoc."). The Court noted, too, that, even after his arrest, Alimehmeti had continued, with Chelsea bomber Rahimi, to spread ISIS propaganda, including burning discs of materials with instructions on how to build a pressure cooker bomb. *Id.* at 86. For these reasons, the Court found, the factor of just punishment demanded a very long sentence. *Id.* at 89.

Such a sentence was supported by other § 3553(a) factors, including general deterrence, *id.* at 90, and especially specific deterrence, given that Alimehmeti had been undeterred by his

two prior convictions, and that his instant offenses were far more destructive than his earlier ones. *Id.* at 90–92. Also supporting a long sentence was the interest in public protection, given that Alimehmeti had attempted to supply and fight for ISIS abroad, stockpiled weapons for apparent domestic use, and partnered with the lone-wolf Chelsea bomber, Rahimi, to promote ISIS among MCC inmates. *Id.* at 92–93. At the same time, the Court recognized mitigating factors, which contributed to its decision to impose a significantly below-Guidelines sentence. These included Alimehmeti's acceptance of responsibility as reflected in his guilty plea, *id.* at 94; his challenging background as an immigrant from Albania who had found himself living at a young age in a violent gang-dominated neighborhood and who was later exposed to rough elements and extremist ideologies while in state prison, *id.* at 96–97; his challenging conditions of confinement, *id.* at 102; the courses and other steps towards self-improvement he had taken while in pre-sentence custody, *id.* at 102–03; and letter testimonials from family and friends, *id.* at 104–05. The Court also attempted to calibrate Alimehmeti's sentence to those in cases involving material support of terrorism, while recognizing that Alimehmeti's case was more serious than most because he had also attempted to stockpile weapons at home. *Id.* at 106–08. Although finding the prison sentence the Government recommended (30 years) reasonable, the Court found that lesser sentences, including the 22-year sentence imposed, were also reasonable, and noted its obligation under the parsimony principle to impose the lowest reasonable sentence consistent with the § 3553(a) factors. *Id.* at 108.

### C. Alimehmeti's Compassionate Release Motion

On June 5, 2024, Alimehmeti, represented by the same counsel who had represented him during his plea and sentencing, moved for compassionate release, pursuant to 18 U.S.C. § 3582(c). Counsel's memorandum of law, Dkt. 143 ("D. Mem."), attached, *inter alia*, a

6

personal letter to the Court from Alimehmeti expressing regret for his offenses, disavowing ISIS and its ideology, and attesting to his maturation, *id.* Ex. A; records of courses he had taken or applied to take while in custody, *id.* Exs. F–I; and a memo from an Assistant Attorney General approving the application by the United States Attorney for the Southern District of New York and the Federal Bureau of Investigation for a one-year renewal—beyond the March 5, 2024 expiration date—of the Special Administrative Measures ("SAMs") that had resulted in heightened restrictions on Alimehmeti's confinement, *id.* Ex. L ("AAG SAMs Memo"). Citing Alimehmeti's offense conduct and aspects of his conduct while incarcerated, the memo found a substantial risk that Alimehmeti's communications and contacts with other persons could result in death or serious bodily injury to others. *Id.* at 7.

On July 2, 2024, the Government submitted a memorandum opposing compassionate release. Dkt. 149 ("G. Mem."). The memorandum attached, in addition to the PSR and sentencing transcript, Alimehmeti's prison disciplinary record. *Id.* Ex. C.

On July 3, 2024, Alimehmeti's counsel submitted a brief letter response. On July 16, 2024, counsel submitted a letter reporting that Alimehmeti had since been moved to a new unit within ADX Florence in which he enjoys limited additional privileges. Dkt. 150.

## II.   Discussion

### A.   Standards Governing Compassionate Release Motions

"[U]pon motion of the defendant," and "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," the Court may reduce such defendant's sentence if it finds that "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A).

The defendant bears the burden of proving he is entitled to compassionate release. *See United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992) ("If the defendant seeks decreased punishment, he or she has the burden of showing that the circumstances warrant that decrease." (citations omitted)); *see also, e.g.*, *United States v. Clarke*, No. 9 Cr. 705, 2010 WL 4449443, at *1 (S.D.N.Y. Oct. 29, 2010).

Originally, § 3582(c)(1)(A) did not permit defendants to initiate compassionate release proceedings; it required the BOP to seek such release on their behalf. *See United States v. Phillibert*, 557 F. Supp. 3d 456, 459 (S.D.N.Y. 2021). However, "[a]s part of the First Step Act of 2018, Congress authorized courts to reduce a term of imprisonment upon motion by a defendant." *United States v. Amato*, 48 F.4th 61, 63 (2d Cir. 2022) (per curiam).

Although Congress tasked the Sentencing Commission with identifying the circumstances that are sufficiently extraordinary and compelling to justify a reduction in sentence, *United States v. Brooker*, 976 F.3d 228, 232 (2d Cir. 2020) (citing 28 U.S.C. § 994(t)), before November 1, 2023, the Sentencing Commission's only guidance on this point had been promulgated prior to the enactment of the First Step Act. This guidance thus applied only to a "motion of the Director of the Bureau of Prisons," *see* U.S.S.G. § 1B1.13 (historical note), and not "to compassionate release motions brought by defendants," *Brooker*, 976 F.3d at 236; accordingly, the Second Circuit held in 2020, this guidance "[could not] constrain district courts' discretion to consider whether any reasons [were] extraordinary and compelling" in such cases, *id.*; *see also id.* at 237 ("Neither Application Note 1(D), nor anything else in the now-outdated version of Guideline § 1B1.13, limits the district court's discretion."). Thus, through November 1, 2023, when assessing a motion brought by an imprisoned defendant and not the BOP, a district court was not constrained by U.S.S.G. § 1B1.13's enumeration of extraordinary

and compelling reasons and could "consider the full slate of extraordinary and compelling

reasons that an imprisoned person might bring before [it] in motions for compassionate release."

*Id.* at 237.

Effective November 1, 2023, however, the Sentencing Commission amended the

Guidelines to also cover defendant-initiated petitions. *See generally* U.S. Sent'g Comm'n,

Amendments to the Sentencing Guidelines, 88 Fed. Reg. 28,254 (effective Nov. 1, 2023). The

amended guidance from the Commission as to what constitutes extraordinary and compelling

reasons now controls the analysis of a compassionate release petition, however initiated.

The Commission's updated guidance identifies six circumstances that, singly or in

combination, may so qualify. U.S.S.G. § 1B1.13(b). These are:

- *Medical circumstances of the defendant.* In addition to previously recognized circumstances such as a defendant suffering from a terminal illness or a serious medical condition, U.S.S.G. § 1B1.13(b)(1)(A)–(B), the amended guidelines direct courts to consider whether the defendant is "suffering from a medical condition that requires long-term or specialized medical care that is not being provided" in prison "and without which the defendant is at risk" of serious health deterioration or death, *id.* § 1B1.13(b)(1)(C), or is held at a facility affected by or at imminent risk of being affected by an outbreak of infectious disease or other "ongoing public health emergency declared by the appropriate federal, state, or local authority," where "due to personal health risk factors and custodial status," the defendant is at a greater risk of severe complications upon exposure, and where "such risk cannot be adequately mitigated in a timely manner." *Id.* § 1B1.13(b)(1)(D). This factor was informed by compassionate release decisions coming out of the COVID-19 pandemic. *See* U.S. Sent'g Comm'n, Guidelines Manual 2023: Supplement to Appendix C at 206 (Nov. 1, 2023).

- *Age of the defendant.* Coupled with a "deterioration in physical or mental health" corresponding with the aging process as well as the portion of the original sentence served at the time of a compassionate release motion, this may support sentence reduction. U.S.S.G. § 1B1.13(b)(2).

- *Family circumstances of the defendant.* Where the defendant is the "only available caregiver" for an immediate family member, this may support a sentence reduction. *See id.* § 1B1.13(b)(3).

- *Victim of abuse in custody.* Where the defendant while in custody on the sentence in question was a victim of sexual abuse, or physical abuse resulting in serious

9

bodily injury "committed by, or at the direction of, a correctional officer, an employee or contractor of the Bureau of Prisons, or any other individual who had custody or control over the defendant," and the misconduct was "established by a conviction in a criminal case, a finding or admission of liability in a civil case, or a finding in an administrative proceeding," this may support a sentence reduction. *Id.* § 1B1.13(b)(4).

- *Catchall provision*. Where a defendant presents "any other circumstance or [a] combination of circumstances" that themselves or with the above circumstances "are similar in gravity" to those above, such may support sentence reduction. *Id.* § 1B1.13(b)(5). The Commission "rejected a requirement that 'other reasons' be similar in nature and consequence to the specified reasons. Rather, they need be similar only in gravity[.]" U.S. Sent'g Comm'n, Guidelines Manual 2023: Supplement to Appendix C at 207 ("[T]he Commission continues to believe . . . that judges are in a unique position to determine whether the circumstances warrant a reduction. Guidance beyond that provided in the amended policy statement regarding what circumstances or combination of circumstances are sufficiently extraordinary and compelling to warrant a reduction in sentence is best provided by reviewing courts[.]" *Id.* (cleaned up).

- *Unusually long sentence plus changes in law*. Where "a defendant received an unusually long sentence and has served at least 10 years of the term of imprisonment, a change in the law (other than an amendment to the Guidelines Manual that has not been made retroactive) may be considered in determining whether the defendant presents an extraordinary and compelling reason, but only where such change would produce a gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed, and after full consideration of the defendant's individualized circumstances." U.S.S.G. § 1B1.13(b)(6).

Finally, even if extraordinary and compelling reasons are present, the Court must also assure itself that release is consistent with "the factors set forth in section 3553(a) to the extent that they are applicable." 18 U.S.C. § 3582(c)(1)(A).

### B.    Application to Alimemeti's Motion

Alimehmeti makes three arguments why extraordinary and compelling circumstances ostensibly support his early release under § 3582(c). These are based on (1) his conditions of confinement; (2) his claim of extraordinary rehabilitation; and (3) his age. He does not make any argument based on medical or family circumstances or an intervening change of law applicable

to his offenses.[1]  The Government, opposing the petition, disputes that these grounds, singly or

together, meet the standard for extraordinary and compelling circumstances justifying early

release.  And, it argues, even if this standard were met, the § 3553(a) factors support requiring

Alimehmeti to serve the sentence imposed.[2]

### 1.  Extraordinary and Compelling Circumstances

*Prison conditions*:  Alimehmeti first argues that his conditions of confinement merit his

early release from custody.  He relies upon his prison conditions both before and after his

December 2019 sentencing.  D. Mem. at 11–26.

For the purposes of this motion, however, the Court considers only post-sentencing

prison conditions.  That is because the conditions in which Alimehmeti had been held at the

MCC between his arrest and sentencing were fully taken into account at his sentencing.  They

formed a prominent part of his able counsel's sentencing submission.  *See* Dkt. 127 ("D. Sent.

Mem.") at 26–36.  As a result of heightened security considerations prompted by his terrorism

offenses and his post-offense sharing of discovery material propaganda with Rahimi, Alimehmeti

had been held in solitary confinement.  The defense reply sentencing memorandum thus

described Alimehmeti as having long been "caged in isolation at the MCC."  Dkt. 132 ("D. Sent.

---

[1] As the Probation Department has calculated, Alimehmeti is not eligible for a reduction of his
sentence based on the recent Amendment 821 to the Sentencing Guidelines.  *See* Dkt. 148 at 2
(supplemental presentence report, filed July 2, 2024).

[2] It is undisputed that Alimehmeti has exhausted his administrative options.  His request for
compassionate release, submitted to the warden at ADX Florence, was submitted on April 20,
2023, *see* D. Mem. Ex. A, and denied by the warden on June 22, 2023, *id.* Ex. B, and his appeal
of the denial, filed July 6, 2023, was denied by the warden on July 20, 2023, *id.* Ex. C.  *See
United States v. Rivera*, No. 89 Cr. 346, 2021 WL 5235093, at *4 (S.D.N.Y. Nov. 9, 2021)
(exhaustion requirement satisfied where warden denied defendant's request for compassionate
release).  His further appeal, submitted to the regional director, was submitted on July 25, 2023,
and denied on September 1, 2023, *see* D. Mem. Ex. D, and his appeal of that denial, filed
September 22, 2023, was denied by the administrator on October 30, 2023, *id.* Ex. E.

Reply") at 4. And the Court, in fashioning the sentence, explicitly took these conditions into account. The Court stated:

> I have also considered the argument from the defense that your conditions of confinement in the MCC have been hard . . . on account of the special administrative measures that have separated you from others. In past cases in which a defendant's conditions of confinement have been unusually hard, whether in foreign prison, awaiting extradition, or at the MDC last year when it became effectively uninhabitable, I and my colleagues have in calculating the just sentence, often considered each day spent in pretrial confinement as more onerous than a day in a BOP prison whose conditions are more humane. That principle applies here too. You have spent nearly two years, often in near solitary confinement. I am not opining on the validity of your designation or of the disciplinary measures that have been taken against you within the BOP. But I do accept the hard nature of the isolated conditions in which you have been held. I regard these as mitigating. I have these firmly in mind today.

Sent. Tr. at 102. Although not explicitly referenced in the sentencing transcript, the Court was also mindful—and took into account at sentencing—that Alimehmeti was apt to remain held in trying conditions in the MCC for a period of some months after sentencing while he was designed and transferred to a full-time prison facility. In August 2020, Alimehmeti was transferred from the MCC. D. Mem. at 16.

The Court accordingly focuses its analysis on the conditions of confinement at ADX Florence, the Colorado "super max" facility at which Alimehmeti has been held since April 2021, *see* G. Mem. at 6, and which (apart from the MCC) is the focus of Alimehmeti's claim regarding prison conditions. Between April 2021 and July 2024, Alimehmeti was housed in the H-Unit at ADX Florence, the unit reserved for inmates subject to SAMs. *Id.* As recounted by defense counsel, Alimehmeti's cells in this unit were small (roughly 10 feet by 7 feet), with limited room to move, no shower, a tiny window, recycled and unfiltered air, and antiquated and weak plumbing system. D. Mem. at 16–18. He was allowed out of his cell for two hours a day, in an outdoor yard divided into meshed cages. *Id.* As a result of this designation, Alimehmeti

was able to access much of ADX Florence's pertinent programming (including educational and religious programs and classes on psychology and anger management) only via closed-circuit channels. *Id*. at 18. There was no in-person congregate prayer. *Id*. at 18. Alimehmeti completed a 10–12-week psychology class with four other inmates in the same tier; the class met in H-Unit's outdoor recreation area, with the inmates placed in separate meshed cages and the psychologist standing outside. *Id*. at 18–19. Alimehmeti was on the wait list for other classes but, as of June 2024, had not been notified when they would next be offered. *Id*. at 19. In January 2024, Alimehmeti, as a result of his good conduct, was given a job as a unit orderly. *Id*. at 19. This enabled him to interact unrestrained with prison staff and allowed him out of his cell three days a week to clean for approximately two hours and to speak and interact with correctional officers. *Id*. at 19–20.

According to Alimehmeti, prisoners cannot leave H-Unit without the lifting of the SAMs, a decision made by DOJ. *Id.* at 20. There is, however, an internal "step-down" program, in which prisoners may qualify for phases, each lasting a minimum of one year, in which certain restrictions are relaxed. *Id.* at 20. In Phase I, prisoners get two 15-minute phone calls per month and three 15-minute showers per week; in Phase II, three 15-minute phone calls per month and one 15-minute shower daily; and in Phase III, which requires a SAMs modification, they usually move to J-Unit, where they are permitted to associate for 90 minutes per day as part of a four-person group, and are issued tablets on which they can watch movies, listen to music, and play video games. *Id*. at 20–21. An inmate who is not granted a SAMs modification may still graduate to Phase III, but must remain in H-Unit; in February 2023, Alimehmeti was approved for Phase III, which resulted in his placement in a cell the size (7 feet by 12 feet) of a general population cell. *Id*. at 21. In mid-July 2024, Alimehmeti notified his counsel that he had been

13

transferred to the J-Unit. Dkt. 150.[3] There, he has additional privileges and has been assigned to work as a unit orderly. *Id.*

The Court does not minimize the rigors and challenges presented by Alimehmeti's conditions of confinement. But there is a reason Alimehmeti is subject to these restrictions: he is a prisoner subject to SAMs. That fact was known to all at sentencing. The defense's sentencing memorandum emphasized that Alimehmeti's unusually restrictive conditions of confinement at the MCC resulted from his being subjected to SAMs, D. Sent. Mem. at 26–27, that Alimehmeti's SAMs "may well be renewed year after year throughout the duration of his sentence," *id.* at 34, and that, on account of the SAMs, Alimehmeti was apt to be designated to ADX Florence, which the defense memorandum termed "the Alcatraz of the Rockies," and within ADX Florence, in H-Unit, whose geography and modes of confinement the defense accurately described, *id.* at 34–35. That Alimehmeti's SAMs would result in especially restricted confinement at ADX Florence was thus anticipated by all. It does not come as any surprise.

And Alimehmeti does not cite any authority for the proposition that an inmate's being subject to SAMs can warrant early release. On the contrary, these conditions have been imposed on Alimehmeti, like many other inmates convicted of terrorism offenses, to mitigate the dangers he has been proven to pose, including while incarcerated. The case law well establishes that SAMs imposed on account of a defendant's conduct serve "legitimate penological interests," *United States v. Hashmi*, 621 F. Supp. 2d 76, 86 (S.D.N.Y. 2008), which have the "non-punitive objective of protecting national security" and "curtailing [the defendant's] dangerousness," *Basciano v. Lindsay*, 530 F. Supp. 2d 435, 446 (E.D.N.Y. 2008) (citing *United States v. El-Hage*, 213 F.3d 74, 81–82 (2d Cir. 2000)). The Court is unaware of any case holding such

---

[3] Counsel's letter reporting this transfer does not recite the transfer's date. Dkt. 150.

administrative measures extraordinary and compelling circumstances supporting early release under § 3582(c). *Cf. Cross v. McGinnis*, No. 5 Civ. 504, 2006 WL 1788955, at * 4 (S.D.N.Y. June 28, 2006) (collecting cases) ("Solitary confinement and the restrictions associated with it are not an extraordinary circumstance" that warrants equitable tolling).

As to the SAMs applicable to him, Alimehmeti does not claim that they lack a factual basis or challenge their continuing imposition. And any such challenge would be required to be brought administratively in the first instance. *See United States v. Yousef*, 327 F.3d 56, 169 (2d Cir. 2003) (courts lack jurisdiction to consider challenges to SAMs where the defendant fails to exhaust administrative remedies). Here, there clearly is such a basis. Apart from his offense conduct, Alimehmeti, as recounted above, exchanged terrorist propaganda with Chelsea bomber Rahimi while incarcerated, in violation of discovery limitations. And the most recent SAMs renewal, covering the 12 months beginning March 5, 2024, which the Court has been supplied in a sealed submission, recounts a range of factual bases for the SAMs, including infractions post-dating Alimehmeti's sentencing. *See* D. Mem. Ex. L (BOP memorandum to DOJ in support of SAMs extension); *see also id.* Ex. K (same, for preceding one-year period); G. Mem. Ex. C (Alimehmeti's prison disciplinary record).

The Court therefore does not find Alimehmeti's conditions of confinement to qualify as an extraordinary and compelling circumstance justifying his early release.

*Rehabilitation*: Alimehmeti next pursues early release on the grounds of extraordinary rehabilitation. Predominantly, Alimehmeti relies on a lengthy letter that he prepared and filed that renounces ISIS and other violent extremist terrorist organizations. Alimehmeti also notes his appointment by ADX Florence as an orderly, a position of trust, his movement through the

step-down program, and his participation in classes available to him. D. Mem. at 26–33 & Ex. N
("Letter").

Alimehmeti's letter is important and praiseworthy. As of his sentencing, he had not
repudiated ISIS or terrorist ideologies, a point the Court noted. *See* Sent. Tr. at 94 ("You haven't
repudiated ISIS, or, for that matter, terrorism. And your commitment to ISIS is ultimately what
motivated these two crimes. That would have reflected a fuller acceptance of responsibility.");
*id.* at 94–95 ("I hope . . . that in the future you will reflect back on these events and that you will
reject and repudiate a creed that encourages the beheadings of innocent people as a way to make
a point."). His letter to the Court now does so. *See* Letter at 5 ("Your Honor, I categorically
disavow ISIS and other similar terrorist organizations along with their violent extremist
ideologies and philosophies."). That statement is consequential because the public repudiation of
ISIS has some potential to inspire retaliation against Alimehmeti from ISIS adherents, while he
is in prison or after. The letter is also laudably introspective, thoughtful, and prepared with
evident care. Alimehmeti explains in detail and articulate prose the evolution of his thinking
about terrorism. He plausibly accounts for both his earlier draw to terrorism and his present
repudiation of it. He chronicles his regrets and the pain his choices have caused to others,
including his mother, wife, and late father. Although a court cannot credulously accept the
say-so of an interested defendant in a letter submitted in support of early release from prison, the
Court can and does commend Alimehmeti for the letter. Even discounting the letter given its
strategic purpose as an exhibit in support of a bid for early release, the letter, in the Court's
assessment, reveals real maturation on the part of its author.

Commendable though the letter is as a sign of progress, the Court, however, does not find it—or the other circumstances Alimehmeti cites—to rise to the level of an extraordinary and compelling circumstance justifying early release. That is so for several reasons.

First, to the extent Alimehmeti now accounts for his offenses and wrong turns, he is, in substance, tracking, in personal prose, observations that this counsel, and the Court, each made at sentencing. *See, e.g.*, Sent. Tr. at 100 ("The big picture here as to your background is that your youth, your isolation, your alienation, your limited roots here, and your imprisonment at a young age—all of that helps me understand the choices you made[.]"); D. Sent. Mem. at 4 ("Sajmir, a young person struggling with belonging and identity, went online looking for answers" and became "radicalized, through a process known as 'identity fusion,' through which an individual personal identity is gradually overshadowed by a radicalized group entity[.]") (citation omitted). Alimehmeti's expressions of self-awareness and repudiation of evil are not game-changing so much as recognitions of what has long been apparent to others.

Second, Alimehmeti's gradual maturation was already underway to a degree at the time of sentencing, and the Court, in imposing sentence, anticipated that it would continue during his time in custody. The Court commended Alimehmeti for the progress he had shown in prison, including in taking courses and working productively, and forecast further progress. *See id.* at 103 ("The training you have so far received in prison . . . will situate you well to build a constructive life after your release. Your decision to put some of your time in prison to good use in the ways I've just described is encouraging to me.") And, drawing on the letters about Alimehmeti from his family and friends, the Court found these to supply a basis for hope that "as you mature[,] the positive side [of] your characteristics and history [] that these people see in you will prevail over the darker impulses on display in the conduct for which you're being sentenced

17

today." *Id.* at 105. Alimehmeti's welcome positive trajectory since his sentencing is not unanticipated. Nor is it so unusual as to qualify as extraordinary. The letter is uncommon among other, former defendants in its articulateness and detail, but the expressions of repentance and remorse are familiar. They echo numerous defendants' submissions in support of sentencing or post-sentencing relief.

Third, Alimehmeti's enrollment or completion of educational courses, and his having done productive work while incarcerated, do not justify early release. As this Court has observed in other cases, some amount of rehabilitative effort is expected of inmates. *See, e.g.*, *United States v. Corbett*, No. 10 Cr. 184 (PAE), 2023 WL 8073638, at *7 (S.D.N.Y. Nov. 21, 2023) ("[P]articipation in programming aimed at rehabilitation is expected of inmates[.]"); *United States v. Morales*, 10 Cr. 392, 2021 WL 3038650, at *2 (S.D.N.Y. July 14, 2021) ("Making good use of one's time and obeying the rules in prison is not uncommon, and indeed is expected."); *United States v. Saleh,* No. 93 Cr. 181, 2020 WL 3839626, at *4 (S.D.N.Y. July 8, 2020) ("[E]very inmate should strive for a productive institutional record while incarcerated because that is what is expected."). The assembled record, although exhibiting welcome personal growth, does not supply evidence of rehabilitative steps or achievements that rise to the level of extraordinary and compelling. *See, e.g.*, *Corbett*, 2023 WL 8073638, at *7 (defendant's "participation in programming d[id] not make out an extraordinary circumstance"); *United States v. Needham*, No. 6 Cr. 911, 2022 WL 19769, at *4 (S.D.N.Y. Jan. 3, 2022) (rehabilitation through prison programming did not rise to the level of extraordinary and compelling reason for early release); *United States v. Torres*, No. 16 Cr. 500, 2021 WL 1131478, at *3 (S.D.N.Y. Mar. 24, 2021) (similar); *United States v. Marmolejos*, No. 19 Cr. 626 (PAE), 2021 WL 807128, at *4 (S.D.N.Y. Mar. 3, 2021) (defendant's "commendable" efforts at rehabilitation in prison fell "well

18

short" of justifying compassionate release); *United States v. Bolden*, 15 Cr. 466, 2021 WL 242551, at \*2 (S.D.N.Y. Jan. 25, 2021) ("[P]articipation in or completion of [programming], while laudable, is not an extraordinary and compelling reason warranting a compassionate release.").

*Age:*  Finally, Alimehmeti argues that the Court should view his age—age 20 at the start of his radicalization in 2014 and age 24 when he was convicted in 2018—as a basis for granting relief under § 3582(c). That is wrong. Alimehmeti's age at the time of his offenses was not unusual. As the Government argued in its sentencing submission, it is "squarely in line with the ages of other young, male ISIS followers who have joined the group and attacked and killed in its name." Dkt. 131 at 45. And the Court took Alimehmeti's relative youth and his capacity for maturation into account in fashioning his sentence. The Court noted that Alimehmeti had come to the United States at a young age; that he had joined a local Albanian gang at age 15; that he soon committed a robbery that led him to be imprisoned in Rikers Island as a minor, which "is no place for a minor to be"; that he married young and against his parents' approval; and that "[o]verall, I can see a young person without strong roots here in a new country and without strong parental guidance that can provide ballast to a young person who is growing up and trying to find his place in the world." Sent. Tr. at 96–98; *see also id.* at 98 ("All this helps me understand why you might have been susceptible to the call of faith and/or a new ideology as you were exposed to it in state prison and later through online videos."). The Court explicitly accounted for Alimehmeti's age and capacity for maturation in fashioning the well-below-Guidelines sentence of 22 years' imprisonment. Alimehmeti's motion for relief under § 3582(c) does not shed any new light on this factor. Alimehmeti's age thus does not amount to an extraordinary or compelling circumstance justifying reduction of his carefully considered

sentence. *See, e.g.*, *United States v. Delgado*, 582 F. Supp. 3d 136, 140 (S.D.N.Y. 2022)

(denying defendant's motion for sentence reduction based, in part, on age); *Saleh*, 2020 WL

3839626, at *3 (defendant "has not demonstrated that his pre-existing medical conditions,

combined with his age, rise to the level of 'extraordinary and compelling reasons'"); *United

States v. Hidalgo*, 462 F. Supp. 3d 470, 473 (S.D.N.Y. 2020) ("The defendant's age . . . is not, in

and of itself, an extraordinary and compelling reason[.]").

 Alimehmeti thus has not established an extraordinary or compelling circumstance within

the meaning of § 3582(c). Nor do the factors he identifies, considered in combination, reach that

level. For the reason alone, his motion must be denied. *See, e.g.*, *United States v. Ogbuokiri*,

No. 20 Cr. 3-4, 2024 WL 3026559, at *6 (S.D.N.Y. June 17, 2024) (defendant's incarceration

conditions, medical issues, rehabilitation efforts, lengthy sentence, and family circumstances,

together, do not establish extraordinary and compelling reasons warranting release); *United

States v. Rivera*, No. 13 Cr. 424, 2024 WL 706961, at *3 (S.D.N.Y. Feb. 21, 2024) (defendant's

susceptibility to COVID-19 infection, harsh confinement conditions, acceptance of

responsibility, and rehabilitation, together, did not establish an extraordinary and compelling

reason for release); *Corbett*, 2023 WL 8073638, at *5–7 (similar); *United States v. Miller*, No. 12

Cr. 368, 2021 WL 2716205, at *4 (S.D.N.Y. July 1, 2021) (similar); *United States v. Mitchell*,

No. 96 Cr. 126, 2021 WL 1400053, at *5 (S.D.N.Y. Apr. 14, 2021) (similar).

### 2. Section 3553(a) Factors

 Even if Alimehmeti had made such a showing, the § 3553(a) factors, considered in

combination, continue to favor the sentence imposed. At sentencing, the Court carefully and in

detail reviewed the § 3553(a) factors as they applied to Alimehmeti, and explained why these

required the sentence of 22 years' imprisonment and made any lesser sentence unsustainable.

*See* Sent. Tr. at 74–110.  Having reviewed the sentencing record and evaluated the § 3553(a)

factors anew, the Court reiterates, for substantially the same reasons as at sentencing, that the

sentence imposed is the lowest compatible with these factors.

Particularly influential in the Court's assessment that a lengthy sentence consistent with

that imposed was needed were the interests in just punishment and in promotion of respect for

the law, given the nature and gravity of Alimehmeti's crimes.  *Id.* at 76–89.  The Court began by

reviewing Alimehmeti's steps in support of ISIS and his stockpiling of combat knives, military

style equipment, and weapons in his home.  *Id.* at 77–78.  The Court noted:

> The decision to buy these was yours and yours alone.  It wasn't until your apartment
> was searched in May 2016 that the FBI found your collection of combat knives and
> military-style equipment.  And of course they found the large ISIS flag displayed
> [] on the wall [] in your apartment.
>
> They found the laptop computer, the cell phone belonging to you which
> contained a vast amount of ISIS promotional material, including an array of
> materials glorifying ISIS fighters.  They included videos of ISIS fighters engaged
> in combat and beheading prisoners.
>
> Because the undercover operation resulted in your arrest, we cannot
> know—and we will never know for certain—how events involving these munitions
> would have played out had you not been arrested. . . .
>
> But the rest of the record supplies important clues as to your intentions.  The
> ISIS propaganda materials found in your possession included extensive propaganda
> encouraging domestic terrorism in the U.S. and the killing of innocent people here.
>
> It includes your glorification of ISIS beheading people.  You possessed
> copious photographs and literature glorifying these horrifying acts, and your
> statements to the undercover officers were to the same effect.
>
> Your attempts to go and fight for ISIS abroad and to assist the undercover
> in doing so also put in context your decision to stockpile weapons that could be
> used to restrain, gut, or [de]capitate another human being.
>
> The timing of your purchases is also relevant context.  In late 2014, ISIS
> released a speech by its then[-]spokesman, Abu Muhammed al-Adnnai, instructing
> ISIS supporters in the West that if they were unable to travel overseas to join ISIS,

they [should] carry out lone-wolf attacks in their homelands and kill non-Muslims by any means possible.

[V]iewed in light of this evidence, the munitions you were stockpiling in your home were alarming. Your buying and collecting them says to me you were prepared eventually to use these weapons, most likely offensively and most likely directed towards civilians here in the United States. . . .

Every indication is that you were on course to wreak havoc. I find this aspect of your conduct extraordinarily troubling. Thank goodness that law enforcement stepped in when it did. They stopped you. You did not stop yourself.

Sent. Tr. at 78–81.

The Court's assessment today remains that "this dimension of [Alimehmeti's] conduct alone, your ordering and housing weapons usable for death, torture, and decapitation, consistent with a domestic lone-wolf attack at home, points towards a long, long sentence." *Id.* at 82; *see also id.* at 82–87 (long sentence also required for just punishment given Alimehmeti's repeated attempts to travel overseas to fight for ISIS; stockpiling of videos of beheadings and videos celebrating and encouraging suicide attacks; submission of a false passport application to enable travel to join ISIS; and post-offense sharing of terrorist propaganda with Rahimi). As the Court summed up its evaluation of this factor:

Over a period of several years[,] in a variety of ways and in a variety of contexts, both alone and in concert with others, both while in free society and while in prison, you took steps to support ISIS'[s] evil, violent mission[,] at home and abroad. Through a variety of actions, you backed up your statements that you were dedicated to joining and fighting for ISIS.

Your actions made clear that you were ready, willing, and able to promote ISIS, to recruit for ISIS, to travel for ISIS, to fight for ISIS, and to kill for ISIS, and, if necessary, to die for ISIS.

You sought to enlist in Syria for the cause. You assisted another to travel there to fight for ISIS, and you stocked your Bronx apartment with terrifying munitions suited to a lone-wolf attack on domestic soil of the sort you frequently celebrated in the communications you collected and shared. And your efforts to promote ISIS continued even after your arrest on these charges in prison.

> So from the perspective of the first set of 3553(a) factors involving the gravity of the offense, I find your conduct deadly serious, ab[ho]rrent, and terrifying.
>
> You were a ticking time bomb. Had you not been apprehended, there is every reason to assume that grave harm would likely to have come to somebody or perhaps many somebodies, whether at home or abroad, whether at your hand or the hand of somebody you abetted or encouraged.
>
> The fact that you were caught before someone got hurt or [killed] does not make your intentions in preparation more innocuous. As a matter of just punishment and as a matter of making sure that the sentence fits the crime, your conduct demands a very long punishment[.]

*Id.* at 88–89.

The Court also reaffirms its assessment that the sentence imposed was necessary to achieve the related interests in specific deterrence and protection of the public. At sentencing, after reviewing Alimehmeti's prior convictions and parole violations, the Court stated:

> [Y]our prior brushes with the criminal justice system didn't deter you at all. The crimes and relevant conduct for which you're being sentenced today is far more destructive than any of your prior crime[s]. It follows that if there is any hope for the sentence I impose here to truly get your attention and deter you from committing further crimes—and I cannot be sure that there is—it would have to be much longer than the sentences you've previously served. . . .
>
> I have to [also] consider the interest in public protection, or incapacitation. . . . That factor is paramount here. You were caught in the act of attempting to go overseas to fight for ISIS. You were caught in the act of assisting someone else to go do that.
>
> You were caught in the possession of a cache of weapons and supplies that appeared intended to facilitate a domestic attack. After being apprehended, you partnered with an infamous lone-wolf terrorist attacker [Rahimi] to promote ISIS among criminal defendants in the MCC. All this conduct unavoidably makes you a clear and present danger to society . . . if you were at liberty. . . .
>
> I am charged with assuring the [] sentence I impose will reasonably protect the public. Given what I have just said, how could any sentence, other than a very long one, be up to that challenge[?]

> What reasonable assurance, other than blind hope, could a person have that
> if released from prison any time soon, you would not be poised to resume these
> dangerous ways[?]

*Id.* at 92–93. Alimehmeti's recent repudiation of ISIS is a positive step, but the Court continues

to view the sentence imposed as vital to achieving public protection, insofar as it is a specific

deterrent and insofar as it incapacitates Alimehmeti from committing new crimes.

The Court's assessment is that the assembled § 3553(a) factors, including those reviewed

above, today continue to favor the sentence imposed. As noted, that sentence was below that

recommended by the Sentencing Guidelines and took into account various mitigating factors.

The limited mitigating facts that were not known or anticipated at the time of sentencing do not

disturb the Court's overall assessment. And a shorter sentence than imposed would not respect

the gravity of Alimehmeti's crimes or the interests in specific deterrence and incapacitation. *See*

18 U.S.C. § 3582(c)(1)(A) (release permissible only if compatible with § 3553(a) factors); *see,*

*e.g.*, *United States v. Butler*, No. 18 Cr. 834-10 (PAE), 2022 WL 17968627, at *3 (S.D.N.Y.

Dec. 27, 2022) (§ 3553(a) factors, considered "in totality," disfavored early release); *United*

*States v. Lopez*, No. 11 Cr. 1032 (PAE), 2020 WL 4450941, at *3 (S.D.N.Y. Aug. 3, 2020)

(defendant's "history of senseless and retributive violence" "carrie[d] the day as to the Court's

assessment of the risk he would pose to society if at liberty"); *United States v. Wright*, No. 15 Cr.

445-3 (PAE), 2022 WL 134870, at *5 (S.D.N.Y. Jan. 13, 2022) (same); *United States v. Hope*,

464 F. Supp. 3d 646, 650 (S.D.N.Y. 2020) (interest in public safety weighed heavily against

early release where defendant's conduct had been "violent, severe, and senseless").

## CONCLUSION

For the reasons stated, the Court denies Alimehmeti's motion for compassionate release.

The Clerk of Court is respectfully directed to terminate the motions pending at Dockets 143 and

150.


SO ORDERED.

Paul A. Engelmayer

PAUL A. ENGELMAYER
United States District Judge

Dated: November 25, 2024
       New York, New York